UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6273-CR-HUCK

**NIGHT BOX FILED**

OCT 02 2000

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

**UNITED STATES OF AMERICA,**      )
                                    )
        Plaintiff,           )
                                    )
v.                                  )
                                    )
**ANTHONY TRENTACOSTA,**           )
                                    )
        Defendant.           )
_____)

GOVERNMENT'S APPEAL OF MAGISTRATE'S ORDER
DENYING MOTION FOR PRETRIAL DETENTION
AND SETTING CONDITIONS OF PRETRIAL RELEASE
AND REQUEST FOR STAY OF MAGISTRATE'S ORDER PENDING
DISPOSITION OF THIS APPEAL

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorneys, and, pursuant to Local Magistrate's Rule 4(a)(2), files this appeal of Magistrate Judge Joel M. Feldman's order entered on September 29, 2000 which denied the government's motion for pretrial detention of the defendant, Anthony Trentacosta, and set conditions of his pretrial release. The government files this appeal on both grounds that the defendant is a danger to the community and that there are no conditions of release which will reasonably assure the appearance of the defendant at trial. The government further requests a stay of Magistrate Judge Feldman's order pending disposition of the instant appeal.

I.     PROCEDURAL HISTORY

On September 19, 2000, a federal grand jury sitting in the

Southern District of Florida returned a 25-count indictment charging nine defendants with RICO conspiracy, in violation of Title 18, United States Code, Section 1962(d), and other substantive offenses. Defendant Anthony Trentacosta is charged in Count 1 with RICO conspiracy. On September 26, 2000, Trentacosta was arrested in the Northern District of Georgia where he resides and made his initial appearance on the indictment. At that time, the government requested that the defendant be detained pending trial in this District. On September 29, 2000, a pretrial detention hearing was held before Magistrate Judge Joel M. Feldman of the Northern District of Georgia.[1] On September 29, 2000, Magistrate Judge Feldman entered his written order denying the government's motion for pretrial detention and setting conditions of release. A copy of that order is attached hereto as Attachment A.[2] Magistrate Judge Feldman stayed this order until 5:00 P.M. on October 2, 2000.

II.     FACTS

The indictment charges that defendant **ANTHONY TRENTACOSTA a/k/a "Tony Pep"**, is a soldier in the Gambino Crime Family of La Cosa Nostra who controlled the day-to-day operations of the South Florida crew of the Gambino Crime Family (the enterprise) through Gambino

---

[1] The government has ordered a transcript of the hearing. That transcript will be filed with this court upon its receipt by the undersigned.

[2] While Magistrate Judge Feldman entered his order on September 29, 2000, the undersigned did not receive a copy of same until October 2, 2000 at approximately 3:30 P.M.

Crime Family associate **FREDERICK J. MASSARO**. **TRENTACOSTA** formally assumed control of this crew on March 19, 1999 upon the death of Gambino Crime Family soldier Anthony "Fat Andy" Ruggiano. This crew, controlled by **TRENTACOSTA**, is charged with conspiring to conduct the affairs of the enterprise through a pattern of racketeering activity that included Murder, in violation Section 782.04, Florida Statute; Extortion, in violation of Section 836.05, Florida Statute; Making and Financing Extortionate Extensions of Credit, in violation of 18 USC 892 and 893; Collection of Extensions of Credit by Extortionate Means, in violation of 18 USC 894; Fraud and Related Activity in Connection with Identification Documents and Information, in violation of 18 USC 1028; Bank Fraud in violation of 18 USC 1344; Theft from Interstate Shipments, 18 USC 659; Interference with Commerce by Threats or Violence, 18 USC 1951; and Obstruction of Justice, in violation of 18 USC 1503.

The government calculates **TRENTACOSTA's** criminal history to be a level I[3] and, upon conviction of RICO conspiracy, his offense level

---

[3] The following is a brief summary of **TRENTACOSTA's** criminal history. In the early 1960s, **TRENTACOSTA** was arrested numerous times but convicted only twice, once on **12/7/60** for an unspecified misdemeanor and on **9/27/63** for felonious assault where he was sentenced to one year. In the 1970s, **TRENTACOSTA** was convicted four times on both state and federal charges. On **6/26/72**, he was arrested by federal authorities in New York City and subsequently convicted and sentenced to 9 months' incarceration for theft of interstate shipment of goods. On **11/9/73**, he was arrested in Queens, N.Y. and subsequently convicted upon a guilty plea for harassment. It is unknown whether this was a felony or misdemeanor conviction. It is also unknown what the sentence was. On **1/25/74**, he was arrested by

would be 36 (188 - 235 months). RICO conspiracy is governed by USSG Section 2E1.1(a)(2). It requires that the offense level applicable to the underlying racketeering activity be applied where it is greater than a level 19[4]. In this case, the underlying racketeering activity with the highest guideline level applicable to **TRENTACOSTA** is Conspiracy to Commit Murder in Aid of Racketeering pursuant to 18 USC 1959(a)(5). As a result, offense level 36 is derived from USSG Sections 2A1.5(b)[5] and 3B1.1(a)[6].

**TRENTACOSTA** became a soldier in the Gambino Crime Family on April 21, 1986. From approximately June of 1987 to approximately 1989, a reliable cooperating source (CS-1) frequently met with made

---

federal authorities in New York City and subsequently convicted and sentenced to 9 months' incarceration for possession of goods stolen from interstate shipment. On **10/24/77**, he was arrested in Islip, N.Y. and subsequently convicted and sentenced to one year for criminal contempt. In the 1980s, **TRENTACOSTA** was convicted twice in New York on state charges involving gambling related charges. Both appear to be misdemeanors. Due the staleness of **TRENTACOSTA's** criminal convictions, he appears to score out at a criminal history category I.

[4] **Unlawful Conduct Relating to Racketeering Influenced and Corrupt Organizations** - (a) Base Offense Level (Apply the greater): (1) **19**; or (2) the offense level applicable to the underlying racketeering activity.

[5] **Conspiracy or solicitation to commit murder** - (a) base offense level **28**; (b) if the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder, increase by **4** levels.

[6] **Aggravating role** - (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.

members of various organized crime families in New York concerning a fuel tax evasion scheme. One of those individuals was **TRENTACOSTA**.

In June of 1987, CS-1 arranged a meeting at the Marriot Hotel at LaGuardia Airport where representatives of the Genovese, Lucchese, Colombo and Gambino families attended. **TRENTACOSTA** and fellow Gambino soldier Anthony Morelli attended on behalf of the Gambino Family. CS-1 would testify that he was well versed in Italian Organized Crime protocol and that, in addition to observing general formalities between made and non-made associates, all of the "civilian" or non-made associates were made to leave the meeting room so that the made members, including **TRENTACOSTA** and Morelli, could meet and discuss business. CS-1 specifically recalls **TRENTACOSTA** asking him to leave the room, stating to CS-1 that they were going to discuss some "mob shit."

Subsequent to the above-mentioned meeting, CS-1 met with **TRENTACOSTA** and Morelli on a weekly basis for several months advising them on various issues concerning the fuel tax evasion scheme. The scheme entitled the Gambino Family, as well as other organized crime families, to receive a portion of the proceeds derived from evading federal and state fuel taxes. This scheme ultimately defrauded the government of approximately $100,000,000.00. In 1993, Morelli and approximately 11 other associates of Italian and Russian organized crime were indicted and eventually convicted in Newark, New Jersey.

CS-1's association with **TRENTACOSTA** ended in approximately 1987

5

or 1988 after **TRENTACOSTA** threatened to chop off CS-1's head. This threat emanated from a dispute involving an individual known as "the Turk" and a load of gasoline that had been seized by the State of New York. CS-1, a fuel terminal owner, had been ordered not release the load by the State of New York. Despite the order, **TRENTACOSTA** ordered CS-1 to release the barge to the Turk. When CS-1 explained to **TRENTACOSTA** that he could not release the barge, **TRENTACOSTA** threatened to chop off CS-1's head. CS-1 took the threat very seriously and stopped attending these meetings with **TRENTACOSTA**. Subsequently, in 1989, CS-1 learned that **TRENTACOSTA** had moved to Atlanta, Georgia. CS-1 continued to engage in the fuel tax scam, with Morelli as the representative of the Gambino Family.

**TRENTACOSTA's** position with the Gambino Family is corroborated by video surveillance conducted of the Ravenite Social Club, located at 247 Mullberry Street in New York City, between 1988 and 1989. The Ravenite Social Club was a club which was maintained by Gambino Family Boss John Gotti, and was frequented by many made members and associates of the Gambino Family. Information developed by the FBI in connection with its investigations into the Gambino Family established that, in order to thwart electronic surveillance by law enforcement, Gotti would meet with associates at the Ravenite and then walk with them around the block while discussing criminal business. These were referred to as "walk-talks." Based upon this pattern of behavior, FBI agents made video tape recordings of the

outside of the club. **TRENTACOSTA** was videotaped on 6/16/88, 7/28/88, 8/2/88 and 3/15/89 walking and talking with John Gotti and Tony Morelli. **TRENTACOSTA** spoke directly with Gotti on each occasion.

CS-2 is another reliable cooperating source who was intimately familiar with **TRENTACOSTA**, his association with the Gambino Crime Family and **TRENTACOSTA**'s relationship with defendant **MASSARO**. **TRENTACOSTA** admitted to CS-2 that he became a soldier in the Gambino Family in 1986 after being sponsored by John Gotti. At the time **TRENTACOSTA** was involved in bookmaking and loansharking in New York on behalf of the Gambino Family. In 1990, after **TRENTACOSTA** moved to Atlanta, **TRENTACOSTA** informed CS-2 that **MASSARO** was in **TRENTACOSTA**'s crew. CS-2 personally knows **MASSARO**, and knows that he is a longtime Gambino Family associate who was officially "on record with" (reported to) **TRENTACOSTA** after Gambino Soldier, Anthony "Fat Andy" Ruggiano died on March 19, 1999. Fat Andy was convicted in the Southern District of Florida on RICO related charges in 1984 and remained incarcerated until he was released to a half-way house in New York in 1997. According to CS-2, **MASSARO** failed to pay Fat Andy a portion of the proceeds of criminal activity he conducted while Fat Andy was incarcerated. Although **MASSARO** was on record with the Gambino Crime Family as a member of Fat Andy's crew, at some point in time, and by at least October 1, 1994, **MASSARO** associated with and paid, as tribute money to **TRENTACOSTA**, a portion of all the proceeds

derived from **MASSARO**'s criminal activity, which included credit card fraud and loansharking. CS-2 knows that in 1992, prior to Fat Andy's incarceration, an incident occurred during which **TRENTACOSTA** stabbed **MASSARO** in the stomach with a knife after **MASSARO** failed to pay **TRENTACOSTA** some money which was owed. After the stabbing, **MASSARO** paid the money to **TRENTACOSTA**.

According to **MASSARO** associate Steve Horowitz, **MASSARO** became a 50% partner in a moving company called Father and Son of Jacksonville ("F & S") in 1992. The other 50% owner of F & S was Horowitz's wife. Since the inception of F & S, F & S paid **TRENTACOSTA**'s wife (Denise) a $500 per week "consulting" fee despite the fact that Mrs. TRENTACOSTA lives with her husband in Cumming, Georgia. The consultation fee was arranged by **MASSARO**. Furthermore, documents seized pursuant to a search warrant at **MASSARO**'s residence on September 2, 1999 revealed that **MASSARO** paid for hotel and rental car bills on behalf of **TRENTACOSTA** well before Fat Andy's death on March 19, 1999.

CS-2 would also testify that in 1995, **TRENTACOSTA** asked Nicholas Corozzo, then acting boss of the Gambino Crime Family, to intercede to have Fat Andy release **MASSARO** to his crew. Corrozo, apparently left it up to Fat Andy who refused. CS-2 would testify that Fat Andy was upset with **TRENTACOSTA** for attempting to take **MASSARO** and with **MASSARO** for failing to pay him anything while he was incarcerated.

The friction between **TRENTACOSTA** and Fat Andy concerning **MASSARO**

is partially corroborated by the following court authorized intercepted conversations[7]:

March 21, 1999 (court authorized interception)

**MASSARO** called and spoke to an individual named David Alwais. During the conversation, **MASSARO** asked Alwais whether he had heard that Fat Andy died on Friday (March 19, 1999) from internal bleeding. **MASSARO** advised that Ruggiano was going to be buried the next day and that he (**MASSARO**) could not go up there (New York). **MASSARO** also advised that **TRENTACOSTA** was not going, that **TRENTACOSTA** was in Atlanta, and that **TRENTACOSTA** just got back from New York.

April 1, 1999 (court authorized interception)

During this conversation an associate of **TRENTACOSTA's** asked **TRENTACOSTA** if he knew that Andy died (Fat Andy died March 19, 1999). **TRENTACOSTA** responded by saying that he knew Andy for more than 40 years and "I'm glad I made friends with him."

After Fat Andy was released to a half way house in 1997, MASSARO reported to Fat Andy. **MASSARO's** organized crime association with Fat Andy is corroborated by the following recorded conversations.

September 15, 1998

**MASSARO** discusses a $25,000 loan to an individual named Joseph Spitaleri. **MASSARO** stated that he would contact Andy to register the claim.

March 20, 1999 (court authorized interception)

---

[7]During the investigation which gave rise to the instant indictment, United States District Judge William P. Dimitrouleas, Southern District of Florida, entered orders authorizing the interception of wire communications occurring over various telephone facilities utilized by the defendants.

**MASSARO** and business associate Steve Horowitz talked about Fat Andy's death, whether to go to New York for the funeral and how much money to send to his widow.

March 21, 1999 (court-authorized interception)

**MASSARO** called and spoke to an individual named David Alwais. During the conversation, **MASSARO** asked Alwais whether he had heard that Fat Andy died Friday (March 19, 1999) from internal bleeding. **MASSARO** advised that Fat Andy was going to be buried the next day and that he (**MASSARO**) could not go up there (New York). **MASSARO** then asked Alwais where Nicky (believed to be Gambino Capo, Nicholas Corozzo,) was in prison. Alwais advised that Lenny (believed to be Gambino Capo Leonard DiMaria) was incarcerated in Cumberland, Maryland and Nicky was in transit in a county jail in Patterson, New Jersey.

According to CS-2, in 1991, after Gambino Family Underboss Salvatore "Sammy the Bull" Gravano became a government witness, **TRENTACOSTA** had a lengthy telephone conversation with Morelli. Thereafter, **TRENTACOSTA** told CS-2 that "New York" wanted him to "get lost" for a while. **TRENTACOSTA** stated that Gravano could put **TRENTACOSTA** away because of a prior murder, and that if it appeared that **TRENTACOSTA** was going to be arrested, he would flee the country.

CS-3 is another reliable cooperating source who was familiar with **TRENTACOSTA** and **TRENTACOSTA**'s relationship with **MASSARO**. According to CS-3, **MASSARO** has, on numerous occasions, described his involvement with the Gambino Crime Family. CS-3 said that **MASSARO** liked to brag to his employees and/or associates of his connections with the Mafia. According to CS-3, **MASSARO** told him that he was in the crew of Anthony "Fat Andy" Ruggiano prior to Fat Andy's death.

10

After Fat Andy's death, **MASSARO** told CS-3 that "Tony Pep is my Capo." CS-3 said that he witnessed **MASSARO** pay **TRENTACOSTA** on one occasion and **MASSARO** would constantly complain that he had to pay a percentage of proceeds derived from illegal activities to **TRENTACOSTA**.

**MASSARO's** formal affiliation with **TRENTACOSTA** after Fat Andy died is corroborated by the following court authorized intercepted conversations

March 30, 1999

**TRENTACOSTA** called his wife, Denise, from a cellular telephone. Mrs. TRENTACOSTA answered and said, "I see that you are still using Freddy's (MASSARO's) phone."

March 31, 1999

During a conversation between MASSARO business associate Steve Horowitz and TRENTACOSTA, Horowitz said that "his buddy" (MASSARO) is freaking out over there ... **TRENTACOSTA** said "I don't think so, not at all, ... I never told [Denise] that. He looked fine, and he came to my rescue the other night."

April 1, 1999

During a conversation between **MASSARO** business associate Steve Horowitz and **TRENTACOSTA**, Horowitz asked **TRENTACOSTA** if he saw **MASSARO**. **TRENTACOSTA** said yes that **MASSARO** is a tough guy to figure out and he thinks that he really liked this kid and he has a 1:00 p.m. meeting with the cops.

The reference to the kid presumably is **HERNANDEZ** since **MASSARO** was scheduled that day to meet and did meet with detectives from the Broward Sheriff's Office who were investigating the murder of Jeanette Smith (which is discussed hereinbelow).

11

This conversation was followed later that day with the next conversation:

April 1, 1999

During a conversation between **MASSARO** and **TRENTACOSTA**, **TRENTACOSTA** asked **MASSARO** whether they (the cops) came down. **MASSARO** said they came down and that they asked and he answered.

April 2, 1999

**TRENTACOSTA** called **MASSARO**. **MASSARO** said "yes sir" to **TRENTACOSTA**. **TRENTACOSTA** asked whether MASSARO was taking him to the airport. **MASSARO** said yes and they made arrangements.

April 21, 1999

During a conversation between **MASSARO** and **TRENTACOSTA**, they talked about a Russian referred to as "Fat Boy". **MASSARO** said "I helped the guy out and he didn't do the right thing." **TRENTACOSTA**: I'll tell him. I told you ... not to do that ..., you should have told me. ... I don't know how he's gonna pay you, he don't make no money. **MASSARO**: "I'll find a way he can pay me."

April 30, 1999

**MASSARO**: "Whatever I do, I record .... You understand?  I put it on record ... You have to do the same thing.  You first have to go get permission to do what you want to do ... And I said, and then when you get the permission, you can operate."

The murder of Jeanette Smith & the plot to kill Ariel Hernandez

On Saturday, March 20, 1999, sometime after 5:20 a.m. but before 3:43 p.m., **HERNANDEZ** murdered Jeanette Smith, a dancer at a nearby strip club called Thee Dollhouse, in a motel room in Sunny Isles,

Florida. Just prior to Smith's murder, **MASSARO** told another cooperating source (CS-4) that orders came down from up north to take care of some girl, a dancer, who was an informant for the FBI[8].

At approximately 3:43 p.m. on March 20, 1999, a court authorized interception recorded **HERNANDEZ** notifying **MASSARO** that a murder got messy and that he needed help in getting rid of the body[9]. Subsequently intercepted conversations recorded **MASSARO** and **HERNANDEZ** planning the disposal of Smith's body and the cover-up of **MASSARO's** involvement in the crime[10].

Shortly after Smith's murder, CS-3 overheard **TRENTACOSTA** scream

---

[8] There is no evidence that Smith was an FBI informant; however, Smith was involved with Hernandez and Massaro in a counterfeit check scheme which is encompassed within the pending indictment.

[9] HERNANDEZ:"Listen, uh, things got, uh, a little messy yesterday. Remember that, uh, detective from the thing?" MASSARO: "From what thing?" HERNANDEZ: "The homicide." MASSARO: "Yeah" HERNANDEZ: "Well, the thing is this I just, I, I tied up the loose ends and I gotta package I gotta get rid of." MASSARO: "Uh huh." HERNANDEZ: "What should I do?" MASSARO: "I don't know. I'll talk to you in person."

[10] During an intercepted conversation which occurred on April 1, 1999, after Hernandez was arrested and while he was incarcerated in the Broward County Jail, HERNANDEZ advised MASSARO that he (HERNANDEZ) was "taking the whole rap." HERNANDEZ thereupon stated the following: "The story that's laid out in the press is the story that me and Jerry came up with that way nobody will be incriminated ... Because the way it was explained to the police, it was an accidental fucking some rough sex shit, but the only problem is they're not gonna find no sperm or DNA or anything like that in the girl from me. So that's when, when, when we get to that case, when we get to that point, we'll fucking see what we're going to do."

at **MASSARO** at **MASSARO's** restaurant, Beachside Mario's, because **TRENTACOSTA** was upset that **MASSARO** was using unreliable people like **ARIEL HERNANDEZ** in his (**MASSARO's**) operations.

According to CS-3, during the early morning hours of March 27, 1999, **MASSARO** met with co-defendant **CARLOS GARCIA** at Beachside Mario's whereupon **MASSARO** told him, "that kid Ariel - he's no good anymore - he's got to go." As a result, during the early morning hours of March 27, 1999, **GARCIA** and CS-3 unsuccessfully tried to locate **HERNANDEZ** at various locations to kill him. **HERNANDEZ** was arrested for Smith's murder by the Broward County Sheriff's Office at approximately 11:00 a.m. on March 28, 1999.

III.   **MEMORANDUM OF LAW**

It is well settled that the district court conducts a <u>de novo</u> review of the government's request for pre-trial detention. <u>United States v. King</u>, 849 F.2d 485, 490 (11th Cir. 1988). A <u>de novo</u> review, however, does not require the district court to hold a <u>de novo</u> hearing. In conducting its review the district court may rely on the transcript of the hearing that occurred before the magistrate judge. <u>United States v. Gaviria</u>, 828 F.2d 667, 668 (11th Cir. 1987).

Furthermore, the return of the indictment provides the basis for concluding establishing probable cause that the defendant committed the charged offenses. See <u>United States v. Quartermaine</u>, 913 F.2d 910, 916 (11th Cir. 1990). In order for a court to order the pre-trial detention of a defendant, the government is required to

establish by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the defendant's presence at trial. <u>United States v. Quartermaine</u>, 913 F.2d at 917. The government may also independently demonstrate the need for pre-trial detention by presenting clear and convincing evidence that the defendant is a danger to the community. <u>Id</u>. The Eleventh Circuit, in accord with the legislative history of the pre-trial detention statute, observed that the risk that a defendant will continue to engage in criminal activity constitutes a danger to the 'safety of any other person or the community. <u>United States v. King</u>, 849 F.2d 485, 487 n.2 (11th Cir. 1988).

In <u>United States v. Gaviria</u>, 828 F.2d 667, 668-69 (11th Cir. 1987), the Eleventh Circuit held that the United States is not required to present any witnesses at a detention hearing. The United State may present evidence solely based on the unsworn proffer from the prosecutor. The court further ruled that the magistrate judge may prohibit the defendant from calling the case agent as an adverse witness even though the agent is present at the hearing. <u>Id</u> at 670.[11]

An independent review in this case clearly demonstrates that the Magistrate Judged erred when he denied the Government's motion for

---

[11]In the case at bar, the defendant was afforded far greater latitude at the detention hearing than was the defendant in <u>Gaviria</u>. In this case, the United States produced an agent for cross-examination. As observed by the court in <u>Gaviria</u>, pre-trial detention hearings are not a vehicle to afford a defendant with pre-trial discovery. 828 F.2d at 669.

15

pre-trial detention. See <u>United States v. King</u>, 849 F.2d 485, 490 (11th Cir. 1988).

WHEREFORE, the government respectfully submits that the decision of Magistrate Judge Feldman should properly be reversed and requests that this Court enter a stay of Magistrate Judge Feldman's order pending disposition of the instant appeal.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____
JEFFREY H. SLOMAN
Assistant United States Attorney
Florida Bar No. 0378879
500 E. Broward Blvd. 7th Floor
Fort Lauderdale, Florida 33394
Tel: (954) 356-7255
Fax: (954) 356-7230

_____
LAWRENCE D. LaVECCHIO
Assistant United States Attorney
Florida Bar No. 0305405
500 E. Broward Blvd. 7th Floor
Fort Lauderdale, Florida 33394
Tel: (954) 356-7255
Fax: (954) 356-7230

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was delivered by U.S. mail to Millie Geckler Dunn, Federal Defender's Program, Suite 200, 100 Peachtree Street, Atlanta, Georgia on this 2nd day of October, 2000.

                                                LAWRENCE D. LaVECCHIO
                                                Assistant United States Attorney

**FAX TRANSMITTAL**

To: Jeff Sloman
Dept/Agency: AUSA 7230
Fax: 954.356-[illegible]

From: Janis Gordon
Phone: 404.581-6000

# FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL CASE NO. |
| v. | 1:00-M-1214 |
| ANTHONY TRENTACOSTA | |
| Defendant(s) | |

## ORDER

On September 29, 2000, after conducting a detention hearing in connection with the Government's Motion to Detain Defendant Anthony Trentacosta, who is indicted in the Southern District of Florida (See United States v. Trentacosta, et al., Indictment No. 00-6273 (S.D. Fla.), this Court concluded that the defendant should not be detained without bond, and set a bond in the amount of $500,000.00 surety with several special conditions, including:

(a) house arrest with electronic monitoring;

(b) travel restricted to Metro Atlanta, Southern District of Florida to answer said indictment, and to visit his cancer treatment facility in New York as required; and

(c) surrender his passport *instanter*.

AO 72A
(Rev 8/82)

The Government has requested a stay of the foregoing order to permit it to appeal to the District Judge before whom the Indictment is pending; and this Court has agreed to enter a stay for such purpose.

IT IS THEREFORE ORDERED that this Order be stayed until 5:00 P.M., Monday, October 2, 2000. Notwithstanding the foregoing, the United States Marshal is not prohibited from transporting the defendant to the Southern District of Florida during the pendency of the stay.

IT IS SO ORDERED this _____ day of SEPTEMBER, 2000.

JOEL M. FELDMAN
UNITED STATES MAGISTRATE JUDGE

2

AO 72A