# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF GEORGIA

### 2211 UNITED STATES COURTHOUSE
### 75 SPRING STREET, SW
### ATLANTA, GEORGIA 30303-3361

**LUTHER D. THOMAS**
**CLERK OF COURT**

October 18, 2000

*Huck*

Clerk's Office:

Rule 40 proceedings were held in this district on SEPTEMBER 26 & 29, 2000 regarding ANTHONY TRENTACOSTA, N.D.Ga. Case No. 1:00-M-1214, your Case No. 00-6273-SDFL. Enclosed are our documents of said proceedings.

If you have any questions, please call the Magistrate Courtroom Deputies' Office at (404) 215-1358.

Sincerely,

*Pat Walker*
PAT WALKER
Deputy Clerk

Enclosure

OCT 2 5 2000

Rec'd in MIA Dkt _____



FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 1 1 2000

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA DIVISION

 3  UNITED STATES OF AMERICA     )   DOCKET NO. 1:00-M-1214
                                 )   ATLANTA, GEORGIA
 4  V.                           )   SEPTEMBER 29, 2000
                                 )
 5  ANTHONY TRENTACOSTA,         )
    -------------------------------

 6
                UNITED STATES DISTRICT COURT
 7              SOUTHERN DISTRICT OF FLORIDA
                      MIAMI DIVISION
 8  UNITED STATES OF AMERICA     )
                                 )
 9  V.                           )   DOCKET NO. 00-6273
                                 )
10  ANTHONY TRENTACOSTA,         )

11

12          TRANSCRIPT FROM TAPE OF DETENTION HEARING
               BEFORE THE HONORABLE JOEL M. FELDMAN,
13              UNITED STATES MAGISTRATE JUDGE

14  APPEARANCES OF COUNSEL:

15  FOR THE GOVERNMENT:           ART LEACH
                                  JOE SLOMAN
16                                ASSISTANT U. S. ATTORNEY

17  FOR THE DEFENDANT:            MILLIE GECKLER-DUNN
                                  FEDERAL DEFENDER PROGRAM
18

19
    COURT REPORTER:               ANDY ASHLEY
20                                1949 U. S. COURTHOUSE
                                  ATLANTA, GEORGIA  30303-3361
21                                (404) 215-1478

22

23
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
24  PRODUCED BY COMPUTER.

25
```

ANDRE G. ASHLEY, O.C.R.

2

P R O C E E D I N G S

1

2 (ATLANTA, FULTON COUNTY, GEORGIA; SEPTEMBER 29, 2000

3 IN OPEN COURT.)

4          THE COURT:  THIS IS THE CASE OF THE UNITED STATES OF

5 AMERICA VERSES ANTHONY TRENTACOSTA, CRIMINAL INDICTMENT

6 00-6273 OUT OF THE SOUTHERN DISTRICT OF FLORIDA.  THIS COURT'S

7 NUMBER IS 1:00-M-1214.

8          LET THE RECORD SHOW THAT MR. TRENTACOSTA IS PRESENT

9 WITH HIS ATTORNEY, MS. DUNN, AND MR. LEACH IS HERE ON BEHALF OF

10 THE GOVERNMENT.  THIS IS A DETENTION HEARING.

11          GOVERNMENT READY?

12          MR. LEACH:  WE ARE, YOUR HONOR.

13          THE COURT:  YOU READY, MS. DUNN?

14          MS. DUNN:  YES, YOUR HONOR.

15          THE COURT:  YOU MAY PROCEED.

16          MR. LEACH:  YOUR HONOR, BEFORE I BEGIN, I WANT THE

17 COURT TO KNOW THAT SEATED AT COUNSEL TABLE WITH ME IS JOE

18 SLOMAN.  HE'S AN ASSISTANT UNITED STATES ATTORNEY, AND HE WILL

19 BE THE PROSECUTOR RESPONSIBLE FOR THE CASE IN SOUTH FLORIDA,

20 AND NEXT TO HIM IS WILLIE CREECH --

21          THE COURT:  WHO IS THE NAME AGAIN?

22          MR. LEACH:  SLOMAN, YOUR HONOR.

23          THE COURT:  S L O M A N?

24          MR. SLOMAN:  YES, YOUR HONOR.

25          MR. LEACH:  AND MR. CREECH IS THE OTHER PERSON SEATED

ANDRE G. ASHLEY, O.C.R.

3

1   AT COUNSELS TABLE, AND I WILL CALL HIM AS MY WITNESS AT THIS

2   TIME.

3              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND TO TAKE THE

4   OATH.

5                        WILLIE J. CREECH,

6   HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

7              THE CLERK:  IF YOU WILL HAVE A SEAT, PLEASE, AND

8   STATE YOUR FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME

9   ALSO.

10             THE WITNESS:  WILLIE J. CREECH, C R E E C H.

11             MR. LEACH:  BEFORE I BEGIN WITH MR. CREECH, YOUR

12  HONOR, I'M GOING TO TENDER INTO THE COURT AS A-T NUMBER 6, A

13  CERTIFIED COPY OF THE INDICTMENT FROM THE SOUTHERN DISTRICT OF

14  FLORIDA.

15             THE COURT:  WHAT DOES A-T STAND FOR?

16             MR. LEACH:  IT'S THE INDICTMENT, YOUR HONOR.  I'M

17  JUST TENDERING IT.

18             THE COURT:  I MEAN WHAT DOES IT STAND FOR?

19             MR. LEACH:  OH, ANTHONY TRENTACOSTA 6.  BECAUSE THESE

20  DOCUMENTS WILL GO TO SOUTH FLORIDA EVENTUALLY, I WANTED TO --

21             THE COURT:  OKAY.

22             MR. LEACH:  AND BOTH NUMBERS -- THE NUMBERS FROM --

23  OUR M NUMBER IS AT THE BOTTOM OF THE EXHIBIT LIST, AND

24  FLORIDA'S CASE NUMBER IS ALSO ON EACH EXHIBIT THAT I WILL BE

25  TENDERING.

4

```
1           THE COURT:  ALL RIGHT.  I'M GOING TO CHANGE IT TO --
2    WELL, HE'S GOT A GOVERNMENT EXHIBIT.  IT WILL JUST BE GX-AT-6.
3           MR. LEACH:  OKAY.  AND I'LL ADJUST EACH ONE OF MY
4    OTHER EXHIBITS TO SHOW THAT.
5           THE COURT:  OKAY.
6           MR. LEACH:  OKAY.
7           THE COURT:  AND PURSUANT TO RULE 201, I WILL TAKE
8    JUDICIAL NOTICE OF THE CONTENTS OF THAT OFFICIAL COURT RECORD.
9           MR. LEACH:  THANK YOU, YOUR HONOR.
10                     DIRECT EXAMINATION
11   BY MR. LEACH:
12   Q.   STATE YOUR NAME, PLEASE, SIR.
13   A.   WILLIE CREECH.
14          MR. LEACH:  HAS HE BEEN SWORN, JUDGE?
15          THE COURT:  YES.
16   BY MR. LEACH:
17   Q.   MR. CREECH, WHAT DO YOU DO FOR A LIVING?
18   A.   I AM A SPECIAL AGENT WITH THE FBI.
19   Q.   HOW LONG HAVE YOU BEEN AN FBI SPECIAL AGENT?
20   A.   IT WILL BE TWO YEARS IN JANUARY.
21   Q.   WHAT DID YOU DO PRIOR TO YOUR TIME AS AN FBI SPECIAL
22   AGENT?
23   A.   I WAS A SPECIAL AGENT WITH THE GEORGIA BUREAU OF
24   INVESTIGATION.
25   Q.   AND HOW LONG WERE YOU A GBI AGENT HERE IN GEORGIA?
```

5

1   A.    THREE AND A HALF YEARS.

2   Q.    AND WHAT KIND OF WORK DID YOU DO AS A GBI AGENT?

3   A.    MOSTLY INVESTIGATIONS INVOLVING HOMICIDES, ROBBERIES,

4   RAPES.

5   Q.    WHAT OFFICE WERE YOU ASSIGNED TO HERE IN GEORGIA?

6   A.    THE CONYER'S OFFICE.

7   Q.    HOW MANY HOMICIDE CASES DID YOU INVESTIGATE AS A GBI

8   AGENT?

9   A.    NUMEROUS.

10  Q.    OKAY.  I WANT TO DIRECT YOUR ATTENTION TO THE CASE IN

11  SOUTH FLORIDA AGAINST ANTHONY TRENTACOSTA.  ARE YOU FAMILIAR

12  WITH THAT CASE?

13  A.    YES, I AM.

14  Q.    DO YOU KNOW MR. TRENTACOSTA TO RECOGNIZE HIM?

15  A.    YES.

16  Q.    DO YOU SEE HIM HERE IN COURT?

17  A.    YES, I DO.

18  Q.    WOULD YOU IDENTIFY HIM FOR THE RECORD, PLEASE?

19  A.    HE IS SITTING HERE AT THE TABLE.

20          MR. LEACH:  YOUR HONOR, MAY THE RECORD REFLECT THE

21  IDENTIFICATION OF THE DEFENDANT IN THIS CASE?

22          THE COURT:  SO NOTED.

23  BY MR. LEACH:

24  Q.    WHERE ARE YOU PRESENTLY ASSIGNED AS AN FBI AGENT?

25  A.    MIAMI, THE MIAMI DIVISION, ORGANIZED CRIME SQUAD.


ANDRE G. ASHLEY, O.C.R.

6

```
 1  Q.   OKAY.  AND I WANT TO SHOW YOU THE INDICTMENT THAT IS

 2  MARKED AS --

 3           THE COURT:  WELL, IT SAYS GOVERNMENT EXHIBIT UP AT

 4  THE TOP, SO THAT'S THE GS.

 5           MR. LEACH:  OH, I SEE.

 6  BY MR. LEACH:

 7  Q.   ALL RIGHT.  GOVERNMENT EXHIBIT AT-7, WHICH IS YOUR

 8  DOCUMENT, AND ASK YOU IF YOU ARE FAMILIAR WITH THAT DOCUMENT?

 9  A.   YES, I AM.

10  Q.   IF YOU WOULD, JUST BRIEFLY TELL THE COURT WHAT THAT

11  DOCUMENT IS, AND WHAT IT'S INTENDED TO DO FOR THIS HEARING.

12  A.   THIS DOCUMENT WAS PUT TOGETHER FOR THE SOLE PURPOSE OF

13  THIS DETENTION HEARING.  IT'S BASICALLY EXCERPTS FROM THE

14  INDICTMENT.

15  Q.   OKAY.  AND DOES IT ALSO INCLUDE A SUMMARY OF THE EVIDENCE

16  AS IT RELATES TO MR. TRENTACOSTA IN THIS CASE?

17  A.   YES, IT DOES.

18  Q.   AND DID YOU ASSIST IN THE PREPARATION OF THAT DOCUMENT?

19  A.   NO, I DIDN'T.

20  Q.   OKAY.  IN PREPARATION FOR YOUR TESTIMONY HERE TODAY, DID

21  YOU AND I GO OVER THAT DOCUMENT IN SOME DETAIL YESTERDAY?

22  A.   YES, WE DID.

23           MR. LEACH:  OKAY.  WHAT I'D LIKE TO DO IS GO AHEAD

24  AND TENDER IN GOVERNMENT 6, YOUR HONOR, WHICH IS THE SUMMARY OF

25  THE TESTIMONY.
```

ANDRE G. ASHLEY, O.C.R.

1          THE COURT:  WELL, I THOUGHT YOU SAID GX-6 WAS THE

2   INDICTMENT ITSELF.

3          MR. LEACH:  SEVEN.  EXCUSE ME, YOUR HONOR.

4          MS. DUNN:  IS THAT THE DOCUMENT I HAVE ENTITLED

5   GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION?

6          THE WITNESS:  RIGHT.

7          MR. LEACH:  IT IS.

8          MS. DUNN:  WELL, I THINK YOU HAVE A RIGHT TO FILE

9   THIS WITH THE COURT AS THEIR POSITION.  I DON'T KNOW THAT IT'S

10  EVIDENCE IN THIS HEARING, OR THAT IT RISES TO THE LEVEL OF

11  EVIDENCE.

12         THE COURT:  WELL, FIRST OF ALL, WE'VE GOT CONFUSION

13  BECAUSE HE'S REFERRED TO IT AS GX-6, WHICH IS THE INDICTMENT.

14         MR. LEACH:  IT'S MARKED AS 7, YOUR HONOR.

15         THE COURT:  OKAY.  SO GX-7, GX-AT-7 IS WHAT?

16         MR. LEACH:  IT IS A GOVERNMENT'S MEMORANDUM IN

17  SUPPORT OF PRETRIAL DETENTION.  I AM MARKING IT AS AN EXHIBIT,

18  YOUR HONOR, BECAUSE IT IS SIGNED BY MR. SLOMAN, BUT IT IS WHAT

19  THIS WITNESS USED TO PREPARE FOR THIS HEARING TODAY.

20         THE COURT:  ALL RIGHT.  FOR THAT LIMITED PURPOSE.

21         MS. DUNN:  YOUR HONOR, WHICH I WOULD LIKE TO SAY THAT

22  I HAVE A REAL PROBLEM.  WHAT THIS IS IS THIS IS THE

23  GOVERNMENT'S BELIEF OF WHAT THE EVIDENCE IN THE CASE IS.  THEY

24  THEN TAKE THIS DOCUMENT THEY CREATE, GIVE IT TO A WITNESS, AND

25  HAVE A WITNESS COME IN TO TESTIFY ABOUT WHAT THE GOVERNMENT

TELLS THEM THEIR EVIDENCE IS.

THE COURT: WHAT I'M SAYING, MS. DUNN, IS THAT I AM ADMITTING IT FOR THE LIMITED PURPOSE, THAT IS, THAT THE WITNESS REVIEWED IT FOR THE PURPOSE OF TESTIFYING TODAY. YOU CAN CROSS-EXAMINE HIM ABOUT ANYTHING IN IT.

MS. DUNN: I UNDERSTAND. MY OBJECTION IS BROADER, YOUR HONOR. MY OBJECTION IS BRINGING A WITNESS HERE TO TESTIFY WHO HAS BEEN SOLELY BRIEFED BY A GOVERNMENT EMPLOYEE, NOT THE EMPLOYEE WHO IS THE FBI AGENT ON THE CASE, BUT THE PROSECUTOR ON THE CASE.

THE COURT: WELL, THAT GOES TO THE WEIGHT, NOT TO THE ADMISSIBILITY.

MS. DUNN: WELL, I WOULD LIKE IT ON THE RECORD.

THE COURT: ALL RIGHT. IT'S NOTED.

MR. LEACH: YOUR HONOR, I'M GOING TO TENDER A COPY SO YOUR HONOR CAN FOLLOW ALONG. THE WITNESS CAN USE THE ACTUAL EXHIBIT.

MS. DUNN: AND I ALSO OBJECT TO HIM USING THIS EXHIBIT TO TESTIFY FROM. YOU KNOW, I MEAN, WHY ARE WE EVEN HAVING A HEARING? WHY DOESN'T THE GOVERNMENT JUST FILE THEIR BRIEF AND GO THAT WAY, BECAUSE YOU ARE NOT ALLOWED TO DO THAT UNDER THE RULES. I OBJECT TO HIM LOOKING AT THIS DOCUMENT WHILE HE TESTIFIES.

IF HE TRIES TO TESTIFY AND HE DOESN'T RECALL SOMETHING, AND THE GOVERNMENT ATTEMPTS TO USE IT TO REFRESH HIS

```
 1    RECOLLECTION, THERE ARE RULES THAT HAVE CERTAIN REQUIREMENTS

 2    AND FOUNDATIONS FOR THAT, WE CAN GO THAT ROUTE, BUT I OBJECT TO

 3    HIM SITTING THERE HOLDING A DOCUMENT PREPARED BY THE PROSECUTOR

 4    IN THIS CASE AS A ROAD MAP AS TO WHAT THE GOVERNMENT WANTS HIM

 5    TO SAY.

 6              THE COURT:  OVERRULED.

 7    BY MR. LEACH:

 8    Q.    ALL RIGHT.  DIRECTING YOUR ATTENTION TO THE GOVERNMENT'S

 9    MEMORANDUM, THE FIRST THING I WOULD LIKE YOU TO DO IS TALK TO

10    US A LITTLE BIT IN TERMS OF THE BACKGROUND OF THE DEFENDANT IN

11    THIS CASE, MR. TRENTACOSTA, WHICH CAN BE FOUND ON PAGE 1, ABOUT

12    MIDDLE OF THE FIRST PARAGRAPH MARKED NUMBER 1.

13    A.    ALL RIGHT.

14    Q.    FIRST, LET ME, SO THE RECORD IS CLEAR, THE INFORMATION IN

15    THIS DOCUMENT, DO YOU HAVE PERSONAL KNOWLEDGE; IN OTHER WORDS,

16    HAVE YOU LEARNED THIS THROUGH THIS INVESTIGATION?

17    A.    RIGHT, YES.

18    Q.    BUT THIS IS AN ACCURATE OUTLINE OF THAT?

19    A.    RIGHT.

20    Q.    OKAY.  GO AHEAD.

21    A.    MR. TRENTACOSTA IS A --

22              MS. DUNN:  YOUR HONOR, I OBJECT TO HIM READING FROM

23    THIS DOCUMENT.

24              THE COURT:  OVERRULED.  GO AHEAD.

25              THE WITNESS:  MR. TRENTACOSTA IS A GAMBINO SOLDIER.
```

1   HE WAS MADE INTO THE FAMILY IN 1986.

2   BY MR. LEACH:

3   Q.    HOW DO YOU KNOW THAT?

4   A.    THROUGH CONFIDENTIAL SOURCE INFORMATION.

5   Q.    OKAY.  AND WHERE, BACK IN THE LATE 84'S, WHERE WAS HE

6   PHYSICALLY LOCATED AS A GAMBINO SOLDIER?

7   A.    WHERE WAS MR. TRENTACOSTA?

8   Q.    YES.

9   A.    NEW YORK.

10  Q.    AND DID THERE COME A TIME WHERE HE MOVED FROM THE NEW YORK

11  METROPOLITAN AREA TO SOME OTHER LOCATION IN THE UNITED STATES?

12  A.    YES, HERE IN ATLANTA.

13  Q.    OKAY.  AND CAN YOU TELL US ROUGHLY WHEN THAT OCCURRED?

14  A.    ROUGHLY 89, 90, I THINK IT WAS.

15  Q.    OKAY.  I WANT TO DIRECT YOUR ATTENTION TO PAGE 3 OF THE

16  OUTLINE, AND I WANT TO ASK YOU ABOUT MR. TRENTACOSTA'S

17  ASSOCIATION WITH THE GAMBINO CRIME FAMILY, AND WITH HIGHER-UPS

18  WITHIN THE GAMBINO FAMILY.

19          WAS THERE AN INVESTIGATION INTO A FUEL EXCISE TAX

20  FRAUD THAT YOU CAN USE AS AN EXAMPLE TO SHOW HIS RELATIONSHIP

21  TO THE GAMBINO CRIME FAMILY?

22  A.    YES.  BACK IN 87, 88, MR. TRENTACOSTA, ALONG WITH MR.

23  ANTHONY MORELLI, WERE IN CHARGE FOR THE GAMBINO FAMILY IN DOING

24  MEETINGS WITH A CONFIDENTIAL SOURCE IN REGARDS TO A GAS TAX

25  SCAM.

ANDRE G. ASHLEY, O.C.R.

1    Q.    STOP FOR A MINUTE AND TELL US WHO MR. MORELLI IS.

2    A.    MR. MORELLI IS ALSO A GAMBINO SOLDIER IN NEW YORK.

3    Q.    AND IS MR. MORELLI CURRENTLY SERVING A SENTENCE?

4    A.    YES, HE IS.

5    Q.    AND IS THAT SENTENCE ALSO OUT OF SOUTH FLORIDA?

6    A.    YES, IT IS.

7    Q.    OKAY.  NOW, JUST VERY BRIEFLY, TELL US ABOUT THESE

8    MEETINGS, AND WHAT THE LOSS WAS ON THIS EXCISE TAX FRAUD?

9              MS. DUNN:  YOUR HONOR, I WOULD OBJECT TO THIS ON

10    RELEVANCE GROUNDS.

11             MR. LEACH:  IT SHOWS HIS RELATIONSHIP TO OTHER

12    GAMBINOS, INCLUDING TONY MORELLI AND JOHN GOTTI, SR.; IS THAT

13    CORRECT?

14             THE WITNESS:  CORRECT.

15             THE COURT:  OVERRULED.

16    BY MR. LEACH:

17    Q.    GO AHEAD.

18    A.    I'M SORRY.

19    Q.    THE RELATIONSHIP BETWEEN THE EXCISE TAX FRAUD AND OTHER

20    HIGHER-UPS WITHIN THE GAMBINO FAMILY.

21    A.    OKAY.  WHAT BASICALLY HAPPENED IS THAT THE SOURCE THAT

22    WENT TO MEETINGS INVOLVING ACTUALLY ALL FOUR FAMILIES OF THE

23    LCN.  MR. TRENTACOSTA AND MORELLI WERE THE REPRESENTATIVES FOR

24    THE GAMBINO FAMILY.

25    Q.    WHERE DID THESE MEETINGS OCCUR?


ANDRE G. ASHLEY, O.C.R.

1    A.   AT THE -- I THINK IT WAS THE MARRIOTT HOTEL AT LA GUARDIA

2    AIRPORT.   AT LEAST ONE OF THE MEETINGS OCCURRED THERE.

3    Q.   AND WAS THE INFORMANT PERMITTED TO REMAIN THROUGHOUT THE

4    ENTIRETY OF THESE MEETINGS?

5    A.   NO.   AS PART OF PROTOCOL FOR, I GUESS, THE MOB FAMILY,

6    WHEN THE TIME CAME FOR THEM TO SPEAK OF MOB BUSINESS, ANYBODY

7    THAT WAS NOT A MADE MEMBER HAD TO LEAVE THE ROOM.

8    Q.   OKAY.   AT THE TOP OF PAGE FOUR OF OUR MEMORANDUM, THERE IS

9    A QUOTE FROM MR. TRENTACOSTA IN WHICH THE INFORMANT WAS

10   DIRECTED TO LEAVE BECAUSE THEY WERE GOING TO TALK ABOUT MOB

11   BUSINESS?

12   A.   CORRECT.   THIS WAS THE MEETING AT THE MARRIOTT AT LA

13   GUARDIA; WHEREAS, WHEN THE TIME CAME FOR THEM TO DISCUSS THEIR

14   MOB BUSINESS, MR. TRENTACOSTA TOLD THE SOURCE THAT HE HAD TO

15   LEAVE THE ROOM BECAUSE THEY HAD TO DISCUSS THE MOB SHIT.

16   Q.   OKAY.   AND CAN YOU TELL US WHY THIS PARTICULAR INFORMANT

17   SHOULD BE VIEWED AS RELIABLE BY THIS COURT?

18   A.   WELL, THIS INFORMANT HAS TESTIFIED AT OTHER TRIALS, AND

19   PROVIDED VALUABLE EVIDENCE TO FBI AND THE GOVERNMENT.

20   Q.   AND HAVE OTHER PEOPLE BEEN NOT ONLY ARRESTED BUT CONVICTED

21   ON THAT TESTIMONY?

22   A.   YES.

23   Q.   OKAY.   WAS THIS PARTICULAR INFORMANT SOMEONE THAT WAS

24   CLOSE TO THE GAMBINO CRIME FAMILY?

25            MS. DUNN:   I WOULD OBJECT, YOUR HONOR.   HE DOESN'T

ANDRE G. ASHLEY, O.C.R.

13

```
 1   KNOW WHETHER OR NOT THIS GUY WAS CLOSE.

 2              THE COURT:  OVERRULED.

 3   BY MR. LEACH:

 4   Q.    GO AHEAD.

 5   A.    YES, HE WAS.

 6   Q.    CAN YOU DESCRIBE THAT IN ANY RESPECT; IN OTHER WORDS, WAS

 7   HE A DAY-TO-DAY ASSOCIATE OF THE DEFENDANT IN THIS CASE?

 8              MS. DUNN:  I WOULD ALSO OBJECT AS CONSTANTLY

 9   LEADING.  IT'S BAD ENOUGH THAT THE PROSECUTOR HAS GIVEN THIS

10   WITNESS A ROAD MAP OF TESTIMONY TO USE --

11              THE COURT:  ALL RIGHT.  THE OBJECTION IS NOTED.  YOU

12   MAY CONTINUE.

13              MR. LEACH:  THANK YOU, YOUR HONOR.

14   BY MR. LEACH:

15   Q.    WHAT WAS THE LOSS IN THE FUEL EXCISE TAX FRAUD?

16   A.    ROUGHLY A HUNDRED MILLION DOLLARS.

17   Q.    OKAY.  WAS THIS ACTIVITY GOING ON AT A TIME THAT THE

18   DEFENDANT LIVED IN ATLANTA, OR WHILE HE LIVED IN THE NEW YORK

19   METROPOLITAN AREA?

20   A.    NEW YORK.

21   Q.    OKAY.  DURING THE PERIOD OF TIME THAT THE DEFENDANT LIVED

22   IN THE NEW YORK METROPOLITAN AREA, WAS THERE VIDEO SURVEILLANCE

23   OF A KNOWN GAMBINO LOCATION IN NEW YORK CITY?

24   A.    YES.

25   Q.    WHAT WAS THAT LOCATION?
```

1   A.    IT'S THE RAVEN NIGHT SOCIAL CLUB, WHICH WAS RUN BY JOHN

2   GOTTI.

3   Q.    ALL RIGHT.  AND WHO IS JOHN GOTTI FOR THE RECORD?

4   A.    HE IS THE LEADER OF THE GAMBINO FAMILY.

5   Q.    SO ARE WE TALKING ABOUT JOHN GOTTI, THE FATHER, OR JOHN A.

6   GOTTI, THE SON?

7   A.    JOHN GOTTI, THE FATHER.

8   Q.    OKAY.  NOW, HAS THE FBI PROVIDED TO YOU STILL PRINTS FROM

9   THOSE VIDEOTAPES SHOWING THE DEFENDANT IN RELATIONSHIP TO JOHN

10  GOTTI AND TONY MORELLI?

11  A.    YES.

12  Q.    I'M GOING TO SHOW YOU WHAT'S MARKED AS GOVERNMENT'S

13  EXHIBITS AT-2, 3, 4 AND 5, AND I WANT YOU TO PUT THEM IN ORDER.

14  THERE'S TWO AND THE REST ARE IN ORDER.

15          I WANT YOU TO PICK THEM UP ONE BY ONE, AND TELL US

16  WHAT THOSE PICTURES SHOW.

17  A.    OKAY.  THIS WOULD BE AT-2 --.

18          THE COURT:  WAIT A MINUTE.  AT-2, 3, 4 AND 5?

19          MR. LEACH:  YES, FOUR PHOTOS.

20          THE WITNESS:  OKAY.  I HAVE NOT SEEN THE VIDEO, AND

21  THESE PICTURES ARE A LITTLE BLURRY, BUT I AM TOLD THAT THIS

22  PICTURE IS OF MR. TRENTACOSTA, WHICH IS ON THE LEFT, MR. JOHN

23  GOTTI IN THE CENTER, AND MORELLI ON THE RIGHT.

24  BY MR. LEACH:

25  Q.    AND WHAT IS THE DATE OF THAT PICTURE?

ANDRE G. ASHLEY, O.C.R.

1    A.    THIS PICTURE IS DATED 6-16-88.

2    Q.    GOING ON TO EXHIBIT 3, PLEASE.

3    A.    AGAIN, NUMBER 3, DATED 8-2-88, SHOWS MR. JOHN GOTTI ON THE

4    RIGHT SIDE, MR. TRENTACOSTA IN THE CENTER, AND MR. MORELLI ON

5    THE LEFT.

6    Q.    OKAY.    NUMBER 4?

7    A.    NUMBER 4 IS DATED 3-15-89.    IT SHOWS MR. JOHN GOTTI ON THE

8    RIGHT, AGAIN MR. TRENTACOSTA IN THE CENTER, AND MR. MORELLI

9    STANDING BEHIND MR. TRENTACOSTA.

10          AND NUMBER 5, DATED 3-15-89 SHOWS MR. TRENTACOSTA ON

11   THE LEFT, MR. MORELLI THIS TIME IN THE CENTER, AND MR. JOHN

12   GOTTI ON THE RIGHT.

13   Q.    DIRECTING YOUR ATTENTION TO PAGE 5, THE FULL PARAGRAPH

14   THERE ON THAT PAGE, I WANT YOU TO TALK ABOUT FAT ANDY RUGGIANO,

15   AND THE RELATIONSHIP TO THE DEFENDANT IN THIS CASE AND ANOTHER

16   DEFENDANT IN THIS CASE, TONY MOCERRO --

17   A.    FREDDY MOCERRO.

18   Q.    FREDDY MOCERRO, EXCUSE ME.

19   A.    OKAY.    FAT ANDY RUGGIANO WAS ALSO A GAMBINO SOLDIER.

20   RUGGIANO WAS IN PRISON FROM, I THINK, 84 UNTIL 97, IF I AM NOT

21   MISTAKEN.

22          THE COURT:    WAIT A MINUTE.    NOW, HOW DOES FAT ANDY

23   SPELL HIS LAST NAME?

24          THE COURT:    YOU SAID PAGE 5?

25          MR. LEACH:    YES, SIR.    IT MOVES ONTO THE PAGES

16

1   AFTERWARDS, AS WELL.

2           THE WITNESS:  THE SPELLINGS ON PAGE 6, SIR.

3   R U G G I A N O.

4   BY MR. LEACH:

5   Q.   WHERE IS IT ON PAGE 6, PLEASE?

6   A.   ABOUT MIDWAYS RIGHT UNDERNEATH REPORTED TO.

7           THE COURT:  AND WHO WAS THE MOCERRO THAT YOU ASKED

8   ABOUT?

9           THE WITNESS:  MOCERRO IS ANOTHER DEFENDANT IN THE

10  CASE IN FLORIDA.

11  BY MR. LEACH:

12  Q.   OKAY.  NOW, FIRST, TELL US ABOUT MR. RUGGIANO, WAS HE A

13  MADE MEMBER OF THE GAMBINO CRIME FAMILY?

14  A.   YES.

15  Q.   I AM USING PAST TENSE BECAUSE HE IS DECEASED; IS THAT

16  CORRECT?

17  A.   CORRECT.

18  Q.   DID HE HAVE ANY PARTICULAR RANK WITHIN THE GAMBINO CRIME

19  FAMILY?

20  A.   HE WAS A GAMBINO SOLDIER.

21  Q.   OKAY.  AND NOW, MR. MOCERRO, WHO IS THE CODEFENDANT, IS HE

22  A MADE MEMBER OF THE GAMBINO CRIME FAMILY?

23  A.   HE'S AN ASSOCIATE.

24  Q.   AND CAN YOU EXPLAIN TO THE COURT THE DIFFERENCE BETWEEN AN

25  ASSOCIATE AND A MADE MEMBER OR A SOLDIER IN THE GAMBINO CRIME

1  FAMILY?

2  A.    ASSOCIATES ARE BASICALLY EARNERS FOR THESE MADE GUYS, THE

3  MADE MEMBERS.

4          MS. DUNN:  I WOULD OBJECT, LACK OF FOUNDATION.

5          THE COURT:  OVERRULED.

6  BY MR. LEACH:

7  Q.    CAN YOU TELL US WHAT THE RELATIONSHIP WAS BETWEEN MR.

8  RUGGIANO AND MR. MOCERRO?

9  A.    MR. MOCERRO REPORTED TO MR. RUGGIANO.

10  Q.    AND WITHIN THE VERBIAGE THAT'S USED WITHIN THE CRIME

11  FAMILY, DOES THAT MEAN THAT MR. MOCERRO IS PART OF THE CREW OF

12  MR. RUGGIANO?

13  A.    CORRECT.

14  Q.    AND CAN YOU DESCRIBE WHAT A CREW IS FOR THE COURT?

15  A.    YES.  AGAIN, MR. RUGGIANO WOULD HAVE BEEN THE SOLDIER AND

16  THE HEAD OF THE CREW.  MR. MOCERRO BASICALLY RAN THE CREW IN

17  SOUTH FLORIDA, WHEREAS MR. MOCERRO WAS THE ASSOCIATE, AND HE

18  HAD A BUNCH OF PEOPLE UNDERNEATH HIM, WHICH WENT OUT AND DID

19  OTHER ILLEGAL ACTIVITIES FOR THE CREW.

20  Q.    WOULD THE PEOPLE WHO WERE BELOW MR. MOCERRO ALSO BE

21  CONSIDERED TO BE PART OF THE CREW?

22  A.    YES.

23  Q.    OKAY.  NOW, YOU HAVE ALREADY MENTIONED THAT THERE CAME A

24  TIME WHERE FREDDY MOCERRO WENT TO PRISON?

25  A.    RUGGIANO.

ANDRE G. ASHLEY, O.C.R.

1    Q.    MR. RUGGIANO, I'M SORRY.  AND DURING THAT PERIOD OF TIME,

2    WAS THERE A RELATIONSHIP BETWEEN MR. MOCERRO AND MR.

3    TRENTACOSTA?

4    A.    YES, THERE WAS.

5    Q.    OKAY.  AND DID THAT CREATE PROBLEMS WITHIN THE GAMBINO

6    CRIME FAMILY?

7    A.    YES, IT DID.

8    Q.    OKAY.  CAN YOU DESCRIBE THAT SITUATION, AND WHY IT CREATED

9    PROBLEMS?

10   A.    YES.

11          MS. DUNN:  YOUR HONOR, I THINK THIS TESTIMONY CAN

12   ONLY BE UNDERSTOOD IF HE TALKS ABOUT HOW HE FOUND OUT THIS

13   INFORMATION.

14          THE COURT:  WELL, YOU WILL HAVE THE OPPORTUNITY TO DO

15   THAT ON CROSS-EXAMINATION.

16          MS. DUNN:  WELL, I UNDERSTAND, BUT BEFORE YOUR HONOR

17   IS COLORED BY THE TESTIMONY, I THINK AN APPROPRIATE FOUNDATION

18   OUGHT TO BE LAID EVIDENTIALLY.

19          THE COURT:  WELL, I WILL LET YOU DO IT ON YOUR SIDE,

20   IF HE IS NOT DOING IT ON HIS SIDE.  SO FAR I'VE BEEN ABLE TO

21   KEEP IT STRAIGHT.

22          MS. DUNN:  IT'S NOT A MATTER OF KEEPING THINGS

23   STRAIGHT, YOUR HONOR.  THIS MAN OBVIOUSLY IS NOT A MEMBER OF

24   WHAT HE CALLS THE GAMBINO CRIME FAMILY, SO HE IS GETTING THIS

25   INFORMATION FROM SOMEWHERE.

1       IF IT'S FROM THE PROSECUTOR, WE HAVE THE RIGHT TO

2   KNOW THAT, AS THE INFORMATION COMES OUT, BECAUSE YOUR HONOR HAS

3   TO TEST THE CREDIBILITY AS YOU HEAR THE INFORMATION.

4       IF IT'S FROM CONFIDENTIAL SOURCES, YOUR HONOR SHOULD

5   KNOW THAT WHEN IT COMES OUT.

6       THE COURT:  HE JUST SAID PART OF IT IS FROM

7   CONFIDENTIAL SOURCES WHO IS CLOSE TO JOHN GOTTI, AND WHOSE

8   TESTIMONY AT OTHER TRIALS HAS LED TO CONVICTIONS OF OTHER

9   PEOPLE.

10      MS. DUNN:  HE SAID THAT BASED ON COMMUNICATIONS IN

11  1988.  WE ARE NOW FASTFORWARDED TO A TIME MOCERRO IS IN PRISON,

12  AND MR. TRENTACOSTA DOESN'T EVEN LIVE IN NEW YORK ANY MORE.

13      THE COURT:  I DON'T KNOW WHEN THIS TOOK PLACE.

14      MS. DUNN:  WELL, HE JUST TESTIFIED IT WAS AFTER HE

15  MOVED FROM NEW YORK.

16      THE COURT:  ALL RIGHT.  YOU MAY CONTINUE.

17      MR. LEACH:  I THINK THE DEFENDANT NEEDS TO BE

18  ADVISED, YOUR HONOR, THAT ALL OF HIS COMMENTS HERE WILL GO ON

19  THIS RECORD.

20      THE COURT:  WELL, YOU HAVE THE RIGHT, MR.

21  TRENTACOSTA, TO CONFER WITH YOUR ATTORNEY ANY TIME YOU WANT TO,

22  BUT IF YOU CONFER LOUD ENOUGH, THEN THE MICROPHONES ARE GOING

23  TO PICK IT UP, AND IT WILL BE A PART OF THE RECORD, AND I DON'T

24  WANT YOU TO HAVE TO BE PUT IN A SITUATION THAT MIGHT HAVE SOME

25  LEGAL RAMIFICATIONS FOR YOU.

ANDRE G. ASHLEY, O.C.R.

1           YOU CAN ALWAYS CUT THE MICROPHONE OFF IF YOU WANT TO,

2   BUT WE ARE GOING TO CONTINUE WITH THE HEARING.

3           MS. DUNN:  YOUR HONOR, IF WE COULD DO THIS.  IT'S MY

4   IMPRESSION THAT WE ARE TALKING ABOUT A TIME PERIOD THAT THERE

5   IS SOME LAPSE BETWEEN WHEN YOU LAST TALKED ABOUT A CONFIDENTIAL

6   SOURCE AND A CURRENT CONFIDENTIAL SOURCE.

7           I DON'T THINK IT WOULD HURT THE GOVERNMENT TO CLARIFY

8   THAT RIGHT NOW WHILE YOUR HONOR IS HEARING THE TESTIMONY, AND I

9   WOULD ASK THAT --

10          THE COURT:  WHAT TIME FRAME ARE WE TALKING ABOUT

11  NOW?

12          MR. LEACH:  ASK THE WITNESS.

13          THE WITNESS:  AS FAR AS THE CONNECTION WHEN --

14  BY MR. LEACH:

15  Q.   BETWEEN MOCERRO, TRENTACOSTA, DURING THE TIME THAT

16  RUGGIANO IS IN PRISON?

17  A.   MR. RUGGIANO WENT TO PRISON IN 84.  HE WAS IN PRISON FROM

18  84 TO 97.

19  Q.   WHEN DID THE RELATIONSHIP BETWEEN MR. MOCERRO AND THE

20  DEFENDANT AGAIN?

21  A.   WHILE MR. RUGGIANO WAS IN PRISON.

22  Q.   OKAY.  AND WHEN DID THE DEFENDANT BEGIN LIVING IN ATLANTA

23  AND SPENDING TIME IN SOUTH FLORIDA?

24  A.   I AM THINKING IT WAS AROUND THE 90'S, IN THE EARLY 90'S,

25  90, THE 91.

1  Q.    AND THE BASIS FOR THIS INFORMATION LEADING TO THE

2  CONNECTION BETWEEN THE DEFENDANT AND MR. MOCERRO IS WHAT?

3  A.    THAT'S COMING FROM CONFIDENTIAL SOURCES.

4  Q.    OKAY.  NOW, THIS IS CS-2?

5  A.    CORRECT.

6  Q.    AND WHAT IS THE RELIABILITY OF CS-2?

7  A.    CS-2 HAS MADE NUMEROUS RECORDINGS FOR US, CONSENSUAL

8  RECORDINGS.

9  Q.    AND IS CS-2 A CONVICTED FELON?

10 A.    I'M NOT SURE ABOUT THAT.

11 Q.    OKAY.  NOW, IS CS-2 IN A POSITION TO HAVE DIRECT CONTACT

12 WITH THESE INDIVIDUALS, EITHER BY TELEPHONE OR IN PERSONAL

13 CONTACT, SO THAT HE WOULD KNOW THE INFORMATION THAT HE IS

14 RELATED TO THE FBI?

15 A.    YES.

16 Q.    OKAY.  NOW, COUNSEL HAS ASKED -- MADE A SERIES OF

17 OBJECTIONS RELATED TO YOUR LEVEL OF KNOWLEDGE.  WITH REGARD TO

18 THE THINGS THAT ARE OUTLINED IN THIS MEMO, HAVE YOU GAINED THAT

19 INFORMATION FROM A PROSECUTOR OR FROM AGENTS IN THIS CASE?

20 A.    AGENTS.

21 Q.    OKAY.  AND HAVE YOU ALSO HAD SOME CONTACT WITH SOME OF THE

22 CONFIDENTIAL SOURCES --

23 A.    YES.

24 Q.    -- THAT ARE MENTIONED IN THE MEMO?

25 A.    YES, I AM.

1  Q.    AND IS THAT WHERE YOU'VE BEEN PERSONALLY PRESENT AND

2  DEBRIEFED ON?

3  A.    YES.

4  Q.    OKAY.  WAS THERE AN EFFORT BY THE DEFENDANT IN THIS CASE,

5  MR. TRENTACOSTA, TO MOVE MR. MOCERRO UNDER HIS CONTROL AS

6  OPPOSED TO RUGGIANO'S CONTROL?

7  A.    YES.

8  Q.    AND ROUGHLY WHEN DID THAT HAPPEN?

9  A.    THAT -- I THINK IT WAS RIGHT BEFORE OR RIGHT AFTER MR.

10 RUGGIANO WAS RELEASED TO THE HALFWAY HOUSE.

11 Q.    WHICH WOULD HAVE BEEN ROUGHLY -- ARE WE TALKING IN THE

12 90'S OR THE 80'S?

13 A.    AROUND 97, I THINK IT WAS.

14 Q.    97.  OKAY.  AND WHAT WAS THE RESULT OF THAT EFFORT TO MOVE

15 MR. MOCERRO UNDER THE DEFENDANT?

16 A.    MR. TRENTACOSTA WENT TO NICHOLAS CHORAZO, WHO WAS ALSO A

17 CAPO IN THE GAMBINO FAMILY.

18 Q.    OKAY.  NOW STOP FOR A MOMENT, BECAUSE THE COURT DOESN'T

19 KNOW WHAT A CAPO IS.  EXPLAIN THE HIERARCHY WITHIN THE GAMBINO

20 FAMILY AND THE RELATIONSHIP BETWEEN A CAPO TO A MADE MAN OR A

21 SOLDIER AND AN ASSOCIATE, PLEASE?

22 A.    ALL RIGHT.  THE CAPO OR CAPTAIN IS ABOVE THE SOLDIER.  THE

23 SOLDIER REPORTS UP TO THE CAPTAIN.  SO MR. CHORAZO WAS MR.

24 TRENTACOSTA'S CAPTAIN OR, YOU KNOW, BOSS, BASICALLY.

25 Q.    OKAY.  AND WHEN HE APPROACHED MR. CHORAZO IN HIS EFFORT TO

ANDRE G. ASHLEY, O.C.R.

1 MOVE MR. MOCERRO, WHY WAS THAT EVEN NECESSARY?

2 A.    WELL, BASED ON THE PROTOCOL, YOU HAVE TO GET PERMISSION IN

3 ORDER TO DO SOMETHING LIKE THAT.

4 Q.    ALL RIGHT.  AND WHAT WAS MR. CHORAZO'S DECISION WITH

5 REGARD TO THE SITUATION WITH MOCERRO?

6 A.    MR. CHORAZO SENT WORD THROUGH MR. RUGGIANO'S SON, ANTHONY,

7 JR., HE BASICALLY LET MR. RUGGIANO MAKE THAT DECISION, IF HE

8 WANTED TO RELEASE MOCERRO OR NOT.

9 Q.    OKAY.  AND WHAT WAS THE DECISION THAT WAS MADE?

10 A.    MR. RUGGIANO REFUSED TO DO SO.

11 Q.    OKAY.  DID THERE COME A TIME WHERE MR. RUGGIANO DIED?

12 A.    YES.

13 Q.    WHEN DID HE DIE?

14 A.    MARCH 19TH, 1999.

15 Q.    AND DID THAT HAVE AN EFFECT AS TO WHERE MR. MOCERRO WAS

16 THEN GOING TO GO ONCE RUGGIANO DIED?

17 A.    ONCE THAT HAPPENED, MR. MOCERRO WENT TO MR. TRENTACOSTA.

18 Q.    ALL RIGHT.  AND AT THAT POINT, WHAT IS MR. TRENTACOSTA'S

19 RELATIONSHIP TO THE CREW THAT WAS PREVIOUSLY BEING RUN BY MR.

20 RUGGIANO AND SO FORTH?

21 A.    AT THAT POINT THE CREW IS NOW BEING RUN BY MR.

22 TRENTACOSTA.

23 Q.    OKAY.  SO FROM MARCH 19TH, 1999 TO PRESENT?

24 A.    CORRECT.

25 Q.    AND CAN YOU EXPLAIN TO THE COURT WHAT THE IMPORT -- WHAT

1   HAPPENS WHEN A GAMBINO SOLDIER RUNS A CREW?  WHAT DOES THAT

2   MEAN?

3   A.    NOW THAT MR. TRENTACOSTA IS RUNNING THE CREW, THAT MEANS

4   HE IS IN CHARGE OF THE DAY-TO-DAY ACTIONS OF THAT CREW.  MR.

5   MOCERRO HAS TO REPORT TO MR. TRENTACOSTA, AND MR. TRENTACOSTA

6   GIVES THE ORDERS FOR THAT CREW AS TO WHAT, YOU KNOW, THE

7   DAY-TO-DAY ACTIONS WILL BE.

8   Q.    FROM MARCH 19TH, 1999 FORWARD, HOW MANY INDIVIDUALS, AND

9   BY THAT I MEAN GAMBINO SOLDIERS AND ASSOCIATES, WERE IN THE

10  CREW CONTROLLED BY MR. TRENTACOSTA?

11  A.    WELL, THERE WERE NINE TOTAL PEOPLE INDICTED, BUT WE THINK

12  THERE ARE OTHERS INVOLVED IN THE CREW THAT WILL BE COMING LATER

13  DOWN THE ROAD.  SO AT LEAST NINE PEOPLE.

14  Q.    NOW, I WANT TO DIRECT YOUR ATTENTION TO ANY VIOLENCE

15  COMMITTED BY MR. TRENTACOSTA.  WAS THERE EVER A TIME THAT HE

16  TOOK ANY VIOLENCE AGAINST MR. MOCERRO?

17  A.    YES.

18  Q.    EXPLAIN THAT TO THE COURT.

19  A.    AGAIN, THROUGH A CONFIDENTIAL SOURCE, WE HAVE INFORMATION

20  THAT --

21  Q.    WHICH ONE, NUMBER 2?

22  A.    NUMBER 2.

23  Q.    OKAY.  GO AHEAD.

24  A.    THAT DURING A -- I GUESS AN ARGUMENT OR CONFRONTATION

25  BETWEEN MR. TRENTACOSTA AND MOCERRO IN 1982 AT A HOTEL IN SOUTH

1    FLORIDA, APPARENTLY MR. MOCERRO OWED MONEY, HAD NOT PAID -- I

2    THINK IT WAS 3,000 DOLLARS, 3,000 OR 3500 DOLLARS, TO MR.

3    TRENTACOSTA, AND AT SOME POINT MR. TRENTACOSTA GOT ANGRY AND

4    STABBED MR. MOCERRO IN THE ABDOMEN.

5         MR. LEACH:  I'LL POINT OUT TO THE COURT THAT THAT'S

6    AT THE VERY TOP OF PAGE 7 OF THE MEMO.

7    BY MR. LEACH:

8    Q.   AFTER MR. MOCERRO WAS STABBED, DID THAT CAUSE HIM TO BE

9    HOSPITALIZED, OR DID HE TAKE SOME OTHER ACTION ONCE HE WAS

10   STABBED?

11   A.   AFTER HE WAS STABBED, HE LEFT THE RESTAURANT OR THE HOTEL,

12   AND RETURNED 15, 20 MINUTES LATER WITH THE MONEY HE OWED TO MR.

13   TRENTACOSTA.

14   Q.   NOW, IN 1999, DID THE FBI CONDUCT A WIRETAP IN SOUTH

15   FLORIDA RELATING TO THE OPERATIONS OF THIS CREW?

16   A.   YES.

17   Q.   WAS THAT WIRETAP OPERATING AT THE TIME, OR CLOSE IN TIME

18   TO WHEN MR. RUGGIANO DIED?

19   A.   YES.

20   Q.   ARE THERE SOME INTERCEPTS IN MARCH OF 1999 WHICH ARE

21   OUTLINED IN THE MEMO RELATING TO MR. TRENTACOSTA AND MR.

22   MOCERRO AND OTHERS INVOLVED IN THE CREW?

23   A.   YES.

24         MR. LEACH:  AND I WILL POINT OUT TO THE COURT THAT

25   THEY BEGIN AT THE TOP OF PAGE 8 OF THE MEMO.

1   BY MR. LEACH:

2   Q.    LET'S FIRST DIRECT YOUR ATTENTION TO MARCH 21, 1999.

3   FIRST, WHOSE TELEPHONE IS BEING INTERCEPTED HERE?

4   A.    MR. MOCERRO.

5   Q.    ALL RIGHT.  AND OVER WHAT PERIOD OF TIME DID YOU HAVE THE

6   INTERCEPT ON MR. MOCERRO'S PHONE?

7   A.    FROM -- I THINK IT STARTED MARCH 19TH, I THINK, UNTIL LIKE

8   JUNE 16 OR 19, IN THAT AREA, 90 DAYS, ROUGHLY.

9   Q.    IS THE DEFENDANT, THAT IS, IS MR. TRENTACOSTA HIMSELF

10  CAPTURED ON THAT TELEPHONE AT ANY TIME?

11  A.    YES, HE IS.

12  Q.    IS MR. MOCERRO CAPTURED ON THAT PHONE?

13  A.    YES, HE IS.

14  Q.    YOU SAY IT STARTED ON THE 19TH, SO IT STARTED THE DAY THAT

15  MR. RUGGIANO DIED?

16  A.    YES.

17  Q.    SO YOU DID NOT CAPTURE HIM?

18  A.    NO, WE DID NOT.

19  Q.    OKAY.  WERE THERE DISCUSSIONS ON THE TELEPHONE ABOUT THE

20  DEATH OF MR. RUGGIANO?

21  A.    YES.

22  Q.    AND DO THESE CONVERSATIONS SHOW THE RELATIONSHIP BETWEEN

23  MR. TRENTACOSTA, MR. MOCERRO AND MR. RUGGIANO?

24  A.    YES.

25  Q.    AND IS THAT THE FIRST CONVERSATION, THE MARCH 21ST, 1999

```
 1   CONVERSATION?

 2   A.   YES, IT IS.

 3   Q.   JUST GIVE US THE SUM AND SUBSTANCE OF THAT CONVERSATION,

 4   WHAT IT SHOWS.

 5   A.    IT'S BASICALLY A CONVERSATION BETWEEN MR. MOCERRO AND

 6   DAVID ALLWAYS, WHERE MR. MOCERRO IS TELLING ALLWAYS THAT MR.

 7   RUGGIANO HAD DIED, AND MOCERRO TOLD HIM THAT HE -- HE COULD NOT

 8   GO TO NEW YORK, AND THAT MR. TRENTACOSTA WAS ALSO NOT GOING.

 9   HE HAD JUST RETURNED FROM NEW YORK.

10   Q.   IS THERE ALSO A DISCUSSION ON APRIL 1ST, 1999, ROUGHLY THE

11   SAME SUBJECT?

12   A.   CORRECT, YES.

13   Q.   OKAY.  AND IS THIS MR. TRENTACOSTA SPEAKING?

14   A.   YES, IT IS.

15   Q.   AND WHAT DOES HE SAY ABOUT MR. RUGGIANO?

16   A.   BASICALLY SAYING THAT HE'S GLAD HE MADE UP WITH HIM, HE

17   KNEW HIM FOR 40 YEARS, AND HE'S GLAD HE MADE UP WITH HIM BEFORE

18   HE DIED.

19   Q.   NOW THROUGH INFORMANT INFORMATION, WAS IT EVER REVEALED BY

20   MR. TRENTACOSTA THAT IF HE WERE CHARGED, HE WOULD FLEE THE

21   UNITED STATES?

22   A.   YES.

23   Q.   WHAT INFORMANT PROVIDED THAT INFORMATION?

24   A.   I THINK THAT WAS ALSO CS-2.

25            MR. LEACH:  YOUR HONOR, THIS IS THE FIRST FULL
```

ANDRE G. ASHLEY, O.C.R.

```
 1   PARAGRAPH ON PAGE 9.

 2   BY MR. LEACH:

 3   Q.    TELL US ABOUT THAT CONVERSATION, PLEASE.

 4   A.    APPARENTLY AFTER SAMMY, THE BULL, GRAVANO BEGAN TESTIFYING

 5   FOR THE GOVERNMENT, OR BECAME A WITNESS FOR THE GOVERNMENT, MR.

 6   TRENTACOSTA HAD A CONVERSATION WITH MR. MORELLI, AND THEN

 7   SHORTLY AFTER THAT CONVERSATION HAD A CONVERSATION WITH THE

 8   CS-2, IN WHICH HE TOLD THE CS-2 THAT IF HE EVER GOT INTO A

 9   SITUATION WHERE HE LOOKED LIKE HE WAS FACING CHARGES THAT HE

10   COULDN'T BEAT, THEN HE WOULD FLEE THE COUNTRY AND GO TO SPAIN.

11   Q.    WAS MR. TRENTACOSTA IN THAT CONVERSATION SPECIFICALLY

12   CONCERNED ABOUT A PARTICULAR PRIOR MURDER THAT MR. GRAVANO

13   COULD PROVIDE TO THE GOVERNMENT?

14   A.    THAT'S THE INFORMATION THAT WE ARE GETTING, YES.

15   Q.    OKAY.  AND WAS MR. TRENTACOSTA PARTICULAR ABOUT WHERE HE

16   WOULD GO IN THE WORLD, WHAT COUNTRY?

17   A.    SPAIN.

18   Q.    NOW, HAVE THERE BEEN CONVERSATIONS IN WHICH THE DEFENDANT

19   HAS TALKED ABOUT BEING PART OF THE MOB?

20   A.    YES.

21   Q.    OKAY.  TELL US ABOUT THAT, PLEASE.

22   A.    YOU MEAN MR. TRENTACOSTA OR MR. --

23   Q.    MR. MOCERRO, EXCUSE ME, TALKING ABOUT BEING PART OF THE

24   MOB.

25   A.    YES.  WE HAD A THIRD CONFIDENTIAL SOURCE.
```

ANDRE G. ASHLEY, O.C.R.

1    Q.    FIRST, TELL US ABOUT THAT SOURCE?

2    A.  HE ALSO -- HE WORKED FOR MR. MOCERRO DOING LOAN SHARKS,

3    PICKING UP, MAKING PAYMENTS -- NOT MAKING PAYMENTS, I'M SORRY,

4    COLLECTING PAYMENTS, AND ALSO FROM TIME TO TIME BEING IN THE

5    RESTAURANT WITH MR. MOCERRO.

6    Q.    OKAY.  AND CAN YOU TELL US WHETHER CONFIDENTIAL SOURCE

7    NUMBER 3 IS RELIABLE?

8    A.    YES, HE IS.

9    Q.    AND IS CONFIDENTIAL SOURCE NUMBER 3 SOMEBODY WHO HAS

10   TESTIFIED PREVIOUSLY, OR NOT TESTIFIED PREVIOUSLY?

11   A.   HE HAS NOT TESTIFIED PREVIOUSLY.  WE HAVE BASICALLY

12   CORROBORATED HIM THROUGH INTERVIEWS AND THROUGH THE TITLE III

13   INTERCEPTS.

14   Q.    OKAY.  WHAT DID MOCERRO TELL CS-3 ABOUT BEING PART OF THE

15   MOB?

16   A.   HE ALWAYS BRAGGED ABOUT BEING A PART OF THE MOB, THAT HE

17   KNEW HE HAD BIG MAJOR CONTACTS, AND THAT HE WAS IN ANDY

18   RUGGIANO'S CREW.

19   Q.    OKAY.  HAS HE EVER MADE ANY REFERENCE TO MR. TRENTACOSTA?

20   A.    YES.  AFTER MR. RUGGIANO DIED, MR. MOCERRO TOLD THE SOURCE

21   THAT HE IS NOW -- THAT MR. TRENTACOSTA WAS NOW HIS CAPO, MR.

22   MOCERRO'S CAPO.

23           MR. LEACH:  YOUR HONOR, THAT'S ON PAGE 9, ABOUT 5

24   LINES FROM THE BOTTOM.

25   BY MR. LEACH:

ANDRE G. ASHLEY, O.C.R.

1   Q.   DID MR. MOCERRO ALSO COMPLAIN ABOUT THE MONEY THAT HE HAD

2   TO PAY TO MR. TRENTACOSTA?

3   A.   YES, HE ALWAYS COMPLAINED ABOUT THE PERCENTAGES HE HAD TO

4   SEND TO MR. TRENTACOSTA.

5   Q.   AND THAT AGAIN IS ALSO RECEIVED THROUGH THIS CONFIDENTIAL

6   SOURCE NUMBER 3?

7   A.   CORRECT.

8   Q.   WAS THERE ALSO AN INTERCEPT THAT WAS RECEIVED ON MARCH

9   30TH, 1999, INVOLVING MR. TRENTACOSTA'S WIFE?

10  A.   YES.

11  Q.   TELL US ABOUT THAT INTERCEPT.

12  A.   IT'S BASICALLY HE WAS CALLING HIS WIFE, AND SHE SAID THAT

13  SHE COULD SEE THAT HE WAS STILL USING MR. MOCERRO'S PHONE.

14  Q.   AND IS MR. MOCERRO'S NAME SPECIFICALLY MENTIONED IN THAT

15  INTERCEPT, OR JUST FREDDY'S PHONE?

16  A.   FREDDY'S PHONE.

17          THE COURT:  WHERE ARE YOU REFERRING TO?

18          MR. LEACH:  WE ARE ON PAGE 10 AT THE VERY TOP OF THE

19  MARCH 30TH, 1999 INTERCEPT.

20  BY MR. LEACH:

21  Q.   OKAY.  NOW, I WANT TO SHIFT OUR ATTENTION TO THE MURDER OF

22  AN ENTERTAINER NAMED MS. SMITH.  FIRST, TELL US ABOUT MS. SMITH

23  AND HER RELATIONSHIP TO THIS CREW.

24  A.   OKAY.  JENNETTE SMITH WAS A 22-YEAR-OLD WHITE FEMALE.  SHE

25  WAS A STRIPPER AT THE DOLLHOUSE, WHICH IS A STRIP CLUB IN SUNNY

ANDRE G. ASHLEY, O.C.R.

1   ISLES, FLORIDA.  MS. SMITH'S BODY WAS FOUND ON -- I THINK IT

2   WAS THE 21ST, EARLY MORNING OF THE 21ST, IN A CANAL IN A BOX.

3          A COUPLE OF FISHERMEN WERE LAUNCHING THEIR BOAT, AND

4   THEY SAW THE STEREO BOX IN THE CANAL, IN THE WATER.  IN THEIR

5   EFFORTS TO REMOVE THAT BOX, THEY FELT MAYBE THERE WAS A STEREO

6   IN THERE.  WHEN THEY PICKED THE BOX UP, MS. SMITH'S BODY FELL

7   OUT OF THE BOTTOM OF IT.

8   Q.    OKAY.  AND GIVE THE COURT SOME IDEA OF THE CONDITION OF

9   THAT BODY WHEN IT WAS RECOVERED.

10  A.    THROUGH -- I MET WITH THE MEDICAL EXAMINER TO GO OVER THE

11  INJURIES TO MS. SMITH.

12  Q.    DID YOU PERSONALLY SEE THE BODY?

13  A.    NO, I DID NOT SEE THE BODY.

14  Q.    OKAY.  GO AHEAD.

15  A.    FROM PHOTOS, AND JUST THE CONVERSATION WITH THE MEDICAL

16  EXAMINER, MS. SMITH HAD BEEN STRANGLED.  HER LARYNX WAS BROKEN.

17  Q.    LARYNX WAS BROKEN?

18  A.    RIGHT.  THE CONDITION OF HER NECK SHOWED THAT -- IT

19  APPEARED THAT SHE HAD BEEN STRANGLED MORE THAN ONCE.  IN OTHER

20  WORDS, THERE WAS NO SINGLE HOLD ON HER NECK.  THERE WERE

21  BRUISES FROM THE TOP ALL THE WAY TO THE BOTTOM.

22  Q.    WHAT DOES THAT TELL YOU?

23  A.    THAT IT WAS LIKE HE TOOK HER OUT FOR A WHILE.

24          MS. DUNN:  YOUR HONOR, I WOULD OBJECT TO THIS WITNESS

25  WHO IS NOT AN EXPERT IN PATHOLOGY OR A MEDICAL EXAMINER.  IF HE

ANDRE G. ASHLEY, O.C.R.

1   WANTS TO SAY WHAT THE MEDICAL EXAMINER TOLD US --

2           THE COURT:  I WILL LET YOU CROSS-EXAMINE HIM.  HE

3   SAID HE HAS INVESTIGATED NUMEROUS HOMICIDES.

4           THE WITNESS:  AGAIN, THIS IS INFORMATION WITH MY

5   MEETING WITH THE MEDICAL EXAMINER.

6   BY MR. LEACH:

7   Q.   AND IS IT ALSO BASED ON YOUR EXPERIENCE AS A GBI

8   INVESTIGATOR?

9   A.   YES.

10  Q.   OKAY.  GO AHEAD.

11  A.   AGAIN, SHE HAD NUMEROUS BRUISES ON HER NECK FROM THE TOP

12  TO THE BOTTOM, AND IT -- FROM OUR OPINION IS THAT IT LOOKED

13  LIKE HE CHOKED HER OUT FOR A WHILE.

14  Q.   CHOKE HER OUT MEANING WHAT?

15  A.   SHE HAD PASSED OUT.  MR. ARIEL HERNANDEZ, THE PERSON WHO

16  IS IN PRISON FOR HER HOMICIDE.

17          THE COURT:  WHO IS THE KILLER?

18          THE WITNESS:  ARIEL HERNANDEZ.

19          MR. LEACH:  HE IS ALSO MENTIONED IN THE AFFIDAVIT,

20  YOUR HONOR, AT THE BOTTOM OF PAGE 11, STARTING ABOUT MIDWAY IN

21  THE PAGE ALL THE WAY TO THE END.

22  BY MR. LEACH:

23  Q.   AND WHEN YOU SAY CHOKE HER OUT, WHAT DO YOU MEAN BY THAT?

24  A.   BASICALLY WHEN SOMEONE APPLIES PRESSURE TO THE THROAT AREA

25  OR THE ARTERIES IN THE NECK, THE PERSON -- EVENTUALLY THE

ANDRE G. ASHLEY, O.C.R.

33

 1   PERSON THAT'S BEING CHOKED WILL PASS OUT.

 2   Q.   OKAY.

 3   A.   AND THAT'S WHAT APPEARED HAPPENED HERE, BECAUSE, AGAIN,

 4   SHE HAD THE BRUISES UP AND DOWN HER NECK, YOU KNOW, HER ENTIRE

 5   NECK.

 6   Q.   OKAY.   WHAT OTHER INJURIES DID SHE HAVE?

 7   A.   SHE ALSO HAD A BRUISE IN THE RIGHT FOREHEAD, RIGHT ABOVE

 8   THE TEMPLE AREA.   SHE HAD A BRUISE AT THE BOTTOM OF HER CHIN,

 9   WHICH COULD HAVE COME FROM A FALL OR A PUNCH.

10            IT WAS A MAJOR FALL OR PUNCH, WHATEVER IT WAS,

11   BECAUSE THE INSIDE OF HER MOUTH, SHE BIT HER TONGUE, AND ONE

12   SIDE OF HER TONGUE WAS BLACK.

13   Q.   BLACK MEANING BRUISING?

14   A.   RIGHT, FROM BLOOD INSIDE.

15   Q.   OKAY.   AND DOES THAT INDICATE TO YOU THAT THAT HAD TO

16   OCCUR PRIOR TO HER DEATH?

17   A.   YES.   SHE HAD TO BE ALIVE WHEN THAT OCCURRED.

18   Q.   EXPLAIN WHY.

19   A.   BECAUSE AFTER DEATH, I MEAN, IT STOPS BLEEDING, SO IT

20   WOULD NOT BRUISE LIKE THAT.

21   Q.   OKAY.

22   A.   SHE ALSO HAD BRUISES TO HER THIGHS, AND MAJOR BRUISING TO

23   THE ANAL AREA.

24   Q.   AND WAS THERE ANYTHING PRESENT IN HER ANUS AT THE TIME SHE

25   WAS RECOVERED?

ANDRE G. ASHLEY, O.C.R.

1   A.    NOTHING IN HER ANUS.  SHE HAD SEMEN IN HER MOUTH.

2   Q.    I SEE, OKAY.  HOW IS IT THAT ARIEL HERNANDEZ WAS FINALLY

3   APPREHENDED FOR THAT HOMICIDE?

4   A.    WELL, TWO THINGS.  THE SHERIFF'S DEPARTMENT HAD ALREADY

5   STARTED TRACKING HIM BASED ON THE BOX.  MR. HERNANDEZ PURCHASED

6   THE BOX WITH A COUNTERFEIT CHECK FROM A LOCAL STORE.  AND, I

7   GUESS, UNBEKNOWNST TO HIM, THE SERIAL -- THE BAR CODE ON THAT

8   BOX, ONCE SCANNED BY THE STORE, THEY CAN GO BACK AND TELL WHO

9   PURCHASED THE STEREO, AND ALSO FROM OUR TITLE III WIRETAP.

10  Q.    AND DID MR. HERNANDEZ CALL A TIP LINE WITH REGARD TO THE

11  HOMICIDE?

12  A.    CORRECT.  MR. HERNANDEZ CALLED A TIP LINE, I THINK, TWICE,

13  TWO OR THREE TIMES, AND GAVE DIFFERENT STORIES PRETENDING TO BE

14  SOMEONE ELSE.

15  Q.    ALL RIGHT.  NOW, EXPLAIN TO THE COURT WHAT THE

16  RELATIONSHIP BETWEEN ARIEL HERNANDEZ IS TO THE DEFENDANT IN

17  THIS CASE, MR. TRENTACOSTA?

18  A.    OKAY.  ARIEL HERNANDEZ IS BASICALLY A MEMBER OF HIS CREW.

19  HIS PURPOSE WAS BASICALLY TO MAKE COUNTERFEIT CHECKS, AND WITH

20  THESE CHECKS THEY WOULD GO OUT AND MAKE PURCHASES OF BIG TICKET

21  ITEMS, LIKE, FOR INSTANCE, THIS STEREO.

22          THEY PURCHASED THREE OF THESE STEREOS, WHICH ARE LIKE

23  300 BUCKS EACH, AND THEN SELL THEM HALF PRICE, OR WHATEVER,

24  PURCHASE THEM FOR OTHER MEMBERS OF THE CREW.

25  Q.    IS THAT PART OF WHAT THIS CREW DID IN JUST THERE

ANDRE G. ASHLEY, O.C.R.

1  DAY-TO-DAY CRIMINAL ACTIVITIES?

2  A.    YES.

3  Q.    OKAY.  AND ARE YOU ABLE TO ASCERTAIN, OR DO YOU HAVE

4  KNOWLEDGE OF WHAT THE MOTIVE OF THE MURDER OF MS. SMITH WAS,

5  AND WAS IT RELATED TO CREW BUSINESS?

6  A.    YES.  WE HAVE WITNESSES WHO HAVE IDENTIFIED MS. SMITH AS

7  BEING WITH ARIEL HERNANDEZ WHEN HE MADE SEVERAL OF THESE

8  PURCHASES.

9  Q.    AND DO WE HAVE -- ARE THOSE CONFIDENTIAL SOURCES OR PEOPLE

10 WHO WOULD BE WITNESSES?

11 A.    NO.  THESE ARE PEOPLE WHO WOULD BE WITNESSES, WHO ARE

12 EMPLOYEES OF THE STORE.

13 Q.    ALL RIGHT.  AND DO WE HAVE ANY INFORMATION LEADING US TO

14 BELIEVE THAT MS. SMITH HAD INDICATED AT ANY TIME THAT SHE WOULD

15 GO TO THE AUTHORITIES?

16 A.    WE HAVE INFORMATION THAT WAS SUPPOSEDLY WHY SHE WAS

17 KILLED, BECAUSE SHE WAS -- ONE PERSON SAID THAT SHE WAS AN FBI

18 INFORMANT, WHICH SHE WAS NOT, AND ANOTHER ONE SAID SHE WAS

19 GOING TO GO TO THE AUTHORITIES ABOUT THE CHECKS.

20 Q.    OKAY.  AND DO WE HAVE ANY INFORMATION LEADING US TO KNOW

21 WHETHER OR NOT HER DEATH WAS SOMETHING THAT WAS DIRECTED AS

22 PART OF CREW ACTIVITIES?

23 A.    DO WE HAVE ANY INFORMATION THAT --

24 Q.    THAT HER DEATH; IN OTHER WORDS, THAT SHE WAS ORDERED

25 KILLED BECAUSE OF THE FACT THAT SHE MAY BE AN FBI INFORMANT OR

1  MIGHT GO TO THE AUTHORITIES?

2  A.    WE DO HAVE A CONFIDENTIAL SOURCE WHO SAID THAT --

3  Q.    WHICH ONE IS IT?

4  A.    THIS IS NUMBER 4, I THINK IT WAS.

5  Q.    OKAY.  FIRST TELL US ABOUT CONFIDENTIAL SOURCE 4.

6  A.    CONFIDENTIAL SOURCE 4 IS ALSO AN ASSOCIATE OF MR. MOCERRO,

7  WORKED FOR MR. MOCERRO IN HIS RESTAURANT.  NO, NO -- I DON'T

8  THINK HE HAS (INAUDIBLE) IN THE UNITED STATES, ANY WAY.

9  Q.    ALL RIGHT.  AND IS CONFIDENTIAL SOURCE NUMBER 4 IN A

10 POSITION TO KNOW THIS INFORMATION THAT YOU'RE ABOUT TO RELATE?

11 A.    YES.

12 Q.    HOW WOULD HE HAVE GOTTEN THIS INFORMATION?

13 A.    HE GOT IT FROM MOCERRO.

14 Q.    DIRECTLY?

15 A.    DIRECTLY.

16 Q.    OKAY.  NOW, TELL US WHAT THAT INFORMATION IS.

17 A.    THE SOURCE TOLD US THAT ONE NIGHT WHILE THEY WERE AT THE

18 RESTAURANT WORKING, HE SAW MR. MOCERRO SITTING OUTSIDE THE

19 RESTAURANT, AND APPARENTLY ONE OF MR. MOCERRO'S LITTLE NERVOUS

20 TICKS IS HE RUBS HIS THUMBS IN HIS HANDS LIKE THIS.

21        THE SOURCE ASKED HIM, YOU KNOW, WHAT WAS WRONG, AND

22 MR. MOCERRO SAID HE GOT WORD FROM UP NORTH THAT THIS GIRL HAS

23 TO BE KILLED.

24 Q.    AND THAT'S PRIOR TO HER DEATH?

25 A.    THAT'S PRIOR TO HER DEATH.

ANDRE G. ASHLEY, O.C.R.

37

1   Q.   DID THERE COME A TIME WHEN THERE WAS A CONSPIRACY TO KILL

2   MR. HERNANDEZ, THE MURDERER OF MS. SMITH?

3   A.   YES.

4   Q.   AT THE TIME THAT THE CONSPIRACY TO KILL MR. HERNANDEZ

5   OCCURRED, WAS MR. TRENTACOSTA IN CHARGE OF THE CREW?

6   A.   YES, HE WAS.

7   Q.   WHY, IF YOU KNOW -- WELL, FIRST, WHAT WAS THE SOURCE OF

8   YOUR INFORMATION ON THE CONSPIRACY TO KILL MR. HERNANDEZ?

9   A.   THAT WOULD BE CONFIDENTIAL SOURCE NUMBER 3.

10  Q.   AND WAS CONFIDENTIAL SOURCE NUMBER 3 IN A POSITION TO

11  DIRECTLY KNOW THIS INFORMATION?

12  A.   YES.

13  Q.   ALL RIGHT.   WHAT WAS THE MOTIVE BEHIND WANTING TO KILL

14  ARIEL HERNANDEZ?

15  A.   WELL, AFTER -- OF COURSE, AFTER THE MURDER, THAT BROUGHT A

16  LOT OF HEAT OR ATTENTION TO MR. MOCERRO; THEREFORE, THEY

17  BASICALLY SAID THAT HE WAS TROUBLE, THEY NEEDED TO GET RID OF

18  HIM.

19  Q.   THEY NEEDED TO GET RID OF WHO?

20  A.   MR. HERNANDEZ.

21  Q.   ALL RIGHT.   AND DID CS-3, CONFIDENTIAL SOURCE NUMBER 3,

22  WITNESS AN EVENT INVOLVING MR. TRENTACOSTA AT A RESTAURANT

23  CALLED BEACHSIDE MARIO'S?

24  A.   YES.

25  Q.   EXPLAIN THAT TO THE COURT, PLEASE.

ANDRE G. ASHLEY, O.C.R.

38

```
 1              MR. LEACH:  THIS IS ON PAGE 12, YOUR HONOR.

 2              THE WITNESS:  YES.  MR. TRENTACOSTA BASICALLY YELLED

 3   AT MOCERRO FOR HAVING INCOMPETENT PEOPLE WORKING FOR HIM,

 4   BASICALLY.

 5   BY MR. LEACH:

 6   Q.   AND WAS THIS IMMEDIATELY AFTER THE MURDER OF MS. SMITH?

 7   A.   YES, IT IS.

 8   Q.   ALL RIGHT.  NOW, AS A RESULT OF THAT, WAS THERE A

 9   CONVERSATION WHERE MOCERRO SAID THAT HERNANDEZ HAS TO DIE, OR

10   HE'S GOT TO GO?

11   A.   YES.

12   Q.   TELL US ABOUT THAT.

13   A.   MR. MOCERRO CALLED, WHO IS NOW SOURCE NUMBER 3, AND A

14   CODEFENDANT, CARLOS GARCIA, TO THE RESTAURANT.  THEY HAD A

15   MEETING IN THE BACK, AT WHICH TIME MR. MOCERRO ASKED THE TWO

16   GUYS TO KILL MR. HERNANDEZ.

17   Q.   OKAY.  ON PAGE 12, THE SECOND FULL PARAGRAPH THERE, IT'S

18   INDICATED THAT THIS IS MARCH 27, 1999; IS THAT CORRECT?

19   A.   CORRECT.

20   Q.   ALL RIGHT.  AND LOOKING BACK ON PAGE 11, THE MURDER OF MS.

21   SMITH OCCURRED A WEEK EARLIER, MARCH 20TH, 1999?

22   A.   CORRECT.

23   Q.   WAS THERE AN EFFORT TO KILL MR. HERNANDEZ?

24   A.   YES, THERE WAS.

25   Q.   TELL US ABOUT THAT.
```

1  A.   MR. GARCIA AND SOURCE NUMBER 3 WENT LOOKING FOR MR.

2  HERNANDEZ, WENT TO THE PLACE WHERE THEY THOUGHT HE WAS LIVING,

3  AND TRIED TO GET HIM TO GO ALONG WITH THEM.

4        MR. HERNANDEZ WOULDN'T GO WITH THEM, AND SHORTLY

5  AFTER THAT WE ACTUALLY CAPTURED THE PHONE CALL FROM MR.

6  HERNANDEZ TO MOCERRO IN REGARDS TO THOSE GUYS LOOKING FOR HIM.

7  Q.   TELL US WHAT THAT CONVERSATION SHOWED IN SUM AND

8  SUBSTANCE.

9  A.   BASICALLY MR. HERNANDEZ CALLED MOCERRO TO ASK HIM WHAT

10  WERE THOSE GUYS LOOKING FOR HIM, WHY WERE THEY LOOKING FOR

11  HIM.

12       HE SAID THEY WERE OUTSIDE HIS GIRLFRIEND'S APARTMENT

13  YELLING FOR HIM.  HE SAID HE KNEW IT WAS -- DIDN'T THINK THEY

14  WOULD BE LOOKING FOR HIM IF THEY WOULDN'T -- IF HE WANTED A

15  COUPLE CHECKS, AND HE BASICALLY TOLD MR. MOCERRO YOU DON'T HAVE

16  TO WORRY ABOUT ME, I'M NOT GOING TO SAY ANYTHING.

17  Q.   OKAY.  NOW, THE CONVERSATION WITH REGARD TO THE EFFORT TO

18  KILL HERNANDEZ OCCURS ON MARCH 27?

19  A.   CORRECT.

20  Q.   IS THE EFFORT TO FIND HIM IMMEDIATELY AFTER THAT

21  CONVERSATION?

22  A.   YES.

23  Q.   HOW LONG WAS IT BEFORE HERNANDEZ WAS PLACED UNDER ARREST

24  BY THE BROWARD COUNTY SHERIFF'S OFFICE?

25  A.   MR. HERNANDEZ WAS ARRESTED THE NEXT DAY.

40

1  Q.   THE 28TH?

2  A.   THE 28TH.

3  Q.   NOW, JUST BRIEFLY, I WANT TO GO BACK TO THE PHOTOGRAPHS.

4  THESE PHOTOGRAPHS SHOWING, YOU'VE TESTIFIED, THE DEFENDANT WITH

5  JOHN GOTTI AND TONY MORELLI, WHAT IS GOING ON IN THESE

6  PHOTOGRAPHS WHEN THEY ARE WALKING ALONG THE STREET THERE IN NEW

7  YORK?

8  A.   WHAT'S BASICALLY HAPPENING IS, I GUESS, TO AVOID AUDIO

9  SURVEILLANCE, THINKING THAT THE RAVEN NIGHT WAS BUGGED, OR THE

10 PHONES WERE BUGGED --

11        MS. DUNN:  I WOULD OBJECT TO WHAT JOHN GOTTI MIGHT

12 HAVE BEEN THINKING, YOUR HONOR.

13        THE COURT:  SUSTAIN THE OBJECTION.

14        THE WITNESS:  WHAT'S BASICALLY HAPPENING IS --.

15 BY MR. LEACH:

16 Q.   WHOA, WHOA, LET ME ASK ANOTHER QUESTION.  ARE YOU FAMILIAR

17 WITH THE TERM WALK-TALK?

18 A.   YES.

19 Q.   WHAT IS A WALK-TALK?

20 A.   WALK-TALK IS BASICALLY WHEN THE GUYS GET TOGETHER, AND

21 THEY WALK DOWN THE STREET, THEY WILL WALK AWAY FROM ANY

22 BUILDINGS, WHATEVER, TO HAVE THEIR CONVERSATIONS TO AVOID ANY

23 AUDIO SURVEILLANCE.

24 Q.   OKAY.  IS THAT YOUR IMPRESSION OF WHAT IS OCCURRING IN

25 THOSE PHOTOGRAPHS?

ANDRE G. ASHLEY, O.C.R.

41

```
 1   A.   YES.

 2             MS. DUNN:  I WOULD OBJECT WHAT HIS IMPRESSIONS ARE.

 3             THE COURT:  OVERRULED.

 4   BY MR. LEACH:

 5   Q.   I'M GOING TO SHOW YOU WHAT'S MARKED AS A-T NUMBER 1.  DO

 6   YOU RECOGNIZE THAT TAPE?

 7   A.   YES, I DO.

 8   Q.   WHAT IS THAT A TAPE OF?

 9   A.   THIS IS A TAPE FROM -- TAKEN FROM THE JAIL.  IT'S

10   BASICALLY THE LOGGERT TAPES FROM THE JAIL.

11   Q.   AND THAT'S L O G G E R T?

12   A.   RIGHT.

13   Q.   LOGGERT TAPES?

14   A.   RIGHT.

15             MS. DUNN:  FROM WHAT JAIL?

16   BY MR. LEACH:

17   Q.   WHAT JAIL IS THIS FROM?

18   A.   I THINK IT'S BROWARD COUNTY.  I THINK IT IS.  I'M NOT A

19   HUNDRED PERCENT ON THAT ONE.

20   Q.   WHO ARE THE PARTICIPANTS IN THIS CONVERSATION?

21   A.   MR. TRENTACOSTA AND PETE ROUSSONICOLAS.

22   Q.   AND WHO IS THAT, ROUSSONICOLAS, WHO IS HE?

23   A.   PETE ROUSSONICOLAS ACTUALLY WAS IN JAIL DURING THE TIME

24   WHEN THIS CALL WAS MADE.

25   Q.   AND OBVIOUSLY HE IS COOPERATING OR NO?
```

42

```
 1  A.    IS HE COOPERATING?

 2  Q.    IS HE COOPERATING AT THE TIME OF THIS TELEPHONE

 3  CONVERSATION?

 4  A.    NO.

 5            MS. DUNN:  WOULD YOU SPELL ME THAT NAME FOR THE

 6  RECORD?

 7            THE WITNESS:  ROUSSONICOLAS?  I THINK IT'S WRITTEN ON

 8  THAT.

 9            MR. LEACH: R U S S O N I C O L A S.

10            MR. SLOMAN:  IT'S R O U.

11            MR. LEACH:  R O U?

12            MR. SLOMAN:  YES.

13            MR. LEACH:  OKAY.  R O U.

14  BY MR. LEACH:

15  Q.    HOW IS IT THEN THAT THIS CONVERSATION IS CAPTURED?

16  A.    THROUGH THE JAIL.  THE JAIL RECORDS CONVERSATIONS BY THE

17  INMATES.

18  Q.    AND DID FBI IN FLORIDA SUBPOENA THIS TAPE?

19  A.    YES.

20  Q.    OKAY.  WHAT DOES THIS TAPE INDICATE?  WHAT'S GOING ON IN

21  THIS TAPE?

22  A.    IT'S BASICALLY MR. ROUSSONICOLAS CALLING LOOKING FOR MR.

23  MOCERRO, BUT HE GETS MR. TRENTACOSTA, AND IT SHOWS MR.

24  TRENTACOSTA -- HIS POSITION, BASICALLY, BECAUSE -- WELL, YOU

25  WILL HEAR IT ON THE TAPE, BUT HIS POSITION IS AS A PERSON TO BE
```

1  RESPECTED.

2  Q.   OKAY.   AND DOES IT ALSO SHOW THE POTENTIAL FOR VIOLENCE?

3  A.   YES, IT DOES.

4           MR. LEACH:  I'D LIKE TO TENDER IN AT-1, AND I'D LIKE

5  TO PLAY IT FOR THE COURT.

6           THE COURT:  ALL RIGHT.

7           MR. LEACH:  IT'S FAIRLY SHORT.  IT WON'T TAKE LONG.

8           (TAPE PLAYED FOR THE COURT)

9  BY MR. LEACH:

10  Q.   IT'S MENTIONED IN THERE A PERSON WHO IDENTIFIED HIMSELF AS

11  TONY PECK.  WHO IS TONY PECK?

12  A.   ANTHONY TRENTACOSTA.

13  Q.   AND IS THAT THE NICKNAME HE USES, TONY PECK?

14  A.   YES.

15  Q.   OKAY.

16           MR. LEACH:  IF I COULD JUST HAVE A MOMENT, YOUR

17  HONOR.

18           THE COURT:  MS. DUNN, YOU MAY INQUIRE.

19           MS. DUNN:  YOUR HONOR, MAY I HAVE A 5-MINUTE BREAK.

20  I REALLY NEED TO GO TO THE RESTROOM.

21           THE COURT:  ALL RIGHT.  LET'S TAKE A 5-MINUTE

22  RECESS.

23           (RECESS)

24           THE COURT:  ALL RIGHT.

25           MR. LEACH:  I THINK 6 AND 7 ARE CLEAR THAT YOUR HONOR

ANDRE G. ASHLEY, O.C.R.

1   WAS LETTING THOSE DOCUMENTS ADMITTED.  1 THROUGH 5 IS THE TAPE

2   AND THE FOUR PHOTOGRAPHS ARE NOT CLEAR, SO I WOULD JUST

3   RETENDER THEM TO JUST BE ABSOLUTELY CERTAIN THAT THOSE ARE IN.

4            THE COURT:  THE FOUR PHOTOGRAPHS ARE 2, 3, 4 AND 5.

5            MR. LEACH:  RIGHT.  AND 1 WAS THE TAPE.

6            THE COURT:  ALL RIGHT.  2, 3, 4 AND 5 HAVE NOT BEEN

7   TENDERED.

8            MR. LEACH:  THEY HAVE BEEN TENDERED, AND I -- IT'S

9   JUST THE RECORD IS NOT CLEAR THAT THEY ARE IN.

10           MS. DUNN:  RIGHT, AND I WOULD OBJECT TO ALL OF THEM

11  ON RELEVANCE.

12           THE COURT:  WELL, LET ME SEE THEM.  AND YOU'RE

13  TENDERING THEM TO SHOW THAT THERE WAS AN ASSOCIATION BETWEEN

14  THIS DEFENDANT AND MR. GOTTI?

15           MR. LEACH:  AND TONY MORELLI, WHO IS ALSO IN THOSE

16  PICTURES, YOUR HONOR.  TONY MORELLI IS ANOTHER SOLDIER.

17           THE COURT:  ALL RIGHT.  THEY'LL BE ADMITTED OVER

18  OBJECTION.

19           MR. LEACH:  AND THEN THE TAPE, YOUR HONOR, WHICH IS

20  1.  IT'S ALSO SITTING RIGHT IN FRONT OF YOU THERE.

21           THE COURT:  ARE YOU TALKING ABOUT THE POTENTIAL FOR

22  VIOLENCE IS THREATENING TO KICK HIM IN THE GROIN FOR CALLING

23  HIM A PRICK?  IS THAT WHAT YOU'RE TALKING ABOUT WAS THE

24  VIOLENCE?

25           MR. LEACH:  I THINK THERE WAS MORE THAN THAT ONE

1   COMMENT.  IT WAS SOMETHING TO THE EFFECT THAT HE WOULD TEAR HIS

2   PRIVATE PARTS OFF, OR SOMETHING TO THAT EFFECT.

3           MS. DUNN:  THAT'S NOT WHAT I HEARD.

4           MR. LEACH:  WELL, YOU CAN LISTEN TO IT AGAIN, BUT

5   THAT'S WHAT -- AND IT ALSO SHOWS HIS RELATIONSHIP TO THE

6   FAMILY, DO YOU KNOW WHO I AM, DO YOU KNOW WHO YOU'RE TALKING

7   TO.

8           THE COURT:  WELL, I WILL ADMIT IT FOR WHATEVER IT

9   PURPORTS TO BE, WHICH IS AN ISOLATED CALL RECEIVED BY SOMEBODY

10  WHO DIDN'T KNOW WHO HE IS CALLING.

11          MR. LEACH:  JUDGE, THERE IS A COUPLE OTHER THINGS, IF

12  I COULD.

13          THE COURT:  WAIT A MINUTE.  LET ME MARK THAT.  YOU'RE

14  OBJECTING TO THAT, TOO?

15          MS. DUNN:  YES, I AM OBJECTING TO IT.

16          THE COURT:  ALL RIGHT.  ADMITTED OVER OBJECTION.  ALL

17  RIGHT.  NOW, THAT'S 1 THROUGH 6 -- 1 THROUGH 5.

18          MR. LEACH:  1 THROUGH 7.  SIX WAS THE INDICTMENT,

19  YOUR HONOR.  SEVEN IS A COMPILATION WHICH YOU ADMITTED FOR A

20  LIMITED PURPOSE, THE MEMO.

21          THE COURT:  OKAY.  SIX IS ADMITTED WITHOUT

22  OBJECTION.

23          MS. DUNN:  YOUR HONOR, I OBJECT TO EVERYTHING, EXCEPT

24  FOR THE INDICTMENT.

25          THE COURT:  WELL, THAT'S 6.

ANDRE G. ASHLEY, O.C.R.

1          MS. DUNN:  OKAY.  I JUST WANTED TO MAKE SURE.

2          THE COURT:  AND 7, I WILL HAVE TO READ IT OVER.  I

3    WILL DEFER A RULING ON GX-7 AT THIS POINT.  MY RECOLLECTION IS,

4    NUMBER 1, THIS DOCUMENT WAS NOT PREPARED BY THIS WITNESS.  IT

5    WAS PREPARED BY A THIRD PERSON.

6          MR. LEACH:  IT'S MR. SLOMAN, AND IT'S AT THE VERY

7    END, HE HAS SIGNED IT, THE ASSISTANT U.S. ATTORNEY HAS SIGNED

8    IT.

9          THE COURT:  AND THIS WITNESS HAS TESTIFIED THAT HE

10   READ THE DOCUMENT OVER TO ASSIST HIM IN HIS PREPARING TO

11   TESTIFY TODAY?

12         MR. LEACH:  RIGHT.

13         THE COURT:  SO I WILL ADMIT IT OVER OBJECTION FOR

14   THAT LIMITED PURPOSES.

15         MR. LEACH:  OKAY.  AND I'D LIKE TO ASK JUST A COUPLE

16   OF MORE QUESTIONS, IF I COULD, RELATING TO THAT.

17   BY MR. LEACH:

18   Q.   THERE ARE A NUMBER OF FACTUAL STATEMENTS IN THAT DOCUMENT

19   THAT WE HAVEN'T REVIEWED, BUT AS TO ALL OF THE FACTUAL

20   STATEMENTS MADE IN THAT DOCUMENT, ARE THEY TRUE AND ACCURATE,

21   BASED ON YOUR KNOWLEDGE OF THE INVESTIGATION?

22   A.   YES.

23   Q.   OKAY.  AT THE BOTTOM OF PAGE 4, THERE IS A REFERENCE TO

24   CHOPPING SOMEONE'S HEAD OFF, LAST FULL PARAGRAPH AT THE BOTTOM

25   OF PAGE 4.  TELL US ABOUT THAT ONE INCIDENT.

1  A.  OKAY.  THIS WAS INVOLVING THE GAS TAX SCAM.  THIS ONE

2  INDIVIDUAL, MR. TRENTACOSTA WANTED HIM TO RELEASE -- I KNOW THE

3  PAPER SAYS IT WAS A TANKER OF FUEL, AND THE INDIVIDUAL TOLD MR.

4  TRENTACOSTA HE COULDN'T DO IT.  THE STATE OF NEW YORK TOLD HIM

5  NOT TO DO IT, AND MR. TRENTACOSTA TOLD THE SUBJECT THAT HE

6  WOULD CHOP HIS HEAD OFF.

7  Q.  OKAY.  AND WAS THAT THE END OF THE ASSOCIATION BETWEEN

8  CONFIDENTIAL SOURCE NUMBER 1 AND MR. TRENTACOSTA?

9  A.  YES, IT WAS.

10  Q.  ALL RIGHT.  NOW, THE LAST THING I WANT TO GO OVER IS

11  DURING THE BREAK, WERE YOU HERE SEATED IN THE WITNESS BOX

12  DURING THE BREAK?

13  A.  YES.

14  Q.  WAS MR. TRENTACOSTA SEATED WHERE HE IS PRESENTLY SEATED?

15  A.  YES.

16  Q.  DID HE MAKE A NUMBER OF STATEMENTS TO YOU DURING THE

17  BREAK?

18  A.  YES, HE DID.

19  Q.  WOULD YOU RELATE TO THE COURT WHAT THOSE STATEMENTS WERE?

20  A.  HE BASICALLY STARED AT ME THE ENTIRE TIME, AND CALLED ME

21  AN ASSHOLE, A LIAR, AND A BUM.

22          THE DEFENDANT:  THAT'S WHAT YOU ARE.

23          MR. LEACH:  LET THE RECORD SO REFLECT MR.

24  TRENTACOSTA'S STATEMENT.

25          THE COURT:  SO NOTED.

ANDRE G. ASHLEY, O.C.R.

48

```
 1                MR. LEACH:  I AM DONE WITH THIS WITNESS, YOUR HONOR.
 2                      CROSS-EXAMINATION
 3   BY MS. DUNN:
 4   Q.   WHERE IS MR. TRENTACOSTA FROM?
 5   A.   WHERE IS HE FROM?
 6   Q.   WHERE IS HE FROM?
 7   A.   NEW YORK.
 8   Q.   WHERE IN NEW YORK?
 9   A.   BROOKLYN.
10   Q.   WHERE IS MR. MOCERRO FROM?
11   A.   NEW YORK.
12   Q.   WHERE IS MR. ROUSSONICOLAS FROM?
13   A.   I'M NOT SURE.
14   Q.   YOU DIDN'T FIND THAT OUT IN YOUR INVESTIGATION?
15   A.   WELL, I'M SURE WE HAVE, BUT I DON'T KNOW.
16   Q.   YOU DON'T KNOW.  WHERE IS MR. JOHN GOTTI, SR., FROM?
17   A.   I DON'T KNOW.
18   Q.   WHERE DOES HE LIVE NOW?
19   A.   HE'S IN PRISON.
20   Q.   WHERE DID HE LIVE BEFORE, DURING THE PICTURES THAT YOU --
21   A.   NEW YORK.
22   Q.   AND IN 1988 WHEN THESE PICTURES WERE TAKEN, WHERE DID MR.
23   TRENTACOSTA LIVE?
24   A.   FROM THE INFORMATION THAT I HAVE IS NEW YORK.
25   Q.   OKAY.  INFORMATION THAT YOU HAVE.  WHO GAVE YOU THESE
```

ANDRE G. ASHLEY, O.C.R.

49

```
 1  PICTURES?

 2  A.    THE U.S. ATTORNEY.

 3  Q.    AND WHO TOLD YOU WHO WAS IN THE PICTURES?

 4  A.    THE AGENT.

 5  Q.    WHAT AGENT?

 6  A.    MR. HOWARD GROVER.

 7  Q.    AND HE POINTED OUT WHO THE PEOPLE WERE?

 8  A.    YES.

 9  Q.    AND HOW DID HE KNOW?

10  A.    WELL, THE VIDEO IS A LOT CLEARER, APPARENTLY.  I HAVE NOT

11  SEEN THE VIDEO.

12  Q.    SO WHEN YOU POINT OUT PEOPLE ON THOSE PICTURES SAYING WHO

13  YOU BELIEVE THEY ARE, THAT'S NOT WHO YOU BELIEVE THEY ARE

14  BECAUSE THEY ARE BAD PICTURES, IT'S WHO MR. GROVER TOLD YOU HE

15  BELIEVES THEY WERE?

16  A.    EXACTLY.

17  Q.    AND YOU HAVEN'T SEEN THE VIDEO?

18  A.    NO.

19  Q.    WHO TOOK THE VIDEO?

20  A.    YOU WANT TO KNOW THE AGENT'S NAME?

21  Q.    DO YOU KNOW?

22  A.    I HAVE NO IDEA.

23  Q.    SO ALL YOU SAW WERE THESE PICTURES WHICH WERE GIVEN TO YOU

24  BY THIS PROSECUTOR?

25  A.    YES.
```

ANDRE G. ASHLEY, O.C.R.

50

1  Q.   AND TOLD TO YOU BY MR. GROVER WHO HE THOUGHT WAS ON THE

2  PHOTOS?

3  A.   THAT'S CORRECT.

4  Q.   AND YOU CAN'T TELL BY LOOKING AT THOSE PHOTOS THAT ANY OF

5  THOSE PEOPLE ARE MR. TRENTACOSTA; ISN'T THAT CORRECT?

6  A.   THERE IS ONE PHOTO THAT, YES, IT DOES LOOK LIKE MR.

7  TRENTACOSTA.

8  Q.   IT LOOKS LIKE MR. TRENTACOSTA?

9  A.   YES.

10 Q.   TELL ME WHAT DISTINGUISHING FEATURE DO YOU SEE ON ANY

11 PHOTO THAT YOU BELIEVE IS MR. TRENTACOSTA?

12 A.   WELL, ACTUALLY, BOTH OF THESE.  OF COURSE, HE'S A LOT

13 YOUNGER THERE, BUT THE HAIR, AND IT LOOKS LIKE HIM.

14 Q.   THIS WOULD BE AT-3, WHICH IS AUGUST 8TH, 1988, AND AT-5?

15 A.   CORRECT.

16 Q.   WHICH IS 3-15-99?

17 A.   89.

18 Q.   89.  ON AT-5, WHICH ONE IS MR. TRENTACOSTA?

19 A.   THE ONE ON THE LEFT.

20 Q.   POINT FOR ME.

21 A.   HERE.

22 Q.   OKAY.  THIS ONE THAT'S GRAINY?

23 A.   YOU ASKED ME IF IT LOOKED LIKE HIM.  YES, IT LOOKS LIKE

24 HIM.

25 Q.   NO. I ASKED YOU WHAT DISTINGUISHING FEATURES.

ANDRE G. ASHLEY, O.C.R.

51

```
 1   A.   IT LOOKS LIKE HIM.  I MEAN, HIS HAIR, HIS BUILD.

 2   Q.   CAN YOU SEE HIS FACE ON THIS PICTURE?

 3   A.   THE SIDE OF IT.

 4   Q.   WHAT ABOUT HIS FACE DO YOU SEE IN THIS PICTURE?

 5   A.   NOT A WHOLE LOT.

 6   Q.   IS THE GUY IN THIS PICTURE WEARING GLASSES?

 7   A.   I HAVE NO IDEA.

 8   Q.   CAN'T TELL FROM THIS PICTURE, CAN YOU?

 9   A.   CANNOT.

10   Q.   OKAY.  AND AT-3, WHAT ABOUT THIS MAN DISTINGUISHES HIM AS

11   MR. TRENTACOSTA?

12   A.   SAME THING, HIS BUILD, HAIR.

13   Q.   SO HE FITS THE GENERAL PHYSICAL DESCRIPTION THAT YOU

14   EXPECT MR. TRENTACOSTA WOULD HAVE HAD IN 1988?

15   A.   THAT'S WHAT I THINK HE LOOKS LIKE.

16   Q.   DID YOU KNOW MR. TRENTACOSTA IN 1988?

17   A.   NO, I DID NOT.

18   Q.   SO YOU DON'T KNOW IF HE HAD DARK HAIR OR GRAY HAIR AT THE

19   TIME?

20   A.   NO IDEA.

21   Q.   OKAY.  LET'S TALK A LITTLE BIT ABOUT THIS CRIME FAMILY,

22   AND THE HIERARCHY OF THE CRIME FAMILY.  WHO IS THE NUMBER 1

23   GUY?

24   A.   JOHN GOTTI.

25   Q.   AND WHO IS UNDER HIM?
```

ANDRE G. ASHLEY, O.C.R.

52

1   A.   CURRENTLY?

2   Q.   YES.

3   A.   I HAVE NO IDEA.

4   Q.   OKAY.  WELL, HOW MANY LEVELS ARE THERE?

5   A.   THERE ARE SEVERAL LEVELS.

6   Q.   WHY DON'T YOU TELL ME ABOUT THEM.

7   A.   THERE IS THE ACTING -- THE LEADER, MR. GOTTI.  THERE IS

8   USUALLY AN UNDERBOSS.

9   Q.   NOT USUALLY, RIGHT NOW.

10  A.   THERE IS AN UNDERBOSS, CAPOS, SOLDIERS AND ASSOCIATES.

11  Q.   OKAY.  SO LEADER, UNDERBOSS, CAPOS, SOLDIERS, AND

12  ASSOCIATES.  AND THE LEADER YOU SAY IS GOTTI --

13  A.   CORRECT.

14  Q.   -- EVEN THOUGH HE IS IN JAIL?  AND THAT WOULD BE SENIOR,

15  NOT JUNIOR?

16  A.   SENIOR.

17  Q.   WHO IS THE UNDERBOSS?  HOW MANY UNDERBOSSES ARE THERE?

18  A.   I DON'T KNOW.

19  Q.   YOU DON'T KNOW.  WELL, WHO ARE SOME OF THE UNDERBOSSES

20  THAT YOU KNOW OF?

21  A.   I DON'T KNOW.

22  Q.   YOU DON'T KNOW ANY UNDERBOSSES?

23  A.   NO.

24  Q.   AND WHO ARE THE CAPOS?

25  A.   WHO ARE THE CAPOS?

1    Q.    UH-HUH, CAPOS.

2    A.    I DON'T KNOW.

3    Q.    YOU DON'T KNOW ANY OF THEM?

4    A.    NO.

5    Q.    WELL, DIDN'T YOU TESTIFY ABOUT PEOPLE WHO YOU SAID YOU

6 THOUGHT WERE CAPOS OR CAPOS?

7    A.    RIGHT. ACCORDING TO THIS DOCUMENT, YES, CORRECT.

8    Q.    OH, ACCORDING TO THIS DOCUMENT. YOU MEAN, YOU DON'T HAVE

9 ANY INDEPENDENT KNOWLEDGE OF THAT?

10    A.    NO.

11    Q.    AND YOU HAVEN'T SPOKEN TO ANY CONFIDENTIAL SOURCE ABOUT

12 THAT?

13    A.    I HAVE NOT SPOKEN TO CONFIDENTIAL SOURCE NUMBER 1, NO.

14    Q.    OKAY. SO ANY OF THAT INFORMATION YOU TESTIFIED TO CAME

15 FROM THIS DOCUMENT?

16    A.    NO. CAME FROM AGENT -- ACTUALLY THAT CAME FROM RENTZEL.

17    Q.    CAME FROM WHO?

18    A.    KEVIN RENTZEL.

19    Q.    AND WHO IS KEVIN RENTZEL?

20    A.    HE IS ALSO A SPECIAL AGENT. HE INTERVIEWED SOURCE

21 NUMBER 1.

22    Q.    AND DID YOU REVIEW A REPORT OF KEVIN RENTZEL?

23    A.    NO, I HAVE NOT.

24    Q.    YOU'VE NEVER LOOKED AT HIS REPORT?

25    A.    NEVER.

ANDRE G. ASHLEY, O.C.R.

54

1   Q.   AND YOU'VE NEVER LOOKED AT HOWARD GROVER'S REPORT?

2   A.   NEVER.

3   Q.   YOU'VE JUST SPOKEN WITH HIM?

4   A.   RIGHT.

5   Q.   HOW FREQUENTLY?

6   A.   EVERYDAY.

7   Q.   FOR HOW LONG?

8   A.   LAST YEAR AND WHATEVER LONG I'VE BEEN ON THE SQUAD.

9   Q.   OKAY.  WHEN DID CONFIDENTIAL SOURCE NUMBER 1 HAVE AN

10  INTERVIEW WITH KEVIN RENTZEL THAT WAS REPORTED TO YOU?

11  A.   I DON'T KNOW THE DATE.  IT WAS RECENTLY, LIKE WITHIN THE

12  LAST TWO OR THREE MONTHS.

13  Q.   OKAY.  SO YOU NEVER TALKED WITH CONFIDENTIAL SOURCE

14  NUMBER 1?

15  A.   NO.

16  Q.   ONLY KEVIN RENTZEL DID.  DO YOU KNOW WHO ELSE?

17  A.   I THINK ONE OF THE ATTORNEYS WENT WITH HIM.

18  Q.   AND THAT WOULD INCLUDE THE ASSISTANT UNITED STATES

19  ATTORNEY UP HERE FROM MIAMI, JEFFERY SLOMAN?

20  A.   I'M NOT SURE IF JEFF WAS THE ONE WHO WENT WITH HIM OR

21  NOT.  I DON'T KNOW.

22  Q.   OKAY.  WAS THAT RECORDED?

23  A.   WAS THE CONVERSATION RECORDED?

24  Q.   UH-HUH.

25  A.   I DON'T KNOW.

ANDRE G. ASHLEY, O.C.R.

55

1  Q.   WELL, IS IT FBI'S USUAL PROCEDURE TO RECORD PHONE

2  CONVERSATIONS?

3  A.   PHONE CONVERSATIONS OR INTERVIEWS?

4  Q.   EXCUSE ME.  I DIDN'T MEAN PHONE CONVERSATIONS.  I MEANT

5  INTERVIEWS.  YOU'RE RIGHT.

6  A.   NO.

7  Q.   NO. IN FACT, YOU BELIEVE IT'S NOT RECORDED?

8  A.   I DON'T KNOW.

9  Q.   YOU'VE NEVER LISTENED TO A RECORDING OF IT?

10  A.   NO.

11  Q.   AND YOU HAVE NEVER SEEN IT WRITTEN DOWN ON PAPER?

12  A.   NO.

13  Q.   HOW LONG AFTER THIS INTERVIEW DID YOU SPEAK WITH MR.

14  RENTZEL ABOUT WHAT WAS SAID?

15  A.   PROBABLY AS SOON AS HE GOT BACK.

16  Q.   AND WHAT DID HE TELL YOU?

17  A.   THAT THE GUY GAVE HIM ALL THE INFORMATION ABOUT THE GAS

18  TAX SCAM.

19  Q.   AND THE GUY WAS INVOLVED IN THE GAS TAX SCAM?

20  A.   YES.

21  Q.   AND THIS GUY, BY THE WAY, IS THE ONE WHO ALLEGEDLY MR.

22  TRENTACOSTA SAID HE WAS GOING TO, WHAT, RIP HIS HEAD OFF?

23  A.   CHOP HIS HEAD OFF.

24  Q.   CHOP HIS HEAD OFF.  NOW, WHAT DID CONFIDENTIAL SOURCE --

25  LET'S TALK ABOUT WHEN THIS HAPPENED.  THIS WAS BACK IN 1993?

56

1  A.    WHAT WAS IN 93?

2  Q.    THE GAS TAX SCAM.

3  A.    NO.  I THINK IT'S 87 AND 88, 88 AND 89.

4  Q.    OKAY.  SO IN 87 OR 88, MR. TRENTACOSTA -- IS THAT WHEN HE

5  ALLEGEDLY THREATENED TO CHOP HIS HEAD OFF?

6  A.    CORRECT.

7  Q.    OKAY.  AND IS CONFIDENTIAL SOURCE NUMBER 1 NOW IN JAIL?

8  A.    I DON'T THINK SO.  I DON'T KNOW.

9  Q.    SO HE WAS PROSECUTED FOR THIS HUNDRED MILLION DOLLAR FRAUD

10 AGAINST THE UNITED STATES GOVERNMENT, AND YOU BELIEVE HE IS OUT

11 OF JAIL ALREADY?

12 A.    MORELLI WAS PROSECUTED IN THAT.

13 Q.    I'M SORRY?

14 A.    ANTHONY MORELLI?

15 Q.    NO. CONFIDENTIAL SOURCE NUMBER 1.

16 A.    DID I SAY HE WAS PROSECUTED?

17 Q.    I THOUGHT YOU DID.  YOU SAID HE WAS A PARTICIPANT.  WAS HE

18 PROSECUTED?

19 A.    I DON'T KNOW IF HE WAS OR NOT.  I DON'T KNOW.

20 Q.    YOU DON'T KNOW IF HE WAS PROSECUTED?

21 A.    NO.  I DON'T KNOW IF HE WAS PROSECUTED IN THIS.  I HAVE NO

22 IDEA.

23 Q.    OKAY.  WHERE WAS THIS GAS TAX, WHATEVER YOU CALL IT, SCAM,

24 PROSECUTED IN?

25 A.    NEW YORK.

ANDRE G. ASHLEY, O.C.R.

57

```
 1   Q.   NEW YORK OR NEWARK?

 2   A.   I THINK IT WAS NEW YORK.

 3   Q.   ON PAGE 4 IT SAYS NEWARK, NEW JERSEY.

 4   A.   OKAY.

 5   Q.   AND YOU DON'T KNOW IF CONFIDENTIAL SOURCE NUMBER 1 WAS

 6   EVER PROSECUTED, ALTHOUGH YOU DO KNOW THAT HE PLAYED A MAJOR

 7   PART IN THE SCAM?

 8   A.   CORRECT.

 9   Q.   HOW LONG HAS HE BEEN COOPERATING WITH THE GOVERNMENT?

10   A.   I DON'T KNOW.

11   Q.   WHERE HAS HE BEEN SINCE 1988?

12   A.   I HAVE NO IDEA.  I DON'T HAVE ANY CONTACT WITH HIM.

13   Q.   WELL, DID HE MOVE OVERSEAS?

14   A.   NOT TO MY KNOWLEDGE.  AGAIN, I DON'T KNOW.

15   Q.   WHERE WAS HE WHEN MR. RENTZEL WENT TO INTERVIEW HIM?

16   A.   I THINK HE MAY HAVE BEEN IN JAIL.

17   Q.   OKAY.  AND WHAT DAY --

18   A.   I THINK SO.

19          MR. LEACH:  YOUR HONOR, I'M GOING TO OBJECT TO THE

20   EFFORTS TO TRY TO IDENTIFY CS NUMBER 1.

21          MS. DUNN:  I'M NOT TRYING TO IDENTIFY CS NUMBER 1,

22   YOUR HONOR.  WHAT I'M TRYING TO DO IS FIND OUT PHYSICALLY IF

23   HE'S LOCATED WITHIN THE UNITED STATES.

24          THE WITNESS:  YES.

25          MR. LEACH:  WHAT GOOD IS THAT EVIDENCE?
```

58

1              MS. DUNN:  WELL, PERHAPS THAT'S MY ARGUMENT.

2              MR. LEACH:  I DON'T SEE HOW THAT ARGUMENT IS

3    RELEVANT.  SO I STILL HAVE MY OBJECTION ON THE TABLE, YOUR

4    HONOR.

5              THE COURT:  THE QUESTION IS WHAT JAIL WAS HE LOCATED

6    IN?

7              MS. DUNN:  NO, WHAT STATE IS HE IN.

8              THE COURT:  I WILL SUSTAIN THE OBJECTION.

9    BY MS. DUNN:

10   Q.   IS HE IN THE UNITED STATES?

11   A.   YES, HE IS.

12   Q.   OKAY.  NO ONE WAS PROSECUTED ON THIS CASE UNTIL 1993,

13   CORRECT?

14             MR. LEACH:  THE TAX CASE?

15             MS. DUNN:  YES.

16             MR. LEACH:  I THOUGHT SO.

17             THE WITNESS:  I DON'T KNOW.  I THINK SO.  I DON'T

18   KNOW.

19   BY MS. DUNN:

20   Q.   WELL, ON PAGE 4 OF THE MEMORANDUM --

21   A.   IT SAYS THEY WERE CONVICTED IN 93.

22   Q.   -- IT SAYS 1993, CORRECT?

23   A.   RIGHT.  CONVICTED, CORRECT.

24   Q.   OKAY.  NOW, THAT MEANS HE WOULD HAVE BEEN AROUND FROM 1988

25   TO 1993, RIGHT?

ANDRE G. ASHLEY, O.C.R.

1   A.   YES.

2   Q.   AND HE'S ALIVE TODAY?

3   A.   WELL, AS OF A COUPLE MONTHS AGO, HE WAS.

4   Q.   DID MR. TRENTACOSTA EVER CHOP HIS HEAD OFF?

5   A.   I GUESS NOT.  THEY TALKED TO HIM.

6   Q.   SO CLEARLY THAT WAS A VERBAL THREAT THAT WAS NEVER

7   FOLLOWED THROUGH ON?

8   A.   CORRECT.

9   Q.   DO YOU HAVE ANY INFORMATION THAT MR. TRENTACOSTA EVER DID

10  ANYTHING PHYSICALLY VIOLENT TOWARDS HIM?

11  A.   NOT TO MY KNOWLEDGE, NO.

12  Q.   NOW, LET'S TALK ABOUT MR. RUGGIANO.  IS THAT THE CORRECT

13  PRONUNCIATION?

14  A.   YES.

15  Q.   HE DIED ON MARCH 19TH?

16  A.   MARCH 19TH, 99.

17  Q.   WHERE WAS HE PHYSICALLY WHEN HE DIED?  DO YOU KNOW WHAT

18  STATE HE WAS IN?

19  A.   I THINK HE WAS IN NEW YORK.  I'M NOT SURE IF HE WAS

20  ACTUALLY IN THE HALFWAY HOUSE AT THE TIME OR IF HE WAS OUT.

21  I'M NOT SURE.

22  Q.   OKAY.  BUT HE WAS -- YOU BELIEVE HE WAS IN NEW YORK?

23  A.   CORRECT.

24  Q.   AND THE STRIPPER, MS. SMITH, SHE WAS KILLED ON MARCH 20TH,

25  THE DAY AFTER MR. RUGGIANO DIED?

ANDRE G. ASHLEY, O.C.R.

```
 1  A.   CORRECT.

 2  Q.   WHAT EVIDENCE DO YOU HAVE THAT MR. TRENTACOSTA HAD ANY

 3  CONTACT WITH MR. MOCERRO BETWEEN MARCH 19TH AND MARCH 20?

 4  A.   I DIDN'T SAY I HAVE ANY EVIDENCE OF THAT.

 5  Q.   I'M ASKING YOU WHAT EVIDENCE YOU HAVE.

 6  A.   NONE.

 7  Q.   NONE.  WHAT EVIDENCE DO YOU HAVE THAT MR. TRENTACOSTA HAD

 8  ANY -- STRIKE THAT.

 9        THE ALLEGED HIT AGAINST MR. HERNANDEZ WHO KILLED THE

10  STRIPPER, RIGHT, THAT WAS MARCH 27?

11  A.   RIGHT.

12  Q.   WHAT EVIDENCE DO YOU HAVE THAT MR. TRENTACOSTA HAD ANY

13  CONTACT WITH MR. MOCERRO BETWEEN MARCH 20TH AND MARCH 27TH?

14  A.   WE HAVE NO EVIDENCE THAT HE HAD CONTACT WITH HIM, BUT AS A

15  PART OF PROTOCOL FOR THE MOB, IN ORDER FOR --

16  Q.   I'M NOT ASKING YOU ABOUT PROTOCOL.  I'M ASKING YOU WHAT

17  CONTACT HE HAD.

18  A.   I'M SURE THERE WAS SOME, BUT I CAN'T -- I DON'T HAVE IT IN

19  FRONT OF ME RIGHT NOW.

20  Q.   WELL, DO YOU HAVE ANY EVIDENCE?

21  A.   NO.

22  Q.   WHEN YOU SAY YOU'RE SURE THERE WAS SOME, THAT'S BECAUSE

23  YOU BELIEVE YOU KNOW HOW THE MOB WORKS FROM TALKING TO THESE

24  CONFIDENTIAL SOURCES WHO HAVE FLIPPED, CORRECT?

25  A.   NO.
```

61

```
 1  Q.   NOT BECAUSE YOU HAVE EVER WORKED IN THE MOB, HAVE YOU?

 2  A.   NEVER.

 3  Q.   OKAY.  SO WHAT EVIDENCE DO YOU HAVE OR THE UNITED STATES

 4  GOVERNMENT, I'D BE HAPPY TO HEAR ANYTHING THE PROSECUTOR HAS

 5  TOLD YOU THAT MR. TRENTACOSTA HAD ANY KIND OF CONTACT WITH MR.

 6  MOCERRO BETWEEN MARCH 20TH AND MARCH 27TH?

 7  A.   WELL, I DON'T HAVE ANYTHING IN FRONT OF ME, BUT I'M SURE

 8  -- THERE MAY BE PHONE CALLS.  I DON'T KNOW.

 9  Q.   WELL, DO YOU HAVE ANY PHONE CALLS?

10  A.   YOU ARE ASKING ME ABOUT EVIDENCE, CORRECT?

11  Q.   I'M ASKING YOU WHAT EVIDENCE YOU HAVE.

12  A.   OKAY.  WE HAVE TONS OF EVIDENCE THAT THEY TALKED ALL THE

13  TIME.

14  Q.   THEY TALKED ALL THE TIME?

15  A.   BUT YOU'RE ASKING ME WHAT EVIDENCE I HAVE SPECIFICALLY

16  BETWEEN THE 20TH AND 27TH?

17  Q.   RIGHT.

18  A.   AGAIN, THERE MAY BE SOME.  THERE MAY NOT.  I DON'T KNOW.

19  Q.   WELL, YOU PREPARED FOR THIS HEARING, DIDN'T YOU?

20  A.   YES.

21  Q.   AND YOU TALKED WITH THE OTHER AGENTS ON THE CASE BEFORE

22  THIS HEARING, DIDN'T YOU?

23  A.   YES.

24  Q.   AND YOU READ THIS 27-PAGE INDICTMENT BEFORE THIS HEARING,

25  DIDN'T YOU?
```

62

1   A.   YES.

2   Q.   AND YOU READ THIS NIFTY LITTLE 12, 13 PAGE DOCUMENT

3   PREPARED BY THE ASSISTANT UNITED STATES ATTORNEY IN THIS CASE

4   CALLED GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

5   BEFORE COMING HERE TO TESTIFY, DIDN'T YOU?

6   A.   CORRECT.

7   Q.   AND YOU WANTED TO MAKE SURE THAT YOU HAD ALL THE

8   INFORMATION THIS COURT WOULD FIND NECESSARY, NOT INNUENDO AND

9   SUGGESTION, BUT EVIDENCE TO HOLD A MAN WITHOUT HIS LIBERTY,

10  DIDN'T YOU?

11  A.   CORRECT.

12  Q.   WHAT EVIDENCE DO YOU HAVE SITTING HERE TODAY THAT THERE

13  WAS ANY CONTACT BETWEEN MR. TRENTACOSTA ON MARCH 20TH AND MR.

14  MOCERRO BETWEEN MARCH 20TH AND MARCH 27TH?

15  A.   NONE.

16  Q.   WHAT EVIDENCE DO YOU HAVE THAT THERE WAS ANY CONTACT

17  BETWEEN MR. TRENTACOSTA AND MR. MOCERRO BETWEEN MARCH 27TH AND

18  MARCH 28TH?

19  A.   NONE.

20  Q.   MARCH 28TH IS THE DAY MR. HERNANDEZ WAS ARRESTED BY

21  BROWARD COUNTY, CORRECT?

22  A.   CORRECT.

23  Q.   NOW, MR. HERNANDEZ WAS ARRESTED BY BROWARD COUNTY FOR

24  MURDERING THIS WOMAN, MS. SMITH, AND I DON'T MEAN TO BE

25  DISRESPECTFUL, BUT SHE WAS A STRIPPER, CORRECT?

ANDRE G. ASHLEY, O.C.R.

```
1   A.   CORRECT.

2   Q.   DO YOU REMEMBER WHAT CLUB SHE WORKED AT?

3   A.   YES.

4   Q.   AND TOOK HER CLOTHES OFF FOR MONEY?

5   A.   YES.

6   Q.   WHICH ONE?

7   A.   THE GOLD CLUB.

8   Q.   THE GOLD CLUB?

9   A.   I'M SORRY.  NO, THE DOLLHOUSE, I'M SORRY.

10  Q.   THAT'S IN SOUTH FLORIDA?

11  A.   CORRECT.

12  Q.   FT. LAUDERDALE?

13  A.   NO, SUNNY ISLES.

14  Q.   SUNNY ISLES.  SHE WORKED AT THE DOLLHOUSE.  NOW, WHEN MR.

15  HERNANDEZ WAS INTERVIEWED, HE SAID -- WELL, LET'S NOT TALK

16  ABOUT WHAT HE SAID YET.

17           LET'S TALK ABOUT HER INJURIES.  SHE HAD -- YOU SAID,

18  SHE WAS STRANGLED AROUND THE THROAT, AND IT LOOKED AS IF THERE

19  WERE MULTIPLE STRANGULATIONS?

20  A.   CORRECT.

21  Q.   IN OTHER WORDS, NOT MULTIPLE PEOPLE STRANGLING HER AT THE

22  SAME TIME, BUT SOMEBODY'S HANDS HAD BEEN WRAPPED AROUND HER

23  THROAT AND MOVED IN THEIR POSITIONING?

24  A.   CORRECT.

25  Q.   OKAY.  YOU SAID THAT THERE WAS A BRUISE TO THE BOTTOM OF
```

ANDRE G. ASHLEY, O.C.R.

64

1   HER CHIN?

2   A.   CORRECT.

3   Q.   THAT THERE WAS SOME KIND OF CUT OR ABRASION ON HER TONGUE?

4   A.   THE TONGUE AND THE LIP.

5   Q.   THE TONGUE AND THE LIP?

6   A.   RIGHT.

7   Q.   AND THAT SHE HAD SEMEN IN HER MOUTH?

8   A.   CORRECT.

9   Q.   WHICH WOULD INDICATE TO SOME PEOPLE, PERHAPS, THAT SHE HAD

10  HAD ORAL SEX WITH SOMEONE?

11  A.   PERHAPS.

12  Q.   OKAY.  YOU ALSO SAID THAT THERE WAS MAJOR BRUISING TO HER

13  ANAL AREA?

14  A.   CORRECT.

15  Q.   AND THAT'S ONE OF THE THINGS A PATHOLOGIST OR A MEDICAL

16  EXAMINER WOULD LOOK AT TO SEE IF SOMEONE HAD HAD ANAL SEX, IS

17  THAT NOT CORRECT?

18  A.   CORRECT.

19  Q.   BECAUSE EVEN IN A CONSENSUAL ANAL SEXUAL ACT, THERE IS

20  BRUISING TO THE ANUS, CORRECT?

21  A.   CORRECT.

22  Q.   OKAY.

23  A.   BUT --

24  Q.   BUT?

25  A.   IN THIS CASE, THE BRUISING LOOKED MORE SEVERE THAN USUAL

ANDRE G. ASHLEY, O.C.R.

65

1  WITH ANAL SEX.  ACCORDING TO THE MEDICAL EXAMINER, IT APPEARED

2  THAT SOMETHING LARGER THAN A PENIS HAD BEEN INSERTED INTO HER

3  RECTAL AREA.

4  Q.   WELL, WAS MR. HERNANDEZ' PENIS MEASURED?

5  A.   I HAVE NO IDEA.

6  Q.   HOW MUCH LARGER?

7  A.   WELL, SHE THINKS IT WAS A BOTTLE, OR SOMETHING LARGER THAN

8  A BOTTLE.

9  Q.   WELL, IT WOULD NOT BE UNUSUAL IN YOUR EXPERIENCE IF PEOPLE

10  WERE HAVING ROUGH OR UNUSUAL SEX TO HAVE THINGS INSERTED IN

11  EITHER AN ANUS OR A VAGINA THAT WAS OTHER THAN A MEMBER OF

12  ANOTHER HUMAN BEINGS BODY, CORRECT?

13  A.   CORRECT.

14          MR. LEACH:  THAT CALLS FOR SPECULATION.  HOW CAN WE

15  SAY WHAT'S USUAL?

16          MS. DUNN:  YOUR HONOR, HE IS THIS INVESTIGATOR, WHO

17  HAS DONE SO MANY INVESTIGATIONS --

18          THE COURT:  WHAT HE SAID WAS THIS IS WHAT THE MEDICAL

19  EXAMINER OR CORONER TOLD HIM, AND IT LOOKED TO HER, I GUESS

20  IT'S A FEMALE?

21          THE WITNESS:  CORRECT.

22          THE COURT:  BASED ON THE NATURE OF THE INJURIES THAT

23  IT WAS PROBABLY A BOTTLE, AND THAT'S ALL HE KNOWS.  NOW, THERE

24  MAY BE PEOPLE WHO ARE ENDOWED AS LARGE AS BOTTLES.

25          ALL HE'S DOING IS TESTIFYING WHAT THE CORONER TOLD

ANDRE G. ASHLEY, O.C.R.

66

1    HIM.

2              MS. DUNN:  I UNDERSTAND.

3              THE COURT:  I AM SUSTAINING THE OBJECTION.

4              MS. DUNN:  WELL, YOUR HONOR, I'M ASKING HIM ABOUT HIS

5    PERSONAL KNOWLEDGE AS A HOMICIDE INVESTIGATOR.

6              THE COURT:  WELL, HE IS NOT TESTIFYING ABOUT HIS

7    PERSONAL KNOWLEDGE AS A HOMICIDE INVESTIGATOR.  HE IS

8    TESTIFYING AS TO WHAT THE MEDICAL EXAMINER OR THE CORONER TOLD

9    HIM ABOUT THE STATE OF MS. SMITH'S BODY.

10             MS. DUNN:  YOUR HONOR, I OBJECT, THEN, BECAUSE THE

11   GOVERNMENT WAS ASKING HIM ABOUT -- HIS SPECULATION ABOUT HOW

12   THE BRUISING OCCURRED ON MS. SMITH'S BODY, AND YOU LEFT THAT

13   IN, NOT JUST ABOUT THE MEDICAL EXAMINER --

14             THE COURT:  WE TALKED ABOUT, AT THAT POINT, HE WAS

15   TESTIFYING ABOUT CHOKING UNTIL SOMEBODY LOST CONSCIOUSNESS, AND

16   THEN CHOKING AGAIN.  WE'RE NOT TALKING ABOUT A SPECIFIC INJURY

17   TO THE ANAL AREA OF MS. SMITH.

18             MS. DUNN:  OKAY.

19   BY MS. DUNN:

20   Q.   WELL, LET ME ASK YOU THIS.  AS AN OFFICER WHO HAS

21   INVESTIGATED HOMICIDES, YOU HAVE SEEN SEXUAL ASSAULTS THAT

22   ACCOMPANY HOMICIDES, CORRECT?

23   A.   YES.

24   Q.   AND YOU HAVE SEEN SEXUAL ASSAULTS WHICH INCLUDED OBJECTS

25   LARGER THAN A HUMAN MEMBER, CORRECT?

ANDRE G. ASHLEY, O.C.R.

1    A.    CORRECT, YES.

2    Q.    OKAY.  SO THAT WOULD NOT BE UNUSUAL IN YOUR EXPERIENCE TO

3    FIND?

4    A.    NO.

5    Q.    AND WHEN MR. HERNANDEZ WAS ARRESTED, WHAT HE SAID, HE

6    ADMITTED THAT HE KILLED MS. SMITH, DIDN'T HE?

7    A.    YES.

8    Q.    AND HE SAID THAT HE KILLED HER BECAUSE THEY WERE IN A

9    HOTEL ROOM, HE HAD PAID HER $500 TO HAVE SEX, THAT THEY WERE

10   HAVING ROUGH SEX, SOMETHING WENT WRONG, AND IT WAS ACCIDENTAL,

11   DIDN'T HE?

12   A.    CORRECT.

13   Q.    NOW, HE HAS BEEN ASKED NUMEROUS TIMES WHETHER HE WAS ASKED

14   TO KILL MS. SMITH BY MR. MOCERRO, HASN'T HE BEEN?

15   A.    I HAVE NO IDEA.

16   Q.    YOU DON'T KNOW THAT HE'S DENIED --

17   A.    WHO'S ASKING THAT?

18   Q.    I'M ASKING YOU IF YOU KNOW.

19   A.    WELL, YOU JUST TOLD ME HE WAS ASKED THAT.  I DON'T KNOW.

20   Q.    WELL, I GET TO DO THAT ON CROSS-EXAMINATION.

21         YOU DON'T KNOW THAT ANYBODY'S EVER ASKED HIM IF HE

22   WAS PUT UP TO IT BY ANYBODY?

23   A.    NO, I DON'T KNOW.

24   Q.    SO YOU DON'T KNOW THAT HE'S DENIED THAT ANYBODY PUT HIM UP

25   TO IT?

ANDRE G. ASHLEY, O.C.R.

68

1   A.   NO.  I NEVER PARTICIPATED IN ANY INTERVIEWS WITH HIM.

2   Q.   OKAY.  AND YOU'VE NEVER REVIEWED THE NEWSPAPER ARTICLES

3   SURROUNDING IT?

4   A.   OH, YEAH, I HAVE SEEN SEVERAL ARTICLES.  I MEAN, HE'S TOLD

5   SEVERAL STORIES.

6   Q.   OKAY.  AND ONE OF THE THINGS HE SAYS IS THAT HE WAS HAVING

7   ROUGH SEX WITH THIS HOOKER, AND IT WENT WRONG?

8   A.   RIGHT.

9   Q.   OKAY.  NOW, LET'S GO BACK TO THE INDICTMENT.  MR.

10  TRENTACOSTA IS NAMED ONLY IN COUNT 1 OF THE INDICTMENT,

11  CORRECT?

12  A.   IF YOU SAY SO.

13  Q.   YOU DON'T KNOW?

14  A.   I DON'T HAVE IT IN FRONT OF ME.  I DON'T KNOW.

15  Q.   YOU DON'T RECALL FROM YOUR REVIEW?

16  A.   NO.  I DIDN'T REVIEW THE INDICTMENT.  I REVIEWED THIS.

17  THIS IS NOT THE INDICTMENT.

18  Q.   DID YOU ASSIST IN THE PREPARATION OF THE INDICTMENT?

19  A.   NO.

20  Q.   WELL, LET'S TALK ABOUT THIS GOVERNMENT'S MEMORANDA.  TO

21  YOUR KNOWLEDGE, WHO PROVIDED THE EVIDENTIARY EXCERPTS TO THE

22  GOVERNMENT THAT ARE CONTAINED IN THIS DOCUMENT?

23  A.   WHICH EXCERPTS, THE CALLS, ALL THE INFORMATION?

24  Q.   THE FACTUAL INFORMATION.

25  A.   THE AGENTS.

ANDRE G. ASHLEY, O.C.R.

```
 1   Q.   I'M SORRY?

 2   A.   THE AGENTS.  WE DID.

 3   Q.   OKAY.  AND DID YOU PROVIDE ANY PARTICULAR INFORMATION?

 4   A.   YES.

 5   Q.   WHAT DID YOU PROVIDE?

 6   A.   INFORMATION WITH REGARDS TO THE HOMICIDE.

 7   Q.   OKAY.  THE HOMICIDE OF --

 8   A.   MS. SMITH.

 9   Q.   -- MS. SMITH.  DID YOU INVESTIGATE THE HOMICIDE OF MS.

10   SMITH?

11   A.   YES.

12   Q.   OKAY.  BUT YOU NEVER SPOKE WITH THE MAN WHO --

13   A.   NO.

14   Q.   -- ADMITTED THAT HE DID THE HOMICIDE?

15   A.   NO.  I WAS NOT ON THE SQUAD WHEN THIS ALL HAPPENED.

16   Q.   OKAY.  BECAUSE THIS IS LIKE A YEAR AND A HALF AGO?

17   A.   RIGHT, YEAH.

18   Q.   LET'S TALK ABOUT ON PAGE 8 OF THIS MEMORANDUM, YOU START

19   DETAILING PHONE CONVERSATIONS THAT WERE AMASSED ON A WIRETAP?

20   A.   CORRECT.

21   Q.   ON MARCH 21, YOU HAVE A PHONE CONVERSATION WHERE MOCERRO

22   IS TALKING WITH DAVID ALLWAYS?

23   A.   ALLWAYS.

24   Q.   OKAY.  MR. TRENTACOSTA IS NOT IN THIS CONVERSATION,

25   CORRECT?
```

ANDRE G. ASHLEY, O.C.R.

1    A.   NO.

2    Q.   HE'S ONLY BEING SPOKEN ABOUT?

3    A.   CORRECT.

4    Q.   DO YOU KNOW WHAT TIME OF DAY ON MARCH 21ST THIS CALL

5    OCCURRED?

6    A.   NOT FROM THIS, NO.

7    Q.   OKAY.  AND WHAT THIS SAYS IS THAT MR. RUGGIANO IS GOING TO

8    BE BURIED IN NEW YORK, CORRECT?

9    A.   CORRECT.

10   Q.   AND MOCERRO IS ASKING -- LET'S SEE.  MOCERRO IS ASKING

11   ALLWAYS IF HE KNOWS HOW FAT ANDY DIED?

12   A.   CORRECT.

13   Q.   OKAY.  AND THE ONLY THING IT SAYS ABOUT MR. TRENTACOSTA IS

14   THAT MR. TRENTACOSTA HAD PREVIOUSLY BEEN IN NEW YORK, THAT HE

15   WAS CURRENTLY IN ATLANTA, ON MARCH 21ST, RIGHT?

16   A.   CORRECT.

17   Q.   AND THAT HE DIDN'T THINK -- MOCERRO DIDN'T THINK THAT

18   TRENTACOSTA WAS GOING TO GO BACK TO NEW YORK?

19   A.   CORRECT.

20   Q.   NOW, I PRESUME THAT SOME AGENT DISTILLED WHAT WAS ON THE

21   TAPE, THAT THIS IS NOT A WORD-FOR-WORD QUOTE, CORRECT?

22   A.   I'M NOT SURE.

23   Q.   WELL --

24   A.   PROBABLY NOT.

25   Q.   MOCERRO CERTAINLY DIDN'T SAY ON THE PHONE MOCERRO CALLED

1    AND SPOKE TO AN INDIVIDUAL NAMED DAVID ALLWAYS?

2    A.    OF COURSE, CORRECT.

3    Q.    OKAY.  SO IT'S OBVIOUSLY -- IF YOU READ THE CONTEXT, IT'S

4    OBVIOUSLY SOME DISTILLATION?

5    A.    RIGHT.

6    Q.    OKAY.  AND I PRESUME THAT THESE ARE NOT THE ACTUAL WORDS

7    THAT WERE USED?

8    A.    I GUESS YOU CAN MAKE THAT PRESUMPTION.

9    Q.    DID YOU HEAR THE TITLE III WIRETAPS?  YOU'VE NEVER

10   LISTENED TO THEM?

11   A.    YES, I HAVE.

12   Q.    OKAY.  WELL, WHICH OF THESE WORDS ARE ON THE TITLE III

13   WIRETAP?

14   A.    IF YOU WANT ME TO GO THROUGH THIS WORD FOR WORD, THERE'S

15   NO WAY I CAN DO THAT.

16   Q.    OKAY.  WELL, I MEAN, IS THERE SOMETHING IN HERE THAT

17   STANDS OUT TO YOU THAT THE WORDS THAT WERE USED, AS OPPOSED TO

18   SOME AGENT'S WORDS?

19   A.    NO.  THE INTERNAL BLEEDING -- I MEAN, THE WORDS ARE HERE.

20   I MEAN, THIS IS WHAT WAS SAID.

21   Q.    OKAY.  WELL, YOU'RE SAYING MR. MOCERRO USED THE TERM

22   INTERNAL BLEEDING, RATHER THAN BLEEDING ON HIS INSIDES, OR

23   SOMETHING LIKE THAT?

24   A.    YES.

25   Q.    OKAY.  SO INTERNAL BLEEDING WERE HIS WORDS?

72

1   A.   CORRECT.

2   Q.   BUT YOU SAY ON APRIL 1ST, THERE IS AN ACTUAL QUOTE MARK.

3   THAT WOULD INDICATE TO MOST READERS THAT THAT IS AN ACTUAL

4   QUOTE TAKEN FROM THE TAPE, WHEREAS THE REST OF IT IS A

5   DISTILLATION, CORRECT?

6   A.   CORRECT.

7   Q.   OKAY.  NOW, ON APRIL 1ST, WHICH IS SUBSEQUENT TO MS. SMITH

8   BEING KILLED, AND ANY HIT THAT MAY OR MAY NOT HAVE BEEN PUT OUT

9   ON MR. HERNANDEZ, AND MR. HERNANDEZ'S ARREST ON MARCH 28TH,

10  CORRECT?

11  A.   CORRECT.

12  Q.   OKAY.  AND DURING THIS PHONE CALL, THIS IS A PHONE CALL

13  BETWEEN MR. TRENTACOSTA, YOU BELIEVE, AND WHEN YOU SAY A FEMALE

14  ASSOCIATE OF TRENTACOSTA, WHAT DOES THAT MEAN?

15  A.   I DON'T SAY A FEMALE ASSOCIATE.  YOU WILL HAVE TO ASK

16  WHOEVER DID IT.

17  Q.   OKAY.  BASED ON YOUR REVIEW OF THIS WIRETAP, DO YOU KNOW

18  WHAT A FEMALE ASSOCIATE OF TRENTACOSTA'S IS, DO YOU KNOW WHO IT

19  IS?

20  A.   COULD BE A FRIEND, COULD BE A MEMBER OF THE CREW.

21  Q.   OKAY.  DO YOU KNOW WHO WAS ON MR. MOCERRO'S PHONE?

22  A.   NO, I DON'T.

23  Q.   OKAY.  DO YOU KNOW WHERE MR. TRENTACOSTA IS PHYSICALLY

24  LOCATED ON APRIL 1ST, 1999?

25  A.   NO.

ANDRE G. ASHLEY, O.C.R.

1  Q.    AND WHAT THIS SAYS IS MR. TRENTACOSTA SAID THAT HE HAD

2  KNOWN ANDY RUGGIANO --

3  A.    RIGHT.

4  Q.    -- FOR OVER 40 YEARS?

5  A.    CORRECT.

6  Q.    AND HE'S GLAD THAT THEY WERE FRIENDS BEFORE FAT ANDY DIED?

7  A.    RIGHT.

8  Q.    OKAY.  AND THAT'S A NORMAL CONVERSATION SOMEBODY WOULD

9  HAVE AFTER A FRIEND OF 40 YEARS HAD DIED, IF THEY HAD HAD A

10 FALLING OUT AND HAD MADE UP, RIGHT?

11 A.    SURE, YEAH.

12 Q.    OKAY.  NOW, THERE IS A SEPTEMBER 15TH, 1998 PHONE CALL,

13 THAT HAS NOTHING TO DO WITH MR. TRENTACOSTA, CORRECT?

14 A.    NO.

15 Q.    MARCH 20TH, 1999, THAT HAS NOTHING TO DO WITH MR.

16 TRENTACOSTA, CORRECT?

17 A.    NO.

18 Q.    MARCH 21ST, 1999, THAT HAS NOTHING TO DO WITH MR.

19 TRENTACOSTA, CORRECT?

20 A.    THAT'S ACTUALLY THE SAME AS THE ONE UP AT THE TOP.  IT'S A

21 REPEAT.

22 Q.    OKAY.  SO THE ONLY COMMUNICATION IN THAT ONE WAS MR.

23 MOCERRO SAYING HIS BELIEF THAT SINCE TRENTACOSTA HAD JUST BEEN

24 IN NEW YORK, HE WASN'T GOING TO GO BACK FOR FAT ANDY'S FUNERAL?

25 A.    RIGHT.

1   Q.   DID YOU ALL SURVEIL FAY ANDY'S FUNERAL?

2   A.   NOT TO MY KNOWLEDGE.  MIAMI DIDN'T.

3   Q.   MIAMI DIDN'T?

4   A.   NO.

5   Q.   OKAY.  NOW, LET'S GO ON TO PAGE 10, MARCH 30TH, 1999.

6   THERE IS A PHONE CALL FROM MR. TRENTACOSTA TO HIS WIFE, DENISE?

7   A.   CORRECT.

8          THE COURT:  WHAT PAGE ARE YOU REFERRING TO?

9          MS. DUNN:  PAGE 10, YOUR HONOR.

10         THE COURT:  OKAY.

11  BY MS. DUNN:

12  Q.   NOW, HAVE YOU GOTTEN MR. MOCERRO'S CELL PHONE BILLS?

13  A.   HAVE I -- DO I HAVE HIS CELL PHONE BILLS?

14  Q.   UH-HUH.

15  A.   NO.

16  Q.   OKAY.  AND THE CONTEXT OF THIS PHONE CALL IS TRENTACOSTA

17  IS ON A CELL PHONE, CORRECT?

18  A.   CORRECT.

19  Q.   OKAY.  DO YOU KNOW WHERE MR. TRENTACOSTA IS PHYSICALLY

20  LOCATED WHILE HE IS MAKING THIS PHONE CALL?

21  A.   NO.

22  Q.   OKAY.  SO HE COULD BE IN ATLANTA?

23  A.   YES.

24  Q.   OKAY.  MARCH 31ST, 1999 -- LET'S GO BACK TO MARCH 30TH.

25  THERE IS NOTHING ON THAT PHONE CALL, EXCEPT FOR MR.

ANDRE G. ASHLEY, O.C.R.

1    TRENTACOSTA'S WIFE, WHO SAYS YOU'RE STILL USING FREDDY'S CELL

2    PHONE?

3    A.    RIGHT.

4    Q.    OKAY.    MARCH 31ST, 1999.    OKAY.    MOCERRO IS NOT ON THIS

5    PHONE CALL?

6    A.    NO, NO.

7    Q.    OKAY.    THIS IS JUST A PHONE CONVERSATION BETWEEN HORIWITZ

8    AND TRENTACOSTA?

9    A.    CORRECT.

10    Q.    AND WHAT THEY ARE TALKING ABOUT IS THAT MOCERRO IS

11    FREAKING OUT, WHATEVER THAT MEANS?

12    A.    RIGHT.

13    Q.    AND THIS IS MARCH 31ST, WHICH IS TWO DAYS AFTER MR.

14    HERNANDEZ'S ARREST, CORRECT?

15    A.    RIGHT.

16    Q.    THREE DAYS AFTER ANY ALLEGED HITS THAT WERE PUT ON MR.

17    HERNANDEZ BY MR. MOCERRO?

18    A.    RIGHT.

19    Q.    AND SOME 11 DAYS -- 11 DAYS AFTER THE DEATH OF MS. SMITH?

20    A.    CORRECT.

21    Q.    THEN YOU HAVE APRIL 1ST, 1999'S PHONE CONVERSATION WHERE

22    HORIWITZ IS ASKING MR. TRENTACOSTA IF HE HAS SEEN MOCERRO,

23    RIGHT?

24    A.    RIGHT.

25    Q.    AND MR. TRENTACOSTA SAYS MOCERRO IS A TOUGH GUY TO FIGURE

76

1   OUT, AND THAT HE REALLY LIKED THIS KID?

2   A.    RIGHT.

3   Q.    AND HE HAS A 1:00 MEETING WITH THE COPS?

4   A.    RIGHT.

5   Q.    WHO HAS A 1:00 MEETING WITH THE COPS?

6   A.    MOCERRO.

7   Q.    OKAY.  SO TRENTACOSTA WAS SAYING MR. MOCERRO IS A TOUGH

8   GUY TO FIGURE OUT, I REALLY LIKE HIM, AND HE IS GOING TO MEET

9   WITH THE COPS AT ONE, RIGHT?

10  A.    YES.

11  Q.    THAT'S EVERYTHING THAT WAS IN THAT CONVERSATION THAT WAS

12  OF SIGNIFICANCE?

13  A.    WELL, THAT'S EVERYTHING THAT'S HERE.

14  Q.    WELL, WHOEVER PUT IT IN THIS BRIEF PRESUMABLY PUT WHAT WAS

15  SIGNIFICANT FOR DETENTION ISSUE IN THIS BRIEF?

16  A.    RIGHT, RIGHT.

17  Q.    AND DO YOU KNOW OF ANYTHING SIGNIFICANT ON THAT TAPE

18  THAT'S NOT RIGHT HERE?

19  A.    NOT THAT I CAN THINK OF RIGHT NOW, NO.

20  Q.    OKAY.  NOW, THEN WE HAVE APRIL 1ST, 1999.  AGAIN, THESE

21  ARE ALL POST ALL OF THIS PEOPLE KILLING CONDUCT, CORRECT?

22  A.    RIGHT.

23  Q.    OKAY.  THERE IS A CONVERSATION BETWEEN MOCERRO AND

24  TRENTACOSTA WHERE TRENTACOSTA ASKED MOCERRO WHETHER THE COPS

25  CAME DOWN?

ANDRE G. ASHLEY, O.C.R.

77

```
 1  A.   CORRECT.

 2  Q.   MOCERRO SAYS THEY CAME DOWN, AND THEY ASKED AND HE

 3  ANSWERED?

 4  A.   CORRECT.

 5  Q.   OKAY.  ANSWERED WHAT, ASKED WHAT?

 6  A.   I DON'T KNOW.  I GUESS THE QUESTIONS.

 7  Q.   BUT THERE'S NO DETAILING OF THE QUESTIONS THAT WERE ASKED?

 8  A.   I WASN'T THERE.

 9  Q.   IN THIS PHONE CALL, DO YOU RECALL MR. MOCERRO DETAILING

10  ANY OF THE QUESTIONS THAT WERE ASKED TO HIM?

11  A.   NO.

12  Q.   SO IF I AM YOUR FRIEND FOR 40 YEARS, AND I KNOW THAT

13  YOU'RE GOING TO MEET WITH POLICE OFFICERS AT 1:00 ON THE 31 --

14  EXCUSE ME, 1:00 ON APRIL 1ST, AND I'M TALKING TO YOU LATER, I

15  MIGHT ASK YOU DID YOU TALK TO THEM, AND YOU MIGHT RESPOND TO

16  ME, YEAH, THEY CAME DOWN, THEY ASKED, THEY ANSWERED, RIGHT?

17  A.   YES, CORRECT.

18  Q.   AND THEN ON APRIL 2ND, THEY ARE TALKING ABOUT FLIGHT

19  ARRANGEMENTS TO THE AIRPORT, CORRECT?

20  A.   CORRECT.

21  Q.   MOCERRO DIDN'T -- WHERE DID MOCERRO FLY ON APRIL 2ND?

22  A.   I THINK TRENTACOSTA WAS FLYING, NOT MOCERRO.

23  Q.   OKAY.  AND WHERE WAS HE GOING?

24  A.   I HAVE NO IDEA.

25  Q.   WHERE WAS HE COMING FROM?
```

78

1  A.    I HAVE NO IDEA.

2  Q.    MOCERRO HAS BEEN ARRESTED, CORRECT?

3  A.    YES.

4  Q.    IN MIAMI?

5  A.    YES.

6  Q.    OKAY.  AND THEN APRIL 2ND 1, WE HAVE GOT THIS PHONE

7  CONVERSATION ABOUT SOME RUSSIAN, RIGHT?  MOCERRO SAID I HELPED

8  A GUY OUT, AND HE DIDN'T DO RIGHT BY ME?

9  A.    RIGHT.

10  Q.    AND TRENTACOSTA SAID I WILL TELL HIM.  I TOLD YOU HE'S NOT

11  GOING TO DO THAT, YOU SHOULD HAVE TOLD ME, I DON'T KNOW HOW HE

12  IS GOING TO PAY YOU, BECAUSE HE DOESN'T EVEN HAVE ANY MONEY.

13  THAT'S WHAT HE SAYS?

14  A.    RIGHT.

15  Q.    OKAY.  HE DOESN'T SAY GO BREAK HIS ARMS?

16  A.    NO.

17  Q.    DOESN'T SAY CUT HIS HEART OUT, CHOP HIS HEAD OFF, KICK HIM

18  IN THE BALLS, NONE OF THAT?

19  A.    NONE OF THAT.

20  Q.    AND HE SAID -- MOCERRO SAID I WILL FIND A WAY HE CAN PAY

21  ME?

22  A.    RIGHT.

23  Q.    COULD BE COMING TO WORK AT HIS RESTAURANT.  HE OWNS A

24  RESTAURANT, RIGHT?

25  A.    YES.

ANDRE G. ASHLEY, O.C.R.

1  Q.   OKAY.  APRIL 30TH, NOW, WHO IS MOCERRO TALKING TO?

2  A.   YOU WANT ME TO REFER TO THIS, OR FROM MY OWN KNOWLEDGE?

3  Q.   WELL, THIS DOESN'T TELL US, SO YOUR OWN KNOWLEDGE WOULD BE

4  GOOD?

5  A.   VICTOR DIBIASI.

6  Q.   AND WHO IS HE?

7  A.   VICTOR DIBIASI IS A -- HE OWNS A BODY SHOP IN SOUTH

8  FLORIDA.  HE IS ALSO A SHYLOCK VICTIM.

9  Q.   A WHAT VICTIM?

10  A.   SHYLOCK VICTIM.

11  Q.   SHYLOCK VICTIM?

12  A.   RIGHT.

13  Q.   OKAY.  HE SAYS?

14  A.   YES.

15  Q.   OKAY.  BACK TO WHAT EVIDENCE DO YOU HAVE.  MR. RUGGIANO

16  WAS ASKED IF MR. MOCERRO COULD WORK WITH MR. TRENTACOSTA, YOU

17  TESTIFIED TO?

18  A.   RIGHT.

19  Q.   OKAY.  AND HE SAID NO?

20  A.   RIGHT.

21  Q.   OKAY.  SO AS OF THE TIME OF MR. RUGGIANO'S DEATH, THERE'S

22  NO QUESTION THAT MR. MOCERRO WAS WORKING FOR MR. RUGGIANO?

23  A.   ACTUALLY, WE HAVE EVIDENCE THAT HE WAS ALSO PROVIDING

24  MONIES TO MR. TRENTACOSTA.

25  Q.   OKAY.  WELL, DO YOU HAVE ANY EVIDENCE THAT MR. TRENTACOSTA

80

```
 1   WAS DIRECTING HIM TO DO ANYTHING?

 2   A.   NO.

 3   Q.   OKAY.  SO IT'S POSSIBLE THAT EVEN IF HE WAS GIVING MR.

 4   TRENTACOSTA MONEY, IT WAS FOR SOMETHING OTHER THAN A BOSS/

 5   UNDERLING RELATIONSHIP, CORRECT?

 6   A.   POSSIBLE.

 7   Q.   OKAY.  AND HOW MUCH MONEY?

 8   A.   WELL, THEY WERE IN DIFFERENT FORMS.  HE PAID FOR THE CELL

 9   PHONES, HE PAID FOR CAR RENTALS.

10   Q.   CAR RENTALS, LIKE WHEN MR. TRENTACOSTA CAME TO MIAMI?

11   A.   THAT, AND WHATEVER CARS HE HAD UP HERE.

12   Q.   HE PAID FOR CARS HERE?

13   A.   RIGHT.

14   Q.   WHICH CARS?

15   A.   WHATEVER VEHICLES HE HAS.

16   Q.   WHAT VEHICLES?

17   A.   I DON'T KNOW WHAT KIND OF CARS HE HAS.  I DON'T HAVE THAT

18   INFORMATION IN FRONT OF ME.

19   Q.   OKAY.  WELL, CELL PHONES?

20   A.   RIGHT.

21   Q.   40 BUCKS A MONTH.  RENTAL OF A CAR?

22   A.   OR A LEASE.

23   Q.   LEASE OF A CAR?

24   A.   CORRECT.

25   Q.   OKAY.  BUT YOU DON'T KNOW WHAT CARS?
```

1   A.   NO.

2   Q.   WHAT ELSE?

3   A.   THAT'S IT.   THAT'S ALL I CAN TELL YOU RIGHT NOW.   THAT'S

4   ALL I KNOW.

5   Q.   THAT'S ALL YOU KNOW?

6   A.   THAT'S ALL I HAVE, YEAH.   THAT'S ALL I CAN THINK OF RIGHT

7   NOW.

8   Q.   SO HE DIDN'T JUST GIVE HIM CASH?

9   A.   I CAN'T SAY THAT.

10  Q.   WELL, DO YOU KNOW THAT HE DID?

11  A.   NO.

12  Q.   OKAY.   WHAT EVIDENCE DO YOU HAVE OF ANY CONTROL BY MR.

13  TRENTACOSTA OVER MR. MOCERRO OR HIS ACTIONS FROM THE TIME

14  RUGGIANO GOT OUT OF PRISON UP UNTIL RUGGIANO'S DEATH?

15  A.   NONE.

16  Q.   WHAT EVIDENCE DO YOU HAVE OF ANY CONTROL MR. TRENTACOSTA

17  HAD OVER MR. MOCERRO FROM THE DATE OF MR. RUGGIANO'S DEATH UP

18  UNTIL APRIL 1ST OF 1999?

19  A.   WE HAVE MR. MOCERRO SAYING THAT MR. TRENTACOSTA WAS HIS

20  CAPO.

21  Q.   TO WHOM?

22  A.   THE SOURCE.

23  Q.   WHICH SOURCE?

24  A.   I THINK THAT'S TWO.

25  Q.   SO YOU HAVE CONFIDENTIAL SOURCE NUMBER 2, WHO MAY BE A

ANDRE G. ASHLEY, O.C.R.

1    CONVICTED FELON, BUT YOU DON'T KNOW, WHO SAYS MOCERRO TOLD HIM

2    THAT TRENTACOSTA WAS HIS CAPO?

3    A.    WAIT A MINUTE.    I'M SORRY.    THAT IS NUMBER 3.

4    Q.    NUMBER 3.    NOW, CONFIDENTIAL SOURCE NUMBER 3 -- LET ME

5    MAKE SURE I HAVE THIS RIGHT -- HE IS THE ONE, WHO ALONG WITH

6    CARLOS GARCIA, WAS SUPPOSED TO KILL MR. HERNANDEZ?

7    A.    CORRECT.

8    Q.    HE IS THE GUY WHO AGREED TO KILL MR. HERNANDEZ?

9    A.    CORRECT.

10   Q.    HE IS THE GUY WHO WENT LOOKING FOR MR. HERNANDEZ?

11   A.    CORRECT.

12   Q.    OKAY.    AND I PRESUME HE TOLD YOU ALL OF THIS AFTER HE WAS

13   ARRESTED?

14   A.    CORRECT.

15   Q.    AND IS HE UNDER INDICTMENT IN THIS CASE?

16   A.    I THINK HE PLED ALREADY.

17   Q.    WHAT DID HE PLEAD TO?

18   A.    THERE WERE DRUG CHARGES.

19   Q.    NOT ATTEMPTED MURDER?

20   A.    I DON'T THINK SO.

21   Q.    DID HE HAVE FELONY CONVICTIONS PRIOR TO THAT?

22   A.    YES, I THINK HE DID.

23   Q.    AND DID HE ALSO WORK IN MR. MOCERRO'S RESTAURANT?

24   A.    FROM TIME TO TIME.    I DON'T THINK HE WAS A STABLE

25   EMPLOYEE.

83

1   Q.   LET'S TALK ABOUT SUNNY ISLES, FLORIDA.   I AM FROM SOUTH

2   FLORIDA, SO I KNOW THAT AREA.   PLEASE DON'T TAKE THIS IN ANY

3   WAY DEROGATORILY.   THAT'S AN AREA THAT HAS A LOT OF OLD PEOPLE

4   IN IT, DOESN'T IT?

5   A.   OH, YEAH.

6   Q.   A LOT OF OLD PEOPLE, RIGHT?

7   A.   YES.

8   Q.   AND A LOT OF OLD PEOPLE FROM NEW YORK AND NEW JERSEY?

9   A.   CORRECT.

10   Q.   AND A LOT OF PEOPLE WHO HAVE ITALIAN LAST NAMES?

11   A.   POSSIBLY.

12   Q.   LOTS OF PEOPLE FROM LONG ISLAND, TOO?

13   A.   I DON'T KNOW.

14   Q.   YOU LIVE DOWN THERE, RIGHT?

15   A.   I DON'T KNOW WHERE THEY ARE FROM, THOUGH.   I DON'T

16   INTERVIEW EVERYBODY I SEE ON THE STREETS.

17   Q.   OKAY.   BUT YOU HAVE HEARD TALK?

18   A.   YES.

19   Q.   OKAY.   AND IT CERTAINLY IS WELL KNOWN IN SOUTH FLORIDA

20   THAT SUNNY ISLES, IN PARTICULAR, IS A HAVEN FOR PEOPLE WHO COME

21   FROM THE NORTHEAST WHO HAVE ITALIAN OR JEWISH SURNAMES,

22   CORRECT?

23   A.   YES.

24   Q.   OKAY.   SO IF -- STRIKE THAT.   I THINK THAT WOULD BE A

25   LITTLE ARGUMENTATIVE.

ANDRE G. ASHLEY, O.C.R.

```
 1              LET'S TALK ABOUT THE RESTAURANT THAT THESE PICTURES

 2   ARE TAKEN IN FRONT OF IN 1988.  IT'S A CLUB, YOU SAID?

 3   A.    RAVEN NIGHT, SOCIAL CLUB.

 4   Q.    OKAY.  DOES THAT STILL EXIST?

 5   A.    I DON'T KNOW.

 6   Q.    OKAY.  WHAT WAS THE RAVEN NIGHT SOCIAL CLUB?

 7   A.    A HANGOUT FOR THE MOBSTERS.

 8   Q.    ONLY THE MOBSTERS?

 9   A.    I'M SURE OTHER PEOPLE FREQUENTED IT, AS WELL.

10   Q.    IT WAS A PUBLIC CLUB, WAS IT NOT?

11   A.    I CAN'T TELL YOU THAT A HUNDRED PERCENT.  I DON'T KNOW.

12   Q.    OKAY.  WELL, HAVE YOU ASKED IF ANYBODY ELSE WALKED AROUND

13   THE CLUB?

14   A.    NO.

15   Q.    OKAY.  THESE PICTURES MARKED AUGUST, MARCH, JUNE ARE ALL

16   TAKEN DURING THE EARLY SPRING AND SUMMER MONTHS, CORRECT?

17   A.    CORRECT.

18   Q.    AND I PRESUME THAT IF SOMEONE WERE TO LOOK AT THE

19   VIDEOTAPE, THEY'D SEE LOTS OF OTHER PEOPLE OUTSIDE?

20   A.    I HAVEN'T SEEN THE VIDEO.

21   Q.    BUT YOU DIDN'T ASK THAT?

22   A.    NO.

23   Q.    NOW, YOU TALKED ABOUT THE MOTIVE FOR MS. SMITH'S MURDER,

24   AND YOU SAID THAT SOME WITNESSES WHO WERE IN THE STORE

25   IDENTIFIED MS. SMITH AS BEING THERE WITH MR. HERNANDEZ?
```

85

1    A.    CORRECT.

2    Q.    WHETHER OR NOT MS. SMITH WAS INVOLVED IN AN ONGOING

3    RELATIONSHIP WITH MR. HERNANDEZ, CERTAINLY DOES NOT PRECLUDE,

4    IN YOUR MIND, THAT OF AN EXPERIENCED HOMICIDE INVESTIGATOR,

5    THAT HIS STORY COULD BE TRUE, THAT HE WAS HAVING ROUGH SEX WITH

6    HER AND IT WENT WRONG, CORRECT?

7    A.    YOU'RE ASKING ME IF THAT -- COULD THAT STORY BE TRUE?

8    Q.    RIGHT.

9    A.    NOT FROM THE EVIDENCE, NO.

10   Q.    NOT FROM THE EVIDENCE OF -- WHAT EVIDENCE?

11   A.    THE EVIDENCE OF THE WAY HE SAID SHE WAS KILLED.

12   Q.    AND HOW DID HE SAY SHE WAS KILLED?

13   A.    HE SAID HE HAD HIS ARM ON HER NECK, AND HE HEARD SOMETHING

14   POP.

15   Q.    OKAY.

16   A.    WELL, THE BRUISES ARE LIKE THIS.

17   Q.    OKAY.  WELL, YOU SAID HE MADE SEVERAL STATEMENTS?

18   A.    YOU JUST ASKED ME THAT, YEAH, THAT'S RIGHT, CORRECT.

19   Q.    AND HE ACTUALLY SAID HE STRANGLED HER IN THE REPORTS THAT

20   I HAVE FROM THE FT. LAUDERDALE SUN?

21   A.    I DON'T RECALL THAT.

22   Q.    YOU ARE NOT FAMILIAR WITH HIM SAYING THAT?

23   A.    NO.

24   Q.    OKAY.  AND WHO DID YOU TALK TO TO GET THAT FROM?

25   A.    GET WHAT FROM?

ANDRE G. ASHLEY, O.C.R.

86

1   Q.   WELL, YOU DIDN'T TALK TO MR. HERNANDEZ?

2   A.   GET WHAT FROM?

3   Q.   THE INFORMATION THAT YOU JUST RELAYED?

4   A.   MEDICAL EXAMINER.

5   Q.   SHE SAID THAT HERNANDEZ SAID HE STRANGLED -- HE PUT HIS

6   ARM AROUND HER NECK?

7   A.   OH, NO, NO, NO. THAT CAME FROM THE HOMICIDE DETECTIVE.

8   Q.   OKAY.  ONE OF MANY, I PRESUME?

9   A.   OR THE LEAD DETECTIVE.

10  Q.   AND WHAT'S HIS NAME?

11  A.   FRANK GALLARAZA.

12  Q.   SO THIS SPOTTING OF MS. SMITH AND MR. HERNANDEZ OCCURRED

13  PRIOR TO HER DEATH SOME DAYS, CORRECT?

14  A.   YES.

15  Q.   SO THAT OCCURRED DURING THE TIME THAT MR. RUGGIANO WAS

16  STILL ALIVE?

17  A.   I'M NOT --

18  Q.   HE DIED MARCH 19TH, SHE DIES MARCH 20TH, AND IT HAPPENED

19  PRIOR TO HER DEATH?

20  A.   CORRECT.

21  Q.   HE WAS STILL ALIVE?

22  A.   CORRECT.

23  Q.   WHO DID MOCERRO GET WORD FROM THAT MS. SMITH SHOULD BE

24  KILLED?

25  A.   NO IDEA.

ANDRE G. ASHLEY, O.C.R.

1  Q.   OKAY.  SOMEBODY SUGGESTS UP NORTH?

2  A.   RIGHT.

3  Q.   WHERE UP NORTH?

4  A.   IT'S JUST UP NORTH.  THAT'S IT.  NO SPECIFICS.

5  Q.   SO CONFIDENTIAL SOURCE 4 DID NOT KNOW WHO MOCERRO HAD

6  TALKED TO ABOUT IT?

7  A.   CORRECT.

8  Q.   BUT WE KNOW THAT THAT HAPPENED PRIOR TO HER DEATH?

9  A.   CORRECT.

10 Q.   OKAY.  AND WHEN DID MOCERRO GET THIS WORD?

11 A.   WE DON'T KNOW.

12 Q.   CONFIDENTIAL SOURCE 4 DIDN'T TELL YOU THAT?

13 A.   NO.

14 Q.   DID YOU ASK?

15 A.   YES.

16 Q.   HE DIDN'T KNOW?

17 A.   WELL, MOCERRO DIDN'T TELL HIM.

18 Q.   OKAY.  SO HE DIDN'T KNOW?

19 A.   RIGHT, HE DIDN'T KNOW.

20 Q.   OKAY.  NOW, THIS PETRUS GUY, PETE --

21 A.   PETE ROUSSONICOLAS.

22 Q.   ROUSSONICOLAS?

23 A.   OKAY, YES.

24 Q.   HE, YOU BELIEVE, WAS TAPED OUT OF THE BROWARD COUNTY JAIL?

25 A.   I'M NOT SURE IF HE IS IN BROWARD COUNTY OR IF HE WAS IN

1    THE FEDERAL LOCKUP AT THE TIME, BUT HE WAS IN JAIL.

2    Q.    OKAY.  HE IS IN JAIL, HE MAKES A PHONE CALL?

3    A.    CORRECT.

4    Q.    HE'S CALLING MOCERRO WHERE?

5    A.    I'M NOT SURE WHAT --

6    Q.    YOU DON'T KNOW IF IT'S HIS HOME, RESTAURANT?

7    A.    RIGHT, COULD BE EITHER ONE.

8    Q.    NOW, WHAT IS PETE TO THIS GAMBINO CRIME FAMILY?

9    A.    A FRIEND OF FREDDY'S.

10   Q.    WHAT KIND OF FRIEND?

11   A.    I DON'T KNOW.  HE WAS JUST A FRIEND, AN ASSOCIATE.

12   Q.    WHAT KIND OF ASSOCIATE?

13   A.    IF YOU'RE ASKING ME IF HE WORKED FOR HIM; IS THAT WHAT

14   YOU'RE ASKING ME?

15   Q.    I'M TRYING TO FIND OUT WHAT THEIR RELATIONSHIP IS.

16   A.    HE'S A FRIEND OF FREDDY'S.

17   Q.    OKAY.  SO THEY GO OUT PARTYING TOGETHER, THEY GO TO DINNER

18   TOGETHER?

19   A.    THEY HAVE GONE TO DINNER TOGETHER.

20   Q.    OKAY.  DID HE WORK FOR FREDDY?

21   A.    NOT TO MY KNOWLEDGE.

22   Q.    WAS HE PART OF WHAT YOU CALL THE SOUTH FLORIDA CREW?

23   A.    NO.

24   Q.    OKAY.  HOW CLOSE WAS PETE TO MR. MOCERRO?

25   A.    WHAT DO YOU --

ANDRE G. ASHLEY, O.C.R.

1  Q.    HOW MANY TIMES DID THEY MEET WITH EACH OTHER?  WHAT WAS

2  THEIR RELATIONSHIP LIKE?

3  A.    WELL, PETE WAS IN JAIL FOR MOST OF THE TIME.  WHEN HE GOT

4  OUT OF JAIL, I THINK THAT THEY DID MEET ON A COUPLE OF

5  OCCASIONS.

6  Q.    OKAY.

7  A.    PETE IS CURRENTLY IN JAIL NOW.

8  Q.    OKAY.  SO HE'S BEEN IN JAIL, HE GOT OUT FOR A LITTLE

9  WHILE, AND NOW HE'S BACK IN JAIL?

10 A.    RIGHT.

11 Q.    OKAY.  AND PETE CALLS UP MR. MOCERRO, WHO IS SUPPOSED TO

12 BE HIS FRIEND?

13 A.    RIGHT.

14 Q.    AND HE TALKS WITH MR. TRENTACOSTA ON THE PHONE INSTEAD,

15 YOU SAY?

16 A.    CORRECT.

17 Q.    AND MR. TRENTACOSTA -- WELL, PETE CALLS MR. TRENTACOSTA A

18 PRICK?

19 A.    RIGHT.

20 Q.    RIGHT.  NOW, LET'S TALK ABOUT CRIME FAMILY POLITICS.  YOU

21 SAY MR. TRENTACOSTA IS A SOLDIER?

22 A.    RIGHT.

23 Q.    PEOPLE DON'T CALL SOLDIERS IN THE CRIME FAMILY PRICKS, DO

24 THEY?

25 A.    NO.

ANDRE G. ASHLEY, O.C.R.

1  Q.   OKAY.  DO YOU LIKE BEING CALLED A PRICK?

2  A.   DOESN'T BOTHER ME.  I'VE BEEN CALLED WORSE.

3  Q.   REALLY.  IT DOESN'T BOTHER YOU.

4  A.   YEAH, HE JUST CALLED ME SOMETHING ELSE, TOO, SO IT GOES

5  WITH THE TERRITORY.

6  Q.   I DON'T LIKE BEING CALLED NAMES.

7          NOW, IF RUGGIANO REFUSED TO RELEASE MOCERRO TO MR.

8  TRENTACOSTA, WHY DIDN'T MR. TRENTACOSTA GO UP THE CHAIN OF

9  AUTHORITY TO GET MOCERRO TO WORK FOR HIM?

10 A.   THAT'S WHAT HE DID.  HE WENT TO HIS BOSS AND ASKED HIS

11 BOSS TO ASK RUGGIANO TO RELEASE MOCERRO TO HIM.

12 Q.   RIGHT.  AND IF I DON'T LIKE WHAT YOU SAY, I GO TO YOUR

13 SUPERVISOR, AND IF I DON'T LIKE WHAT HE SAYS, I GO TO HIS

14 SUPERVISOR?

15 A.   WELL, I GUESS HE COULD HAVE DONE THAT, BUT --

16 Q.   WELL, YOU DON'T HAVE ANY EVIDENCE HE DID?

17 A.   NO, WE DON'T.

18 Q.   AND YOU DON'T HAVE ANY EVIDENCE THAT HE WAS EVER RELEASED,

19 TO WORK FOR HIM?

20 A.   NO.

21 Q.   ALTHOUGH YOU SAY YOU HAVE PICTURES OF MR. TRENTACOSTA

22 WALKING AROUND HAVING A GRAND OLD TIME WITH JOHN GOTTI, SR.,

23 THE ULTIMATE BOSS, CORRECT?

24 A.   CORRECT.

25 Q.   NOW, SAMMY THE BULL, SOMEWHERE IN THIS LITTLE MEMO IT

ANDRE G. ASHLEY, O.C.R.

1   TALKS ABOUT MR. TRENTACOSTA TELLING CONFIDENTIAL SOURCE NUMBER

2   2 IN 1991 THAT SAMMY THE BULL COULD GIVE HIM UP FOR SOMETHING?

3   A.    WHAT PAGE IS THAT, PLEASE?

4   Q.    NINE.

5   A.    OKAY.

6   Q.    OKAY.   SAMMY THE BULL HAS BEEN COOPERATING WITH THE

7   GOVERNMENT FOR QUITE SOME TIME, HASN'T HE?

8   A.    CORRECT.

9   Q.    HAS THERE EVER BEEN AN INDICTMENT FOR A MURDER BASED ON

10  SAMMY THE BULL'S TESTIMONY AGAINST MR. TRENTACOSTA?

11  A.    NOT TO MY KNOWLEDGE.

12  Q.    ARE YOU AWARE OF ANY FBI REPORTS BASED ON DEBRIEFINGS OF

13  SAMMY THE BULL, WHERE HE SAYS MR. TRENTACOSTA DID ANYTHING?

14  A.    I'M NOT AWARE OF ANY REPORTS FROM DEBRIEFINGS OF SAMMY THE

15  BULL.

16  Q.    OKAY.   I PRESUME FBI HAS SOME KIND OF DATA BANK WHERE YOU

17  CAN PUT PEOPLE'S NAMES IN?

18  A.    CORRECT.

19  Q.    AND IT PULLS UP OTHER TIMES THAT PERSON HAS BEEN

20  REFERENCED IN DEBRIEFINGS?

21  A.    YES.

22  Q.    I'M SURE YOU HAVE DONE THAT OR SOMEBODY ON THE

23  GOVERNMENT'S BEHALF HAS DONE THAT IN THIS CASE?

24  A.    PROBABLY.

25  Q.    ARE YOU AWARE OF ANY INFORMATION IN THE FBI DATA BANK

1  WHERE SAMMY THE BULL HAS SAID ANYTHING, OR MENTIONED THE NAME

2  OF ANTHONY TRENTACOSTA?

3  A.    I'M NOT AWARE.

4  Q.    AND CERTAINLY, IF YOU WERE INVESTIGATING THIS CASE, AND

5  CONFIDENTIAL SOURCE 2 SAID THAT TO YOU, THE FIRST THING YOU

6  WOULD DO IS GO CHECK OUT WHAT SAMMY THE BULL HAS SAID, CORRECT?

7  A.    CORRECT, YES.

8  Q.    SO THE PHONES WERE TAPPED FOR THREE MONTHS FROM -- WHY

9  MARCH 19TH OF 99?

10 A.    IT'S JUST WHEN IT STARTED.

11 Q.    DID IT HAVE ANYTHING TO DO WITH RUGGIANO'S DEATH, OR WAS

12 THAT JUST COINCIDENTAL?

13 A.    NO, IT WAS COINCIDENCE.

14 Q.    AND THAT WAS RUNNING FOR ABOUT THREE MONTHS?

15 A.    RIGHT.

16 Q.    AND NO INDICTMENTS WERE RETURNED IN THIS CASE AFTER THAT

17 AGAINST MR. MOCERRO OR MR. TRENTACOSTA?

18 A.    RIGHT AFTER THE PHONES?

19 Q.    WELL, AT ANY TIME BETWEEN THEN AND THIS INDICTMENT THAT'S

20 BEEN RETURNED ON DECEMBER 19TH?

21 A.    NO, THAT'S IT.

22 Q.    OKAY.  SO IT WAS THE FOUR CONFIDENTIAL SOURCES WHO GAVE

23 YOU INFORMATION THAT THIS INDICTMENT IS BASED ON?

24 A.    INFORMATION FROM THE SOURCES, PLUS THE WIRETAPS.

25 Q.    WELL, WE HAVE GONE THROUGH THE WIRETAPS.  IS THERE

1  ANYTHING THAT'S NOT IN THIS MEMORANDUM THAT STANDS OUT IN YOUR

2  MIND AS BEING EVIDENCE OF MR. TRENTACOSTA'S INVOLVEMENT IN THIS

3  CASE?

4  A.    NOTHING MORE THAN WHAT I HAVE -- WHAT'S IN THERE ALREADY.

5  Q.    OKAY.  SO WE HAVE BEEN THROUGH THE WIRETAPS.  THEY DON'T

6  SAY NOTHING.  IT'S THE FOUR CONFIDENTIAL SOURCES?

7           MR. LEACH:  I OBJECT TO (INAUDIBLE).

8           MS. DUNN:  WE HAVE BEEN THROUGH THEM ONE BY ONE.

9           THE WITNESS:  WELL, WE HAVE BEEN THROUGH THE ONES ON

10  THE PAPER, YES.

11  BY MS. DUNN:

12  Q.    AND I ASKED YOU IF THERE WERE ANY MORE.

13  A.    WELL, LIKE I SAY, THE THREE MONTHS, NO, I CAN'T REMEMBER

14  EVERYTHING THAT WAS IN IT.

15  Q.    WELL, YOU WOULD REMEMBER ANYTHING THAT WAS EXTREMELY

16  RELEVANT.

17  A.    I DON'T REMEMBER ANYTHING.

18  Q.    OKAY.  OTHER THAN THE WIRETAPS THAT WE'VE TALKED ABOUT AD

19  NAUSEAM, IS THERE ANYTHING ELSE BESIDES THESE FOUR CONFIDENTIAL

20  SOURCES?

21  A.    RECORDINGS THAT ARE ALSO MENTIONED IN HERE.

22  Q.    OKAY.  WHAT RECORDINGS?

23  A.    THAT THE SOURCES MADE.

24  Q.    OKAY.  LET ME MAKE SURE THAT I DON'T LEAVE THOSE OUT.

25  A.    I DON'T THINK THEY ARE CITED IN HERE.

ANDRE G. ASHLEY, O.C.R.

1  Q.  OKAY.  WHAT RECORDINGS DID THE SOURCES MAKE?

2  A.  YOU'RE ASKING ME ABOUT EVIDENCE IN THIS CASE.

3  Q.  I'M ASKING YOU ABOUT EVIDENCE IN THIS CASE.

4  A.  OKAY.  WELL, IN THIS CASE, THE SOURCES ALSO MADE

5  RECORDINGS.  NUMBER 2 MADE RECORDINGS.  NUMBER 3 DID NOT, AND

6  NUMBER 4 MADE RECORDINGS.

7  Q.  OKAY.  WELL, LET'S GO THROUGH THE CONFIDENTIAL SOURCES.

8  CONFIDENTIAL SOURCE 1 DIDN'T MAKE ANY RECORDINGS, THAT YOU'RE

9  AWARE OF?

10 A.  NOT THAT I AM AWARE OF.

11 Q.  OKAY.  AND CONFIDENTIAL SOURCE NUMBER 1 IS GIVING

12 INFORMATION ABOUT THIS CASE CURRENTLY, BUT HIS INFORMATION IS

13 ABOUT 11, 12, 13 YEARS AGO?

14 A.  CORRECT.

15 Q.  BY THE WAY, THAT CASE THAT HE'S TALKING ABOUT 11, 12, 13

16 YEARS AGO, THAT CASE HAS BEEN INDICTED, CORRECT?

17 A.  YES.

18 Q.  PROSECUTED?

19 A.  YES.

20 Q.  CONVICTIONS WERE OBTAINED?

21 A.  YES.

22 Q.  MR. TRENTACOSTA WAS NEVER NAMED IN THAT CASE, CORRECT?

23 A.  NOT TO MY KNOWLEDGE.

24 Q.  WELL, THAT'S SOMETHING YOU'D KNOW?

25 A.  NOT REALLY.

1  Q.   WELL, WHEN YOU REVIEWED THIS LITTLE FOOTNOTE HERE,

2  FOOTNOTE 1, THE FOLLOWING IS A BRIEF SUMMARY OF TRENTACOSTA'S

3  CRIMINAL HISTORY?

4  A.   OKAY.

5  Q.   DID IT MENTION IN THERE THAT HE HAD BEEN INDICTED?

6  A.   NO.

7  Q.   CONFIDENTIAL SOURCE NUMBER 2, HE IS THE GUY WHO SAYS THAT

8  MOCERRO WAS A SOLDIER, OR WAS AN ASSOCIATE?

9  A.   ASSOCIATE.

10  Q.   OKAY.  AND HE IS THE ONE WHO TELLS YOU THAT RUGGIANO WAS

11  THE SOLDIER?

12  A.   RIGHT.

13  Q.   WHAT WERE THE DATES OF ACQUAINTANCE BETWEEN CONFIDENTIAL

14  SOURCE NUMBER 2 AND MR. MOCERRO?

15  A.   THE DATES OF ACQUAINTANCE?

16  Q.   YES.  HOW LONG DID THEY KNOW EACH OTHER?

17  A.   I'M NOT SURE ON THAT.

18  Q.   OKAY.  WELL, WHAT'S THE TIME PERIOD OF THESE NUMEROUS

19  RECORDINGS?

20  A.   THE RECORDINGS DATE BACK TO ANOTHER CASE, AS WELL, SO I'M

21  NOT SURE OF THE TIME PERIOD OF ALL THE RECORDINGS.

22  Q.   OKAY.  ARE THERE ANY OF THESE NUMEROUS RECORDINGS THAT

23  TALK ABOUT MR. TRENTACOSTA?

24  A.   YES.

25  Q.   OKAY.  AND WHAT DO THEY SAY?

96

1  A.   I HAVEN'T REVIEWED ALL THE RECORDINGS.

2  Q.   WELL, WHAT DO YOU REMEMBER THAT THEY SAY?

3  A.   I HAVEN'T REVIEWED ANY OF THESE GUYS' RECORDINGS.

4  Q.   YOU'VE NEVER HEARD THEM, IS THAT WHAT YOU'RE SAYING?

5  A.   NO, NO.

6  Q.   AND YOU HAVEN'T SEEN ANYTHING WRITTEN UP ABOUT THEM?

7  A.   NO.

8  Q.   AND IS THERE SOME AGENT WHO IS LIKE THE HANDLER FOR

9  CONFIDENTIAL SOURCE NUMBER 2?

10  A.   YES.

11  Q.   HAVE YOU TALKED WITH HIM ABOUT WHAT HE MIGHT HAVE SAID

12  ABOUT MR. TRENTACOSTA?

13  A.   THAT'S MR. GROVER.

14  Q.   OKAY.  AND WHAT DID MR. GROVER SAY HE SAID ABOUT MR.

15  TRENTACOSTA?

16  A.   AGAIN, THAT'S AFTER FAT ANDY DIED, MR. TRENTACOSTA BECAME

17  FREDDY'S SOLDIER.

18  Q.   OKAY.  SO JUST AFTER HE DIED, HE BECAME HIS SOLDIER?

19  A.   RIGHT.

20  Q.   NOT ABOUT SPECIFICALLY WHEN?

21  A.   OH, YEAH.

22  Q.   WHEN?

23  A.   DO YOU WANT THE STORY?

24  Q.   SURE.

25  A.   OKAY.  BASICALLY, WHAT HAPPENED AFTER MR. RUGGIANO REFUSED

1  TO RELEASE FREDDY TO MR. TRENTACOSTA, FREDDY AND MR.

2  TRENTACOSTA STILL HAD A RELATIONSHIP GOING THERE.  AND AFTER --

3  WHEN MR. RUGGIANO DIED, YOU KNOW, HE WENT AGAIN AND ASKED TO

4  HAVE FREDDY TRANSFERRED OVER TO HIM.

5  Q.  OKAY.  WHEN DID HE DO THAT?

6  A.  RIGHT AFTER HE DIED, THAT 19TH OR WHATEVER.

7  Q.  OKAY.  THAT'S WHAT THE CONFIDENTIAL SOURCE SAYS?

8  A.  THAT'S THE INFORMATION WE HAVE, IS THAT RUGGIANO --

9  Q.  OKAY.  AND WHO DID THE CONFIDENTIAL SOURCE SAY THAT MR.

10  TRENTACOSTA WENT TO?

11  A.  WHAT DO YOU MEAN WHO HE WENT TO?  TO ASK PERMISSION TO GET

12  FREDDY?

13  Q.  YES.

14  A.  WELL, HE WENT TO MR. CHORAZO.

15  Q.  IS THAT WHAT THE CONFIDENTIAL SOURCE SAYS?

16  A.  RIGHT.

17  Q.  OKAY.  AND HE SAYS HE WENT THAT DAY?

18  A.  NO, NO, NO, NO, NO.

19  Q.  OKAY.  WHAT DAY DID HE GO?

20  A.  NO.  WHEN HE WENT THE FIRST TIME TO ASK MR. CHORAZO TO

21  HAVE ANDY, JR., TALK TO HIS FATHER, THAT'S WHEN MR. RUGGIANO

22  REFUSED.

23  Q.  OKAY.

24  A.  I'M NOT SAYING HE WENT BACK TO HIM A SECOND TIME.  I'M NOT

25  SAYING THAT.

1  Q.    OKAY.

2  A.    AFTER FAT ANDY DIED, FREDDY WENT UNDER TONY PEP.

3  Q.    RIGHT.  BUT -- I AM -- I AM MISSING THE LINK IN TIME.

4  A.    OKAY.

5  Q.    OKAY?  WHAT I DON'T UNDERSTAND FROM YOUR TESTIMONY IS WHAT

6  THE CONFIDENTIAL SOURCE SAID ABOUT THE EXACT COMMUNICATIONS OR

7  RELATIONSHIP.

8  A.    OH, I DON'T KNOW.

9  Q.    FROM THE 19TH UNTIL WHENEVER MR. TRENTACOSTA ALLEGEDLY

10 TOOK OVER THE SOUTH FLORIDA CREW.

11 A.    I DON'T KNOW.

12 Q.    OKAY.  I MEAN, AND THIS WAS A FAIRLY CRITICAL TIME PERIOD,

13 YOU WOULD AGREE WITH ME?

14 A.    YES.

15 Q.    WE HAVE GOT A MURDER, AN ALLEGED HIT, RIGHT?

16 A.    RIGHT.

17 Q.    OKAY.  SO THIS IS A FAIRLY CRITICAL TIME PERIOD?

18 A.    RIGHT.

19 Q.    SO I PRESUME THAT THE FBI, IN DOING ITS JOB, AS IT ALWAYS

20 DOES, WOULD BE ASKING VERY CRITICAL AND SCATHING QUESTIONS AND

21 PARTICULAR QUESTIONS.

22        WHAT INFORMATION HAS THIS CONFIDENTIAL SOURCE GIVEN

23 YOU, BECAUSE THIS TIME PERIOD, AS I UNDERSTAND IT NOW, RESTS ON

24 THE SHOULDERS OF CONFIDENTIAL SOURCE NUMBER 2?

25 A.    RIGHT.

ANDRE G. ASHLEY, O.C.R.

1  Q.   WHAT INFORMATION, SPECIFICALLY, HAS CONFIDENTIAL SOURCE

2  NUMBER 2, GIVEN YOU ABOUT THIS 10-DAY TIME PERIOD, AND MR.

3  TRENTACOSTA'S TAKING OVER RUGGIANO'S BUSINESS, OTHER THAN THE

4  FACT THAT HE DID?

5  A.   NOTHING THAT I AM AWARE OF.

6  Q.   OKAY.  AND WHEN DID CONFIDENTIAL SOURCE NUMBER 2 TELL YOU

7  THAT HE TOOK OVER?

8  A.   I'M NOT SURE ON THE DATE FOR THAT.

9  Q.   DO YOU KNOW WHEN HE WAS INTERVIEWED?

10 A.   NO.

11 Q.   WAS IT IN MARCH OF 99?

12 A.   I DON'T KNOW.

13 Q.   WAS IT MORE RECENTLY?

14 A.   WAIT A MINUTE.  WHAT'S YOUR QUESTION?

15 Q.   WHEN WAS CONFIDENTIAL SOURCE 2 INTERVIEWED BY THE FBI?

16 A.   I DON'T KNOW.

17 Q.   OKAY.  WAS IT BACK IN MARCH OF 99 OR APRIL OF 99?

18 A.   I HAVE NO IDEA.

19 Q.   OR WAS IT MUCH MORE RECENTLY IN PREPARATION FOR THIS CASE?

20 A.   I HAVE NO IDEA.

21 Q.   WHEN DID MOCERRO TELL CONFIDENTIAL SOURCE NUMBER 2 THAT

22 MR. TRENTACOSTA HAD TAKEN OVER?

23 A.   I THINK HE TOLD THAT TO NUMBER 3, IF I AM NOT MISTAKEN.

24 Q.   OKAY, I'M SORRY.  I THOUGHT YOU JUST SAID HE SAID IT TO

25 NUMBER 2.

1   A.   NO, NUMBER 3.

2   Q.   OKAY.  WHEN DID THAT HAPPEN?  WHEN DID MOCERRO TELL NUMBER

3   3 THIS?

4   A.   I'M NOT SURE.

5   Q.   WHEN WAS NUMBER 3 INTERVIEWED BY THE FBI?

6   A.   SEVERAL MONTHS AGO.

7   Q.   SO NOT BACK IN 1999, BUT ONLY RECENTLY?

8   A.   RIGHT.

9   Q.   AND WAS HE ASKED SPECIFIC QUESTIONS ABOUT WHEN MR.

10  TRENTACOSTA'S INVOLVEMENT BEGAN AFTER MR. RUGGIANO'S DEATH?

11  A.   I'M NOT SURE.

12  Q.   BUT YOU DON'T HAVE ANY INFORMATION TO GIVE TO US?

13  A.   NO.

14  Q.   NOW, CONFIDENTIAL SOURCE NUMBER 2, IS HE IN THE

15  INDICTMENT?

16  A.   IN THIS INDICTMENT?

17  Q.   YEAH.

18  A.   NO.

19  Q.   OKAY.  WAS HE ALREADY CHARGED IN THIS CASE?

20  A.   I DON'T THINK -- NO, HE IS NOT CHARGED IN THIS CASE.

21  Q.   WAS HE WORKING FOR MR. MOCERRO AT THE RESTAURANT?

22  A.   NOT TO MY KNOWLEDGE.

23  Q.   OKAY.  WHAT WAS HIS RELATIONSHIP?  IS THIS THE ONE YOU

24  SAID THEY WERE FRIENDS?

25  A.   RIGHT.

ANDRE G. ASHLEY, O.C.R.

1  Q.   HE'S THE ONE THAT WAS IN JAIL, AND THEN GOT OUT FOR A

2  LITTLE BIT, AND THEN WENT BACK TO JAIL?

3  A.   NO, THAT'S PETE ROUSSONICOLAS.

4  Q.   OKAY.  WHAT'S THE RELATIONSHIP BETWEEN CS-2 AND MR.

5  MOCERRO?

6  A.   LONG-TIME FRIENDS.

7  Q.   OKAY.  HOW LONG TIME?

8  A.   DON'T KNOW. DON'T KNOW SPECIFIC DATES.

9  Q.   10 PLUS, 30 PLUS?

10 A.   I WOULD ONLY BE GUESSING.

11 Q.   AND WHAT CS-2 SAYS IS THAT HE GIVES YOU THE HISTORY ABOUT

12 TRENTACOSTA WANTING MOCERRO TO WORK FOR HIM, BUT RUGGIANO

13 REFUSING TO RELEASE HIM?

14 A.   RIGHT.

15 Q.   OKAY.  AND THIS STATEMENT THAT YOU ATTRIBUTE ABOUT MR.

16 TRENTACOSTA FLEEING THE COUNTRY AND GOING TO SPAIN --

17 A.   RIGHT.

18 Q.   -- THAT'S A STATEMENT THAT'S ALLEGEDLY MADE BACK IN 1991;

19 CORRECT?

20 A.   POSSIBLY, YES.

21 Q.   CERTAINLY NOT A CURRENT STATEMENT?

22 A.   NO.

23 Q.   WHEN DID YOU FIND OUT THAT THAT STATEMENT WAS ALLEGEDLY

24 MADE?

25 A.   PROBABLY A COUPLE WEEKS AGO.

1   Q.   OKAY.  SO THIS IS A STATEMENT THAT THE FBI'S ONLY TOLD

2   ABOUT NOW, AND --

3   A.   NO, NO.  YOU ASKED ME WHEN DID I FIND OUT.

4   Q.   YOU FOUND OUT.  OKAY.  WHEN DID THE FBI FIND OUT?

5   A.   I'M NOT SURE ON THAT.  I DON'T KNOW.

6   Q.   OKAY.

7   A.   I DON'T KNOW WHEN NUMBER 2 STARTED COOPERATING.

8   Q.   OKAY.  WELL, YOU'RE AWARE, ARE YOU NOT, THAT MR.

9   TRENTACOSTA AND MR. MOCERRO HAVE BEEN FRIENDS FOR OVER 40

10  YEARS?

11  A.   RIGHT.

12  Q.   SINCE MARCH, APRIL 1ST, 1999, WHAT EVIDENCE DO YOU HAVE

13  THAT MR. MOCERRO HAS PAID ANY MONIES TO OR FOR THE USE OF MR.

14  TRENTACOSTA?

15  A.   WE HAVE INFORMATION ABOUT HIM PAYING, AGAIN, THE LEASE

16  VEHICLES AND THE CELL PHONES.

17  Q.   OKAY.  SO THAT'S SINCE APRIL OF 99?

18  A.   YES.

19  Q.   OKAY.  WHAT ABOUT FROM 88 TO APRIL 99, WHAT EVIDENCE DO

20  YOU HAVE?

21  A.   NONE.

22  Q.   OKAY.  SO YOU DON'T HAVE ANY EVIDENCE OF MONEY EXCHANGING

23  HANDS PRIOR TO THAT?

24  A.   OH, I'M SORRY.  AGAIN, THE VEHICLES, PAYING FOR THE

25  VEHICLES, AND THE CELL PHONES WERE GOING ON WHILE RUGGIANO WAS

```
 1  STILL ALIVE.

 2  Q.   OKAY.  SO THAT'S BEEN -- THAT, YOU'RE SAYING, IS OVER A

 3  COURSE OF YEARS?

 4  A.   RIGHT.  THEY'VE HAD A RELATIONSHIP FOR A WHILE.

 5  Q.   WELL, THEY'VE BEEN FRIENDS FOR 40 YEARS; WE KNOW THAT?

 6  A.   CORRECT.

 7  Q.   SO THEY'VE HAD A RELATIONSHIP FOR A REAL LONG TIME?

 8  A.   RIGHT, YES.

 9  Q.   WHEN DID YOU MEET WITH THE MEDICAL EXAMINER ABOUT MS.

10  SMITH'S BODY?

11  A.   I'M NOT SURE ON THAT DATE.

12  Q.   WAS IT IMMEDIATELY AFTER HER DEATH?

13  A.   IT WAS THIS YEAR.

14  Q.   IT WAS THIS YEAR?

15  A.   YES.

16  Q.   SO IT WAS QUITE SOME TIME AFTER?

17  A.   RIGHT.

18  Q.   THIS ALTERCATION BETWEEN MR. MOCERRO AND MR. TRENTACOSTA

19  IN 1982, THAT WOULD BE, WHAT, OVER 20 YEARS AGO, ABOUT 20 YEARS

20  AGO?

21  A.   YES.

22  Q.   WHAT EVIDENCE DO YOU HAVE OF MR. TRENTACOSTA DOING

23  ANYTHING VIOLENT?

24  A.   WELL, AFTER THE DEATH OF MS. SMITH, CS-3 WITNESSED AN

25  ARGUMENT IN THE RESTAURANT WHERE MR. TRENTACOSTA -- I'M SORRY,
```

1  NO.  I'M SORRY.  THAT'S SOMETHING ELSE.

2  Q.  THAT'S SOMEBODY ELSE?

3  A.  YEAH, THAT'S SOMEBODY ELSE.

4  Q.  OKAY.  SO OTHER THAN THE ALTERCATION BETWEEN MOCERRO AND

5  TRENTACOSTA IN 1982 --

6  A.  WELL, WE HAVE INFORMATION THAT THERE WAS AN ARGUMENT, BUT

7  IT DEALT WITH ANOTHER PERSON, JOHN POCARRO, IN WHICH MR.

8  TRENTACOSTA PUT A KNIFE TO THE THROAT OF MR. MOCERRO, AND TOLD

9  HIM IF HE HAD ANYTHING TO DO WITH POCARRO'S DISAPPEARANCE, HE'D

10  PAY FOR IT.

11  Q.  WHAT DID -- WHEN DID YOU GET THIS INFORMATION?

12  A.  WE HAVE HAD THAT FOR A WHILE.

13  Q.  AND WHEN DID THIS ALLEGEDLY OCCUR?

14  A.  AFTER MR. POCARRO DISAPPEARED.

15  Q.  OKAY.  AND WAS IT A CONFIDENTIAL SOURCE THAT GAVE YOU THIS

16  INFORMATION?

17  A.  YES.

18  Q.  WAS IT ONE OF THE FOUR WHO HAVE BEEN NAMED?

19  A.  YES.

20  Q.  WHICH ONE?

21  A.  I THINK THAT WAS -- I THINK IT WAS 3.  I DON'T THINK

22  THAT'S IN HERE.

23  Q.  YOU DON'T REMEMBER THE TIME FRAME THAT THIS ALLEGEDLY

24  OCCURRED IN?

25  A.  I CAN'T RECALL WHEN MR. POCARRO DISAPPEARED.

ANDRE G. ASHLEY, O.C.R.

```
 1    Q.    IN THE 80'S?

 2    A.    NO, IT'S IN THE 90'S.

 3    Q.    IN THE EARLY 90'S?

 4    A.    I'M NOT SURE.

 5    Q.    AND BASICALLY WHAT THE CONFIDENTIAL SOURCE SAID IS THAT

 6    MR. TRENTACOSTA WAS UPSET BECAUSE SOMEBODY HAD DISAPPEARED, AND

 7    HE SAID IF YOU HAD ANYTHING TO DO WITH THIS, YOU'RE IN A LOT OF

 8    TROUBLE?

 9    A.    RIGHT.

10    Q.    BUT HE DIDN'T HURT HIM?

11    A.    NO.

12    Q.    DIDN'T STAB HIM?

13    A.    NO.

14    Q.    DIDN'T PUNCH HIM?

15    A.    NO.

16    Q.    NOW, DURING THESE CONVERSATIONS, ASSUMING THAT MR.

17    TRENTACOSTA IS EVEN HERE IN 1988, AND YOU'RE RIGHT ABOUT THESE

18    IDENTIFICATIONS, BASED ON WHAT ANOTHER OFFICER TOLD YOU HE SAW,

19    WHAT WAS BEING DISCUSSED?

20    A.    NO IDEA.

21    Q.    SO IT'S POSSIBLE THEY COULD HAVE BEEN DISCUSSING THE

22    SCHOOLS THEIR KIDS WENT TO?

23    A.    BASEBALL, ANYTHING.

24    Q.    JUST OUTSIDE ENJOYING A NICE AUGUST EVENING IN NEW YORK

25    CITY?
```

ANDRE G. ASHLEY, O.C.R.

1   A.    COULD BE ANYTHING.

2   Q.    NOW, YOU'RE FAMILIAR WITH JULIUS TSANO?

3   A.    YES.

4   Q.    AND MR. TSANO IS ACTUALLY NAMED IN THIS INDICTMENT; IS HE

5   NOT?

6   A.    CORRECT.

7   Q.    HE IS NAMED IN COUNT 1, ALONG WITH MR. TRENTACOSTA?

8   A.    IF YOU SAY SO.

9   Q.    HE IS ALSO ALLEGED TO HAVE VIOLATED THE LAW UNDER COUNTS

10  2 THROUGH 16, AND COUNT 21?

11  A.    IF YOU SAY SO.

12  Q.    YOU'RE FAMILIAR WITH THE FACT, ARE YOU NOT, THAT MR. TSANO

13  WAS GRANTED A $100,000 BOND IN SOUTH FLORIDA, PROPERTY BOND?

14  A.    I AM NOW.

15          MS. DUNN:  IF I COULD HAVE A MOMENT TO CONFER, YOUR

16  HONOR.

17          THE COURT:  ALL RIGHT.

18  BY MS. DUNN:

19  Q.    WAS IT YOUR TESTIMONY THAT MR. GOTTI HAS NEVER WALKED

20  AROUND THE BLOCK WITH PEOPLE WHO ARE FRIENDS OF HIS, AS OPPOSED

21  TO WHAT YOU CONSIDER MOB ASSOCIATES; CORRECT?

22  A.    I HAVE NO IDEA WHO MR. GOTTI HANGS OUT WITH.

23  Q.    OKAY.  SO YOU DON'T KNOW BY LOOKING AT THESE PICTURES

24  ANYTHING OTHER THAN MR. GOTTI -- AND ASSUMING THIS IS MR.

25  TRENTACOSTA, WHICH I THINK IS A BIG LEAP, BASED ON THESE

1    PICTURES -- THE ONLY THING YOU KNOW IS THAT IN SOME WAY THEY

2    HAVE AN ACQUAINTANCE WITH EACH OTHER?

3    A.    CORRECT.

4    Q.    AND MR. GOTTI, I PRESUME LIKE THE REST OF US HUMAN BEINGS,

5    HAS TO OPERATE IN THIS WORLD ON A DAY-TO-DAY BUSINESS,

6    DAY-TO-DAY BASIS?

7    A.    YES.

8            MS. DUNN:  OKAY.

9            MR. LEACH:  RETENDER THE PRETRIAL SERVICES REPORT,

10   YOUR HONOR.

11           THE COURT:  LET ME TAKE AN OPPORTUNITY TO REVIEW

12   THAT.  GO AHEAD.

13   BY MS. DUNN:

14   Q.    HAS THE FBI DONE ANY SURVEILLANCE ON DENISE, THE

15   DEFENDANT'S WIFE?

16   A.    NO, NOT TO MY KNOWLEDGE.

17   Q.    OKAY.  SO YOU DON'T KNOW HOW MANY HOURS SHE WORKS PER DAY?

18   A.    NEVER SAID ANYTHING ABOUT HER WORKING.

19   Q.    I'M ASKING YOU A QUESTION.

20   A.    NO IDEA.

21   Q.    NO NEED TO SPEAK OFFENSIVE.  DO YOU KNOW HOW MANY HOURS

22   SHE WORKS EACH DAY?

23   A.    NO.

24   Q.    DO YOU KNOW WHERE SHE GOES WHEN SHE GETS UP AND GETS

25   DRESSED IN THE MORNING?

1  A.    NO.

2  Q.    DO YOU KNOW HOW MANY BUSINESSES SHE OPERATES?

3  A.    NO.

4  Q.    DO YOU KNOW HOW MANY FRANCHISES SHE HAS SOLD?

5  A.    NO.

6  Q.    DO YOU KNOW HOW MANY PHONE CALLS SHE MAKES CONSULTING WITH

7  PEOPLE?

8  A.    NO.

9  Q.    DO YOU KNOW WHETHER SHE'S HOOKED UP ONLINE ON THE INTERNET

10 TO CONSULT WITH PEOPLE?

11 A.    NO.

12 Q.    YOU DON'T KNOW ANY OF THAT STUFF?

13 A.    NO.

14 Q.    DOES ANYBODY AT THE FBI KNOW THAT?

15 A.    NOT TO MY KNOWLEDGE.

16 Q.    DO YOU KNOW IF SHE'S EVER FLOWN TO JACKSONVILLE?

17 A.    NO.

18 Q.    SO YOUR TESTIMONY THAT SHE'S NOT IN JACKSONVILLE DURING

19 THE WHOLE TIME SHE'S GETTING PAID $500.00 DOLLARS A WEEK, THAT

20 WAS FALSE, BECAUSE YOU DON'T KNOW?

21 A.    I DIDN'T SAY SHE WAS IN JACKSONVILLE EVERY TIME -- THE

22 WHOLE TIME SHE WAS GETTING PAID THAT.

23 Q.    YOU SAID SHE'S NOT IN JACKSONVILLE, IS WHAT YOU SAID.

24 A.    SHE DOESN'T LIVE IN JACKSONVILLE.

25 Q.    RIGHT.  SHE DOESN'T LIVE IN JACKSONVILLE?

1  A.    CORRECT.

2  Q.    WELL, THERE ARE PEOPLE WHO CONSULT ON OTHER BUSINESSES WHO

3  DON'T LIVE IN THE CITY WHERE THE BUSINESS IS THAT THEY CONSULT

4  ON?

5  A.    TRUE.

6  Q.    YOU KNOW THAT?

7  A.    CORRECT.

8  Q.    CONFIDENTIAL SOURCE NUMBER 1, WAS HE IN THE MAFIA?

9  A.    I'M NOT SURE ABOUT THAT.  NO, I DON'T THINK SO.

10  Q.    WAS CONFIDENTIAL SOURCE NUMBER 2 IN THE MAFIA?

11  A.    YES, I THINK HE WAS.

12  Q.    WHAT WAS HIS POSITION?

13  A.    I'M NOT SURE.

14  Q.    SO YOU DIDN'T GET THE PROTOCOL FROM HIM?

15  A.    WHAT DO YOU MEAN I DIDN'T GET THE --

16  Q.    WELL, YOU TESTIFIED ABOUT WHAT THE PROTOCOL IS.

17  A.    RIGHT.

18  Q.    IF YOU'D GOTTEN IT FROM HIM, YOU WOULD KNOW WHAT HIS

19  POSITION WAS, I WOULD ASSUME, SO YOU DIDN'T GET IT FROM HIM;

20  CORRECT?

21          MR. LEACH:  BUT THE WITNESS NEVER SAID OTHERWISE.  I

22  DON'T UNDERSTAND WHAT THE QUESTION IS.

23          THE COURT:  WELL, SHE'S TRYING TO DETERMINE WHERE, IN

24  FACT, HE MIGHT HAVE GOTTEN THE INFORMATION ABOUT THIS

25  PROTOCOL.

1          MR. LEACH:  I ASKED HIM DIRECTLY, HE SAID FROM HIS

2   COLLEAGUES.

3          MS. DUNN:  HE ALSO SAID CONFIDENTIAL SOURCES.

4          THE COURT:  WELL, SHE'S ON CROSS.

5   BY MS. DUNN:

6   Q.   DID YOU GET IT FROM HIM?

7   A.   NO.

8   Q.   AND YOU DON'T KNOW WHAT HIS POSITION IS?

9   A.   NO, I DON'T KNOW WHAT HIS POSITION IS.

10  Q.   CONFIDENTIAL SOURCE NUMBER 3, IS HE IN THE MAFIA?

11  A.   NO.

12  Q.   CONFIDENTIAL SOURCE NUMBER 4, IS HE IN THE MAFIA?

13  A.   NO.

14  Q.   SO ALL OF YOUR INFORMATION ABOUT THE PROTOCOL OF THE MAFIA

15  COMES FROM WHOM?

16  A.   MY COLLEAGUES.

17  Q.   WHICH COLLEAGUES?

18  A.   AT MY OFFICE.

19  Q.   WHEN DID YOU START INVESTIGATING THE MAFIA AND FIND OUT

20  ABOUT THE PROTOCOL OF THE MAFIA?

21  A.   IN SEPTEMBER OF 1999.

22  Q.   OH, SEPTEMBER OF 1999?

23  A.   YES.

24  Q.   THIS MONTH.  WHAT DAY?

25  A.   1999.

1    Q.    1999, A YEAR AGO?

2    A.    RIGHT.

3    Q.    INVESTIGATING THIS CASE?

4    A.    YES.

5    Q.    OKAY.  AND WHO DID YOU TALK TO AT YOUR OFFICE?

6    A.    HOWARD GROVER.

7    Q.    OKAY.  WHO ELSE?

8    A.    KEVIN RENTZEL.

9    Q.    OKAY.  WHO ELSE?

10   A.    MIKE WELCH.

11   Q.    OKAY.  AND THEY ALL TOLD YOU ABOUT THE PROTOCOL OF THE

12   MAFIA?

13   A.    THAT'S THE PART OF TRAINING FOR A POSITION LIKE THAT,

14   CORRECT, YES.

15   Q.    OKAY.  AND OF THOSE THREE PEOPLE, TO WHOM IN THE MAFIA DID

16   THEY SPEAK?

17   A.    WELL, MR. GROVER HAS TALKED TO CS NUMBER 2 EXTENSIVELY,

18   AND MEMBERS OF -- HE'S BEEN DOING ORGANIZED CRIME

19   INVESTIGATIONS FOR 27 YEARS.

20   Q.    OKAY.  WELL, WHO ELSE DID HE SPEAK TO?

21   A.    I DON'T KNOW.

22   Q.    WE'RE NOT JUST TALKING ABOUT ORGANIZED CRIME IN THIS

23   CASE.  WE ARE TALKING SPECIFICALLY ABOUT JOHN GOTTI, SR.

24   ORGANIZATION; CORRECT?

25   A.    CORRECT.

ANDRE G. ASHLEY, O.C.R.

112

1  Q.   OKAY.  AND EVERY BUSINESS RUNS DIFFERENTLY; CORRECT?

2  A.   CORRECT.

3  Q.   SO WHEN YOU'RE TALKING ABOUT THE PROTOCOL IN THIS CASE,

4  YOU WANT THE JUDGE TO BELIEVE THAT THE PROTOCOL YOU'RE TALKING

5  ABOUT IS WITH RESPECT TO JOHN GOTTI'S BUSINESS; CORRECT?

6  A.   NO.

7  Q.   NO, YOU DON'T?

8  A.   WITH RESPECT TO THE MOB IN GENERAL.

9  Q.   OH.  SO THESE PARTICULAR MOBSTERS, AS YOU CALL THEM, MAY

10  BEHAVE A LITTLE DIFFERENTLY?

11  A.   IT'S POSSIBLE.

12  Q.   OH.  OH.  HAVE YOU EVER TALKED TO A CONFIDENTIAL SOURCE

13  WHO TOLD YOU ABOUT THE WAY JOHN GOTTI'S ORGANIZATION RAN?

14  A.   NO.

15  Q.   HAS ANYBODY TOLD YOU ANY SPECIFICS ABOUT ANY CONFIDENTIAL

16  SOURCE ABOUT WHAT HE TOLD YOU, OR SHE TOLD YOU ABOUT HOW JOHN

17  GOTTI'S ORGANIZATION RAN?

18  A.   ACCORDING TO, AGAIN, HOWARD GROVER, THE PROTOCOL THAT I

19  HAVE GIVEN YOU IS --

20  Q.   I'M NOT ASKING WHAT GROVER SAID.  I'M ASKING WHO DID

21  GROVER TALK TO AND WHAT DID THAT PERSON SAY?  I WANT TO GET

22  BACK TO THE SOURCE OF THE KNOWLEDGE.

23       HAS GROVER EVER BEEN IN THE MAFIA, TO YOUR KNOWLEDGE?

24  A.   NO.

25  Q.   OKAY.  SO HE OBVIOUSLY DOES NOT HAVE INFORMATION BASED ON

1  PERSONAL EXPERIENCE; CORRECT?

2  A.   CORRECT.

3  Q.   WHERE DID HE GET HIS INFORMATION?   I WANT THE SOURCE.

4  A.   SOURCES.

5  Q.   OKAY.

6  A.   AGAIN, HE'S BEEN DOING THIS FOR 27 YEARS.  I CAN'T NAME

7  PEOPLE THAT HE'S TALKED TO.  I HAVE NO IDEA.

8  Q.   OKAY.  WELL, HOW MANY OF THEM SPECIFICALLY HAVE BEEN IN

9  JOHN GOTTI'S ORGANIZATION?

10 A.   I HAVE NO IDEA.

11 Q.   OKAY.  SO YOU DON'T REALLY KNOW ANYTHING PARTICULAR TO

12 JOHN GOTTI'S ORGANIZATION; IS THAT WHAT YOU'RE TRYING TO TELL

13 ME?

14 A.   I DON'T PERSONALLY, NO, I DO NOT.

15 Q.   OKAY.  WHAT YOU DO KNOW IS THAT MR. MOCERRO AND MR.

16 TRENTACOSTA HAVE BEEN FRIENDS FOR 40 YEARS?

17 A.   CORRECT.

18 Q.   AND YOU ALSO KNOW THAT MR. TRENTACOSTA IS A PRETTY

19 PLAIN-SPOKEN MAN; CORRECT?

20 A.   WHAT DO YOU MEAN PLAIN-SPOKEN MAN?

21 Q.   WELL, I MEAN, WHEN HE FEELS SOMETHING, HE SAYS IT; DOESN'T

22 HE?

23 A.   CORRECT.

24          THE COURT:  OKAY.  ANYTHING ELSE?

25          MR. LEACH:  NO, YOUR HONOR.

ANDRE G. ASHLEY, O.C.R.

1        THE COURT:  OKAY, HE CAN COME DOWN.  NOW, I'M GOING

2   TO HAVE TO READ OVER THE PRETRIAL SERVICE OFFICER'S REPORT, AND

3   I HAVE NOT READ GX-7 YET. .

4        (PAUSE IN THE PROCEEDINGS.)

5        THE COURT:  ALL RIGHT.  I HAVE REVIEWED IT.  ANY

6   OBJECTIONS, MS. DUNN?

7        MS. DUNN:  TO THE PRETRIAL SERVICES REPORT, YOUR

8   HONOR?

9        THE COURT:  RIGHT.

10       MS. DUNN:  NO, SIR.

11       THE COURT:  OKAY.  I WILL CONSIDER IT.  ANYTHING ELSE

12   ON BEHALF OF THE GOVERNMENT?

13       MR. LEACH:  NO, YOUR HONOR.

14       THE COURT:  GOVERNMENT RESTS.  ANY EVIDENCE ON BEHALF

15   OF THE DEFENDANT?

16       MS. DUNN:  NO, SIR.  I MEAN, I WOULD STATE FOR THE

17   RECORD THAT THE DEFENDANT'S WIFE IS HERE IN COURT, AND SHE DOES

18   OWN PROPERTY THAT WOULD BE SUFFICIENT TO POST A BOND AND GIVE

19   THIS COURT SECURITY FOR HIS APPEARANCE IN MIAMI, OR FT.

20   LAUDERDALE, I BELIEVE.

21       IS THIS A FT. LAUDERDALE CASE?

22       MR. SLOMAN:  MIAMI.

23       THE COURT:  ALL RIGHT.  PARTIES DESIRE TO ARGUE?

24       MR. LEACH:  BRIEFLY, YOUR HONOR.

25       THE COURT:  ALL RIGHT.

ANDRE G. ASHLEY, O.C.R.

1            MR. LEACH:  JUDGE, BECAUSE OF THE HOMICIDES THAT ARE

2    IN THIS CASE, I THINK THE PRESUMPTION ARISES IN THIS CASE.  YOU

3    HAVE A CONSPIRACY TO COMMIT MURDER UNDER FLORIDA LAW WITH

4    REGARD TO HERNANDEZ, THAT YOU HAVE HEARD TESTIMONY ABOUT.

5            I AM TOLD THAT UNDER FLORIDA LAW, THE POTENTIAL

6    SENTENCE IN THAT CASE IS LIFE IN PRISON.  ADDITIONALLY, YOU

7    HAVE A CRIME OF VIOLENCE PRESUMPTION.

8            WE FEEL THAT UNDER THE CIRCUMSTANCES PRESENTED IN

9    THIS CASE, YOU ARE FACED WITH A LONG-TIME MEMBER OF THE GAMBINO

10   CRIME FAMILY, SOMEONE WHO HAS BEEN INDUCTED, SOMEONE WHO IS A

11   SOLDIER, AND SOMEONE WHO IS AFFILIATED WITH A CREW, WHO IS

12   OBVIOUSLY EXTREMELY VIOLENT.

13           YOU HAVE EVIDENCE BEFORE YOU AS TO RISK OF FLIGHT.

14           THE COURT:  WAIT JUST A MINUTE.  LET'S STOP AT THAT

15   POINT.  NOW, THERE IS EVIDENCE THAT THIS FELLOW, HERNANDEZ,

16   ADMITTED KILLING THIS JEANETTE SMITH.

17           MR. LEACH:  CORRECT, JUDGE.

18           THE COURT:  AND THERE IS A DISPUTE BETWEEN WHAT THE

19   EVIDENCE SHOWED AND HOW HE SAID THE KILLING TOOK PLACE.

20           MR. LEACH:  CORRECT.

21           THE COURT:  HE SAID IT WAS ACCIDENTAL.

22           MR. LEACH:  I'M NOT ARGUING THE SMITH MURDER.

23           THE COURT:  OKAY.  WELL, ALL RIGHT.

24           SO THERE IS -- I DON'T RECALL ANY EVIDENCE THAT THIS

25   DEFENDANT WAS IMPLICATED IN THE DECISION TO KILL HER.

1        MR. LEACH:  THE SMITH MURDER, I'M NOT ARGUING.  I'M

2   NOT ARGUING.  I'M ARGUING WHAT HAPPENED AFTER THE SMITH

3   MURDER.

4        THE COURT:  OKAY.  NOW, THERE IS A SCREAMING MATCH

5   BETWEEN THIS DEFENDANT AND FREDERICK MOCERRO, IN WHICH THE

6   DEFENDANT ACCUSES HIM OF HIRING INCOMPETENT PEOPLE.

7        MR. LEACH:  RIGHT.  AND THAT IS IMMEDIATELY AFTER THE

8   MURDER OF SMITH.

9        THE COURT:  RIGHT AFTER SMITH'S MURDER.  AND BASED

10  ON, I ASSUME, THE FACT THAT THEY WERE ABLE TO TRACE THE BODY

11  BACK TO HER THROUGH THE STEREO BOX WITH THE SERIAL NUMBER ON

12  IT.

13       MR. LEACH:  AND I WOULD ARGUE BECAUSE OF THE SLOPPY

14  MANNER IN WHICH THE MURDER WAS DONE AND THE CONDITION OF THE

15  BODY.

16       THE COURT:  AND THEN AT THAT POINT, MOCERRO DECIDES

17  THAT HERNANDEZ HAS TO GO.

18       MR. LEACH:  RIGHT, YOUR HONOR.  I THINK IT'S AN

19  IMPORTANT POINT THAT --

20       THE COURT:  GARCIA AND ONE OF YOUR CS'S TRY AND

21  FINAGLE HIM INTO ACCOMPANYING THEM, PRESUMABLY FOR THAT

22  PURPOSE, AND HE REFUSES, AND THEN HE CALLS AND TALKS TO

23  MOCERRO.

24       MR. LEACH:  CORRECT.  THAT'S WHAT HE SAID.

25       THE COURT:  OKAY.  NOW, IS THERE SOME EVIDENCE, OTHER

1   THAN THE FACT THAT THE DEFENDANT SAID THAT MOCERRO HIRED

2   INCOMPETENT PEOPLE, THAT HE WAS INVOLVED IN PLANNING OR

3   DIRECTING THE ATTEMPTED MURDER OF HERNANDEZ?

4           MR. LEACH:  THAT'S WHERE THE TESTIMONY REGARDING THE

5   PROTOCOL COMES IN; THAT SOMEBODY LIKE MOCERRO, WHO IS NOT A

6   MADE MEMBER OF THE CRIME FAMILY, DOESN'T HAVE THE AUTHORITY ON

7   HIS OWN TO GO AND ORDER THAT SOMEBODY THAT IS ALSO A MEMBER OF

8   THE CREW BE KILLED -- THIS IS EARLIER TESTIMONY -- THAT YOU

9   HAVE TO GET THE APPROVAL OF THE BOSS OF THAT CREW IN ORDER TO

10  COMMIT THAT MURDER OF SOMEONE WHO IS WITHIN THE CREW.

11          THE COURT:  SO THE EVIDENCE THAT YOU'RE RELYING ON IS

12  CIRCUMSTANTIAL EVIDENCE THAT, NUMBER ONE, UNDER LCN PROTOCOL,

13  IN ORDER TO TERMINATE A MEMBER OF THE CREW, THE PROPOSED

14  TERMINATOR HAS TO RECEIVE PERMISSION FROM THE BOSS OF THE CREW,

15  FIRST, AND THAT THE INFORMATION THAT YOU HAVE PRESENTED SHOWS

16  THAT THE DEFENDANT IS THE BOSS OF THIS CREW, AND THAT MOCERRO

17  WORKED FOR HIM.

18          MR. LEACH:  RIGHT, AND THAT RUGGIARO IS DEAD AT THE

19  TIME THESE EVENTS OCCUR.  RUGGIARO DIES MARCH 19TH OF THAT SAME

20  YEAR.

21          THE COURT:  WELL, YOU HAVE MOCERRO INDICATING THAT HE

22  IS A MEMBER OF THIS DEFENDANT'S CREW?

23          MR. LEACH:  RIGHT.  THAT HE IS HIS CAPO, RIGHT.

24          THE COURT:  SO YOU'RE SAYING AS A CONSEQUENCE, IT

25  MUST BE INFERRED THAT MOCERRO HAD TO GET PERMISSION FROM THE

1    DEFENDANT TO HAVE HERNANDEZ TERMINATED?

2              MR. LEACH:  AND I THINK THE SEQUENCE OF EVENTS, WHERE

3    THE SCREAMING INCIDENT AT BEACHSIDE MARIO'S RESTAURANT, WHERE

4    TRENTACOSTA IS SCREAMING AT MOCERRO ABOUT HERNANDEZ, AND HIS

5    INCOMPETENCE IN THIS HOMICIDE, FOLLOWED BY THE MARCH 27TH

6    MEETING BETWEEN MOCERRO, GARCIA, AND THE CONFIDENTIAL SOURCE,

7    IN WHICH THE HIT IS CALLED, AND MOCERRO, NOT HAVING THE

8    AUTHORITY TO DO IT ON HIS OWN, AND TRENTACOSTA BEING IN CHARGE

9    OF THE CREW AT THAT TIME, LEADS TO THE CONCLUSION THAT IT HAD

10   TO BE APPROVED UP THE LINE.

11             THAT IS OUR ARGUMENT WITH REGARD TO THE HERNANDEZ

12   ATTEMPTED MURDER.

13             THE COURT:  AND THOSE ARE THE ACTS OF VIOLENCE,

14   EXCEPT FOR THE TELEPHONE CALL FROM THE JAIL.

15             MR. LEACH:  THOSE ARE THE ACTS OF VIOLENCE, YES, YOUR

16   HONOR.  AND THAT IS THE EVENT THAT WOULD CAUSE THE POTENTIAL

17   LIFE SENTENCE, WHICH WOULD INVOKE THE REBUTTABLE PRESUMPTION.

18             THE COURT:  OKAY.  ANYTHING ELSE?

19             MR. LEACH:  OKAY.  YOU HAVE THE RISK OF FLIGHT, YOUR

20   HONOR, IN WHICH THE DEFENDANT, DURING THE TIME THAT SAMMY THE

21   BULL, SALVATORE GRAVANO, IS COOPERATING, AND THE DEFENDANT HAS

22   SOME CONCERN ABOUT A PRIOR HOMICIDE, THAT IN THE EVENT THAT HE

23   IS ACCUSED OF ANYTHING, HE IS GOING TO TAKE OFF FOR SPAIN.  I

24   THINK THAT SHOWS RISK OF FLIGHT.  OBVIOUSLY, THIS IS A SERIOUS

25   CASE.

1          THE COURT:  AND THAT WAS WHEN?

2          MR. LEACH:  THAT IS GOING BACK IN TIME TO WHEN

3  GRAVANO FIRST COOPERATED, AND I THINK IT'S '91.  I CAN LOOK AT

4  IT HERE, YOUR HONOR, BUT I THINK THE WITNESS TESTIFIED TO THE

5  TIME.

6          THE COURT:  WELL, IT WAS A NUMBER OF YEARS AGO.

7          MR. LEACH:  NUMBER OF YEARS AGO, YES.

8          THE COURT:  AND SINCE THEN, THERE HAS BEEN NO

9  INDICTMENT RETURNED OR CRIMINAL COMPLAINT FILED CHARGING THIS

10  DEFENDANT WITH ANY KIND OF MURDER?

11          MR. LEACH:  HE WAS NOT CHARGED WITH REGARD TO

12  ANYTHING THAT GRAVANO COOPERATED ON, AND TO MY KNOWLEDGE THERE

13  HAVE BEEN NO CHARGES OVER THAT PERIOD OF TIME.  AND THE COURT

14  WILL SEE IN THE PRETRIAL SERVICES REPORT THAT THE DEFENDANT HAD

15  A BOUT WITH CANCER IN THE MIDST OF ALL THIS, THAT PERIOD OF

16  TIME.

17          THE COURT:  WELL, HE'S BEING TREATED FOR CANCER OF

18  THE LARYNX, AND HIS LAST CONVICTION, OTHER THAN THE '97 TRAFFIC

19  OFFENSES IN GWINNETT COUNTY, WAS IN '94.

20          MR. LEACH:  CORRECT.  BUT I THINK THAT 1991 COMMENT,

21  AND IT'S ON PAGE 9, YOUR HONOR, FIRST FULL PARAGRAPH, IS THAT

22  IT SHOWS A CONSCIOUSNESS THAT IN THE EVENT THERE IS AN

23  INDICTMENT RETURNED AGAINST HIM, THAT HE WILL FLEE.

24          NOW, OBVIOUSLY, THE DEFENDANT, YOU CAN SEE FROM THE

25  PRETRIAL SERVICES REPORT, AND BY VIEWING HIM HERE IN COURT, HE

ANDRE G. ASHLEY, O.C.R.

1   IS AN OLDER MAN, NOT AN OLD MAN, OLDER MAN.

2              THE COURT:  61.

3              MR. LEACH:  YES, YOUR HONOR.  AND THAT THERE ARE

4   CALCULATIONS IN THE GOVERNMENT'S MEMORANDUM OF 188 TO 235

5   MONTHS UNDER A GUIDELINE LEVEL 36, AND I'M NOT SURE THERE'S

6   EVEN A CRIMINAL HISTORY CATEGORY MADE.

7              CRIMINAL HISTORY CATEGORY 1 IS THE CALCULATION TO GET

8   AT THAT AT A GUIDELINE LEVEL 36.  SO THE AMOUNT OF TIME UNDER

9   THE SENTENCING GUIDELINES IS GOING TO BE SUBSTANTIAL TO THIS

10  DEFENDANT.  AND THAT, VIEWED IN LIGHT OF HIS AGE, AS WELL,

11  SHOWS THAT FLIGHT WOULD DEFINITELY BE A POSSIBILITY.  AND HIS

12  COMMENT ABOUT GOING TO SPAIN, IF HE WERE EVER CHARGED, I THINK

13  SHOWS A RISK OF FLIGHT.

14             YOUR HONOR, I THINK HIS COMMENTS TO THE AGENT DURING

15  THE BREAK ARE TELLING OF THE DEFENDANT'S STATE OF MIND WITH

16  REGARD TO HIS ABILITY OR THE POSSIBILITY THAT HE MIGHT

17  INTIMIDATE OR OBSTRUCT JUSTICE, OR INTIMIDATE WITNESSES.

18             HERE YOU'VE GOT A PERSON THAT IS KNOWN TO HIM TO BE A

19  FEDERAL AGENT, IN OPEN COURT, IN SITUATIONS WHERE THERE IS ALL

20  SORTS OF WITNESSES, NOT THE LEAST OF WHICH IS THE COURT,

21  ITSELF, YOUR HONOR, DURING THE COMMENTS THAT HE MADE IN YOUR

22  PRESENCE, AND HE'S MAKING THESE COMMENTS TO THE FEDERAL AGENT

23  WITH WHAT INTENT, JUDGE?

24             I MEAN, WHAT COULD POSSIBLY BE HIS INTENT IN TELLING

25  A FEDERAL AGENT THOSE SORT OF THINGS WHILE HE IS TESTIFYING

1   HERE.  IT'S NOT SIMPLY ANGER, AND I SUGGEST TO YOUR HONOR THAT

2   IT INVOKES PROBLEMS WITH REGARD TO OBSTRUCTION.

3          IT MAKES A TELLING STATEMENT ABOUT THESE OTHER

4   INCIDENTS WHERE HE STABBED MOCERRO, WHERE HE MADE THREATS TO

5   CUT PEOPLE'S HEADS OFF, AND ALL OF THAT INVOKES THE SAFETY OF

6   THE COMMUNITY, AND SAFETY OF THE WITNESSES IN THE CASE.

7          THE COURT:  WELL, I'D FORGOTTEN EARLIER, YOU DID

8   PRESENT EVIDENCE THAT HE HAD STABBED MOCERRO OVER A $3,000 DEBT

9   THAT AN ASSOCIATE OF MOCERRO OWED HIM.

10         MR. LEACH:  AND WHAT IS THE OBJECTIVE OF THAT, IS TO

11  GET THE MONEY.  AND WHAT DOES MOCERRO GOT TO DO?  I MEAN, HERE

12  IS -- THE MAN HAS BEEN STABBED, AND HE GOES AND HE GETS THE

13  MONEY AND HE BRINGS IT BACK TO THE DEFENDANT.  THAT IS THE

14  OBJECTIVE.  GO GET THE MONEY, BRING IT HERE.  AND WHEN NOTHING

15  ELSE WORKS, AN ACT OF VIOLENCE GETS THE JOB DONE.

16         I THINK THE TAPE IS TELLING, AND WHAT COUNSEL

17  PRESENTED IN HER CROSS-EXAMINATION.  YOU DON'T CALL A MADE GUY

18  -- YOU DON'T CALL A SOLDIER IN THE GAMBINO CRIME FAMILY A

19  PRICK.

20         THE DEFENDANT:  NO, YOU DON'T CALL ME A PRICK.  ME,

21  ME.  NOBODY CALLS ME A PRICK.

22         MR. LEACH:  LET THE RECORD --

23         THE DEFENDANT:  YOU UNDERSTAND?

24         MR. LEACH:  I UNDERSTAND.  LET THE RECORD SO

25  REFLECT.  AND, YOU KNOW, THERE'S SOMETHING TELLING IN HIS -- IN

1    THE WAY THAT HE MAKES THOSE STATEMENTS, YOUR HONOR.

2            THE DEFENDANT:  NO, I DON'T LIKE THAT.  I DON'T LIKE

3    PEOPLE SAYING THAT TO ME.  IN OTHER WORDS, TALK TO ME LIKE A

4    GENTLEMAN, THAT'S ALL.

5            MR. LEACH:  OKAY.  YOU ALSO HAVE THE SITUATION OVER

6    THE POCARRO DISAPPEARANCE.  AND I BELIEVE THE TESTIMONY IN THIS

7    AREA WAS THAT THE DEFENDANT PUT A KNIFE TO MOCERRO'S THROAT,

8    TELLING HIM THAT HE WOULD KILL HIM IF HE HAD ANYTHING TO DO

9    WITH THE POCARRO DISAPPEARANCE, AND YOU'VE GOT SEVERAL ACTS OF

10   VIOLENCE, YOUR HONOR.

11           THE COURT:  NOW, WHAT IS THE PAGES ABOUT THAT?  IS

12   THAT IN THERE?

13           MR. LEACH:  IT'S NOT IN HERE, YOUR HONOR.  THE

14   WITNESS TESTIFIED TO IT.

15           THE COURT:  THAT'S WHY I COULDN'T FIND IT.

16           MR. LEACH:  YES.  HE TESTIFIED TO THAT, AND IT WAS ON

17   CROSS WHEN MS. DUNN WAS CROSS-EXAMINING HIM.

18           THIS SERIES OF VIOLENT EVENTS SHOW YOUR HONOR A

19   CONSISTENCY OF BEHAVIOR, WHICH I THINK MATCHES UP WITH THE

20   DEFENDANT'S DEMEANOR IN THIS COURTROOM, AND HIS OUTBURSTS

21   THROUGHOUT THE COURSE OF THIS HEARING.

22           I THINK THAT THERE IS NO CONDITION OR SET OF

23   CONDITIONS THAT COULD TAKE CARE OF THE SAFETY OF THIS

24   COMMUNITY, OR THE POSSIBILITY THAT THE DEFENDANT WOULD ATTEMPT

25   TO OBSTRUCT JUSTICE, BECAUSE HIS REACTION TO THIS CASE, HIS

123

1   REACTION TO THE TESTIMONY, HIS REACTION TO THE AUTHORITY OF THE

2   UNITED STATE'S ATTORNEY, THE FBI, THIS COURT, ARE THESE

3   OUTBURSTS.

4           AND I SUGGEST TO YOU THAT IT IS TELLING; COMBINED

5   WITH HIS RISK OF FLIGHT, COMBINED WITH THE SEVERITY OF THIS

6   CASE, YOUR HONOR, AND WE STILL BELIEVE THAT THE REBUTTABLE

7   PRESUMPTION WOULD APPLY HERE, THE DEFENDANT SHOULD BE HELD

8   PENDING HIS TRIAL.  THANK YOU.

9           THE COURT:  WELL, PART OF THE PROBLEM HERE --

10  YOU ASK THAT HE BE DETAINED BECAUSE HE'S CHARGED WITH A CRIME

11  OF VIOLENCE WHICH CARRIES A MAXIMUM SENTENCE OF AT LEAST LIFE

12  IMPRISONMENT, AND THAT THE REBUTTABLE PRESUMPTION UNDER 31-42

13  SHOULD APPLY.

14          NOW, UNDER 31-42(E), IT SAYS THAT IN A CASE DESCRIBED

15  IN SUBSECTION F-1, AND SUBSECTION F-1 RELATES TO, AMONG OTHER

16  THINGS, A CRIME OF VIOLENCE, AND AN OFFENSE FOR WHICH THE

17  MAXIMUM SENTENCE IS LIFE IMPRISONMENT, OR DEATH, A REBUTTABLE

18  PRESUMPTION ARISES THAT NO CONDITION OR COMBINATION OF

19  CONDITIONS WILL REASONABLY ASSURE THE SAFETY OF ANY OTHER

20  PERSON AND THE COMMUNITY, IF SUCH JUDICIAL OFFICER FINDS THAT,

21  ONE, THE PERSON HAS BEEN CONVICTED OF A FEDERAL OFFENSE AS IT'S

22  DESCRIBED IN F-1 OF THIS SUBSECTION, OR OF A STATE OR LOCAL

23  OFFENSE THAT WOULD HAVE BEEN SUCH AN OFFENSE.  I DIDN'T SEE

24  THAT; IS THAT CORRECT?

25          NUMBER TWO, THAT THE OFFENSE DESCRIBED IN PARAGRAPH

1    1, ARE THESE TWO OFFENSES, WAS COMMITTED WHILE THE PERSON WAS

2    ON RELEASE PENDING TRIAL.  I DON'T SEE THAT.

3            NUMBER THREE, THAT A PERIOD OF NOT MORE THAN FIVE

4    YEARS HAS ELAPSED SINCE THE DATE OF THE CONVICTION OR THE

5    RELEASE OF THE PERSON FROM IMPRISONMENT.  I DON'T SEE THAT.

6            THEN IT GOES FURTHER, AND IT SAYS SUBJECT TO

7    REBUTTAL, IT SHALL BE PRESUMED THAT NO CONDITION OR COMBINATION

8    OF CONDITIONS WILL REASONABLY ASSURE THE APPEARANCE OF THE

9    PERSON AS REQUIRED UNDER THE SAFETY OF THE COMMUNITY.  IF THE

10   JUDICIAL OFFICER FINDS OR HAS PROBABLE CAUSE TO BELIEVE THAT

11   THE PERSON COMMITTED AN OFFENSE FOR WHICH A MAXIMUM TERM OF TEN

12   YEARS OR MORE IS PRESCRIBED IN THE CONTROLLED SUBSTANCE ACT,

13   THE CONTROLLED SUBSTANCE IMPORT AND EXPORT ACT, THE MARITIME

14   DRUG LAW AND ENFORCEMENT ACT, OR OFFENSE UNDER SECTION 924(C),

15   WHICH IS USING A FIREARM, 956(A), OR 2332(B) OF TITLE 18.  HE

16   IS NOT CHARGED WITH ANY OF THOSE OFFENSES.

17           SO WHERE IS THE REBUTTABLE PRESUMPTION THAT APPLIES

18   TO HIM IN THIS CASE?

19           MR. LEACH:  I SEE YOUR HONOR'S POINT, BECAUSE THOSE

20   EVENTS NUMBERED ONE, TWO, AND THREE DO NOT APPLY.

21           THE COURT:  AND HE'S NOT CHARGED WITH A DRUG OFFENSE,

22   WHICH HAS A PENALTY OF 10 PLUS YEARS.

23           MR. LEACH:  YOU'RE CORRECT.

24           THE COURT:  OKAY.  I'M SORRY I CUT YOU OFF.  YOU CAN

25   CONTINUE.

ANDRE G. ASHLEY, O.C.R.

125

1        MS. DUNN:  I DIDN'T EVEN START, YOUR HONOR.  IF

2   YOU'RE INCLINED TO GIVE THE BOND RECOMMENDED BY PRETRIAL

3   SERVICES, THEN I DON'T EVEN NEED TO ARGUE.

4        THE COURT:  WELL, ONE OF THE THINGS I HAVE TO LOOK

5   AT, OBVIOUSLY, IS THE SERIOUSNESS OF THE CHARGES, AND THEY ARE

6   EXTRAORDINARILY SERIOUS; THE WEIGHT OF THE EVIDENCE AGAINST

7   HIM, AND THAT'S KIND OF IFFY IN SOME REGARDS; POTENTIAL FOR

8   RISK OF FLIGHT, AND HE HADN'T APPARENTLY TRIED TO FLEE, AND

9   ACCORDING TO THE PRETRIAL SERVICE OFFICER'S REPORT, HE'S BEEN A

10  RESIDENT OF THIS AREA FOR TWELVE YEARS.

11       SO MY INCLINATION IS TO SET A BOND IN SOME AMOUNT,

12  AND, FRANKLY, IT'S GOING TO BE HIGHER THAN THE $100,000.  IF I

13  SET IT, IT'S GOING TO BE $500,000, SINCE YOU'RE TELLING ME THAT

14  THE DEFENDANT'S WIFE HAS A MILLION DOLLARS IN ASSETS.  THAT

15  WOULD TIE UP EVERYTHING THEY HAD, AND WOULD PREVENT THEM FROM

16  ENCUMBERING THAT IN ANY WAY.

17       MS. DUNN:  EXCEPT, YOUR HONOR, ONE THING I SHOULD

18  TELL YOU IS HER ASSETS ARE SOMEWHAT ENCUMBERED.  THE PROPERTY

19  THAT SHE HAS IN NEW YORK ARE COLLATERAL FOR A SMALL BUSINESS

20  LOAN THAT SHE TOOK OUT FOR HER BUSINESS.

21       THE COURT:  WELL, AND I WILL GIVE MR. LEACH THE

22  OPPORTUNITY TO HAVE A HEARING IF YOU WANT ONE ON THE SOURCE OF

23  THE PROCEEDS TO MAKE THE BOND.

24       MR. LEACH:  I THINK I WOULD LET FLORIDA TO DO THAT,

25  YOUR HONOR.  WE WOULD WANT TO FILE AN APPEAL WITH THE SOUTHERN

```
 1   DISTRICT, AND ALLOW THE --
 2           THE COURT:  OKAY.  WELL, I WILL SET HIS BOND AT
 3   $500,000 SURETY.  IT WILL INCLUDE ELECTRONIC MONITORING, AND
 4   TRAVEL RESTRICTED TO METROPOLITAN ATLANTA, WHICH WOULD INCLUDE
 5   CUMMING, AND THE SOUTHERN DISTRICT OF FLORIDA TO ANSWER THE
 6   CHARGES, AND I WILL GIVE YOU A STAY.
 7           ANYTHING ELSE?
 8           MS. DUNN:  YES, YOUR HONOR.  WE HAVE A -- HE HAS TO
 9   GO TO NEW YORK FOR HIS CANCER TREATMENT.  SO AS PART OF HIS
10   TRAVEL RESTRICTIONS, WILL HE BE ALLOWED TO GO TO SEE THE DOCTOR
11   AT THE HOSPITAL, MEMORIAL SLOAN?
12           THE COURT:  SLOAN MEMORIAL?
13           MS. DUNN:  YES, YOUR HONOR.
14           THE COURT:  I WILL EXTEND THAT, AS WELL.
15           MS. DUNN:  AND THE ONLY OTHER THING, YOUR HONOR, IS
16   HIS WIFE HAS BROUGHT SOME MEDICATION WITH HER THAT HE NEEDS.
17           THE COURT:  WELL, SHE'LL HAVE TO GIVE IT TO THE
18   MARSHAL, AND THE MARSHAL WILL HAVE TO DETERMINE WHETHER OR NOT
19   IT CAN BE ADMINISTERED.  I CAN'T GET INTO THAT QUESTION.
20           MS. DUNN:  WELL, I CAN'T TAKE IT TO THE JAIL, AND
21   THEY WON'T GIVE IT TO HIM AT THE JAIL.
22           THE COURT:  WELL, WE'LL HAVE TO GET NORMAN HILTON
23   OVER HERE AND SEE WHAT THE SITUATION IS.  WHAT KIND OF
24   MEDICATION IS IT?
25           MS. DUNN:  ALLERGY PILLS, AND HIS ANTIBIOTIC CREAM,
```

ANDRE G. ASHLEY, O.C.R.

1   AND A FACE CREAM, HYDROCORTISONE CREAM.

2          THE COURT:  OKAY.  WELL, THAT -- WHAT HAS HE GOT, A

3   BREAKOUT, DERMATOLOGICAL PROBLEM?

4          MS. DUNN:  IT'S A PRESCRIPTION, WHAT IT IS AND

5   EVERYTHING IS RIGHT ON THERE.

6          THE COURT:  OKAY.  SO THE CANCER MEDICATION CAUSES

7   YOU TO HAVE A DERMATOLOGICAL PROBLEM THAT YOU NEED TO TAKE THE

8   ANTIHISTAMINES AND THE CORTISONE CREAM FOR.

9          OKAY.  WE'LL TALK TO THE MARSHAL AND SEE IF THEY

10  CAN'T GET THAT CLEARED UP.  IF THEY CAN'T GIVE YOU THAT, THEN

11  WE CAN GET A DOCTOR UP THERE TO PRESCRIBE A SIMILAR TYPE

12  MEDICATION.

13         OKAY.  THE STAY WILL BE IN EFFECT INSTANTER.

14         MR. LEACH:  AND WE WOULD ALSO ASK THAT HE SURRENDER

15  HIS PASSPORT.

16         THE COURT:  YES.  I WILL REQUIRE THAT HE SURRENDER

17  THE PASSPORT, AND, OF COURSE, I'VE ALREADY RESTRICTED HIS

18  TRAVEL, ANYWAY.

19         MR. LEACH:  YOUR HONOR, TYPICALLY THERE ARE CURFEWS

20  SET WITH REGARD TO THE ELECTRONIC MONITORING, AS WELL.

21         THE COURT:  WELL, ELECTRONIC MONITORING MEANS HE'S

22  GOT TO STAY IN THE HOUSE, UNLESS HE GOES SOMEWHERE.

23         MR. LEACH:  HOUSE ARREST, ELECTRONIC MONITORING.

24         THE COURT:  YEAH, HE DOESN'T WORK, SO HE DOESN'T HAVE

25  TO GO TO A JOB.  THE ONLY PLACE HE NEEDS TO GO TO, AT THIS

ANDRE G. ASHLEY, O.C.R.

1    POINT, THAT I'M AWARE OF, IS TO NEW YORK FOR HIS MEDICAL

2    TREATMENT, OR IF HE HAS TO SEE ANY OTHER DOCTORS.

3          MS. DUNN:  RIGHT.

4          THE COURT:  AND HE CAN WORK THAT OUT AS TO WHERE HE

5    MIGHT HAVE TO GO.

6          MR. LEACH:  JUST SO THE RECORD'S CLEAR, YOUR HONOR,

7    YOUR STAY IS SO THAT HE WILL TRAVEL TO SOUTH FLORIDA, AND THE

8    APPEAL WILL BE HEARD IN SOUTH FLORIDA.

9          THE COURT:  I AM SETTING A BOND OF $500,000 SURETY

10   WITH THESE CONDITIONS.  IF HE IS UNABLE TO POST THAT BOND, THEN

11   THE MARSHAL WOULD TRANSPORT HIM TO SOUTH FLORIDA.  THE PROBLEM

12   WITH THAT SCENARIO IS IS THAT YOU'VE ASKED FOR A STAY.

13         MR. LEACH:  YES, SIR.

14         THE COURT:  SO THE MARSHAL CAN'T EVEN TRANSPORT HIM

15   UNTIL A DISPOSITION ON THE STAY IS MADE.

16         MR. LEACH:  I WANT YOUR STAY PURSUANT TO 31-45, UNDER

17   WHICH THE -- YOUR ORDER WILL BE REVIEWED BY THE DISTRICT COURT

18   IN SOUTH FLORIDA.

19         THE COURT:  OF COURSE.

20         MR. LEACH:  OKAY.  THAT'S WHAT I'M ASKING.  I'M

21   ASKING THAT HE BE TRANSPORTED TO SOUTH FLORIDA, SO THAT THAT

22   REVIEW CAN OCCUR; THAT WE'LL ORDER THIS TRANSCRIPT, AND SEND

23   THE WHOLE PACKAGE WITH THE EXHIBITS AND SO FORTH TO SOUTH

24   FLORIDA TO BE REVIEWED BY THE DISTRICT JUDGE THAT'S ASSIGNED

25   THE CASE.

ANDRE G. ASHLEY, O.C.R.

1         MS. DUNN:  I THOUGHT THE JUDGE IN FLORIDA HAD TO DO

2 THE STAY.

3         THE COURT:  NO. I CAN GRANT A STAY OF MY OWN ORDER.

4 LET ME LOOK AT 31-45.

5         (PAUSE IN THE PROCEEDINGS.)

6         THE COURT:  WELL, FIRST OF ALL, I DON'T KNOW WHERE

7 THE WIFE'S PROPERTY IS LOCATED.  APPARENTLY SOME OF IT IS IN

8 NEW YORK.

9         MS. DUNN:  SOME OF IT'S HERE, AND SOME IS IN NEW

10 YORK.

11         THE COURT:  SO AT THIS POINT, NOBODY'S EVEN COME UP

12 WITH ANY PROPERTY TO MAKE THE BOND.

13         MS. DUNN:  WE HAVE THE DEEDS HERE.

14         MR. LEACH:  JUDGE, WHAT WE ARE ASKING, THOUGH, IS

15 THAT MR. SLOMAN --

16         THE COURT:  WELL, I AM STAYING IT EVEN IF I WERE TO

17 APPROVE THE PROPERTY.  I WOULD NOT ALLOW HIM TO BE RELEASED

18 UNTIL THE DISTRICT COURT JUDGE IN FLORIDA HAS HAD THE

19 OPPORTUNITY TO CONSIDER YOUR APPEAL AND TO MAKE A DETERMINATION

20 AS TO WHETHER TO HOLD HIM WITHOUT BOND OR NOT.

21         MR. LEACH:  MR. SLOMAN WANTS ME TO ADVISE THE COURT

22 THAT HE WILL TODAY FILE A NOTICE OF APPEAL AND MOTION TO CHANGE

23 THIS COURT'S ORDER CONSISTENT WITH 31-45, AS SET OUT IN 31-45.

24         MS. DUNN:  CAN I ASK A QUESTION?  DO YOU KNOW IF ANY

25 OF THE OTHER DEFENDANTS ARE REPRESENTED BY THE FEDERAL

ANDRE G. ASHLEY, O.C.R.

130

1    DEFENDERS OFFICE?

2          MR. LEACH:  THERE IS A CONFLICT.

3          MS. DUNN:  OKAY.  SO WE ARE GOING TO NEED TO GET A

4    CJA AND A PANEL LAWYER APPOINTED FOR HIM, AS WELL.  I MEAN AT

5    THIS POINT IT APPEARS THAT THE WIFE IS WILLING TO PUT ALL OF

6    HER ASSETS UP SO SHE WON'T EVEN BE ABLE TO HIRE AN ATTORNEY.

7    HE DOESN'T HAVE THE SUMS TO HIRE AN ATTORNEY.

8          THE COURT:  WELL, HE'S QUALIFIED, ANY WAY.  I

9    QUALIFIED HIM BASED ON WHAT HE SAID.

10         MS. DUNN:  I UNDERSTAND.  BUT I MEAN, IN ORDER TO GET

11   THIS PROCESS MOVING ALONG, I WONDER IF THERE IS ANY WAY WE

12   COULDN'T GET AN ATTORNEY APPOINTED SOONER, RATHER THAN LATER,

13   SO I CAN BE IN CONFERENCE WITH HIM, GIVE HIM THE INFORMATION I

14   KNOW.

15         MR. SLOMAN:  YOUR HONOR, I KNOW THAT THE OTHER

16   DEFENDANTS WHO HAVE BEEN -- HAD THEIR INITIAL APPEARANCES, SOME

17   WHO HAVE BEEN APPOINTED ATTORNEYS, AND I KNOW THAT THIS IS A

18   CATEGORY IV CASE, AND I KNOW THAT THERE IS PARTICULAR ATTORNEYS

19   WHO ARE ON THAT LIST WHO ARE ACCEPTING CATEGORY IV CASES, BUT I

20   DON'T KNOW HOW THE COURT UP HERE WOULD BE ABLE TO ELECT

21   SOMEBODY DOWN THERE.

22         THE COURT:  WELL, IT'S SORT OF SIMPLE IN ONE WAY.

23   WHO DOES THE APPOINTMENTS DOWN THERE?

24         MR. SLOMAN:  WELL, I KNOW JUDGE DUBE'S COURTROOM

25   DEPUTY --

ANDRE G. ASHLEY, O.C.R.

131

1          THE COURT:  WELL, I KNOW JUDGE DUBE, OR WE COULD GET

2   PETER PALERMO OR WE COULD GET --

3          MR. SLOMAN:  YES, SIR.  AS A MATTER OF FACT, JUDGE

4   DUBE'S COURTROOM DEPUTY HAS BEEN DOING IT.  I WAS IN ATTENDANCE

5   AT ONE YESTERDAY AND TWO THE DAY BEFORE.

6          THE COURT:  OKAY.  SO ALL WE HAVE TO DO IS CONTACT

7   THEM AND TELL THEM THAT THIS APPEAL IS COMING IN, AND WE NEED

8   TO HAVE AN ATTORNEY APPOINTED OFF THE PANEL LIST TO REPRESENT

9   THIS DEFENDANT, AND THEN, MS. DUNN, YOU NEED TO TALK TO THE

10  ATTORNEY.

11         MS. DUNN:  RIGHT.

12         MR. LEACH:  JUDGE, I'D ALSO LIKE THE COURT'S

13  PERMISSION TO GIVE MR. SLOMAN ALL OF THE EXHIBITS THAT HAVE

14  ALREADY BEEN TENDERED IN.

15         THE COURT:  I WILL GIVE THEM ALL BACK TO YOU.  NOW

16  REALIZE THAT I HAVE NOT HAD THE OPPORTUNITY TO READ

17  GOVERNMENT'S EXHIBIT 7 IN ITS ENTIRETY.  ALL I'VE HEARD ARE THE

18  REFERENCES.  SO IT MAY BE THAT I MIGHT CHANGE MY MIND AFTER

19  READING THAT.

20         SO IN ONE SENSE, IT MAY BE THAT MY ORDER IS TENTATIVE

21  UNTIL I GET THE OPPORTUNITY TO READ THAT OVER.  IF YOU WANT TO

22  GIVE ME A COUPLE MINUTES, I WILL READ IT OVER, ALTHOUGH IT'S 10

23  OR 12 PAGES, AND I CAN LET YOU KNOW LATER.

24         MR. LEACH:  WE WOULD CERTAINLY LIKE THAT ELECTION,

25  YOUR HONOR.

ANDRE G. ASHLEY, O.C.R.

1          MS. DUNN:  YOUR HONOR, THE WITNESS READ FROM IT

2    VERBATIM.

3          THE COURT:  YEAH, BUT I CAN'T LISTEN AND WRITE --

4    MAKE NOTES AND READ IT AT THE SAME TIME.

5          MS. DUNN:  I CAN ASSURE YOU MR. LEACH DIDN'T MISS ANY

6    OF THE HIGH POINTS.

7          THE COURT:  OKAY.  WELL, THAT'S MY TENTATIVE RULING,

8    I WILL SAY THAT.  I DON'T THINK THE CASE IS SUBJECT TO THE

9    REBUTTABLE PRESUMPTION, AND I WILL LET YOU KNOW IN AN HOUR AND

10   A HALF WHETHER THAT WILL BE MY FINAL RULING, OR I WILL ORDER

11   HIM DETAINED.

12         MR. LEACH:  JUDGE, JUST SO I AM CLEAR, BECAUSE I WANT

13   TO ADVISE THE MARSHAL --

14         THE COURT:  I WILL GIVE YOU THESE EXHIBITS BACK.

15         MR. LEACH:  OKAY.  SO YOU'RE GRANTING US A STAY, AND

16   I CAN HAVE THE DEFENDANT MOVED TO SOUTH FLORIDA, IMMEDIATELY,

17   SO THAT HIS APPEAL CAN BE HEARD.

18         THE COURT:  I DON'T KNOW WHAT THE MARSHAL'S PROCEDURE

19   IS IN ALL CANDOR.  I HAVE NO OBJECTION TO THE MARSHAL MOVING

20   HIM DOWN THERE, IF HE HASN'T MADE BOND HERE, AND HE CAN'T MAKE

21   BOND HERE BECAUSE OF THE STAY.

22         MR. LEACH:  OKAY.

23         THE COURT:  BUT I WANT IT UNDERSTOOD THAT IF, IN

24   FACT, MY ORDER IS UPHELD, THEN YOU WILL ARRANGE TO HAVE THE

25   DEFENDANT RETURNED TO THIS DISTRICT, SO THAT HE CAN BE RELEASED

ANDRE G. ASHLEY, O.C.R.

1    ON BOND, OR RELEASED DOWN THERE.

2              MR. LEACH:  MR. SLOMAN WILL TAKE CARE OF IT IN SOUTH

3    FLORIDA, YOUR HONOR.

4              MR. SLOMAN:  YES, SIR.

5              THE COURT:  OKAY.  THAT'S THE BEST I CAN DO FOR YOU.

6    ALL RIGHT.  WE ARE IN RECESS UNTIL FURTHER ORDER.

7              (END OF TAPE)

8

9

10

11

12

13                              INDEX

14

15   WILLIE J. CREECH
     DIRECT EXAMINATION
16   BY MR. LEACH:............................................ 4
     CROSS-EXAMINATION
17   BY MS. DUNN:............................................ 48

18

19

20

21

22

23

24

25

ANDRE G. ASHLEY, O.C.R.

```
 1
 2                     C-E-R-T-I-F-I-C-A-T-E
 3
 4    UNITED STATES OF AMERICA
 5    NORTHERN DISTRICT OF GEORGIA
 6
 7              I, ANDRE G. ASHLEY, DO HEREBY CERTIFY THAT I AM A
 8    U.S. DISTRICT REPORTER FOR THE NORTHERN DISTRICT OF GEORGIA,
 9    THAT I REPORTED THE FOREGOING AND THE SAME IS A TRUE AND
10    ACCURATE TRANSCRIPTION OF MY MACHINE SHORTHAND NOTES AS TAKEN
11    AFORESAID.
12              IN TESTIMONY WHEREOF I HAVE HEREUNTO SET MY HAND ON
13        THIS 6TH DAY OF OCTOBER, 2000.
14
15
16
17
18                               _____
19                               ANDRE G. ASHLEY
                                 OFFICIAL COURT REPORTER
20                               NORTHERN DISTRICT OF GEORGIA
21
22
23
24
25
```

ANDRE G. ASHLEY, O.C.R.