UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA



CASE NO. 00-6273-CR-HUCK

**UNITED STATES OF AMERICA,**

    Plaintiff,

v.

**ANTHONY TRENTACOSTA,**

    Defendant.
_____/

GOVERNMENT'S REPLY TO DEFENDANT
TRENTACOSTA'S SUBMISSION FOR BOND

    COMES NOW the United States of America, by and through the undersigned Assistant United States Attorneys, and files this Reply to defendant Anthony Trentacosta's Submission for Bond which was filed on November 6, 2000 in connection with the government's appeal of Magistrate Judge Joel M. Feldman's order entered on September 29, 2000 denying the government's motion for pretrial detention of the defendant, Anthony Trentacosta, and setting conditions of his pretrial release. The government has filed this appeal on both grounds that the defendant is a danger to the community and that there are no conditions of release which will reasonably assure the appearance of the defendant at trial.

    In his submission, the defendant has raised six points which, he maintains, are factors in



favor of his release. They are addressed below seriatim.

I.    BOND STATUS OF CO-DEFENDANTS

The defendant asserts that all but two of his eight co-defendants have been granted bond. In fact, six of those co-defendants remain incarcerated pending trial. Magistrate Judge Barry S. Seltzer set bond for Bruce Chiusano in the amount of $100,000.00 corporate surety with a Nebbia requirement and special conditions; Chiusano subsequently posted bond. The government stipulated to a $150,000.00 corporate surety bond for Francis Ruggiero, which he was able to post. On October 5, 2000, a hearing was held before Magistrate Judge Barry Garber on the government's motion to detain defendants Frederick J. Massaro, Ariel Hernandez and Adam Todd Silverman. Magistrate Judge Garber ordered that Massaro and Hernandez be detained pending trial, and set bond for Silverman in the amount of $150,000.00 corporate surety with a Nebbia requirement and special conditions. Silverman has been unable to satisfy these requirements and remains incarcerated. As to defendants Carlos Garcia, Charles Patrick Monico and Anthony Raymond Banks, the government and their respective defense attorneys agreed that, in lieu of detention, bond would be set in the amount of $250,000.00 corporate surety with a Nebbia requirement, with the government retaining the right to seek pretrial detention if the defendant sought a reduction of bond. Thus, as to Garcia, Banks and Monico, the practical effect is that the defendants are being held in pretrial detention without the necessity of having conducted a hearing on the issue.[1]

---

1. This arrangement has an ancillary benefit to these defendants. By avoiding the entry of a judicial determination that the defendant poses a danger or a flight risk, he is eligible for a lower security

Significantly, the two defendants who have managed to secure pretrial release are charged with having a limited role in the conduct of the affairs of the enterprise. Chiusano is charged with providing certain financial information from the operation of a check cashing store which was thereafter utilized by members of the enterprise to manufacture counterfeit checks. Ruggiero is charged solely with loansharking activity. By contrast, probable cause has been established that the defendant Trentacosta is an inducted member of La Cosa Nostra who controlled all the activities of the enterprise, which included acts involving murder, extortion and obstruction of justice, in addition to extensive financial crimes. He was the manager and beneficiary of all the criminal activity being conducted by all the members of this criminal cabal. As such, any comparison of Trentacosta's status and role to that of the two defendants who have posted bail in this case is illusory.

## II. TRENTACOSTA'S ROLE IN THE OFFENSE

The defendant cites to the affidavit of FBI Special Agent Terry L. Feisthammel which was executed on May 20, 1999[2] in support of an application to continue to utilize electronic surveillance in the investigation which gave rise to the instant case. In that affidavit, Special Agent Feisthammel opined, based upon the conduct of his investigation to that point, that "Massaro had been operating cautiously and without assignment of a crew leader from whom

---

designation while being housed pretrial and upon his ultimate designation to a penal facility following conviction.

2. In his submission, the defendant incorrectly stated that this affidavit was executed on May 20, 2000.

3

Massaro could seek guidance and permission to conduct criminal activity." The defendant ignores the fact that, within that same paragraph, Special Agent Feisthammel set forth information which indicated that "Massaro [had] recently been assigned to the crew of Trentacosta." See, Defendant's Submission for Bond, Attachment #3, paragraph 69. It is clear that, as of May 20, 1999, the full details concerning the functions of individuals within the racketeering conspiracy had not been established. That is the reason why Agent Feisthammel further stated in his affidavit that "continued interception [of wire communications] is necessary to reveal the full scope and nature of the racketeering enterprise" and that "[d]ue to the fact that sufficient evidence is not available through other investigative techniques ... there is a need for electronic surveillance in this matter to reveal the manner and scope in which Frederick J. Massaro, Anthony Trentacosta ... and others as yet unknown, participate in the illegal conduct referenced herein, the identities of the participants, co-conspirators and victims, the precise nature and scope of the enterprise and illegal activity, the individual acts committed by aiders, abettors and co-conspirators, the extent of their participation in these offenses, their places of operation, the full nature of the criminal conspiracies involved therein, and the acquisition and disbursement of proceeds derived from criminal activity." See, Defendant's Submission for Bond, Attachment #3, paragraphs 71 and 72. Quite simply, as Agent Feisthammel set forth in his affidavit, as of May 20, 1999 there was insufficient evidence available to clearly establish the precise nature of the defendants' activities and roles in the conduct of the enterprise. That was the reason why he and other state and federal agents were engaged in the covert investigation which gave rise to the instant case. Since May 20, 1999, further evidence has

been developed which established that Massaro was "on record with" Trentacosta upon the death of Anthony "Fat Andy" Ruggiano, and that Massaro was engaged in criminal activity with Trentacosta, and paid tribute money derived through criminal activity to Trentacosta, well before Fat Andy's death. See, Government's Appeal of Magistrate's Order, pages 7-11.[3] Thus, the affidavit of Agent Feisthammel, executed some seventeen months ago while he was engaged in the fact-finding process and while he, admittedly, did not possess sufficient evidence concerning the roles and activities of the defendants, in no way impeaches the evidence currently before this court concerning the defendant's leadership role in the sustained, and oftentimes violent, criminal activity with which he is charged.

III. THE CIRCUMSTANCES OF THE DEFENDANT'S ARREST

The defendant asserts that the fact that he was arrested without incident at his home in Georgia militates in favor of his release. In fact, on September 26, 2000 FBI Special Agent Frank J. Graziano placed a telephone call to the defendant's residence, identified himself, stated to the defendant that he wanted to speak with the defendant, and inquired as to whether the

---

3. Court authorized intercepted conversations corroborate that Massaro was formally "on record" with Fat Andy prior to his death on March 19, 1999. Further investigation conducted since the sworn affidavit executed by Special Agent Feisthammel on May 20, 1999 has revealed that Massaro reported to Trentacosta and paid Trentacosta monies generated from criminal activity before and after Fat Andy's incarceration. Upon Fat Andy's release from prison in 1998, he initially lived in a half-way house. Eventually he lived at his home in the New York City area (while Massaro remained in South Florida) but was still on parole and, therefore, his travel and his ability to associate with convicted felons like Massaro was extremely restricted. As a result, Trentacosta exercised control over Massaro even though Massaro was technically on record with Fat Andy.

defendant would be at home within the next few minutes. The defendant replied that he would be home. Thereupon, Agent Graziano and FBI Special Agent John J. Simmons proceeded to the defendant's home, where they advised the defendant, for the first time, that they were in possession of a warrant for his arrest. While it is true that, at that point, the defendant neither fled nor resisted, these facts are of little significance. Thereafter, while en route to the Atlanta office of the FBI, the defendant claimed to have known that he was going to be indicted in Florida. Assuming that the defendant may have been aware that he was going to be arrested on some charge, there is no indication that he was aware of the seriousness of the charges set forth in the pending indictment or that his potential guidelines sentence would be in the range of 15-20 years. Moreover, the fact that he has previously appeared when required in other cases is of limited relevance given the nature of the prior offenses and the comparatively short prison sentences which he faced in connection therewith. See, Government's Appeal of Magistrate's Order, p. 3, n 3. The evidence before this court establishes that the defendant is a 61-year-old man who claims no assets in his own name and who potentially is facing the remainder of his useful life in prison. Furthermore, the evidence establishes that, when he was previously confronted with the possibility that he might be arrested on serious charges, the defendant expressed his intention to flee the country. See, Government's Appeal of Magistrate's Order, p. 10.

IV. THE DEFENDANT'S MEDICAL CONDITION

The defendant's medical condition is, at this particular point, unremarkable. To the

extent that his conditions require monitoring, the Bureau of Prisons is capable of doing so. Significantly, the defendant's medical problems are not of recent onset. He was suffering from more acute symptoms during the same time frame that he was committing the offenses set forth in the indictment. If he was not too ill to engage in the racketeering activity set forth in the indictment, he is not too ill to be incarcerated as a result.

## V. THE BUSINESS INTERESTS OF THE DEFENDANT'S SPOUSE

As set forth in the defendant's Pretrial Services Report, he has not received income from a reputable job for the past thirty-seven years. The defendant claims no assets, and asserts that his wife has supported him for the past twenty-six years. This statement was confirmed by the defendant's wife. Therefore, the defendant's incarceration could not logically constitute a financial burden to any person in any way.

## VI. ALTERNATIVE CONDITIONS OF RELEASE

The defendant proposes certain conditions of release which, he asserts, "would insure that the interests of both parties are protected." Defendant's Submission on Bond, Point Six. The government respectfully submits that no such conditions, or combination thereof, are sufficient to reasonably assure the appearance of the defendant as required and the safety of the community.

The risk that a defendant will continue to engage in criminal activity constitutes a danger to the safety of the community. United States v. King, 849 F.2d 485, 487 n.2 (11th Cir. 1988).

In this case, the evidence is unrefuted that the defendant has sworn life-long allegiance and loyalty to a nationwide criminal organization which is engaged in an ongoing pattern of illegal, and oftentimes violent, conduct. The evidence in the instant case establishes that the defendant is the organizer and beneficiary of criminal activity here in the Southern District of Florida, which he directs from his home in Georgia. By nature of his position and resources, the defendant can direct, and has directed, the commission of crimes hundreds of miles from his residence. Given the defendant's status within La Cosa Nostra, coupled with the violent acts set forth in the indictment, no conditions of release can reasonably protect the community from the defendant's ability to commit future crimes.[4] See, United States v. Accetturo, 673 F.Supp 746, 781-2 (D.N.J. 1985) (ordering pretrial detention upon a finding that the defendant presents a danger to the community "not merely because of his own potential to personally inflict harm but, as previously stated, because of his exercise of ultimate control and dominion over the often violent and predominantly illegal activities of his underlings"); United States v. Defede, 7 F.Supp.2d 390, 395 (S.D.N.Y. 1998) (finding that, in considering the adequacy of conditions to safeguard the public, it is important to recognize that the threat inherent in defendant's liberty may arise from his ability to plan, order and supervise criminal activity by others).

The defendant's proposed conditions of release are similar to those presented in United States v. Gotti, 776 F.Supp. 666 (E.D.N.Y. 1991). There, defendant Locascio proposed conditions which included house arrest and sophisticated electronic surveillance systems. The

---

4. The return of the indictment establishes probable cause that the defendant committed the charged offense. United States v. Quartermaine, 913 F.2d 910, 917 (11th Cir. 1990).

District Court rejected these proposals and ordered that the defendant remain detained, finding that where the government has met its burden in establishing that the safety of the community is at risk, the government need not be charged with the responsibility to monitor the defendant's activities under a release order. The Court found that "there is a limit to the amount of government resources which have to be expended to release dangerous defendants pretrial, when their constitutional rights are not being violated by continued detention." Id. at 672, quoting United States v. Infelise, 765 F.Supp. 960, 964 (N.D.Ill. 1991). The Court thereupon observed the following:

> [T]he conditions proposed do not provide the assurances of safety the community deserves. The wonders of science and of sophisticated electronic technology have made mobile and portable telephones commonplace. Communication devices are easily carried in briefcases and even shirt pockets. Pen registers and wiretaps are easily circumvented. Monitoring equipment is easily rendered inoperative or becomes so by mechanical failure. In sum, I conclude there are no conditions or combination of conditions that will reasonably assure the safety of any person and the community.

Id. at 673. See also, United States v. Tortora, 922 F.2d 880, 886-87 (1st Cir. 1990) (electronic monitoring and other conditions attendant to home confinement found to be ineffective as their success depends largely on the defendant's good faith or lack thereof). In the case at bar, the inherent flaws in the defendant's proposed conditions of release are exacerbated by the fact that they contemplate his residing in Georgia, where it would be impossible for the agents here in South Florida, who are most knowledgeable about this case, to effectively monitor his activities.

WHEREFORE, the government respectfully submits that, based upon the record

9

currently before the Court, the defendant should properly be held without bond pending trial.[5]

                                        Respectfully submitted,

                                        GUY A. LEWIS
                                        UNITED STATES ATTORNEY

By: _____
       JEFFREY H. SLOMAN
       Assistant United States Attorney
       Florida Bar No. 0378879
       500 E. Broward Blvd., Suite 700
       Fort Lauderdale, Florida 33394
       Tel: (954) 356-7255
       Fax: (954) 356-7230

       _____
       LAWRENCE D. LaVECCHIO
       Assistant United States Attorney
       Florida Bar No. 0305405
       500 E. Broward Blvd., Suite 700
       Fort Lauderdale, Florida 33394
       Tel: (954) 356-7255
       Fax: (954) 356-7230

---

5. The government respectfully submits that detention is appropriate in the instant case notwithstanding the fact that the trial date was recently continued. In United States v. Tortora, supra, the Court found that "Congress conspicuously omitted any instruction to consider the potential length of detention as part of the pretrial release calculus," and held that detention of more than two years' duration did not violate due process considerations. Id., 922 F.2d at 889. Similarly, in United States v. Quartermaine, supra., the Eleventh Circuit reversed a decision by the District Court releasing a defendant based solely on pretrial delay, finding that such delay "does not mandate the release of a defendant for whom pretrial detention is otherwise appropriate." Id., 913 F.2d at 918.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was delivered by U.S. mail to Richard K. Houlihan, Esquire, Suite 310, 300 Aragon Avenue, Coral Gables, Florida 33134 on this 8th day of November, 2000.

_____
LAWRENCE D. LaVECCHIO
Assistant United States Attorney