UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6273-CR-HUCK

Unsealed _by DE 600_

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANTHONY TRENTACOSTA, et al.,

Defendants.

_____/

RECEIVED
FILED

JUN 0 8 2001

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

**UNDER SEAL**

GOVERNMENT'S NOTICE OF FILING COPIES OF WIRETAP
ORDERS AND APPLICATIONS

COMES NOW the United States of America, by and through the undersigned Assistant

United States Attorney, and files copies of the following documents:

      1. Order of The Honorable William P. Dimitrouleas entered on March 18, 1999 authorizing the interception of wire communications in case number 99-1-WPD, and its accompanying application and affidavit in support thereof.

      2. Order of The Honorable William P. Dimitrouleas entered on April 20, 1999 authorizing the continued interception of wire communications in case number 99-1-WPD, and its accompanying application and affidavit in support thereof.

      3. Order of The Honorable William P. Dimitrouleas entered on May 20, 1999 authorizing the continued interception of wire communications in case number 99-1-WPD, and its accompanying application and affidavit in support thereof.

These documents are being filed for the Court's review and consideration in connection with

motions which have been filed by the defendants Anthony Trentacosta, Frederick J. Massaro

and Ariel Hernandez seeking suppression of wiretap evidence (DE 157, 159, 228 and 231) and

the government's Response thereto which is being filed simultaneously herewith.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____

LAWRENCE D. LaVECCHIO
Assistant United States Attorney
Florida Bar No. 0305405
500 E. Broward Blvd., Suite 700
Fort Lauderdale, Florida 33394
Tel: (954) 356-7255/356-7230 - fax

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was delivered by

U.S. mail to the following on this 8th day of June 2001.

Richard K. Houlihan, Esq. **(for Anthony Trentacosta)**
300 Aragon Avenue, Ste. 310
Coral Gables, Florida 33134

Fred Haddad, Esq. **(for Frederick J. Massaro)**
One Financial Plaza, Suite 2612
Fort Lauderdale, Florida 33394

Samuel D. DeLuca, Esq. **(for Francis Ruggiero)**
3451 John F. Kennedy Blvd.
Jersey City, New Jersey 07307

Jeffrey Weinkle, Esquire **(for Ariel Hernandez)**
1035 NW 11th Avenue
Miami, Florida 33136

Donald Spadaro, Esquire **(for Julius B. Chiusano)**
1000 S. Federal Highway, Suite 103
Fort Lauderdale, Florida 33316

Michael G. Smith, Esquire **(for Adam Todd Silverman)**
633 SE 3rd Avenue, Suite 4F
Fort Lauderdale, Florida 33301

Albert Z. Levin, Esquire **(for Carlos Garcia)**
888 Brickell Avenue, Sixth Floor
Miami, Florida 33131

Thomas Almon **(for Charles P. Monico)**
321 NE 26th Street
Miami, Florida 33137

Manuel Gonzalez, Esquire **(for Anthony R. Banks)**
782 NW Le Jeune Road, Suite 440
Miami, Florida 33126

William D. Matthewman, Esq. **(for Ariel Hernandez)**
2300 Glades Rd., Suite 340 - West Tower
Boca Raton, Florida 33431

Christopher A. Grillo, Esq. **(for Frederick J. Massaro)**
1 East Broward Blvd., #700
Ft. Lauderdale, Florida 33301

LAWRENCE D. LaVECCHIO
Assistant United States Attorney

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE APPLICATION )    MISC. NO. *99-1-WPD*
OF THE UNITED STATES OF AMERICA )
FOR AN ORDER AUTHORIZING THE )        **ORDER AUTHORIZING THE**
INTERCEPTION OF WIRE )                **INTERCEPTION OF WIRE**
COMMUNICATIONS )                      **COMMUNICATIONS**
                                 )
_____ )   **UNDER SEAL**

Application under oath having been made before me by Lawrence

D. LaVecchio, Assistant United States Attorney, Southern District

of Florida, an investigative or law enforcement officer of the

United States within the meaning of Section 2510(7) of Title 18,

United States Code, for an Order authorizing the interception of

wire communications pursuant to Section 2518 of Title 18, United

States Code, and full consideration having been given to the matter

set forth therein, the Court finds:

1.    There is probable cause to believe that **FREDERICK J.**

**MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO,**

**MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS**

**BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID**

**GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI** and others

as yet unknown, have committed, are committing, and will continue

to commit violations of the following offenses:

A.    Conspiracy to conduct and participate, and

conducting and participating, directly and indirectly in the

affairs of an enterprise, as defined in Title 18, United States

Code, Section 1961(4), i.e., the Gambino La Cosa Nostra (LCN) Organized Crime Family, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity which includes the offenses set forth in paragraphs (B) through (G) below, and through the collection of an unlawful debt, in violation of Title 18, United States Code, Section 1962 © and (d);

  B. A felony violation relating to the production of false identification documents, in violation of Title 18, United States Code, Section 1028;

  C. Fraud and related activity in connection with access devices, in violation of Title 18, United States Code, Section 1029;

  D. Mail Fraud and Wire Fraud, in violation of Title 18, United States Code, Sections 1341 and 1343;

  E. Making extortionate extensions of credit, financing extortionate extensions of credit and conspiring to collect extensions of credit by extortionate means, in violation of Title 18, United States Code, Sections 892, 893 and 894;

  F. Conspiracy to distribute and to possess with intent to distribute a controlled substance, and distribution and possession with the intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 841 and 846;

  G. Use of a communications facility to facilitate a narcotics offense, in violation of Title 21, United States Code, Section 843(b); and

  H. Conspiracy to commit any or all of the aforesaid

2

offenses set forth above in paragraphs (B), (C), (D) and (G), in violation of Title 18, United States Code, Section 371.

    2.   There is probable cause to believe that particular wire communications of **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI** and others as yet unknown, concerning the above-described offenses, will be obtained through the interception of wire communications occurring on cellular telephone number **(954) 224-7513** (bearing electronic serial number "ESN" **E0F91087**) and cellular telephone number **(954) 224-7512** (bearing ESN **EB8BD944**), each target cellular telephone number being subscribed to FATHER & SON MOVING & STORAGE, 6805 Stuart Ln S., Jacksonville, Florida; telephone number **(954) 456-3020**, subscribed to **FREDERICK J. MASSARO** at 1499 Shoreline Way, Hollywood, Florida; and telephone number **(305) 944-2929**, subscribed to Beachside Mario's at 17210 Collins Avenue, Sunny Isles Beach, Florida. In particular, there is probable cause to believe that the interception of wire communications to and from those telephones (hereinafter referred to jointly as the "target telephones") will concern the specifics of the above enumerated offenses, including, the manner and means of the commission of the offenses; the nature and scope of the illegal activities; the disposition of proceeds obtained as a result of these illegal activities; the location of resources and operations leading to the discovery of the identities of other co-

conspirators, aiders and abettors, and victims; and the role of each participant in the conspiracy and in the substantive violations set forth above. In addition, the communications are expected to constitute admissible evidence of the commission of the above-described offenses.

3. It has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ; and

4. There is probable cause to believe that the above-described facilities have been and will continue to be used in connection with commission of the above-described offenses.

WHEREFORE, IT IS HEREBY ORDERED that Special Agents of the Federal Bureau of Investigation are authorized, pursuant to an Application authorized by a duly designated official of the Criminal Division, United States Department of Justice, under the power delegated to that official by special designation of the Attorney General and vested in the Attorney General by Section 2516 of Title 18, United States Code, to intercept wire communications to and from the above-described target telephones.

PROVIDED that such interceptions shall not terminate automatically after the first interception that reveals the manner in which the above-named persons and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of the

4

participants, co-conspirators and victims, the precise nature and scope of the enterprise and illegal activity, the individual acts committed by aiders, abettors and co-conspirators, the extent of their participation in these offenses, their places of operation, the locations where physical evidence is being stored, the locations and persons to which proceeds derived from criminal activity is transmitted, and the full scope and nature of the conspiracies involved therein, or for a period of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception under this Order, or ten (10) days after this Order is entered, whichever is earlier.

IT IS FURTHER ORDERED that this authorization applies not only to the target telephone numbers listed above, but also to any other telephone numbers subsequently assigned to or used by the instrument bearing the same ESN utilized by either target cellular telephone, and to any other telephone numbers subsequently assigned to the same cable, pair, and binding posts used by the target landline telephones, within the thirty (30) day period. Additionally, this authorization applies notwithstanding any changes in the ESN of either target cellular telephone so long as its assigned telephone number remains the same.

IT IS FURTHER ORDERED that this authorization applies to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

IT IS FURTHER ORDERED that, to the extent that either target

cellular telephone facility is transported outside the territorial jurisdiction of this Court, interceptions may take place in any other jurisdiction within the United States.

IT IS FURTHER ORDERED that, based upon the request of the Applicant pursuant to Section 2518(4) of Title 18, United States Code, BellSouth, AT&T Wireless Communications, and any and all other electronic communication service providers, as defined in Section 2510(15) of Title 18, United States Code, shall furnish the Federal Bureau of Investigation with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such provider is according the persons whose communications are to be intercepted, with the service providers to be compensated by the Federal Bureau of Investigation for reasonable expenses incurred in providing such facilities or assistance.

IT IS FURTHER ORDERED that, to avoid prejudice to the Government's criminal investigation, BellSouth, AT&T Wireless Communications, and any and all other communication services providers, and their agents and employees, are ordered not to disclose or cause a disclosure of this Order, or of any request for information, facilities, and assistance by the Federal Bureau of Investigation, or the existence of the investigation to any person other than those of its agents and employees who require this information to accomplish the services hereby ordered.  In particular, said communications service providers and its agents and employees shall not make such disclosure to a lessee, telephone

6

subscriber or any interceptee or participant in the intercepted communications.

IT IS FURTHER ORDERED that this Order shall be executed as soon as practicable and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under Chapter 119 of Title 18, United States Code. In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. The interception of wire communications must terminate upon the attainment of the authorized objectives, or, in any event, at the end of thirty (30) days, measured from the day on which investigative or law enforcement officers first begin to conduct an interception pursuant to this Order, or ten (10) days after the Order is entered, whichever is earlier.

IT IS FURTHER ORDERED that Applicant or another Assistant United States Attorney familiar with the facts of this case shall provide this Court with a report on or about every ten days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the above-ordered reports should become due on a weekend or holiday, IT IS FURTHER ORDERED that such report shall become due on the next business day thereafter.

7

IT IS FURTHER ORDERED, pursuant to Title 18, United States Code, Section 3123, that Special Agents of the Federal Bureau of Investigation may install and maintain pen register devices to register numbers dialed or pulsed from the subject lines, to record the date and time of such pulsing or recordings, and to record the length of time the telephone receiver in question is off the hook, throughout the period of time for which authorization is hereby given to intercept wire communications.

IT IS FURTHER ORDERED, pursuant to Title 18, United States Code, Section 2703(d) and 3123 that BellSouth, AT&T Wireless Communications, and all other communications service providers, shall provide to the FBI all telephone numbers called from, or into, the above described communications facilities, and all customer and subscriber information, listed and unlisted, and the names and addresses of all subscribers for any and all telephone numbers called from, or calling into, the above described communications facilities. This Court finds that there are reasonable grounds to believe that such information is relevant and material to a criminal investigation and an Assistant United States Attorney has certified that the information sought is material and relevant to the ongoing criminal investigation.

IT IS FURTHER ORDERED that this Order, the Application, Affidavit, any resulting Orders, and all interim reports filed with the Court with regard to this matter shall be sealed until further order of the Court and kept in the possession, custody, care, and control of the Federal Bureau of Investigation, except that copies

8

of the Orders, in full or redacted form, may be served upon the communications service providers as necessary to effectuate this Order.

_____
WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

Dated this ⎽18⎽ day of March, 1999.

Time ⎽3:00 P.M.⎽

Certified to be a true and
correct copy of the original:
Carlos Juenke. Clerk
U.S District Court
Southern District of Florida
By _____
Deputy Clerk
Date ⎽3/18/99⎽

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA
FOR AN ORDER AUTHORIZING THE
INTERCEPTION OF WIRE
COMMUNICATIONS

MISC. NO. *99-1-WPD*

**APPLICATION FOR
INTERCEPTION OF
WIRE COMMUNICATIONS**

**UNDER SEAL**

_____

Lawrence D. LaVecchio, Assistant United States Attorney, Southern District of Florida, being

duly sworn, states:

1.      I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, that is, an attorney authorized by law

to prosecute or participate in the prosecution of offenses enumerated in Section 2516 of Title 18,

United States Code.

2.      This application is for an order pursuant to Section 2518 of Title, 18, United States

Code, authorizing the interception of wire communications until the attainment of the authorized

objectives or, in any event, at the end of the thirty (30) days measured from the day on which the

investigative or law enforcement officers first begin to conduct an interception under the Court's order,

or ten (10) days after the Order is entered, whichever is earlier, of **FREDERICK J. MASSARO,**

**ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN**

SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI (hereinafter referred to as the named interceptees) and others yet unknown occurring over cellular telephone number **(954) 224-7513** (bearing electronic serial number "ESN" **E0F91087**) and cellular telephone number **(954) 224-7512** (bearing ESN **EB8BD944**), each target cellular telephone number being subscribed to FATHER & SON MOVING & STORAGE, 6805 Stuart Ln S., Jacksonville, Florida; telephone number **(954) 456-3020,** subscribed to **FREDERICK J. MASSARO** at 1499 Shoreline Way, Hollywood, Florida; and telephone number **(305) 944-2929**, subscribed to Beachside Mario's at 17210 Collins Avenue, Sunny Isles Beach, Florida, for a period of thirty (30) days, concerning offenses enumerated in Section 2516 of Title 18, United States Code, that is, the following offenses:

A.      Conspiracy to conduct and participate, and conducting and participating, directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4), i.e., the Gambino La Cosa Nostra (LCN) Organized Crime Family, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity which includes the offenses set forth in paragraphs (B) through (G) below, and through the collection of an unlawful debt, in violation of Title 18, United States Code, Section 1962 (c) and (d);

B.      A felony violation relating to the production of false identification documents, in violation of Title 18, United States Code, Section 1028;

C.      Fraud and related activity in connection with access devices, in violation of Title 18, United States Code, Section 1029;

D.      Mail Fraud and Wire Fraud, in violation of Title 18, United States Code, Sections 1341 and 1343;

E.      Making extortionate extensions of credit, financing extortionate extensions of credit and conspiring to collect extensions of credit by extortionate means, in violation of Title 18, United States Code, Sections 892, 893 and 894;

F.      Conspiracy to distribute and to possess with intent to distribute a controlled substance, and possession with the intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 841 and 846;

G.      Use of a communication facility to facilitate a narcotics offense, in violation of Title 21, United States Code, Section 843(b); and

H.      Conspiracy to commit any or all of the aforesaid offenses set forth above in paragraphs (B), (C), (D) and (G), in violation of Title 18, United States Code, Section 371.

3.      Pursuant to Section 2516 of Title 18, United States Code, the Attorney General of the United States has specially designated the Assistant Attorney General of the Criminal Division and any Deputy Assistant Attorney General of the Criminal Division to exercise the power conferred on the Attorney General by Section 2516 of Title 18, United States Code, to authorize this Application. By special designation of the Attorney General pursuant to Order Number 1950-95 of February 13, 1995, an appropriate official of the Criminal Division has authorized this Application. Attached to this Application are copies of the Attorney General's Order of special designation and the Memorandum of Authorization approving this Application.

4.      I have discussed all of the circumstances of the above-described offenses with Special

Agent Terry L. Feisthammel of the Federal Bureau of Investigation (FBI), and have examined the Affidavit of Special Agent Terry L. Feisthammel, which is attached to this Application and is incorporated herein by reference. Based upon that Affidavit, your Applicant states upon information and belief that:

        I.      There is probable cause to believe that **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI** and others as yet unknown, have committed, are committing, and will continue to commit those offenses set forth hereinabove in paragraphs 2(A) through 2(H);

        ii.      There is probable cause to believe that particular wire communications of **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI** and others unknown concerning the above-described offenses will be obtained through the requested interception. In particular, these communications will concern the nature and scope of the illegal activities; the disposition of monies obtained as a result of these illegal activities; the location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims; and the role of each participant in the conspiracy and in the substantive

violations set forth above. In addition, the communications are expected to constitute admissible evidence of the commission of the above-stated offenses;

      iii.    Normal investigative procedures have been tried and failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ, as is described in further detail in the attached Affidavit; and

      iv.    There is probable cause to believe that the above-described communications facilities have been, are being, and will continue to be used in connection with the commission of the above-described offenses.

    5.    The attached Affidavit contains a full and complete statement of facts concerning all previous applications which are known to have been made to any judge of competent jurisdiction for approval of the interception of oral, wire or electronic communications of any of the named interceptees and target communications facilities specified in this Application. The Applicant is aware of no previous applications made to any judge for authorization to intercept oral, wire or electronic communications of any of the persons, or involving any of the persons, facilities, or places specified in this Application, other than those set forth in the attached Affidavit.

    Based on the allegations set forth in this Application and on the Affidavit of Special Agent Terry L. Feisthammel which is attached hereto, the Applicant requests this Court to issue an Order, pursuant to Section 2518 of Title 18, United States Code, authorizing the Federal Bureau of Investigation to intercept wire communications to and from the above-described facilities until such communications are intercepted that reveal the manner in which the above-named persons and others as yet unknown participate in the illegal conduct referenced herein, the identities of all co-conspirators,

participants and victims, the precise nature and scope of the criminal enterprise and illegal activity, the individual acts committed by aiders, abettors and co-conspirators, the extent of their participation in these offenses, their places of operation, the locations where physical evidence is being stored, the locations and persons to which money derived from criminal activity is transmitted, and the full scope and nature of the conspiracies involved therein, or for a period of thirty (30) days, measured from the day on which the investigative or law enforcement officers first begin to conduct the interception, or ten (10) days from the date of this Order, whichever is earlier.

IT IS REQUESTED FURTHER that the authorization given apply not only to the target telephone numbers listed above, but to any other telephone numbers subsequently assigned to or used by the instruments bearing the same ESN utilized by either target cellular telephone, and to any other telephone numbers subsequently assigned to the same cable, pair, and binding posts, utilized by the target landline telephones, within the thirty (30) day period. It is also requested that the authorization apply notwithstanding any changes in the ESN of either target cellular telephone so long as its assigned telephone number remains the same. It is also requested that the authorization be intended to apply to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

IT IS REQUESTED FURTHER that this Court issue an order pursuant to Section 2518(4) of Title 18, United States Code, directing BellSouth, AT&T Wireless Communications, and any and all other electronic communications service providers as defined in Section 2510(15) of Title 18, United States Code, to furnish and continue to furnish the Federal Bureau of Investigation with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively

and with a minimum of interference to the services that such providers are according the persons whose communications are to be intercepted, and to ensure an effective and secure installation of electronic devices capable of intercepting wire communications over the above-described telephones. The service provider shall be compensated by the Federal Bureau of Investigation for reasonable expenses incurred in providing such facilities or assistance.

IT IS REQUESTED FURTHER that, to the extent that either target cellular facility is taken outside the territorial jurisdiction of this Court, interceptions may take place in any other jurisdiction within the United States.

IT IS REQUESTED FURTHER, to avoid prejudice to this criminal investigation, that the Court order the providers of electronic communication service and their agents and employees not to disclose or cause a disclosure of this Court's Order or the request for information, facilities, and assistance by the Federal Bureau of Investigation or the existence of the investigation to any person other than those of their agents and employees who require this information to accomplish the services requested. In particular, said providers and their agents and employees should be ordered not to make such disclosure to a lessee, telephone subscriber, or any interceptee or participant in the intercepted communications.

IT IS REQUESTED FURTHER that this Court direct that its Order be executed as soon as practicable after it is signed and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under Chapter 119 of Title 18, United States Code. The interception of wire communications authorized by this Court's Order must terminate upon attainment of the authorized objectives or, in any event, at

the end of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception, or ten (10) days after the Order is entered, whichever is earlier.

IT IS REQUESTED FURTHER that the Court order that either Applicant or another Assistant United States Attorney familiar with the facts of the case provide the Court with a report on or about every 10 days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the aforementioned reports should become due on a weekend or holiday, it is requested further that such report become due on the next business day thereafter.

IT IS REQUESTED FURTHER that the Court's Orders, this Application and the accompanying Affidavit, and all interim reports submitted with regard to this matter be sealed until further order of this Court, except that copies of the orders, in full or redacted form, may be served on the service providers as necessary to effectuate the Court's orders.

IT IS REQUESTED FURTHER, pursuant to Title 18, United States Code, Section 2703(d) and 3123, that the Court order that the Federal Bureau of Investigation be authorized to maintain pen register devices to register numbers dialed or pulsed from the subject lines during the period for which interception of communications is authorized, and order that BellSouth, AT&T Wireless Communications, and all other communications service providers, shall provide to the FBI all telephone numbers called from, or into, the above described communications facilities, and all customer and subscriber information, listed and unlisted, and the names and addresses of all subscribers for any and all telephone numbers being called from, or calling into, the above described communications facilities. The facts set forth in the attached affidavit establish reasonable grounds

to believe that such information is relevant and material to an ongoing criminal investigation, and the undersigned certifies that the information sought is material and relevant to the ongoing criminal investigation.

IT IS REQUESTED FURTHER that the sealed Orders, Application, and Affidavit be kept in the possession, custody, care, and control of the Federal Bureau of Investigation in a safe and secure place until further order of the Court.

Respectfully submitted,

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By _____

LAWRENCE D. LaVECCHIO
Assistant United States Attorney
500 East Broward Blvd., Suite 700
Ft. Lauderdale, FL 33394
Tel. (954) 356-7255/356-7230 - fax
Fla. Bar No. 305405

SUBSCRIBED and SWORN to before me

this ___ day of March, 1999.

WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

Certified to be a true and
correct copy of the original.
Carlos Juenke. Clerk
U.S District Court
Southern District of Florida
By _____
Deputy Clerk
Date ___3/18/99___



**Office of the Attorney General**
**Washington, D. C. 20530**

ORDER NO. 1950-95

SPECIAL DESIGNATION OF THE ASSISTANT, ACTING ASSISTANT,
ANY DEPUTY ASSISTANT, AND ANY ACTING DEPUTY ASSISTANT ATTORNEY
GENERAL OF THE CRIMINAL DIVISION TO AUTHORIZE APPLICATIONS FOR
COURT ORDERS FOR INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS
UNDER CHAPTER 119, TITLE 18, UNITED STATES CODE

By virtue of the authority vested in me by 28 U.S.C. §§ 509
and 510, 5 U.S.C. § 301, and 18 U.S.C. § 2516(1), and in full
recognition that 18 U.S.C. § 2516(1) empowers the Attorney General,
Deputy Attorney General, and Associate Attorney General to
authorize applications to a Federal judge of competent jurisdiction
for orders authorizing the interception of wire and oral
communications, I hereby specially designate the Assistant Attorney
General in charge of the Criminal Division, any Acting Assistant
Attorney General in charge of the Criminal Division, any Deputy
Assistant Attorney General of the Criminal Division, and any Acting
Deputy Assistant Attorney General of the Criminal Division, to
exercise the power conferred by section 2516(1) of title 18, United
States Code, to authorize applications to a Federal judge of
competent jurisdiction for orders authorizing or approving the
interception of wire or oral communications by the Federal Bureau
of Investigation or a Federal agency having responsibility for the

INTERNAL ORDER/NOT PUBLISHED
IN F.R.

investigation of the offense(s) as to which such application is made, when such interception may provide evidence of any of the offenses specified in section 2516 of title 18, United States Code.

Order No. 1709-93 of April 5, 1993, is revoked effective at midnight of the day following the date of this order.

Date: February 13, 1995

JANET RENO
Attorney General

- 2 -



U.S. Department of Justice

*JKR:FDH:MHK:CHR:JPW:KLS:kls*

---

*Washington, D.C. 20530*

<u>MEMORANDUM</u>                                                    MAR 1 5 1999

TO:        Frederick D. Hess, Director
           Office of Enforcement Operations
           Criminal Division

FROM:      James K. Robinson
           Assistant Attorney General
           Criminal Division

SUBJECT:   Authorization for Interception Order Application


        This is in regard to your recommendation that I, an
appropriately designated official of the Criminal Division,
authorize an application to a federal judge of competent
jurisdiction for an order under Title 18, United States Code,
Section 2518, authorizing for a thirty (30) day period, the
interception of wire communications to and from the cellular
telephones bearing the numbers (954) 224-7513 and (954) 224-7512,
both subscribed to by Father & Son Moving & Storage, 6805 Stuart
Lane S., Jacksonville, Florida; and the landline telephones
bearing the numbers (954) 456-3020, subscribed to by Frederick J.
Massaro, and located at 1499 Shoreline Way, Hollywood, Florida,
and (305) 944-2929, subscribed to by Beachside Mario's, and
located at 17210 Collins Avenue, Sunny Isles Beach, Florida, in
connection with an investigation into possible violations of
Title 18, United States Code, Sections 371, 892, 893, 894, 1028,
1029, 1341, 1343, 1961, and 1962; and Title 21, United States
Code, Sections 841, 843, and 846, by Frederick J. Massaro,
Anthony Ruggiano, Anthony Trentacosta, Michael J. Falco, Martin
Siskind, Ariel A. Hernandez, John Patrick Rogan, Julius Bruce
Chiusano, Irving Harold Weiss, Chester Potash, Richard David
Gazie, John Mirabile, Anthony Esperti, Joseph Spitaleri, and
others as yet unknown.

        By virtue of the authority vested in the Attorney General of
the United States by Section 2516 of Title 18, United States
Code, the Attorney General has by Order Number 1950-95, dated
February 13, 1995, designated specific officials in the Criminal
Division to authorize applications for court orders authorizing
the interception of wire or oral communications. As a duly
designated official in the Criminal Division, this power is
exercisable by me. WHEREFORE, acting under this delegated power,

I hereby authorize the above-described application to be made by any investigative or law enforcement officer of the United States as defined in Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to the target telephone numbers listed above, but to any other telephone numbers subsequently assigned to the same cables, pairs, and binding posts as the target landline telephones within the thirty (30) day period, and to any changed telephone numbers subsequently used by or assigned to the instruments bearing the same electronic serial numbers designated by the target cellular telephones within the thirty (30) day period. The authorization is also intended to apply to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

James K. Robinson
Assistant Attorney General
Criminal Division

3-15-99

Date

John C. Keeney
Deputy Assistant Attorney General

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE APPLICATION )
OF THE UNITED STATES OF AMERICA )     NO. _99-1-WPD_____
FOR AN ORDER AUTHORIZING THE )
INTERCEPTION OF WIRE COMMUNICATIONS )     **UNDER SEAL**
_____ )

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Terry L. Feisthammel, Special Agent, Federal Bureau of Investigation, Miami, Florida, being duly sworn, depose and say:

1   I am a Special Agent of the Federal Bureau of Investigation (FBI). As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code (U.S.C.), Section 2510 (7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, U.S.C., Section 2516.

2   I have been employed as a Special Agent of the FBI for approximately twelve years. For the past three years, I have been assigned primarily to investigations of organized crime, including investigations of an organized criminal enterprise known as the La Cosa Nostra (LCN). As a result of my participation in these investigations, conversations with other FBI Agents familiar with the criminal activities of the LCN, reviews of reports concerning

LCN activities, members and associates, and reliable informant information, I know that the criminal activities of the LCN include, but are not limited to, gambling, trafficking in contraband cigarettes, loansharking, money laundering, extortion, labor racketeering, drug trafficking, and murder. I have also become familiar with many of the methods used by the LCN in the commission of these offenses.

3    This Affidavit is being submitted in support of an application which seeks an order authorizing the interception of wire communications of **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI** (hereinafter referred to as the named interceptees) and others yet unknown occurring over cellular telephone number **(954) 224-7513** (bearing electronic serial number "ESN" **E0F91087**) and cellular telephone number **(954) 224-7512** (bearing ESN **EB8BD944**), each target cellular telephone number being subscribed to FATHER & SON MOVING & STORAGE, 6805 Stuart Ln S., Jacksonville, Florida, with the subscriber records listing the service user as **FRED MASSARO**; telephone number **(954) 456-3020,** subscribed to **FREDERICK J. MASSARO** at 1499 Shoreline Way, Hollywood, Florida; and business telephone number **(305) 944-2929,** subscribed to Beachside Mario's at 17210 Collins Avenue, Sunny Isles Beach, Florida, for a period of thirty (30) days. These four

target telephones have been identified as being utilized by
**FREDERICK J. MASSARO.**

4    The wire interceptions sought herein will be conducted
pursuant to Title 18, United States Code, Section 2518, concerning
the following offenses enumerated in Title 18, United States Code,
Section 2516:

A.    Conspiracy to conduct and participate, and
conducting and participating, directly and indirectly in the
affairs of an enterprise, as defined in Title 18, United States
Code, Section 1961(4), i.e., the Gambino La Cosa Nostra (LCN)
Organized Crime Family, the activities of which affect interstate
and foreign commerce, through a pattern of racketeering activity
which includes the offenses set forth in paragraphs 4(B) through
4(G) below, and through the collection of an unlawful debt, in
violation of Title 18, United States Code, Section 1962 (c) and
(d);

B.    A felony violation relating to the production of
false identification documents, in violation of Title 18, United
States Code, Section 1028;

C. Fraud and related activity in connection with access
devices, in violation of Title 18, United States Code, Section
1029;

D.    Mail Fraud and Wire Fraud, in violation of Title 18,
United States Code, Sections 1341 and 1343;

E.    Making extortionate extensions of credit, financing
extortionate extensions of credit and conspiring to collect

3

extensions of credit by extortionate means, in violation of Title 18, United States Code, Sections 892, 893 and 894;

F.    Conspiracy to distribute and possess with intent to distribute a controlled substance, and distribution and possession with the intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 841 and 846;

G.    Use of a communication facility in facilitating a narcotics offense, in violation of Title 21, United States Code, Section 843(b); and

H.    Conspiracy to commit any or all of the aforesaid offenses set forth above in paragraphs 4(B), 4(C), 4(D) and 4(G), in violation of Title 18, United States Code, Section 371.

5    I base this affidavit upon information I have discovered through my personal participation in this investigation, from oral and written reports made to me by other agents of the FBI and other federal, state, and local law enforcement agencies, I am familiar with the facts and circumstances of the investigation.    In addition, I have reviewed numerous FBI and Drug Enforcement Administration (DEA) investigative reports concerning information provided by confidential informants, cooperating witnesses, and surveillances.    These investigations have been ongoing since approximately October 1995.  These reports, in part, summarize the numerous meetings or telephone conversations among one or more of the principal interceptees of this investigation.

6    Since this affidavit is being submitted for the limited purpose of securing authorization for the interception of wire

4

communications, I have not included each and every fact known to me concerning this investigation. I have only set forth those facts believed to be necessary to establish the requisite foundation for the issuance of the order requested herein.

7    The facts and circumstances of this affidavit as set forth below demonstrate that:

A.    There is probable cause to believe that **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI** and others as yet unknown, have committed, are committing and will continue to commit the offenses enumerated hereinabove in paragraphs 4(A) through 4(H).

B.    There is probable cause to believe that **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI** and others as yet unknown, have used, are using, and will continue to use telephone numbers (954) 224-7513, (954) 224-7512, (954) 456-3020, and (305) 944-2929 for the purpose of facilitating the offenses enumerated hereinabove in paragraphs 4(A) through 4(H).

8    In particular, I believe that wire communications will occur over the target telephones (954) 224-7513, (954) 224-7512, (954) 456-3020 and (305) 944-2929 which will disclose:

5

A.    The precise nature and scope of the illegal activities.

B.    The disposition of proceeds of these illegal activities; and

C.    The location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracies and in the substantive violations set forth hereinabove in paragraph 4.

D.    In addition, the wire communications are expected to constitute admissible evidence of the commission of the above-enumerated offenses.

9    Normal investigative procedures have been tried and have not fully succeeded in achieving the objectives of the investigation, or reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.    These investigative procedures are discussed more fully below.

### DESCRIPTION OF FACILITIES
### TO BE INTERCEPTED

10    AT&T Wireless telephone records reveal that cellular telephone number (954) 224-7513 (bearing ESN E0F91087) and cellular telephone number (954) 224-7512 (bearing ESN EB8BD944) are each subscribed to FATHER & SON MOVING & STORAGE, 6805 Stuart Ln S., Jacksonville, Florida, with the subscriber records listing the service user as FRED MASSARO.    BellSouth Telecommunications records indicate that telephone number (954) 456-3020 is subscribed to FREDERICK J. MASSARO at 1499 Shoreline Way, Hollywood, Florida.

BellSouth Telecommunications records indicate that telephone number (305) 944-2929 is subscribed to Beachside Mario's at 17210 Collins Avenue, Sunny Isles Beach, Florida. Florida Corporate Comprehensive Report listed this business as Mario's of North Miami Beach, Inc., 17210 Collins Avenue, North Miami Beach, Florida. The Corporate Director of Mario's of North Miami Beach is identified as Pacita T. Mosher; date of birth, October 3, 1950; residential address, 1499 Shore Line Way, Hollywood, Florida. It is noted that both MASSARO and Mosher use the same residential address. Surveillance conducted on several occasions has documented MASSARO acting in a managerial capacity at Beachside Mario's.

11    There is probable cause to believe that particular wire communications of **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE,** and others yet unknown, who are engaged in the offenses enumerated in paragraphs 4(A) through 4(G) will be obtained through the interception of wire communications occurring over telephone numbers **(954) 224-7513, (954) 224-7512, (954) 456-3020,** and **(305) 944-2929.**

## BACKGROUND OF THE PRINCIPALS

12    **FREDERICK J. MASSARO,** a/k/a "Freddie Massaro," was born on October 20, 1939 and resides at 1499 Shoreline Way, Hollywood, Florida. MASSARO is an Associate of Gambino soldier ANTHONY TRENTACOSTA and in the crew of Gambino soldier ANTHONY RUGGIANO.

7

In one conversation which occurred between Gambino Caporegima Nicholas Corozzo and a Cooperating Witness, and which was overheard by agents of the FBI, Corozzo indicated that he was upset because MASSARO had not sent the expected percentage of the proceeds from criminal activity to Nicholas Corozzo's brother, Joseph Corozzo. Nicholas Corozzo stated that he had sent MASSARO to New York to straighten out this matter. Numerous surveillances have documented MASSARO meeting with TRENTACOSTA. Confidential source information indicates that MASSARO has had hidden ownership interests in adult entertainment clubs. In addition to numerous arrests, MASSARO was convicted in the 13th Judicial Circuit of Florida, on June 25, 1985, of passing forged instruments (five counts).

13    **ANTHONY RUGGIANO**, a/k/a "Fat Andy," was born on August 16, 1926, and resides in New York. RUGGIANO is currently a soldier in the Gambino LCN Organized Crime Family and supervises crews that conduct criminal activities in New York and South Florida. In addition to numerous arrests, RUGGIANO has the following convictions: March 3, 1948, Brooklyn, New York, Burglary; July 30, 1979, Suffolk County, New York, Criminal Contempt; June 25, 1987, Miami, Florida, Racketeering - Making Extortionate Extension of Credit, Collecting Extensions of Credit by Extortionate Means, Interference with Commerce by Threats of Violence, Interstate/Foreign Travel in Aid of Racketeering, and Prohibited Racketeering Activities, for which he was sentenced to 17 years

incarceration. RUGGIANO was released from custody on May 24, 1997, and was placed on parole until May 23, 2024.

14    **ANTHONY TRENTACOSTA**, a/k/a "Tony Pep," was born on August 22, 1939. TRENTACOSTA resides in Atlanta, Georgia and is a soldier in the Gambino LCN Organized Crime Family, supervising crews that conduct criminal activities in Atlanta, Georgia and South Florida. Confidential source information and surveillances establish that TRENTACOSTA travels to the South Florida area on a monthly basis. In addition to numerous arrests, TRENTACOSTA was convicted on January 25, 1974 in Brooklyn, New York of Theft from Interstate Shipments.

15    **MICHAEL J. FALCO**, a/k/a "Michael Muro," was born on October, 17, 1932, and resides at 6701 N.W. 169th Street, Apartment B-301, Miami, Florida. Pen register records on the four target telephones utilized by FREDERICK MASSARO indicate numerous calls to and from all four target telephone numbers and FALCO's residence. In addition to numerous arrests, FALCO was convicted on March 3, 1962 in Miami, Florida for Uttering Forged Instruments.

16    **MARTIN SISKIND**, a/k/a "Marty Siskind," was born on July 6, 1941. Pen register records on the four target telephones utilized by FREDERICK MASSARO indicate numerous calls to and from all four target telephone numbers and SISKIND's cellular telephone. SISKIND was convicted on May 13, 1991 in Broward County, Florida for Grand Theft and Resisting Arrest without Violence.

17    **ARIEL A. HERNANDEZ** was born July 10, 1965. As set forth hereinbelow, Confidential Source information indicates that Massaro

and Hernandez are conspiring to obtain victim bank account information in order to produce forged personal checks and identification documents in order to cash forged checks. Hernandez has the following convictions: January 14, 1986, Miami, Florida, Aggravated Assault; January 17, 1992, Miami, Florida, Credit Card Fraud.

18    **JOHN PATRICK ROGAN** was born on June 3, 1967, and resides at 341 S.W. 182nd Way, Hollywood, Florida. Previous investigations conducted by the FBI and DEA have established that ROGAN is married to the daughter of the woman who lives with FREDERICK MASSARO. Confidential source information indicates that ROGAN has a business interest in Wesley's Sports Bar, 15346 West Dixie Highway, North Miami, Florida. Surveillance agents have placed ROGAN at Wesley's Sports Bar. Pen register records for the four target telephones indicate calls to and from Wesley's Sports Bar (305) 945-9053 and all four target telephone numbers. ROGAN has the following convictions: October 23, 1987, Dade County, Florida, Drug possession, drug trafficking, possession of narcotics equipment, and dealing in stolen property; November 10, 1988, Miami, Florida; resisting arrest with violence.

19    **JULIUS BRUCE CHIUSANO**, a/k/a "Bruce Chiusano," was born on June 29, 1948. Pen register records on the four target telephones utilized by FREDERICK MASSARO indicate numerous calls to and from all four target telephone numbers and CHIUSANO's cellular telephone. CHIUSANO does not have a criminal history.

10

20    **IRVING HAROLD WEISS,** a/k/a "Irving Weiss," was born on January 30, 1939. Pen register records on the four target telephones utilized by FREDERICK MASSARO indicate numerous calls to and from target telephone numbers (305) 944-2929, (954) 456-3020 and (954) 224-7512 and WEISS' cellular telephone. WEISS does not have a criminal history to the best of my knowledge.

21    **CHESTER POTASH** was born on August 16, 1934. POTASH does not have a criminal history to the best of my knowledge.

22    **RICHARD DAVID GAZIE,** a/k/a "Dick Gazie," was born on September 19, 1926. GAZIE was arrested on January 18, 1981 in Fort Lauderdale, Florida for Procurement of a Prostitute; the disposition of this charge was sealed by the Broward County court on September 23, 1981. GAZIE was also arrested on May 17, 1991 by the Broward County Sheriff's Office for Solicitation of Prostitution; the disposition of this charge is not available.

23    **JOHN MIRABILE,** a/k/a "Johnny Boy," was born on March 24, 1961. MIRABILE resides in New York and is a soldier in the Bonanno LCN Organized Crime Family, supervising crews that conduct criminal activities in New York and South Florida. MIRABILE was convicted on December 15, 1993 in Brooklyn, New York for Possession of Forged Securities. Pen register records on the four target telephones utilized by FREDERICK MASSARO indicate nine telephone calls to and from target telephone numbers (954) 224-7513 and (305) 944-2929 and MIRABILE's cellular telephone.

24    **ANTHONY ESPERTI,** a/k/a "Tony Esperti," was born on August 6, 1932. MIRABILE resides in Pembroke Pines, Florida and is an

11

associate of the Colombo LCN Organized Crime Family.  In addition to numerous arrests, ESPERTI has the following convictions: 1959, Riverhead, New York, Unlawful Entry; 1965, Miami, Florida, Conspiracy to Commit Extortion; 1967, Miami, Florida, Hobbs Act violation; 1974, Lake Butler, Florida, First Degree Murder; and 1983, Miami, Florida, Escape.  Pen register records on the four target telephones utilized by FREDERICK MASSARO indicate numerous calls to and from all four target telephone numbers and ESPERTI's residence.

25    **JOSEPH F. SPITALERI**, a/k/a "Joe Spit," was born on May 28, 1954.  SPITALERI resides in South Florida and is affiliated with MASSARO.  Pen register records on the four target telephones utilized by MASSARO indicate numerous calls to and from all four target telephone numbers and SPITALERI's cellular telephone.  In addition to numerous arrests, SPITALERI was convicted on December 13, 1984 in Miami, Florida for felony drug possession.

### PREVIOUS APPLICATIONS

26    I caused a search to be made of the Electronic Surveillance Indices of the Federal Bureau of Investigation and the Drug Enforcement Administration during the week of February 8, 1999 in order to determine whether previous applications have been made to intercept wire, oral or electronic communications of **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH or RICHARD DAVID GAZIE**, or of any of the communication facilities

12

named in this Affidavit.  In addition, I caused a search to be made of the Electronic Surveillance Indices of the Federal Bureau of Investigation and the Drug Enforcement Administration during the week of March 8, 1999 in order to determine whether previous applications have been made to intercept wire, oral or electronic communications of **JOHN MIRABILE, ANTHONY ESPERTI** and **JOSEPH SPITALERI**.  These searches did not reveal any previous applications to intercept wire, oral or electronic communications of any of those persons, or for any of the communication facilities for which authorization is herein sought, other than the following:

27  On February 5, 1982, The Honorable James W. Kehoe, United States District Judge, Southern District of Florida, executed an order authorizing the interception of wire and oral communications of **ANTHONY RUGGIANO** and others occurring over electronic listening devices placed in the kitchen and Florida room of a single family home located at 1200 N.E. 205th Terrace, North Miami, Florida, and occurring over telephone number (305) 651-8728, a telephone subscribed to Harry Robinson and located at 1200 N.E. 205th Terrace, North Miami, Florida, for a period of thirty (30) days. On March 9, 1982, The Honorable James W. Kehoe executed an order authorizing an extension of time for the above-described interception of wire and oral communications for an additional thirty (30) day period.

### FACTS AND CIRCUMSTANCES
### ESTABLISHING PROBABLE CAUSE

### STRUCTURE OF THE LCN

28    Based on my investigative training and experience, and the sources described below, I have learned the following information about the LCN, a nationwide secret criminal association, and the Gambino Crime Family:

A.    The LCN is the most powerful and sophisticated organized crime group in the United States.

B.    The LCN consists of approximately twenty-four separate organizational units, known as "families," functioning in different cities throughout the United States.

C.    The hierarchy of each LCN family is very rigidly structured in the form of a pyramid. At the top of the pyramid for each LCN family is the Boss. The second-in-command is known as the Underboss. Beneath the Underboss is the Consigliere, or counselor. The fourth highest rank in each LCN family's hierarchy is the position of Caporegima, often referred to simply as "Capo," "Captain" or "Skipper." Caporegime are supervisors over "crews," i.e., groups of Soldiers, the lowest ranking members of the LCN family. Finally, LCN members frequently have nonmember associates who operate under their direction.

D.    There are five LCN families operating in the New York metropolitan area. They are the Bonanno, Colombo, Gambino, Genovese, and Lucchese LCN families. Each of these families is involved in a wide variety of criminal activities including murder, arson, gambling, loansharking, extortion, labor racketeering, robbery, money laundering, and narcotics trafficking. The Miami/Fort Lauderdale area is considered an "open city" in which

14

any LCN family may operate without paying tribute to any other LCN family. Each of the five New York families has representatives in South Florida. In addition to the traditional LCN families, the Trafficante and DeCavalcante Families, along with Russian Organized Crime groups and representatives of the Sicilian mafia, operate in the South Florida area. Often members of these families will operate and invest together in business and/or illegal operations.

29    The Gambino LCN Family, with approximately 210 active and inactive members, is one of the largest and most powerful LCN families in the United States. In fact, previous investigations have revealed that the other LCN families in the New York area frequently seek advice from the Gambino Family. The Gambino LCN Family is presently involved in the construction trades and industries, the gas distribution business, solid and toxic waste transportation and disposal, control of restaurant and hotel industries, shipping and related marine services, as well as aspects of the pornography business. The family also engages in drug trafficking, and is involved in traditional racketeering activities, such as murder, gambling, loansharking, public corruption and obstruction of justice, among other racketeering offenses. Gambino LCN Family operations extend from New York throughout New Jersey, Connecticut, Florida and Nevada.

30    Salvatore Gravano, a/k/a "Sammy the Bull" was a member of the Gambino LCN family. In November 1991, Gravano entered into a plea agreement with the Government whereby he entered a plea of guilty in connection with his criminal activities as a member of

15

the Gambino LCN Family.  As part of this plea agreement, Gravano agreed to provide full, complete and truthful information to the Federal Government.  Gravano was ultimately sentenced in the United States District Court for the Eastern District of New York to a prison term of five (5) years in consideration for his testimony and information provided to the government.  The information which Gravano has provided to the government has been reliable.

31    Gravano has made a number of admissions, including his participation in numerous murders, loansharking and other crimes. Gravano testified in the RICO prosecution of Gambino Family Boss John Gotti, which resulted in a conviction.

32 In November 1991, Gravano was debriefed by Agents of the FBI.  During this debriefing, Gravano was questioned regarding his knowledge of ANTHONY TRENTACOSTA.  Gravano stated that ANTHONY TRENTACOSTA had been formally inducted into the Gambino LCN family and that TRENTACOSTA was a soldier in the Gambino family.

### CHRONOLOGICAL NARRATION OF CONFIDENTIAL SOURCE ACTIVITIES

#### PROTECTED SOURCES

33    Louis Maione has provided information to Agents of the FBI concerning criminal activities in New York, South Florida, and the Atlanta, Georgia area since 1988.  Maione was operated by the Miami Division of the FBI from 1988 to 1991 and from 1994 to 1996. Maione was operated by the Atlanta Division of the FBI from 1991 to 1994.  Maione has provided information concerning members of organized crime and organized crime activities, such as bookmaking, loansharking, narcotics trafficking, and interstate transportation

16

of stolen property. All information provided by Maione has been shown to be reliable and, where possible, has been corroborated by consensual recordings, by information obtained from other confidential sources, and through independent investigations conducted by law enforcement agencies. Information provided by Maione has been previously utilized in three applications for orders authorizing the interception of wire, oral or electronic communications. The information provided by Maione has led to the indictment and conviction, in 1997, of two Gambino capos (including Nicholas Corozzo) and seven Gambino associates.

34     Maione has known ANTHONY TRENTACOSTA and ANTHONY RUGGIANO for approximately forty years, and has known FREDERICK MASSARO since 1983. Maione advised that ANTHONY RUGGIANO was inducted as a member of the Gambino family in 1979, and that ANTHONY TRENTACOSTA was inducted as a member of the Gambino family in April 1986, when John Gotti took over as the Gambino family boss. Prior to RUGGIANO's arrest in 1985, Maione was a close associate of RUGGIANO. Maione was with RUGGIANO at the time of RUGGIANO's arrest in Miami, Florida. Maione indicated that MASSARO is involved in a loansharking operation, as well as having a hidden ownership in Party Girls Adult Entertainment lounge located in Miami, Florida. Maione advised that, as a result of MASSARO's association with ANTHONY TRENTACOSTA, MASSARO is required to send a portion of his earnings from both legal and illegal activities to TRENTACOSTA.

35     On November 30, 1995, Maione met JOHN ROGAN at FREDERICK MASSARO's car lot, Morgan Sales and Leasing Company, 3997 West

17

Hallandale Beach Boulevard, Hallandale Beach, Florida. ROGAN was handling Ryder truck rentals at MASSARO's car lot. Maione indicated to ROGAN that he had stolen cigarettes and liquor to sell; in fact, the cigarettes and liquor had been purchased directly from the manufacturer by the FBI, but were provided to Maione for him to offer as stolen merchandise as part of an undercover investigation. ROGAN indicated that he was interested in purchasing the purportedly stolen cigarettes and liquor from Maione.

36   On December 12, 1995, Maione met JOHN PATRICK ROGAN at ROGAN'S residence, 1945 Alamanda Drive, North Miami, Florida, at which time Maione sold 360 cartons of purportedly stolen cigarettes to ROGAN.   This transaction was consensually tape recorded and observed by FBI agents.

37   On February 24, 1996, Anthony Ruggiano Jr. told Maione that he had recently spoken with his father, ANTHONY "FAT ANDY" RUGGIANO, who stated that he had heard that "the little guy" (which I believe to be a reference to Nicholas Corozzo) had "taken over" the Gambino Family.   During conversations which occurred during March and April of 1996, Corozzo advised Maione that he was going to be the Boss of the Gambino Family, and that a majority of the Caporegime wanted Corozzo to replace the Acting Boss John Gotti, Jr., who had been appointed by his father, John Gotti.   Corozzo also discussed with Maione Corozzo's participation in loansharking, interstate transportation of stolen property, and other criminal

18

activities in which Corozzo had been involved during the previous ten years.

38    On March 13, 1996, Maione met Nicholas Corozzo at the Sonesta Beach Resort, Key Biscayne, Florida. According to Maione, Corozzo provided him with the following information: FREDERICK MASSARO had picked up Corozzo and Ralph Davino, a Gambino associate, at the airport and transported them to the hotel. Corozzo had questioned MASSARO concerning the activities in which MASSARO was currently involved in the South Florida area. MASSARO implied that he was not earning any money. Corozzo stated that MASSARO was lying, and that Corozzo had heard that MASSARO owned half of South Florida. MASSARO told Corozzo that he was selling Party Girls Nude Nightclub for approximately $250,000. Corozzo asked MASSARO how much money MASSARO was sending to Corozzo's brother, Joseph Corozzo, a Gambino capo and close associate of ANTHONY RUGGIANO. MASSARO told Nicholas Corozzo that he was sending Joseph Corozzo $500 per week. Nicholas Corozzo instructed MASSARO to immediately travel to New York and to contact Joseph Corozzo regarding the amount which MASSARO should be paying per week.

39    According to Maione, on March 13, 1996, at the same meeting described above, Nicholas Corozzo advised Maione of the following additional information: Corozzo did not like ANTHONY TRENTACOSTA, and stated that if Corozzo was the boss years ago, he never would have allowed TRENTACOSTA to leave New York. Corozzo complained that TRENTACOSTA was all over the place, indicating

19

TRENTACOSTA's influence and control in New York, in Atlanta, Georgia, and in South Florida. Corozzo advised that TRENTACOSTA made a "ton" of money in the oil business with Anthony Morelli, an incarcerated Gambino Capo. TRENTACOSTA was supposed to pay $100,000 toward Morelli's legal fees, and Corozzo had to sit down with TRENTACOSTA just to get $25,000 out of him.

40   On March 15, 1996, Nicholas Corozzo advised Maione that Corozzo was taking MASSARO away from ANTHONY RUGGIANO's crew and placing MASSARO in the crew of TRENTACOSTA. Maione told Corozzo that RUGGIANO would not be happy about this change, to which Corozzo replied that he (Corozzo) was the boss, and that they would take care of RUGGIANO when he got out of prison.

41   On March 18, 1996, Maione met Nicholas Corozzo, ANTHONY TRENTACOSTA and several other Gambino members and associates at the Fountainbleau Hilton Hotel, Miami Beach, Florida. This meeting was directly observed by agents of the FBI. According to Maione, he obtained the following information during this meeting: TRENTACOSTA was told by Corozzo that TRENTACOSTA had to either spend more time in Florida working for the "Family" or stay retired in Georgia. Corozzo told Maione that TRENTACOSTA indicated his intent to have a more active role in South Florida. Corozzo told Maione that TRENTACOSTA had to be respected because he "did his work" (which I believe was a reference to TRENTACOSTA having previously been involved in the commission of a murder for the LCN).

42    On March 20, 1996, Maione met FREDERICK MASSARO at the Fountainbleau Hilton Hotel, Miami Beach, Florida.  According to Maione, MASSARO was at the Hotel to assist in transporting Nicholas Corozzo, Leonard DiMaria (a Gambino capo), and their wives to the airport for their return flight to New York.

43    Robert Joseph Engel was a co-defendant with Nicholas Corozzo in a federal racketeering case prosecuted in the Southern District of Florida in 1997.  Engel entered into a plea agreement with the government which provided that he give full, complete and truthful information regarding criminal activity.  Engel was sentenced in the United States District Court for the Southern District of Florida to a prison term of two (2) years in consideration for his testimony and information provided to the government.  The information which Engel has provided has proven reliable.

44    Robert Engel advised that he has known FREDERICK MASSARO, ANTHONY RUGGIANO and ANTHONY TRENTACOSTA for at least twenty years. When Engel lived in the South Florida area in 1994 and 1995, Engel would see MASSARO at least once every two weeks at MASSARO's car lot.  Nicholas Corozzo instructed MASSARO to sell a car to Engel in 1994. Engel first met MASSARO in the 1970s when Engel accompanied Anthony Ruggiano Jr. to Miami, Florida.  MASSARO was operating the Newport Hotel located on Collins Avenue and Sunny Isles Boulevard, Miami, Florida.  MASSARO arranged for Engel and Ruggiano Jr. to stay at the Castaways Hotel across the street from the Newport Hotel.  Ruggiano Jr. told Engel that MASSARO was "with" his father,

21

ANTHONY RUGGIANO and Anthony "Tony Lee" Guerreri (a Gambino soldier), and that MASSARO's main source of income was from loansharking. I know, based upon my training and experience, that, in the parlance of the LCN, for an individual to be "with" a made member means that individual is under the protection of that member and that, in turn, the member receives a share of the profits which that individual realizes from criminal activity. Engel met John Porcaro on two occasions. Once Anthony Ruggiano Jr. introduced Engel to Porcaro, and the other time Engel met Porcaro through TRENTACOSTA. Anthony Ruggiano Jr. told Engel that Porcaro was a major drug dealer.

## CONFIDENTIAL SOURCES

45    **Confidential Source One** (hereinafter referred to as "CS-1")[1] came to the FBI within the past nine months to provided information concerning the criminal activities and associations of FREDERICK MASSARO, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, and JOHN PATRICK ROGAN. CS-1 came to the FBI to assist in this investigation as a result of his guilty plea for credit card fraud, which he committed with other LCN associates. CS-1 is providing assistance to the FBI in the hope of obtaining a possible reduction in his sentence.

46    CS-1 advised that he has been associated with numerous organized crime members and associates from several different LCN

---

[1]In order to protect the identities of the confidential sources of information relied upon herein, all references are in the masculine gender.

families over the past 10 - 15 years. The information provided by CS-1, where possible, has been corroborated by information obtained from other confidential sources, consensually recorded conversations, and from independent investigations conducted by law enforcement agencies.

47    CS-1 advised that John Porcaro, the owner of the Father and Son Moving and Storage ("FSMS"), frequented a restaurant named Locatellies (which has been renamed Beachside Mario's) located at 17210 Collins Ave, North Miami Beach, Florida, and that Porcaro reported directly to ANTHONY TRENTACOSTA. TRENTACOSTA received a large percentage of tribute from Porcaro.  Porcaro was very close with TRENTACOSTA  as a "money earner".  CS-1 consensually recorded a conversation in September, 1998 during which MASSARO advised that he (MASSARO) worked for ANTHONY RUGGIANO.  During this conversation MASSARO remarked that everybody thinks MASSARO is with TRENTACOSTA, but that MASSARO  is in fact with RUGGIANO.  MASSARO told CS-1 that he (MASSARO) has been friends with TRENTACOSTA, and that MASSARO took care of TRENTACOSTA when TRENTACOSTA was sick.

48    CS-1 advised that Gambino associate MIKE FALCO was close to FREDERICK MASSARO.  CS-1 advised that FALCO resides in Hialeah, Florida and has telephone number (305) 364-7487.  CS-1 described FALCO as closely associated with MASSARO for several years and knew several criminal activities in which MASSARO was involved.  CS-1 advised that FALCO provided loanshark loans.  In September 1998, CS-1 paid off an outstanding loan which he had received from FALCO

23

in the amount of $3,000, on which he had been paying three points (3%) weekly.

49    CS-1 also advised that MASSARO has previously bragged about his connections to the Gambino LCN Family. MASSARO related that Gambino Boss John Gotti was on MASSARO's boat in Florida during the mysterious disappearance from New York of an individual who had accidentally run over Gotti's son. I believe that this was a reference to Massaro providing an alibi for Gotti during the time that the aforesaid individual was allegedly kidnaped. CS-1 advised that MASSARO is involved in numerous illegal activities, including loansharking and dealing in counterfeit checks. According to CS-1, MASSARO's son-in-law, JOHN ROGAN, is involved in trafficking drugs, including marijuana and cocaine. CS-1 said ROGAN operates out of a bar in North Miami called Westley's, and that ROGAN's drug connection is a Dominican. CS-1 has no direct knowledge of this activity by ROGAN other than what he has heard through associates.

50    CS-1 advised that another MASSARO associate is an individual named ARIEL HERNANDEZ, who handles the fraudulent identification and checks for MASSARO. CS-1 said that HERNANDEZ has been with MASSARO for several years and is MASSARO's "do boy."

51    CS-1 advised that MASSARO had a contact with a check cashing establishment located on North Dixie Highway south of Oakland Park Boulevard near a five point intersection. CS-1 further advised that MASSARO's contact at this check cashing establishment is an individual whom he knows only as BRUCE. It is noted that the Checking Exchange, located at 2603 North Dixie

24

Highway, Wilton Manors, Florida, matches the location and description provided by CS-1. In addition, public records indicate that the President/Director of the Checking Exchange, Inc. is JULIUS BRUCE CHIUSANO, date of birth June 29, 1948.

52    **Confidential Source Two** (hereinafter referred to as "**CS-2**") recently came to the FBI to provided information regarding the criminal activities and associations of FREDERICK MASSARO, ANTHONY TRENTACOSTA, JOHN PATRICK ROGAN and others. CS-2 came to the FBI to assist in this investigation following his indictment on racketeering charges involving other members and associates of the Gambino LCN Family. CS-2 is providing assistance to the FBI with the hope of obtaining a reduction in his ultimate sentence. CS-2 advised that he has been associated with numerous organized crime members and associates from several different LCN families over the past 10 - 15 years. The information provided by CS-2, where possible, has been corroborated by information obtained from other confidential sources, consensually recorded conversations, and from independent investigations conducted by law enforcement agencies.

53 CS-2 advised that, within the last six months, he has established an association with MASSARO and TRENTACOSTA as a result of CS-2's relationship with other Gambino Family members and associates. CS-2 advised that he has learned through discussions with MASSARO and other individuals that MASSARO is involved in providing loanshark loans and making counterfeit checks and identifications. MASSARO advised CS-2 that he would assist in collecting any outstanding loans which were owed to CS-2. CS-2 has

25

had numerous consensually tape recorded conversations, both telephonically and in person, to support his statements concerning these criminal activities.

54    **Confidential Source Three** (hereinafter referred to as "CS-3") came to the FBI within the last two months to provided information concerning the criminal activities and associations of CHIUSANO, WEISS, POTASH and GAZIE. CS-3 came to the FBI after he became the victim of a usurious loan obtained from CHIUSANO, WEISS, POTASH and GAZIE. The information provided by CS-3, where possible, has been corroborated by information obtained from other confidential sources, consensually recorded conversations, and from independent investigations conducted by law enforcement agencies.

55    **Confidential Source Four** (hereinafter referred to as "CS-4"), who no longer is operated by the FBI, had known MASSARO in a business relationship for eight years. CS-4 came to the FBI after he became the victim of an aggravated assault which occurred at the hands of Michael Bilotti in the presence of MASSARO. MASSARO accused CS-4 of leaving MASSARO's business with records and monies belonging to MASSARO. CS-4 last provided information to the FBI in April 1997. MASSARO worked at Father and Son Moving and Storage, which CS-4 indicated was owned by John Porcaro. It was while MASSARO was working at Father and Son that CS-4 was introduced to ANTHONY TRENTACOSTA. TRENTACOSTA would frequently meet Porcaro and MASSARO at Father and Son. MASSARO had a conflict with Porcaro and left Father and Son Moving and Storage to open a used car business, Morgan Sales and Leasing, Inc., Hallandale Beach, Florida. CS-4

26

had observed MASSARO meeting with ANTHONY TRENTACOSTA, JOHN PATRICK ROGAN, Gambino capo Nicholas Corozzo and Gambino associate Ralph Davino at Morgan Sales and Leasing at various times prior to it closing in March 1997. CS-4 knew that MASSARO was associated with Party Girls Adult Entertainment Lounge located on Biscayne Blvd., Miami, Florida. CS-4 was aware that MASSARO was making loanshark loans to numerous individuals, and was present when loanshark loan payments were made to MASSARO. CS-4 had taken a $500 loan from MASSARO, which CS-4 quickly repaid to MASSARO along with $100 interest. CS-4 was also aware that JOHN PATRICK ROGAN was involved in loansharking operations and drug distribution.

56    **Confidential Source Five** (hereinafter referred to as "**CS-5**"), who no longer is operated by the FBI, came to the FBI as a result of his cooperation with a local law enforcement agency. CS-5 has proven to be unreliable and untrustworthy. Notwithstanding that fact, the information presented in this affidavit which is attributed to CS-5 is considered reliable because it is self- incriminating and it is consistent with CS-5's known method of operation. CS-5 has been known to have a reputation for conducting drug rip-offs. CS-5 provided information that in February 1996, Francis Last Name Unknown ("LNU"), a.k.a. Trigger, arranged a deal in which CS-5 would participate in the purchase of fifty pounds of marijuana. CS-5 and an associate went to a hotel located in the vicinity of 172nd Street and Collins Avenue, Miami, Florida and met with an unknown male. CS-5 and his associate stole the fifty pounds of marijuana. A short time after

27

the theft of marijuana, Gerry Barone, a known Bonanno Family associate, called CS-5 and advised CS-5 that the dealer they had just robbed worked for JOHN ROGAN.   Barone told CS-5 that, because of ROGAN's association with TRENTACOSTA, CS-5 should work it out with ROGAN.   CS-5 contacted ROGAN and arranged a meeting in Opa Locka, Florida, at which time ROGAN and CS-5 split the marijuana evenly.   ROGAN attempted to negotiate with CS-5 a $50,000 to $60,000 sale of Quaaludes.   CS-5 advised that ROGAN was also involved with filming pornographic movies in a warehouse located in the vicinity of 122nd street and Biscayne Boulevard, North Miami, Florida.  In addition, CS-5 stated that ROGAN was engaged in "bust-out" schemes whereby he established fraudulent companies to obtain credit and merchandise, whereupon he would subsequently close the companies and sell the merchandise for a profit.

57  John Porcaro, a long time associate of ANTHONY TRENTACOSTA and FREDERICK MASSARO, who was the owner and operator of Father and Son Moving and Storage and Trump Foreign Currency Exchange, has been listed as a missing person since June 14, 1998.  Investigation by the Hollywood Police Department has established that Porcaro's spouse notified MASSARO that Porcaro was missing.  MASSARO went to the Fort Lauderdale/Hollywood International Airport, retrieved Porcaro's automobile, and returned it to Porcaro's spouse.  Since Porcaro's disappearance, MASSARO has taken over the operation of Father and Son Moving and Storage and Trump Foreign Currency Exchange.  CS-1 advised that the word on the street is that Porcaro was killed as a result of his organized crime affiliations.  CS-1

advised that Porcaro reportedly owed a large sum of money to unknown people, and as a result had been killed.

58    CS-1 advised that, during early 1998, he heard that Porcaro had lost control of his company, Father and Son Moving and Storage Company ("FSMS") to Gambino associate FREDDY MASSARO. CS-1 was present when Porcaro was asked if he could assist someone with a residential move.  Porcaro indicated that, if this person wanted a deal on the move, he would have to speak to MASSARO. Additionally CS-1 was present when MASSARO's close associate, MIKE FALCO, complained that MASSARO had muscled his way into a takeover of FSMS.  CS-1 said he saw Porcaro approximately one week before his disappearance.  Porcaro had mentioned his birthday was coming up, and he was planning on traveling to the "islands." CS-1 said he saw MASSARO after Porcaro had been missing for about a week, and that MASSARO told him that Porcaro was "gone." CS-1 indicated that Porcaro was probably just recovering from his weekend in the Bahamas fishing and celebrating, but MASSARO corrected him, stating, "No, he is gone, gone." CS-1 additionally heard from another associate, Leon LNU from New York, that Massaro had recently pulled a photograph of Porcaro from his pocket and shown it to him, indicating that  Porcaro was gone.

59 During a consensually recorded telephone conversation on August 21, 1998, utilizing telephone number (305) 364-7487, MICHAEL FALCO advised CS-1 that ANTHONY TRENTACOSTA grabbed FREDERICK MASSARO by the throat and threatened MASSARO and MARTIN SISKIND if he (TRENTACOSTA) found out that MASSARO and SISKIND had

29

anything to do with the disappearance of John Porcaro. This was done in the Rascal House Restaurant, Sunny Isles, Florida. FALCO told CS-1 that it appears as if MASSARO knows something about Porcaro's disappearance.

60    On September 9, 1998, FREDERICK MASSARO discussed the disappearance of John Porcaro with CS-1 during a consensually recorded conversation. MASSARO advised that the more MASSARO talked with people, the more enemies he realizes Porcaro could have had. MASSARO advised that he (MASSARO) does not ever want to be in the public eye, and that he (MASSARO) never wants a reputation. MASSARO advised that this is where TONY PEP (TRENTACOSTA) takes the biggest hit. MASSARO said that he advised TRENTACOSTA to "pull up" Porcaro because Porcaro was having problems taking care of business. MASSARO said that TRENTACOSTA stated that Porcaro needs to enjoy his life. MASSARO confirmed the fact that TRENTACOSTA had confronted MASSARO and SISKIND in the Rascal House Restaurant.

61    On October 14, 1998, FREDERICK MASSARO told CS-1 that TONY PEP (ANTHONY TRENTACOSTA) was in town, and that MASSARO had given TRENTACOSTA his cellular telephone, **(954) 224-7513**, to use while TRENTACOSTA was in town.

### DOCUMENTATION OF TELEPHONE USE
### IN FURTHERANCE OF CRIMINAL ACTIVITY

### EXTORTIONATE COLLECTION OF CREDIT

62    During a consensually recorded telephone conversation on September 2, 1998, utilizing telephone number **(305) 944-2929** (as advised by CS-1 and verified by telephone billing records),

FREDERICK MASSARO advised CS-1 that Joseph Spitaleri was supposed to see MASSARO on the previous day in order to pay $25,000.00. MASSARO advised that he (MASSARO) had a gun strapped to his leg and was prepared to hold the gun to Spitaleri's head.

63    During a consensually recorded telephone conversation on September 3, 1998, utilizing telephone number (954) 224-7513 (as verified by telephone billing records), FREDERICK MASSARO advised CS-1 that Joe Spitaleri had reached out for some people in Las Vegas. MASSARO said that a Captain named Jimmy from New York had come to see MASSARO. MASSARO said that he told the Captain that if Spitaleri did not pay MASSARO his money, MASSARO was going to kill Spitaleri. MASSARO advised that either MASSARO would get his money or Spitaleri would die. During this same conversation, MASSARO stated that he was not with TONY (which I believe to be a reference to ANTHONY TRENTACOSTA) as the people from Las Vegas believed.

64    During a consensually recorded telephone conversation on September 4, 1998, utilizing telephone number (954) 224-7513 (as advised by CS-1 and verified by telephone billing records), FREDERICK MASSARO advised CS-1 that Joe Spitaleri had contacted MASSARO and advised that Spitaleri would pay half the $25,000. MASSARO said that he told Spitaleri that he would have to pay the entire $25,000.

65    On September 9, 1998, during a consensually recorded conversation with CS-1, FREDERICK MASSARO discussed Joe Spitaleri's $25,000 debt. MASSARO advised that "they" (which I believe to be a reference to Joe Spitaleri and his Las Vegas contacts) would have

31

to take up the issue of the $25,000 debt with ANDY in New York (which I believe to be a reference to ANTHONY RUGGIANO). MASSARO rhetorically asked whether $25,000 was worth Spitaleri's life, and stated that Spitaleri was going to die.

66    On September 17, 1998, CS-1 consensually recorded a conversation with FREDERICK MASSARO. During this conversation, MASSARO indicated to CS-1 that he (MASSARO) put $5,000 "on the street" for MICHAEL FALCO in order that FALCO could collect $250 per week to pay his rent and have some extra money. I believe that this conversation relates to MASSARO's financing of an unlawful credit transaction for FALCO, with a weekly interest rate of five percent.

67    CS-1 advised that, on the evening of October 10, 1998, he telephonically contacted FREDERICK MASSARO at MASSARO's business, Beachside Mario's, 17210 Collins Ave, Sunny Isles, Florida, telephone number (305) 944-2929 (as verified by telephone records). During this recorded conversation, CS-1 asked whether MASSARO had any luck locating the whereabouts of Joseph F. Spitaleri a.k.a. "Joe Spit" regarding the $25,000. MASSARO said he was still looking for him, and commented to CS-1 that Spitaleri should come forward and pay his debt, stating that the longer he hid from MASSARO the worse it would be for Spitaleri. CS-1 advised that MASSARO was intent on killing Spitaleri if he does not repay on this debt.

68    During this same October 10, 1998 conversation, MASSARO indicated to CS-1 that Gambino soldier ANTHONY TRENTACOSTA was

32

currently in the South Florida area. MASSARO told CS-1 that TRENTACOSTA was using MASSARO's cell phone. MASSARO said he would try to get this phone back so that CS-1 could call him directly.

69    On October 15, 1998, FREDERICK MASSARO discussed Joseph Spitaleri's $25,000 debt with CS-1 during a recorded conversation. MASSARO advised that TONY PEP (TRENTACOSTA) was in town to sit down with LCN associates backing Spitaleri in order for MASSARO to collect on this debt.

70    On December 4, 1998, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number **(954) 456-3020** (as advised by CS-2 and verified by pen register records). Utilizing three-way calling, MASSARO attempted to contact his associate **BRUCE CHIUSANO** at the Checking Exchange to make an introduction for CS-2. CS-2 was attempting to seek employment as a clerk at the Checking Exchange. MASSARO was directed to contact BRUCE on cellular telephone number (305) 798-6442. Utilizing three-way calling, MASSARO attempted a call to CHIUSANO's cellular telephone but was unsuccessful.

71    On December 7, 1998, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number **(954) 456-3020** (as advised by CS-2 and verified by pen register records). Utilizing three-way calling, MASSARO called the Checking Exchange and spoke with IRVING HAROLD WEISS. MASSARO advised that he was leaving town, and instructed WEISS to arrange for CS-2 to talk to BRUCE (BRUCE CHIUSANO). WEISS advised MASSARO to have CS-2 go to the Checking Exchange the following day at 10:00 A.M. WEISS

33

began to have a conversation with MASSARO, but abruptly terminated it when he realized that CS-2 was still on the line. MASSARO told WEISS that he would call him back. Pen register records indicate that, immediately following the termination of this telephone call between MASSARO and CS-2, a call was placed from target telephone number **(954) 456-3020** to the Checking Exchange. Based upon the information provided by CS-3, that the Checking Exchange is being used to facilitate a loansharking operation, I believe that the purpose of the second call from telephone number **(954) 456-3020** to the Checking Exchange was for MASSARO to discuss the criminal activity occurring at that location.

72    On January 26, 1999, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number **(954) 224-7512** (as advised by CS-2 and verified by pen register records). During this conversation, CS-2 indicated that he would be going to see Allan Cohen and that maybe CS-2 would have some information for MASSARO. MASSARO advised that he (MASSARO) was really upset, that he (MASSARO) has waited a long time, and that he (MASSARO) needed his money. Agents of the FBI were advised by CS-2 that, based upon prior conversations in which CS-2 had engaged with both Cohen and MASSARO, CS-2 was aware that Cohen had an outstanding loan which he owed to MASSARO.

73    On January 27, 1999, CS-2 met with Allan Cohen and had a consensually recorded conversation. During this conversation, Cohen indicated that he had obtained a $40,000 loan from MASSARO at a weekly interest rate of 3 percent. Cohen advised that he had

paid MASSARO back approximately $32,000 but because MASSARO did not pay Cohen for his work at MASSARO's automobile dealership, Cohen was not paying the remaining $8,000.

74    On January 28, 1999, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number **(305) 944-2929** (as advised by CS-2 and verified by pen register records). During this conversation, CS-2 relayed to MASSARO the conversation CS-2 had with Cohen. MASSARO advised CS-2 that, in addition to the outstanding balance, Cohen owed MASSARO interest because Cohen "borrowed" the money. MASSARO advised CS-2 that he (MASSARO) was going to go with a couple guys and break Cohen's head.

75    On February 2, 1999, CS-2 called Allan Cohen and had a consensually recorded conversation. During this conversation, CS-2 asked Cohen if he did anything for MASSARO. Cohen advised that MASSARO knows the truth and so does TONY PEP (ANTHONY TRENTACOSTA). CS-2 advised that he (CS-2) did not want MASSARO to send anybody to Cohen (to collect payment). Cohen advised that would be MASSARO's worst mistake. I believe that, during this conversation, Cohen was advising that he didn't presently owe anything to MASSARO, and that TRENTACOSTA was aware of that fact.

76    On February 2, 1999, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number **(954) 224-7512** (as verified by pen register records). During this conversation, MASSARO asked CS-2 where Cohen worked and who was Cohen's co-worker at Toyota. CS-2 advised that the co-worker was

Bobby Lloyd.  CS-2 advised that he would attempt to get in contact with Lloyd.  MASSARO advised that he would claim the money owed by Cohen from Lloyd.

77   CS-3 advised that, in September 1998, CS-3 obtained a $10,000 loanshark loan at a weekly interest rate of 5 percent.  The loan quickly increased to a principal amount of $35,000 at 5 percent.  CS-3 had an outstanding principal loan balance of $62,500 at 3 percent weekly interest rate.  CS-3 advised that the subjects of the loansharking operation from which he had obtained this loan are **BRUCE CHIUSANO,  IRVINE WEISS,  CHESTER POTASH** and **RICHARD DAVID GAZIE** of the Checking Exchange, Wilton Manors, Florida.

78   On February 5, 1999, CS-3 consensually recorded a conversation with CHIUSANO at the Checking Exchange, at which time CS-3 made a $1,000.00 weekly interest payment.  CS-3 advised CHIUSANO that he (CS-3) was having economic difficulties, at which time CHIUSANO offered CS-3 a job in a "telephone room."  I believe that this latter reference was an offer by CHIUSANO to get CS-3 employment in some telemarketing operation.

### MAIL FRAUD and WIRE FRAUD

79   **Confidential Source Six** (hereinafter referred to as "**CS-6**") was employed at Trump Financial Group ("TFG") located at Loehmans' Plaza, Aventura, Florida.  The information provided by CS-6, where possible, has been corroborated by information obtained from other confidential sources and through independent investigations conducted by law enforcement agencies.  CS-6 provided information to the FBI as a result of his being released

investment was mailed to TFG by the victims, among other means of transmission. TFG did not invest or purchase any foreign currency, and pocketed the investor's total payment. June 1998 was a bad month for TFG insofar as some of the options should have earned interest due to extreme instability of the Japanese yen. This put TFG in jeopardy, because any interest paid out by TFG would have to have come from TFG's funds, since no legitimate investments into options had ever been made. In most cases, TFG would tell the investor that his funds were being moved into another option, which would eventually be lost.

82    While working at TFG, CS-6 observed an individual he knew as "TONY PEP" (ANTHONY TRENTACOSTA) come to the premises of TFG on several occasions in order to speak with John Porcaro and Michael Pontorno. CS-6 advised that, in late 1998, TFG changed its name to The Sheffield Group.

83    CS-1 provided the following information about an illegal boiler room lottery club named Beachsite EuroClub (BSU) which operated on A1A in North Miami Beach during 1997. This lottery room was started by Bonanno LCN associates Gerry Barone, a.k.a. "Little Gerry"; and Steven Maruca (recently deceased). Also associated with this club as a partner or manager was Julian LNU, Joseph Demarco and Anthony Truglia, both of whom are Gambino Family associates who report to Gambino soldier Augie Corrao. Corrao received a percentage of the proceeds from this lottery room through Truglia. Corrao is the brother of Gambino Capo Joe "Butch" Corrao.

84    CS-1 advised that many LCN associates and members would regularly meet at a Restaurant named Locatellies (renamed Beachside Mario's) located at 17210 Collins Ave, Miami Beach, Florida. This restaurant was later taken over and operated by FREDDY MASSARO. Gambino soldier David "Fat Dave" Iacovetti and Genovese Capo "Chinkie" Albert Facchiano regularly hung out at Locatellies (Beachside Mario's).

85    CS-1 contacted Porcaro's old business partner in the Trump Financial Group, Joseph F. Spitaleri. CS-1 said that Spitaleri and another individual named John Finkelstein, a Canadian who is trying to remain in this country, were the individuals who originally introduced Porcaro to the foreign exchange telemarketing business. The main person who has the most experience in these foreign exchange businesses is an individual named Chip Hostedler, who runs an office in the Savings of America Building located near Federal Highway and Commercial Blvd, Ft. Lauderdale, Florida. CS-1 said that Hostedler had taken John Porcaro to the Bahamas and showed him where the trading and clearing houses for the foreign exchanges were located. CS-1 advised that FREDERICK MASSARO has taken over the operation of Porcaro's financial exchange business. CS-1 advised that Trump Financial Group had changed its name to The Sheffield Group.

86    **Confidential Source Seven** (hereinafter referred to as "**CS-7**") came to the FBI in August, 1998 to assist in this investigation as a result of his guilty plea in a Florida state narcotics case. CS-7 is providing assistance to the FBI in hopes

of obtaining a possible reduction in his sentence. CS-7 advised that he has had business relationships with numerous organized crime members and associates from several different LCN families over the past 10 years. The information provided by CS-7, where possible, has been corroborated by information obtained from other confidential sources and through independent investigations conducted by law enforcement agencies. CS-7 advised that, through his association in a telemarketing lottery business known as the Euro Club International-Beach Site ("ECBS"), Collins Ave, North Miami Beach, Florida, he became acquainted with many LCN individuals. CS-7 advised that ECBS was run by Steve Maruca and Anthony Truglia, each of whom I know to be Gambino Family associates. CS-7 advised that an individual known only to him as "Augie - Crooked Neck" (which I believe to be a reference to Augustus Corrao, a Gambino LCN Family Soldier) would frequently come into ECBS and meet with Truglia in the back room. CS-7 described Truglia as Augie's man. On one occasion Augie came to ECBS and threatened one of the female employees, Irene Cohen, over a list of potential customers for ECBS which had been lost.

87    CS-7 advised that, when Maruca died in August of 1997, "the Mob" people from New York started frequenting ECBS and began to take over the business. CS-7 identified these individuals as Anthony Rabito (Bonanno soldier), Gerry Barone, and other individuals only known to him as Jimmy LNU.

88    CS-7 advised that, after the lottery boiler rooms were shut down by law enforcement authorities, several foreign monetary

exchange telemarketing companies, called FOREX companies, were set up in South Florida by many of the same individuals who had run the lottery rooms. CS-7 described the operation of the FOREX company as follow: Callers would sell options on the chance that the U.S. dollar would reach a certain value plateau, or a "strike level," against a specific foreign currency within a given time period. CS-7 advised that none of the FOREX companies actually pays off to these investors because the strike level is set so high that it could never be reached within the given time period. CS-7 described one company named "FOREX" located at 2500 Hallandale Beach Blvd, Hallandale, Florida. The operators of "FOREX" were John Finkelstein and Joe LNU (believed to be Joseph F. Spitaleri).

89  In August, 1998, CS-7 described a branch office called Trump Financial Group located in the Loehman's Plaza area of Aventura, Florida. CS-7 described this office as a large money maker with weekly gross receipts of almost one million dollars from investors. CS-7 said this office advertized nationally and had advertisements on the E Channel. CS-7 said this office was set up by John Porcaro and managed by another individual. Porcaro had previously set up the "Club One" Florida Lottery telemarketing company. CS-7 said Porcaro was the owner of the Father and Son Moving and Storage Company, ("FSMS") located in South Florida. CS-7 further described Porcaro as "crooked eye" in that he had a bad eye. CS-7 said that Porcaro was sponsored by an individual named "Tony Pep," whom CS-7 described as being a member of the LCN.

41

90   CS-7 advised that, during approximately the first week of July 1998, he heard that Porcaro was "gone," which CS-7 interpreted to mean that he had been killed. When questioned further as to the reason for his death, CS-7 said he heard that Porcaro had an argument with a "Freddy" who wanted control over his FSMS company.

91   On November 20, 1998, CS-1 consensually recorded a telephone conversation with MASSARO on target telephone number **(954) 224-7513** (as verified by telephone records). CS-1 and MASSARO discussed the foreign currency exchange business. CS-1 asked MASSARO how Sheffield was doing. MASSARO replied that they were holding their own. During an unrelated conversation, MASSARO advised that Tony Black (Anthony Induisi, Colombo LCN Family Capo) was getting out soon (released from a halfway house). MASSARO advised that he was going to see Induisi that night.

## FRAUDULENT ACTIVITIES IN CONNECTION WITH
## IDENTIFICATION DOCUMENTS AND ACCESS DEVICES

92   CS-1 advised, during August or September, 1998, that FREDERICK MASSARO and ARIEL HERNANDEZ obtain the names, addresses and bank accounts of victims from various sources. They then make counterfeit checks from these names, which HERNANDEZ then uses to purchase computers, printers, fax machines and other expensive items which are, in turn, resold on the street. CS-1 advised that HERNANDEZ can also make credit cards and false identifications. CS-

1 identified HERNANDEZ as a Hispanic male, approximately 35 years old, who lives at an unknown address in Hialeah.

93    On January 24, 1999, CS-2 consensually recorded a conversation with FREDERICK MASSARO at Beachside Mario's, 17210 Collins Avenue, Sunny Isles Beach, Florida.    During this conversation, CS-2 notified MASSARO that he had an individual who needed to negotiate some fraudulent checks, and that this individual would split 50/50 with whomever cashed the checks. MASSARO advised CS-2 that he (MASSARO) could make fraudulent checks on the computer at Beachside Mario's.  MASSARO stated that the way they do it, nobody gets burned.  CS-2 asked MASSARO about obtaining fraudulent identification.  MASSARO advised that he did not know if ARIEL (ARIEL A. HERNANDEZ) still was capable.  MASSARO advised that ARIEL had just gotten out of jail.

94    On January 26, 1999, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number (954) 224-7512 (as advised by CS-2 and verified by pen register records).  During this conversation, CS-2 cryptically asked if the checks could be made in any amount.  MASSARO advised that they could. During this conversation, CS-2 cryptically asked about the fraudulent identification.  MASSARO advised that all he needed was the information.

95    On January 28, 1999, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number (305) 944-2929 (as advised by CS-2 and verified by pen register records).  During this conversation CS-2 asked whether MASSARO had

43

found out anything about the identification. MASSARO stated that CS-2 needed to obtain two passport type photographs and give them to MASSARO with the information. MASSARO advised CS-2 that the identification could not be used. MASSARO said he would discuss it further when he met CS-2 in person.

96    On February 2, 1999, CS-2 consensually recorded a telephone conversation with MASSARO on target telephone number (954) 224-7512 (as verified by pen register records). During this conversation, CS-2 asked MASSARO the cost to purchase the fraudulent identification. MASSARO advised that each piece cost $250. MASSARO advised that it took three to four days to produce the identification.

### PEN REGISTER ANALYSIS

97    CS-1 advised that, from September, 1998 until the present time, he has had numerous telephone conversations with FREDERICK J. MASSARO over target telephone numbers (305) 944-2929 and (954) 224-7513 in order to discuss criminal activity. For example, MASSARO utilized the two target telephones to discuss, with CS-1, the extortionate collection of a $25,000.00 debt from Joseph F. Spitaleri. Many of these telephone conversations were consensually tape recorded. Toll records indicate that, from September 3, 1998 to September 8, 1998, four (4) telephone calls were registered between CS-1's cellular telephone and MASSARO's cellular telephone number (954) 224-7513.

98    Investigation has established that **ANTHONY TRENTACOSTA** has residential telephone number (770) 781-5262. Pen register

records indicate that, between October 1, 1998 and February 28, 1999, four (4) telephone calls were registered between telephone number (770) 781-5262 and MASSARO's residential telephone number, **(954) 456-3020**, the last call being registered on February 16, 1999.  Pen register records indicate that, between October 1, 1998 and February 28, 1999, ninety (90) telephone calls were registered between telephone number (770) 781-5262 and MASSARO's cellular telephone number, **(954) 224-7513**, the last call being registered on February 27, 1999.  Pen register records indicate that, between October 1, 1998 and February 28, 1999, one (1) telephone call was registered between telephone number (770) 781-5262 and MASSARO's cellular telephone number, **(954) 224-7512**, that call being registered on February 3, 1999.

99    Investigation has established that **ANTHONY TRENTACOSTA** utilizes cellular telephone number (770) 330-9057.  Pen register records indicate that, between October 1, 1998 and February 28, 1999, eighty-nine (89) telephone calls were registered between telephone number (770) 330-9057 and MASSARO's cellular telephone number, **(954) 224-7513**, the last call being registered on February 27, 1999.

100    Investigation has established that **ANTHONY TRENTACOSTA** utilizes message service telephone number (800) 616-8118.  Pen register records indicate that, between October 1, 1998 and February 28, 1999, six (6) telephone calls were registered between telephone number (800) 616-8118 and Beachside Mario's telephone number, **(305) 944-2929**, the last call being registered on February

45

23, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, five (5) telephone calls were registered between telephone number (800) 616-8118 and MASSARO's residential telephone number, **(954) 456-3020**, the last call being registered on February 23, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, one hundred and seventy-one (171) telephone calls were registered between telephone number (800) 616-8118 and MASSARO's cellular telephone number, **(954) 224-7513**, the last call being registered on February 26, 1999. Pen register records indicate that, between October 1, 1998 and February 16, 1999, five (5) telephone calls were registered between telephone number (800) 616-8118 and MASSARO's cellular telephone number, **(954) 224-7512**, the last call being registered on February 4, 1999.

    101  CS-1 advised that **MARTIN SISKIND** (previously identified as an LCN associate of **FREDERICK J. MASSARO**) can be contacted on cellular telephone number (305) 785-3939. Pen register records indicate that, between October 1, 1998 and February 28, 1999, fifty-four (54) telephone calls were registered between telephone number (305) 785-3939 and Beachside Mario's telephone number, **(305) 944-2929**, the last call being registered on February 27, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, thirty-seven (37) telephone calls were registered between telephone number (305) 785-3939 and MASSARO's residential telephone number, **(954) 456-3020**, the last call being registered on February 24, 1998. Pen register records indicate that, between

October 1, 1998 and February 28, 1999, six (6) telephone calls were registered between telephone number (305) 785-3939 and MASSARO's cellular telephone number, **(954) 224-7513**, the last call being registered on November 22, 1998. Pen register records indicate that, between October 1, 1998 and February 28, 1999, nine (9) telephone calls were registered between telephone number (305) 785-3939 and MASSARO's cellular telephone number, **(954) 224-7512**, the last call being registered on February 11, 1999.

102   CS-1 advised that the residential telephone number for **MICHAEL FALCO** (previously identified as an LCN associate of **FREDERICK J. MASSARO**) is (305) 364-7487. Pen register records indicate that, between October 1, 1998 and February 28, 1999, seventy-three (73) telephone calls were registered between telephone number (305) 364-7487 and Beachside Mario's telephone number, **(305) 944-2929**, the last call being registered on February 27, 1999.   Pen register records indicate that, between October 1, 1998 and February 28, 1999, sixty-eight (68) telephone calls were registered between telephone number (305) 364-7487 and MASSARO's residential telephone number, **(954) 456-3020**, the last call being registered on February 24, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, seven (7) telephone calls were registered between telephone number (305) 364-7487 and MASSARO's cellular telephone number, **(954) 224-7513**, the last call being registered on November 20, 1998.   Pen register records indicate that, between October 1, 1998 and February 28, 1999, forty-one (41) telephone calls were registered between

47

telephone number (305) 364-7487 and MASSARO's cellular telephone number, **(954) 224-7512**, the last call being registered on February 16, 1999.

103   Investigation has established that **JOHN PATRICK ROGAN** manages Wesley's Sports Bar, 15346 West Dixie Highway, North Miami Beach, Florida, telephone number (305) 945-9053.   Pen register records indicate that, between October 1, 1998 and February 28, 1999, seven (7) telephone calls were registered between telephone number (305) 945-9053 and Beachside Mario's telephone number, **(305) 944-2929,** the last call being registered on February 19, 1999. Pen register records indicate that, between October 1, 1998 and February 16, 1999, eleven (11) telephone calls were registered between telephone number (305) 945-9053 and MASSARO's residential telephone number, **(954) 456-3020**, the last call being registered on February 19, 1999.   Pen register records indicate that, between October 1, 1998 and February 28, 1999, two (2) telephone calls were registered between telephone number (305) 945-9053 and MASSARO's cellular telephone number, **(954) 224-7513**, the last call being registered on November 22, 1998.   Pen register records indicate that, between October 1, 1998 and February 28, 1999, one (1) telephone call was registered between telephone number (305) 945-9053 and MASSARO's cellular telephone number, **(954) 224-7512**, that call being registered on February 8, 1999.

104   Investigation has established that **JOHN PATRICK ROGAN** has residential telephone number (305) 992-8803.   Pen register records indicate that, between October 1, 1998 and February 28, 1999,

48

twelve (12) telephone calls were registered between telephone number (305) 992-8803 and Beachside Mario's telephone number, **(305) 944-2929**, the last call being registered on February 14, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, fifteen (15) telephone calls were registered between telephone number (305) 992-8803 and MASSARO's residential telephone number, **(954) 456-3020**, the last call being registered on February 22, 1999.

105    CS-1 advised that Joseph F. Spitaleri (previously identified victim of extortionate credit transaction with **FREDERICK J. MASSARO**) has cellular telephone number (954) 295-2398. Pen register records indicate that, between October 1, 1998 and February 28, 1999, two (2) telephone calls were registered between telephone number (954) 295-2398 and Beachside Mario's telephone number, **(305) 944-2929**, the last call being registered on January 21, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, seven (7) telephone calls were registered between telephone number (954) 295-2398 and MASSARO's residential telephone number, **(954) 456-3020**, the last call being registered on February 4, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, five (5) telephone calls were registered between telephone number (954) 295-2398 and MASSARO's cellular telephone number, **(954) 224-7513**, the last call being registered on November 27, 1998. Pen register records indicate that, between October 1, 1998 and February 28, 1999, ten (10) telephone calls were registered between telephone number (954)

295-2398 and MASSARO's cellular telephone number, **(954) 224-7512**, the last call being registered on February 4, 1999.

106    Investigation has established that Anthony Esperti, a Colombo Family LCN associate, utilizes telephone number (954)442-5723. Pen register records indicate that, between October 1, 1998 and February 28, 1999, seventeen (17) telephone calls were registered between telephone number (954) 442-5723 and Beachside Mario's telephone number, **(305) 944-2929**, the last call being registered on January 28, 1999.    Pen register records indicate that, between October 1, 1998 and February 28, 1999, thirty-nine (39) telephone calls were registered between telephone number (954) 442-5723 and MASSARO's residential telephone number, **(954) 456-3020**, the last call being registered on February 28, 1999.    Pen register records indicate that, between October 1, 1998 and February 28, 1999, fourteen (14) telephone calls were registered between telephone number (954) 442-5723 and MASSARO's cellular telephone number, **(954) 224-7513**, the last call being registered on February 17, 1999.    Pen register records indicate that, between October 1, 1998 and February 28, 1999, seven (7) telephone calls were registered between telephone number (954) 442-5723 and MASSARO's cellular telephone number, **(954) 224-7512**, the last call being registered on February 17, 1999.

107    CS-3 advised that **JULIUS BRUCE CHIUSANO** (previously identified as an LCN associate of **FREDERICK J. MASSARO**) utilizes cellular telephone number (305) 798-6442. Pen register records indicate that, between October 1, 1998 and February 28, 1999,

50

eighteen (18) telephone calls were registered between telephone number (305) 798-6442 and Beachside Mario's, **(305) 944-2929**, the last call being registered on January 21, 1999.    Pen register records indicate that, between October 1, 1998 and February 28, 1999, eleven (11) telephone calls were registered between telephone number (305) 798-6442 and MASSARO's residential telephone number, **(954) 456-3020**, the last call being registered on February 20, 1999. Pen register records indicate that, between October 1, 1998 and February 28, 1999, eight (8) telephone calls were registered between telephone number (305) 798-6442 and MASSARO's cellular telephone number, **(954) 224-7513**, the last call being registered on November 27, 1998.    Pen register records indicate that, between October 1, 1998 and February 28, 1999, seven (7) telephone calls were registered between telephone number (305) 798-6442 and MASSARO's cellular telephone number, **(954) 224-7512**, the last call being registered on February 17, 1999.

108    CS-3 advised that **IRVING HAROLD WEISS** (previously identified as an LCN associate of **FREDERICK J. MASSARO**) utilizes cellular telephone number (305) 798-1903. Pen register records indicate that, between October 1, 1998 and February 28, 1999, three (3) telephone calls were registered between telephone number (305) 798-1903 and Beachside Mario's telephone number, **(305) 944-2929**, the last call being registered on January 19, 1999.    Pen register records indicate that, between October 1, 1998 and February 28, 1999, five (5) telephone calls were registered between telephone number (305) 798-1903 and MASSARO's residential telephone number,

51

(954) 456-3020, the last call being registered on December 2, 1998.
Pen register records indicate that, between October 1, 1998 and
February 28, 1999, three (3) telephone calls were registered
between telephone number (305) 798-1903 and MASSARO's cellular
telephone number, (954) 224-7512, the last call being registered on
January 19, 1999.

109    The advertised telephone number for Checking Exchange,
2603 North Dixie Highway, Wilton Manors, Florida, is (954) 567-
9898.  Pen register records indicate that, between October 1, 1998
and February 28, 1999, twenty-two (22) telephone calls were
registered between telephone number (954) 567-9898 and MASSARO's
residential telephone number, (954) 456-3020, the last call being
registered on February 19, 1999. Pen register records indicate
that, between October 1, 1998 and February 28, 1999, five (5)
telephone calls were registered between telephone number (954) 567-
9898 and MASSARO's cellular telephone number, (954) 224-7513, the
last call being registered on November 25, 1998.  Pen register
records indicate that, between October 1, 1998 and February 28,
1999, five (5) telephone calls were registered between telephone
number (954) 567-9898 and MASSARO's cellular telephone number,
(954) 224-7512, the last call being registered on February 26,
1999.

110    Subpoenaed cellular telephone records indicate that
cellular telephone number (917) 804-1117 is subscribed by John
Mirabile, a soldier in the Bonanno LCN Family.   Pen register
records indicate that, between October 1, 1998 and February 28,

1999, one (1) telephone call was registered between telephone number (917) 804-1117 and Beachside Mario's telephone number, **(305) 944-2929,** that call being registered on November 12, 1998. Pen register records indicate that, between October 1, 1998 and February 28, 1999, eight (8) telephone calls were registered between telephone number (917) 804-1117 and MASSARO's cellular telephone number, **(954) 224-7513,** the last call being registered on February 22, 1999.

<u>**NORMAL INVESTIGATIVE TECHNIQUES**</u>

111  Your affiant is aware that an investigation consists of a number of techniques being used in conjunction with each other to develop enough evidence to establish a prosecutable case against all guilty individuals. These techniques include the use of undercover agents, confidential sources, the testimony of witnesses before the Federal Grand Jury, surveillance, analysis of toll and pen register data, and the execution of search warrants. The requested authorization for wire interception is necessary because these normal investigative techniques have been tried, and have not resulted in sufficient evidence to prosecute all the participants in the criminal enterprise. Furthermore, these techniques appear unlikely to produce the needed results if attempted or utilized further, or they are too dangerous, as described below.

112  Your affiant is aware that ANTHONY RUGGIANO and ANTHONY TRENTACOSTA are soldiers in the Gambino LCN crime family. Your affiant is also aware from prior investigations and reports of other agents that "made" members of LCN Crime families, such as

53

RUGGIANO and TRENTACOSTA, typically use LCN associates, such as FREDERICK MASSARO, MICHAEL J. FALCO, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, and RICHARD DAVID GAZIE, as insulation between themselves and outsiders. This buffer serves to protect the "made" member from direct dealings with undercover agents or confidential sources.

113    Your affiant is unaware of any undercover agents or cooperating witnesses who can infiltrate the conspiracy at a level high enough to identify all members of the conspiracy or otherwise satisfy all the goals of this investigation.

114    The use of confidential sources has been very valuable in developing information pertaining to **FREDERICK MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL FALCO, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH,** and **RICHARD DAVID GAZIE,** and their criminal activities. The cooperation of Maione, Engel, CS-1, CS-2, CS-3, CS-4, CS-5, CS-6 and CS-7 has significantly advanced the objectives of this investigation. However, even though Maione and Engel are willing to testify, they are not in a position to provide complete and continued details regarding the activities of this criminal enterprise.

115    Maione and Engel have previously cooperated in the prosecution against Nicholas Corozzo, Leonard DiMaria, and seven co-defendants. While Maione and Engel have known RUGGIANO, TRENTACOSTA, and MASSARO for many years, it has been several years

since they have had any criminal association with RUGGIANO, TRENTACOSTA or MASSARO.

116   Only CS-1, CS-2 and CS-3 have ongoing associations with some of the listed principal interceptees.  CS-4, CS-5, CS-6 and CS-7 are no longer available to work in an undercover capacity for the FBI, and are not known to have any current association with the listed interceptees.   None of the confidential sources possess complete access to all the listed interceptees.   Therefore, the confidential sources are not in a position to provide complete information regarding the criminal activities of those persons who comprise the enterprise under investigation herein.

117   Conducting physical surveillance of participants is a commonly used investigative technique.   Surveillance has been conducted in this investigation and has assisted in disclosing some of the associations and places of meetings by the participants. However, this technique has failed to reveal the identity of all the participants and has failed to provide sufficient admissible evidence of specific criminal activities. Without knowledge of the content of these meetings, surveillance alone is of limited value. While surveillance can confirm the fact that a meeting took place, under most circumstances it cannot provide the content of the discussions which facilitate the organization's illegal activities. Moreover, your affiant knows that the subjects herein are particularly sensitive to efforts to surveille their activities. On at least one occasion, when ROGAN was being surveilled by law

enforcement agents, he actually confronted one of the agents who was following him.

118    Your affiant knows that any extensive surveillance risks exposure, and can compromise the covert nature of this investigation causing **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE,** and their associates to alter and/or temporarily cease their criminal operations. Continued surveillance of the residences and businesses of the principals would jeopardize the covert nature of the ongoing investigation, causing the participants to be more cautious and secretive about their ongoing criminal activity. However, surveillance, in conjunction with the interception of relevant conversations, will provide valuable evidence regarding the activities of those involved in this criminal enterprise.

119    The possibility of initiating a Federal Grand Jury investigation at this time into the illegal activities of the principals of this investigation has been considered. However, many of the possible witnesses are conspirators themselves, and there are presently not sufficient facts to determine which of the alleged conspirators, if any, should be or could be compelled to testify under a grant of immunity. Individuals who are members and associates of organized crime families often invoke their Fifth Amendment testimonial privilege, and even under a grant of immunity have been known to risk and accept contempt charges rather than

testify. From your affiant's experience, as well as that of other Agents of the FBI experienced in organized crime matters, extensive overt investigations would only result in the targets further camouflaging their activities, making detection even more difficult.

120    Consideration has been given to interviewing co-conspirators and associates of the principal subjects. However, the individuals who are knowledgeable of the criminal activities are generally participants in the crimes, and are therefore unwilling to provide information and testify. Even with the testimony of a co-conspirator, there would likely be insufficient evidence to successfully prosecute all co-conspirators or to develop usable information relating to the full scope of the federal violations set forth in this affidavit. The co-conspirators, in addition to being afraid of physical retaliation, are often themselves prior participants or currently involved in illegal activity, and as such refuse to cooperate with law enforcement to any significant degree. Even with the benefit of several key conspirators willing to testify, electronic surveillance is still necessary to accomplish successful prosecution because actual tape recordings of criminal conversations are usually necessary to corroborate testimony of witnesses with criminal backgrounds.

121    From prior investigations and reports of other Agents, your affiant knows that the Gambino LCN Crime family is extremely sophisticated in detecting and avoiding investigations by law

57

enforcement agencies. This has made conventional investigative techniques, such as interviews, of very limited value.

122     Based upon your affiant's experience and the experience of fellow agents who have investigated organized crime activity, your affiant believes that interviews of additional co-conspirators or victims in this matter would be communicated to the principals, their subordinates, or others, who would take even more precautionary measures to avoid the further collection of evidence by law enforcement. Moreover, it is your affiant's belief that interviews with co-conspirators at this stage of the investigation could jeopardize the safety of the confidential sources.

123     Telephone toll call records of telephones used by some of the known participants have been obtained. These records have been useful in revealing some of the associations and frequency of contact of the known participants with each other. However, these records, standing alone, do not provide proof of illegal activities because the records do not reveal the content of conversations. Pursuant to lawful court orders, pen registers and trap and trace techniques have been used in this investigation. As previously outlined in greater detail, the pen register information has revealed the existence of telephonic contact between the principals of this investigation, but like toll record information these records, standing alone, do not provide sufficient proof of illegal activities. The associations and frequency of contacts in themselves, do not provide evidence of criminal activity and do not identify the actual participants in the telephone contacts.

124    Based upon my experience, and the experiences of other law enforcement agents as related to me, it is my belief that use the of search warrants at this time would not provide sufficient evidence necessary to determine the full scope of the criminal conspiracies, the identity of all of the co-conspirators and the various methods used to run this criminal enterprise. Records concerning contacts between criminal associates are not normally kept, and the best evidence of a meeting would be the conversations themselves.    Most such records are typically kept in a coded format, which is difficult to decipher absent the interception of relevant communications.    Moreover, there is no corroborated information concerning the existence or location of any such records at this time.

125  Due to the fact that sufficient evidence is not available through other investigative techniques, as set forth above, your affiant believes there is a need for electronic surveillance in this matter to fully reveal the manner and scope in which **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE,** the named interceptees, and others as yet unknown, are involved in the violations of federal statutes as set forth in paragraph 4 of this affidavit.

## MINIMIZATION

126  All interception will be minimized pursuant to Chapter 119 of Title 18, United States Code.    Interception will be

suspended when it is determined through voice identification, physical surveillance, or otherwise, that none of the name interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined that the conversation is relevant to those matters under investigation. Even if one or more of the named interceptees or their confederates, when identified, is a participant in the conversation, monitoring will be suspended if the conversation is non-pertinent to those matters under investigation. Intermittent spot monitoring will be conducted to ensure that a minimized conversation has not become relevant.

## PERIOD OF INTERCEPTION

127  It is believed that the communications to be intercepted will reflect a continuing criminal conspiracy and continuing course of criminal activity, thereby necessitating the interception of communications on a continuing basis, following the first interception of communications that are the subject of this request. Therefore, it is requested that the interception not automatically terminate when incriminating communications are initially intercepted, but continue until communications are intercepted that reveal the full nature and manner in which **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE,** and others as yet unknown, participate in the illegal conduct referenced herein, the identities of the

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE APPLICATION    )    NO. 99-1-WPD
OF THE UNITED STATES OF AMERICA    )
FOR AN ORDER AUTHORIZING THE    )    **SEALED ORDER AUTHORIZING THE**
CONTINUED INTERCEPTION OF WIRE    )    **CONTINUED INTERCEPTION OF**
COMMUNICATIONS    )    **WIRE COMMUNICATIONS**
_____)

Application under oath having been made before me by Jeffrey H. Sloman, Assistant United States Attorney, Southern District of Florida, an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, for an Order authorizing the continued interception of wire communications pursuant to Section 2518 of Title 18, United States Code, and full consideration having been given to the matter set forth therein, the Court finds:

1.    There is probable cause to believe that **FREDERICK J. MASSARO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI, JOSEPH ROTUNNO, ADAM T. SILVERMAN, STEVEN HOROWITZ, FRANK S. BUSCEMI, FRANCISCO VALDEZ, AUGUSTUS V. CORRAO, TAMMY L. BUBEL, PACITA T. MOSHER, JAMES LAPOLLA, CARLOS ENRIQUE GARCIA, FNU LNU, A/K/A "RICKY", FNU LNU A/K/A "RICO", FNU LNU A/K/A "SALLY", FNU LNU A/K/A "PETE", FNU LNU A/K/A "FRANKIE", FNU LNU A/K/A "MARTIN", FNU LNU A/K/A "JOE"** and others as yet unknown, have committed, are committing, and will

continue to commit violations of the following offenses:

A.    Conspiracy  to  conduct  and  participate,  and conducting and participating, directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4), i.e., the Gambino La Cosa Nostra (LCN) Organized Crime Family, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity which includes the offenses set forth in paragraphs (B)- (G) and(I) -(J) below, and through the collection of an unlawful debt, in violation of Title 18, United States Code, Section 1962(c) and (d);

B.    A felony violation relating to the production of false identification documents, in violation of Title 18, United States Code, Section 1028;

C. Fraud and related activity in connection with access devices, in violation of Title 18, United States Code, Section 1029;

D.    Mail Fraud and Wire Fraud, in violation of Title 18, United States Code, Sections 1341 and 1343;

E.    Making extortionate extensions of credit, financing extortionate  extensions  of  credit  and  conspiring  to  collect extensions of credit by extortionate means, in violation of Title 18, United States Code, Sections 892, 893 and 894;

F.    Conspiracy to distribute and possess with intent to distribute a controlled substance, and distribution and possession

with the intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 841 and 846;

G.    Use of a communication facility in facilitating a narcotics offense, in violation of Title 21, United States Code, Section 843(b);

H.    Murder in connection with an enterprise engaged in racketeering activity, in violation of Title 18, United States Code, Section 1959;

I.    Obstruction of justice, obstruction of criminal investigations, tampering with a witness, victim or informant and retaliation against a victim witness or informant, in violation of Title 18, United States Code, Sections 1503, 1510, 1512 and 1513.

J.    Distribution and operation of illegal gambling machines in violation of Title 18, United States Code, Section 1955; and

K.    Conspiracy to commit any or all of the aforesaid offenses set forth above in paragraphs (B), (C), (D), (I) and (J) in violation of Title 18, United States Code, Section 371.

2.    There is probable cause to believe that particular wire communications of **FREDERICK J. MASSARO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI, JOSEPH ROTUNNO, ADAM T. SILVERMAN, STEVEN HOROWITZ,**

3

**FRANK S. BUSCEMI, FRANCISCO VALDEZ, AUGUSTUS V. CORRAO, TAMMY L. BUBEL, PACITA T. MOSHER, JAMES LAPOLLA, CARLOS ENRIQUE GARCIA, FNU LNU, A/K/A "RICKY", FNU LNU A/K/A "RICO", FNU LNU A/K/A "SALLY", FNU LNU A/K/A "PETE", FNU LNU A/K/A "FRANKIE", FNU LNU A/K/A "MARTIN", FNU LNU A/K/A "JOE"** and others as yet unknown, concerning the above-described offenses, will be obtained through the interception of wire communications occurring on cellular telephone number **(954) 224-7513** (bearing electronic serial number "ESN" **E0F91087**) and cellular telephone number **(954) 224-7512** (bearing ESN **EBF360E5**), each target cellular telephone number being subscribed to FATHER & SON MOVING & STORAGE, 6805 Stuart Ln S., Jacksonville, Florida; telephone number **(954) 456-3020,** subscribed to **FREDERICK J. MASSARO** at 1499 Shoreline Way, Hollywood, Florida; and telephone number **(305) 944-2929,** subscribed to Beachside Mario's at 17210 Collins Avenue, Sunny Isles Beach, Florida. In particular, there is probable cause to believe that the interception of wire communications to and from those telephones (hereinafter referred to jointly as the "target telephones") will concern the specifics of the above enumerated offenses, including, the manner and means of the commission of the offenses; the nature and scope of the illegal activities; the disposition of proceeds obtained as a result of these illegal activities; the location of resources and operations leading to the discovery of the identities of other co-

4

conspirators, aiders and abettors, and victims; and the role of each participant in the conspiracy and in the substantive violations set forth above. In addition, the communications are expected to constitute admissible evidence of the commission of the above-described offenses.

3.    It has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ; and

4.    There is probable cause to believe that the above-described facilities have been and will continue to be used in connection with commission of the above-described offenses.

WHEREFORE, IT IS HEREBY ORDERED that Special Agents of the Federal Bureau of Investigation are authorized, pursuant to an Application authorized by a duly designated official of the Criminal Division, United States Department of Justice, under the power delegated to that official by special designation of the Attorney General and vested in the Attorney General by Section 2516 of Title 18, United States Code, to intercept wire communications to and from the above-described target telephones.

PROVIDED that such interceptions shall not terminate automatically after the first interception that reveals the manner in which the above-named persons and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal fully the manner in which the above-

5

named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of the participants, co-conspirators and victims, the precise nature and scope of the enterprise and illegal activity, the individual acts committed by aiders, abettors and co-conspirators, the extent of their participation in these offenses, their places of operation, the locations where physical evidence is being stored, the locations and persons to which proceeds derived from criminal activity is transmitted, and the full scope and nature of the conspiracies involved therein, or for a period of thirty (30) days measured from the day this Order is entered, whichever is earlier.

IT IS FURTHER ORDERED that this authorization applies not only to the target telephone numbers listed above, but also to any other telephone numbers subsequently assigned to or used by the instrument bearing the same ESN utilized by either target cellular telephone, and to any other telephone numbers subsequently assigned to the same cable, pair, and binding posts used by the target landline telephones, within the thirty (30) day period. Additionally, this authorization applies notwithstanding any changes in the ESN of either target cellular telephone so long as its assigned telephone number remains the same.

IT IS FURTHER ORDERED that this authorization applies to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in

6

use.

IT IS FURTHER ORDERED that, to the extent that either target cellular telephone facility is transported outside the territorial jurisdiction of this Court, interceptions may take place in any other jurisdiction within the United States.

IT IS FURTHER ORDERED that, based upon the request of the Applicant pursuant to Section 2518(4) of Title 18, United States Code, BellSouth, AT&T Wireless Communications, and any and all other electronic communication service providers, as defined in Section 2510(15) of Title 18, United States Code, shall furnish the Federal Bureau of Investigation with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such provider is according the persons whose communications are to be intercepted, with the service providers to be compensated by the Federal Bureau of Investigation for reasonable expenses incurred in providing such facilities or assistance.

IT IS FURTHER ORDERED that, to avoid prejudice to the Government's criminal investigation, BellSouth, AT&T Wireless Communications, and any and all other communication services providers, and their agents and employees, are ordered not to disclose or cause a disclosure of this Order, or of any request for information, facilities, and assistance by the Federal Bureau of Investigation, or the existence of the investigation to any person

7

other than those of its agents and employees who require this information to accomplish the services hereby ordered. In particular, said communications service providers and its agents and employees shall not make such disclosure to a lessee, telephone subscriber or any interceptee or participant in the intercepted communications.

IT IS FURTHER ORDERED that this Order shall be executed as soon as practicable and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under Chapter 119 of Title 18, United States Code. In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. The interception of wire communications must terminate upon the attainment of the authorized objectives, or, in any event, at the end of thirty (30) days, measured from the day on which this Order is entered.

IT IS FURTHER ORDERED that Applicant or another Assistant United States Attorney familiar with the facts of this case shall provide this Court with a report on or about every ten days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the above-ordered reports

8

should become due on a weekend or holiday, IT IS FURTHER ORDERED that such report shall become due on the next business day thereafter.

IT IS FURTHER ORDERED, pursuant to Title 18, United States Code, Section 3123, that Special Agents of the Federal Bureau of Investigation may install and maintain pen register devices to register numbers dialed or pulsed from the subject lines, to record the date and time of such pulsing or recordings, and to record the length of time the telephone receiver in question is off the hook, throughout the period of time for which authorization is hereby given to intercept wire communications.

IT IS FURTHER ORDERED, pursuant to Title 18, United States Code, Section 2703(d) and 3123 that BellSouth, AT&T Wireless Communications, and all other communications service providers, shall provide to the FBI all telephone numbers called from, or into, the above described communications facilities, and all customer and subscriber information, listed and unlisted, and the names and addresses of all subscribers for any and all telephone numbers called from, or calling into, the above described communications facilities. This Court finds that there are reasonable grounds to believe that such information is relevant and material to a criminal investigation and an Assistant United States Attorney has certified that the information sought is material and relevant to the ongoing criminal investigation.

IT IS FURTHER ORDERED that this Order, the Application, Affidavit, any resulting Orders, and all interim reports filed with the Court with regard to this matter shall be sealed until further order of the Court and kept in the possession, custody, care, and control of the Federal Bureau of Investigation, except that copies of the Orders, in full or redacted form, may be served upon the communications service providers as necessary to effectuate this Order.

WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

Dated this 20 day of April, 1999.

Time 2:30 PM

Certified to be a true and
correct copy of the original.
Carlos Juenke, Clerk
U.S. District Court
Southern District of Florida

By _____
Deputy Clerk

Date 4/20/99

10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

IN THE MATTER OF THE APPLICATION          NO. 99-1-WPD
OF THE UNITED STATES OF AMERICA
FOR AN ORDER AUTHORIZING THE              **APPLICATION FOR CONTINUED**
CONTINUED INTERCEPTION OF WIRE            **INTERCEPTION OF**
COMMUNICATIONS                            **WIRE COMMUNICATIONS**

_____

**UNDER SEAL**

Jeffrey H. Sloman, Assistant United States Attorney, Southern District of Florida, being

duly sworn, states:

1.      I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, that is, an attorney authorized by

law to prosecute or participate in the prosecution of offenses enumerated in Section 2516 of Title

18, United States Code.

2.      This application is for an order pursuant to Section 2518 of Title, 18, United

States Code, authorizing the continued interception of wire communications of **FREDERICK J.**

**MASSARO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND,**

**ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO,**

**IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN**

**MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI,** and also the interception of wire

communications of **JOSEPH ROTUNNO, ADAM T. SILVERMAN, STEVEN**

**HOROWITZ, FRANK S. BUSCEMI, FRANCISCO VALDEZ, AUGUSTUS V. CORRAO,**

**TAMMY L. BUBEL, PACITA T. MOSHER, JAMES LAPOLLA, CARLOS ENRIQUE**

GARCIA, FNU LNU, A/K/A "RICKY", FNU LNU A/K/A "RICO", FNU LNU A/K/A "SALLY", FNU  LNU A/K/A "PETE", FNU LNU A/K/A "FRANKIE", FNU LNU A/K/A "MARTIN", FNU LNU A/K/A "JOE"  (hereinafter referred to as the named interceptees) and others yet unknown to and from cellular telephone number **(954) 224-7513** (bearing electronic serial number "ESN" **E0F91087**) and cellular telephone number **(954) 224-7512** (bearing ESN **EBF360E5),** each target cellular telephone number being subscribed to FATHER & SON MOVING & STORAGE, 6805 Stuart Ln S., Jacksonville, Florida;  to and from telephone number **(954) 456-3020,** subscribed to **FREDERICK J. MASSARO** at 1499 Shoreline Way, Hollywood, Florida; and  to and from telephone number **(305) 944-2929,** subscribed to Beachside Mario's at 17210 Collins Avenue, Sunny Isles Beach, Florida, for a period of thirty (30) days, concerning offenses enumerated in Section 2516 of Title 18, United States Code, that is, the following offenses:

A.    Conspiracy to conduct and participate, and conducting and participating, directly and indirectly in the affairs of an enterprise, as defined in Title 18, United States Code, Section 1961(4), i.e., the Gambino La Cosa Nostra (LCN) Organized Crime Family, the activities of which affect interstate and foreign commerce, through a pattern of racketeering activity which includes the offenses set forth in paragraphs 2(B) - (G) and (I) - (J) below, and through the collection of an unlawful debt, in violation of Title 18, United States Code, Section 1962 (c) and (d);

B.    A felony violation relating to the production of false identification documents, in violation of Title 18, United States Code, Section 1028;

2

C.      Fraud and related activity in connection with access devices, in violation of Title 18, United States Code, Section 1029;

D.      Mail Fraud and Wire Fraud, in violation of Title 18, United States Code, Sections 1341 and 1343;

E.      Making extortionate extensions of credit, financing extortionate extensions of credit and conspiring to collect extensions of credit by extortionate means, in violation of Title 18, United States Code, Sections 892, 893 and 894;

F.      Conspiracy to distribute and possess with intent to distribute a controlled substance, and distribution and possession with the intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 841 and 846;

G.      Use of a communication facility in facilitating a narcotics offense, in violation of Title 21, United States Code, Section 843(b);

H.      Murder in connection with an enterprise engaged in racketeering activity, in violation of Title 18, United States Code, Section 1959;

I.      Obstruction of justice, obstruction of criminal investigations, tampering with a witness, victim or informant and  retaliation against a victim witness or informant, in violation of Title 18, United States Code, Sections 1503, 1510, 1512 and 1513.

J.      Distribution and operation of illegal gambling machines in violation of Title 18, United States Code, Section 1955; and

K.      Conspiracy to commit any or all of the aforesaid offenses set forth above in paragraphs 2(B), 2(C), 2(D), 2(I) and 2(J) in violation of Title 18, United States Code, Section 371.

3

3.    Pursuant to Section 2516 of Title 18, United States Code, the Attorney General of the United States has specially designated the Assistant Attorney General of the Criminal Division and any Deputy Assistant Attorney General of the Criminal Division to exercise the power conferred on the Attorney General by Section 2516 of Title 18, United States Code, to authorize this Application. By special designation of the Attorney General pursuant to Order Number 1950-95 of February 13, 1995, an appropriate official of the Criminal Division has authorized this Application. Attached to this Application are copies of the Attorney General's Order of special designation and the Memorandum of Authorization approving this Application.

4.    I have discussed all of the circumstances of the above-described offenses with Special Agent Terry L. Feisthammel of the Federal Bureau of Investigation (FBI), and have examined the Affidavit of Special Agent Terry L. Feisthammel, which is attached to this Application and is incorporated herein by reference. Based upon that Affidavit, your Applicant states upon information and belief that:

A.    There is probable cause to believe that **FREDERICK J. MASSARO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI, JOSEPH ROTUNNO, ADAM T. SILVERMAN, STEVEN HOROWITZ, FRANK S. BUSCEMI, FRANCISCO VALDEZ, AUGUSTUS V. CORRAO, TAMMY L. BUBEL, PACITA T. MOSHER, JAMES LAPOLLA, CARLOS ENRIQUE GARCIA, FNU LNU, A/K/A "RICKY", FNU LNU A/K/A "RICO", FNU LNU A/K/A "SALLY", FNU  LNU A/K/A "PETE", FNU LNU**

4

A/K/A "FRANKIE", FNU LNU A/K/A "MARTIN", FNU LNU A/K/A "JOE" and others as yet unknown, have committed, are committing, and will continue to commit those offenses set forth hereinabove in paragraphs 2(A) through 2(K);

      B.    There is probable cause to believe that particular wire communications of **FREDERICK J. MASSARO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI, JOSEPH ROTUNNO, ADAM T. SILVERMAN, STEVEN HOROWITZ, FRANK S. BUSCEMI, FRANCISCO VALDEZ, AUGUSTUS V. CORRAO, TAMMY L. BUBEL, PACITA T. MOSHER, JAMES LAPOLLA, CARLOS ENRIQUE GARCIA, FNU LNU, A/K/A "RICKY", FNU LNU A/K/A "RICO", FNU LNU A/K/A "SALLY", FNU LNU A/K/A "PETE", FNU LNU A/K/A "FRANKIE", FNU LNU A/K/A "MARTIN", FNU LNU A/K/A "JOE"** and others unknown concerning the above-described offenses will be obtained through the requested interception. In particular, these communications will concern the nature and scope of the illegal activities; the disposition of monies obtained as a result of these illegal activities; the location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims; and the role of each participant in the conspiracy and in the substantive violations set forth above. In addition, the communications are expected to constitute admissible evidence of the commission of the above-stated offenses;

      C.    Normal investigative procedures have been tried and failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ, as is described in

further detail in the attached Affidavit; and

        D.     There is probable cause to believe that the above-described

communications facilities have been, are being,  and will continue to be used in connection with

the commission of the above-described offenses.

        5.     The attached Affidavit contains a full and complete statement of facts concerning

all previous applications which are known to have been made to any judge of competent

jurisdiction for approval of the interception of oral, wire or electronic communications of any of

the named interceptees and target communications facilities specified in this Application. The

Applicant is aware of no previous applications made to any judge for authorization to intercept

oral, wire or electronic communications of any of the persons, or involving any of the persons,

facilities, or places specified in this Application, other than those set forth in the attached

Affidavit.

        Based on the allegations set forth in this Application and on the Affidavit of Special

Agent Terry L. Feisthammel which is attached hereto, the Applicant requests this Court to issue

an Order, pursuant to Section 2518 of Title 18, United States Code, authorizing the Federal

Bureau of Investigation to continue to intercept wire communications to and from the above-

described facilities until such communications are intercepted that reveal the manner in which

the above-named persons and others as yet unknown participate in the illegal conduct referenced

herein, the identities of all co-conspirators, participants and victims, the precise nature and scope

of the criminal enterprise and illegal activity, the individual acts committed by aiders, abettors

and co-conspirators, the extent of their participation in these offenses, their places of operation,

the locations where physical evidence is being stored, the locations and persons to which money

derived from criminal activity is transmitted, and the full scope and nature of the conspiracies involved therein, or for a period of thirty (30) days, measured from the date of this Order.

IT IS REQUESTED FURTHER that the authorization given apply not only to the target telephone numbers listed above, but to any other telephone numbers subsequently assigned to or used by the instruments bearing the same ESN utilized by either target cellular telephone, and to any other telephone numbers subsequently assigned to the same cable, pair, and binding posts, utilized by the target landline telephones, within the thirty (30) day period. It is also requested that the authorization apply notwithstanding any changes in the ESN of either target cellular telephone so long as its assigned telephone number remains the same. It is also requested that the authorization be intended to apply to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

IT IS REQUESTED FURTHER that this Court issue an order pursuant to Section 2518(4) of Title 18, United States Code, directing BellSouth, AT&T Wireless Communications, and any and all other electronic communications service providers as defined in Section 2510(15) of Title 18, United States Code, to furnish and continue to furnish the Federal Bureau of Investigation with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference to the services that such providers are according the persons whose communications are to be intercepted, and to ensure an effective and secure installation of electronic devices capable of intercepting wire communications over the above-described telephones. The service provider shall be compensated by the Federal Bureau of Investigation for reasonable expenses incurred in providing such facilities or assistance.

7

IT IS REQUESTED FURTHER that, to the extent that either target cellular facility is taken outside the territorial jurisdiction of this Court, interceptions may take place in any other jurisdiction within the United States.

IT IS REQUESTED FURTHER, to avoid prejudice to this criminal investigation, that the Court order the providers of electronic communication service and their agents and employees not to disclose or cause a disclosure of this Court's Order or the request for information, facilities, and assistance by the Federal Bureau of Investigation or the existence of the investigation to any person other than those of their agents and employees who require this information to accomplish the services requested. In particular, said providers and their agents and employees should be ordered not to make such disclosure to a lessee, telephone subscriber, or any interceptee or participant in the intercepted communications.

IT IS REQUESTED FURTHER that this Court direct that its Order be executed as soon as practicable after it is signed and that all monitoring of wire communications shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under Chapter 119 of Title 18, United States Code. The interception of wire communications authorized by this Court's Order must terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days measured from the day the Order is entered.

IT IS REQUESTED FURTHER that the Court order that either Applicant or another Assistant United States Attorney familiar with the facts of the case provide the Court with a report on or about every 10 days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued

8

interception. If any of the aforementioned reports should become due on a weekend or holiday,

it is requested further that such report become due on the next business day thereafter.

IT IS REQUESTED FURTHER that the Court's Orders, this Application and the

accompanying Affidavit, and all interim reports submitted with regard to this matter be sealed

until further order of this Court, except that copies of the orders, in full or redacted form, may be

served on the service providers as necessary to effectuate the Court's orders.

IT IS REQUESTED FURTHER, pursuant to Title 18, United States Code, Section

2703(d) and 3123, that the Court order that the Federal Bureau of Investigation be authorized to

maintain pen register devices to register numbers dialed or pulsed from the subject lines during

the period for which interception of communications is authorized, and order that BellSouth,

AT&T Wireless Communications, and all other communications service providers, shall provide

to the FBI all telephone numbers called from, or into, the above described communications

facilities, and all customer and subscriber information, listed and unlisted, and the names and

addresses of all subscribers for any and all telephone numbers being called from, or calling into,

the above described communications facilities. The facts  set forth in the attached affidavit

establish reasonable grounds to believe that such information is relevant and material to an

ongoing criminal investigation, and the undersigned certifies that the  information sought is

material and relevant to the ongoing criminal investigation.

9

IT IS REQUESTED FURTHER that the sealed Orders, Application, and Affidavit be

kept in the possession, custody, care, and control of the Federal Bureau of Investigation in a safe

and secure place until further order of the Court.

Respectfully submitted,

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By _____
JEFFREY H. SLOMAN
Assistant United States Attorney
500 East Broward Blvd., Suite 700
Ft. Lauderdale, FL 33394
Tel. (954) 356-7255/356-7230 - fax
Fla. Bar No. 378879

SUBSCRIBED and SWORN to before me

this ___ day of April, 1999.

_____
WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

Certified to be a true and
correct copy of the original:
Carlos Juenke     Clerk
U.S. District Court
Southern District of Florida
By _____ Deputy Clerk
Date 4/20/99

10



**U. S. Department of Justice**

Post Office Box 7600
Ben Franklin Station
Washington, D.C. 20044-7600

The Honorable Thomas E. Scott                    APR 1 9 1999
United States Attorney
Southern District of Florida
Ft. Lauderdale, Florida

      Attention:     Jeffrey H. Sloman
                       Assistant United States Attorney

Dear Mr. Scott:

      This is to advise you that pursuant to the power delegated
by special delegation by the Attorney General of the United
States under the authority vested in the Attorney General by
Section 2516 of Title 18, United States Code, an appropriate
official of the Criminal Division has authorized an application
to be made to a federal judge of competent jurisdiction for an
order under Section 2518 of Title 18, United States Code,
authorizing for a thirty (30) day period, the continued
interception of wire communications to and from the cellular
telephones bearing the numbers (954) 224-7513 and (954) 224-7512,
both subscribed to by Father & Son Moving & Storage, 6805 Stuart
Lane S., Jacksonville, Florida; and the landline telephones
bearing the numbers (954) 456-3020, subscribed to by Frederick J.
Massaro, and located at 1499 Shoreline Way, Hollywood, Florida,
and (305) 944-2929, subscribed to by Beachside Mario's, and
located at 17210 Collins Avenue, Sunny Isles Beach, Florida, in
connection with an investigation into possible violations of
Title 18, United States Code, Sections 371, 892, 893, 894, 1028,
1029, 1341, 1343, 1503, 1510, 1512, 1513, 1955, 1959, 1961, and
1962; and Title 21, United States Code, Sections 841, 843, and
846, by Frederick J. Massaro, Anthony Trentacosta, Michael J.
Falco, Martin Siskind, Ariel A. Hernandez, John Patrick Rogan,
Julius Bruce Chiusano, Irving Harold Weiss, Chester Potash,
Richard David Gazie, John Mirabile, Anthony Esperti, Joseph
Spitaleri, Joseph Rotunno, Adam T. Silverman, Steven Horowitz,
Frank S. Buscemi, Francisco Valdez, Augustus V. Corrao, Tammy L.
Bubel, Pacita T. Mosher, James Lapolla, Carlos Enrique Garcia,
"Ricky," "Rico," "Sally," "Pete," "Frankie," "Martin," "Joe," and
others as yet unknown.

      The authorization given is intended to apply not only to the
target telephone numbers listed above, but to any other telephone
numbers subsequently assigned to the same cables, pairs, and

binding posts as the target landline telephones within the thirty (30) day period, and to any changed telephone numbers subsequently used by or assigned to the instruments bearing the same electronic serial numbers designated by the target cellular telephones within the thirty (30) day period. The authorization is also intended to apply to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

A copy of the Attorney General's order designating specific officials in the Criminal Division to authorize applications for interception orders of this nature and a copy of the memorandum of authorization are enclosed.

Accordingly, you or any other attorney on your staff who is an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, are authorized to make the above described application.

Please be advised that it is your obligation, as supervising attorney in this matter, to ensure that the tapes of the intercepted conversations are adequately protected, and that these tapes are sealed by the court on a regular basis if the interception should continue beyond thirty days, preferably at the end of each thirty-day interception period. If there should be a break in the interception period, you must have the tapes sealed as soon as practicable thereafter.

Sincerely,

James K. Robinson
Assistant Attorney General
Criminal Division

By: Frederick D. Hess

Frederick D. Hess, Director
Office of Enforcement Operations
Criminal Division

Enclosures



U.S. Department of Justice

*JKR:FDH:MHK:CHR:JPW:KLS:kls*

Washington, D.C. 20530

APR 19 1999

**MEMORANDUM**

TO:     Frederick D. Hess, Director
        Office of Enforcement Operations
        Criminal Division

FROM:   James K. Robinson
        Assistant Attorney General
        Criminal Division

SUBJECT: Authorization for Interception Order Application


    This is in regard to your recommendation that I, an
appropriately designated official of the Criminal Division,
authorize an application to a federal judge of competent
jurisdiction for an order under Title 18, United States Code,
Section 2518, authorizing for a thirty (30) day period, the
continued interception of wire communications to and from the
cellular telephones bearing the numbers (954) 224-7513 and (954)
224-7512, both subscribed to by Father & Son Moving & Storage,
6805 Stuart Lane S., Jacksonville, Florida; and the landline
telephones bearing the numbers (954) 456-3020, subscribed to by
Frederick J. Massaro, and located at 1499 Shoreline Way,
Hollywood, Florida, and (305) 944-2929, subscribed to by
Beachside Mario's, and located at 17210 Collins Avenue, Sunny
Isles Beach, Florida, in connection with an investigation into
possible violations of Title 18, United States Code, Sections
371, 892, 893, 894, 1028, 1029, 1341, 1343, 1503, 1510, 1512,
1513, 1955, 1959, 1961, and 1962; and Title 21, United States
Code, Sections 841, 843, and 846, by Frederick J. Massaro,
Anthony Trentacosta, Michael J. Falco, Martin Siskind, Ariel A.
Hernandez, John Patrick Rogan, Julius Bruce Chiusano, Irving
Harold Weiss, Chester Potash, Richard David Gazie, John Mirabile,
Anthony Esperti, Joseph Spitaleri, Joseph Rotunno, Adam T.
Silverman, Steven Horowitz, Frank S. Buscemi, Francisco Valdez,
Augustus V. Corrao, Tammy L. Bubel, Pacita T. Mosher, James
Lapolla, Carlos Enrique Garcia, "Ricky," "Rico," "Sally," "Pete,"
"Frankie," "Martin," "Joe," and others as yet unknown.

    By virtue of the authority vested in the Attorney General of
the United States by Section 2516 of Title 18, United States
Code, the Attorney General has by Order Number 1950-95, dated
February 13, 1995, designated specific officials in the Criminal

Division to authorize applications for court orders authorizing the interception of wire or oral communications. As a duly designated official in the Criminal Division, this power is exercisable by me. WHEREFORE, acting under this delegated power, I hereby authorize the above-described application to be made by any investigative or law enforcement officer of the United States as defined in Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to the target telephone numbers listed above, but to any other telephone numbers subsequently assigned to the same cables, pairs, and binding posts as the target landline telephones within the thirty (30) day period, and to any changed telephone numbers subsequently used by or assigned to the instruments bearing the same electronic serial numbers designated by the target cellular telephones within the thirty (30) day period. The authorization is also intended to apply to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

James K. Robinson
Assistant Attorney General
Criminal Division

APR 1 9 1999

Date

Mary Lee Warren
Deputy Assistant Attorney General



## Office of the Attorney General
### Washington, D. C. 20530

### ORDER NO. 1950-95

### SPECIAL DESIGNATION OF THE ASSISTANT, ACTING ASSISTANT, ANY DEPUTY ASSISTANT, AND ANY ACTING DEPUTY ASSISTANT ATTORNEY GENERAL OF THE CRIMINAL DIVISION TO AUTHORIZE APPLICATIONS FOR COURT ORDERS FOR INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS UNDER CHAPTER 119, TITLE 18, UNITED STATES CODE

By virtue of the authority vested in me by 28 U.S.C. §§ 509 and 510, 5 U.S.C. § 301, and 18 U.S.C. § 2516(1), and in full recognition that 18 U.S.C. § 2516(1) empowers the Attorney General, Deputy Attorney General, and Associate Attorney General to authorize applications to a Federal judge of competent jurisdiction for orders authorizing the interception of wire and oral communications, I hereby specially designate the Assistant Attorney General in charge of the Criminal Division, any Acting Assistant Attorney General in charge of the Criminal Division, any Deputy Assistant Attorney General of the Criminal Division, and any Acting Deputy Assistant Attorney General of the Criminal Division, to exercise the power conferred by section 2516(1) of title 18, United States Code, to authorize applications to a Federal judge of competent jurisdiction for orders authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation or a Federal agency having responsibility for the

INTERNAL ORDER/NOT PUBLISHED
IN F.R.

investigation of the offense(s) as to which such application is made, when such interception may provide evidence of any of the offenses specified in section 2516 of title 18, United States Code.

Order No. 1709-93 of April 5, 1993, is revoked effective at midnight of the day following the date of this order.

Date: February 13, 1995

JANET RENO
Attorney General

- 2 -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

IN THE MATTER OF THE APPLICATION    )
OF THE UNITED STATES OF AMERICA     )    NO. 99-1-WPD
FOR AN ORDER AUTHORIZING THE        )
CONTINUED INTERCEPTION OF WIRE      )    **UNDER SEAL**
COMMUNICATIONS                      )
_____ )

## **AFFIDAVIT IN SUPPORT OF APPLICATION**

I, Terry L. Feisthammel, Special Agent, Federal Bureau of
Investigation, Miami, Florida, being duly sworn, depose and say:

1.   I am a Special Agent of the Federal Bureau of
Investigation (FBI).  As such, I am an "investigative or law
enforcement officer of the United States" within the meaning of
Title 18, United States Code (U.S.C.), Section 2510 (7), that is,
an officer of the United States who is empowered by law to
conduct investigations of, and to make arrests for, offenses
enumerated in Title 18, U.S.C., Section 2516.

2.   I have been employed as a Special Agent of the FBI for
approximately twelve years.  For the past three years, I have
been assigned primarily to investigations of organized crime,
including investigations of an organized criminal enterprise
known as the La Cosa Nostra (LCN). As a result of my
participation in these  investigations, conversations with other
FBI Agents familiar with  the criminal activities of the LCN,
reviews of reports concerning LCN activities, members and
associates, and reliable informant information, I know that the

criminal activities of the LCN include, but are not limited to, gambling, trafficking in contraband cigarettes, loansharking, money laundering, extortion, labor racketeering, drug trafficking, and murder. I have also become familiar with many of the methods used by the LCN in the commission of these offenses.

3. On March 18, 1999, at approximately 3:00 p.m., the Honorable William P. Dimitrouleas, United States District Judge, signed an Order authorizing the interception of wire communications of **FREDERICK J. MASSARO, ANTHONY RUGGIANO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOSEPH SPITALERI, JOHN MIRABILE, ANTHONY ESPERTI** and others yet unknown to and from cellular telephone number **(954) 224-7513** (bearing ESN **E0F91087**) and cellular telephone number **(954) 224-7512** (bearing ESN **EBF360E5**[1]) each subscribed to FATHER & SON MOVING & STORAGE, 6805 Stuart Ln S., Jacksonville, Florida, with the subscriber records listing the service user as FRED MASSARO,

---

[1] On or about April 17, 1999, a call was intercepted over cellular telephone number **(954) 224-7513**. MASSARO called AT&T Wireless and advised that he has a new cellular telephone, that he wanted to maintain the same telephone number (**(954) 224-7512**) and that he wanted it activated. On April 19, 1999, agents from the FBI obtained the new ESN number (**EBF360E5**) for telephone number **(954) 224-7512** from AT&T Wireless.

telephone number **(954) 456-3020,** subscribed to FREDERICK J.
MASSARO at 1499 Shoreline Way, Hollywood, Florida, and telephone
number **(305) 944-2929,** subscribed to  Beach Side Mario's at 17210
Collins Avenue, Sunny Isles Beach, Florida. Interception of wire
communications commenced on March 19, 1999, at approximately 8:00
a.m. pursuant to the Court's Order.

  A. A copy of the affidavit filed in support of the
application for the order authorizing the interception of wire
communications in No. 99-1-WPD is attached hereto as Exhibit "A"
and incorporated by reference herein.

  4. This Affidavit is being submitted in support of an
application which seeks an order authorizing the continued
interception of wire communications of **FREDERICK J. MASSARO,
ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A.
HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING
HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE,
ANTHONY ESPERTI, JOSEPH SPITALERI[2],** and also the interception of
wire communications of **JOSEPH ROTUNNO, ADAM T. SILVERMAN, STEVEN
HOROWITZ, FRANK S. BUSCEMI, FRANCISCO VALDEZ, AUGUSTUS V. CORRAO,
TAMMY L. BUBEL, PACITA T. MOSHER, JAMES LAPOLLA, CARLOS ENRIQUE
GARCIA, FNU LNU, A/K/A "RICKY", FNU LNU A/K/A "RICO", FNU LNU**

---

  [2] Anthony Ruggiano a/k/a "Fat Andy" (a previously named
interceptee) died on or about March 19, 1999 of a heart attack in
New York.

A/K/A "SALLY", FNU LNU A/K/A "PETE", FNU LNU A/K/A "FRANKIE", FNU
LNU A/K/A "MARTIN", FNU LNU A/K/A "JOE" and others yet unknown
occurring over cellular telephone number **(954) 224-7513** (bearing
electronic serial number "ESN" **E0F91087**) and cellular telephone
number **(954) 224-7512** (bearing ESN **EBF360E5**), each target
cellular telephone number being subscribed to FATHER & SON MOVING
& STORAGE, 6805 Stuart Ln S., Jacksonville, Florida, with the
subscriber records listing the service user as **FRED MASSARO**;
telephone number **(954) 456-3020,** subscribed to **FREDERICK J.**
**MASSARO** at 1499 Shoreline Way, Hollywood, Florida; and business
telephone number **(305) 944-2929,** subscribed to Beachside Mario's
at 17210 Collins Avenue, Sunny Isles Beach, Florida, for a period
of thirty (30) days. Cellular telephone number **(954) 224-7512,**
telephone number **(954) 456-3020** and telephone number **(305) 944-**
**2929** have been identified as being utilized by **FREDERICK J.**
**MASSARO.** Cellular telephone number **(954) 224-7513** has been
identified as being utilized by **ANTHONY TRENTACOSTA.**

       5.   The wire interceptions sought herein will be conducted
pursuant to Title 18, United States Code, Section 2518,
concerning the following offenses enumerated in Title 18, United
States Code, Section 2516:

       A.   Conspiracy to conduct and participate, and
conducting and participating, directly and indirectly in the

                                4

affairs of an enterprise, as defined in Title 18, United States
Code, Section 1961(4), i.e., the Gambino La Cosa Nostra (LCN)
Organized Crime Family, the activities of which affect interstate
and foreign commerce, through a pattern of racketeering activity
which includes the offenses set forth in paragraphs 5(B) through
5(J) below, and through the collection of an unlawful debt, in
violation of Title 18, United States Code, Section 1962 (c) and
(d);

      B.    A felony violation relating to the production of
false identification documents, in violation of Title 18, United
States Code, Section 1028;

      C. Fraud and related activity in connection with access
devices, in violation of Title 18, United States Code, Section
1029;

      D.    Mail Fraud and Wire Fraud, in violation of Title
18, United States Code, Sections 1341 and 1343;

      E.    Making extortionate extensions of credit,
financing extortionate extensions of credit and conspiring to
collect extensions of credit by extortionate means, in violation
of Title 18, United States Code, Sections 892, 893 and 894;

      F.    Conspiracy to distribute and possess with intent to
distribute a controlled substance, and distribution and
possession with the intent to distribute a controlled substance,

in violation of Title 21, United States Code, Sections 841 and 846;

G.   Use of a communication facility in facilitating a narcotics offense, in violation of Title 21, United States Code, Section 843(b);

H.   Murder in connection with an enterprise engaged in racketeering activity, in violation of Title 18, United States Code, Section 1959;

I.   Obstruction of justice, obstruction of criminal investigations, tampering with a witness, victim or informant and retaliation against a victim witness or informant, in violation of Title 18, United States Code, Sections 1503, 1510, 1512 and 1513.

J.   Distribution and operation of illegal gambling machines in violation of Title 18, United States Code, Section 1955; and

K.   Conspiracy to commit any or all of the aforesaid offenses set forth above in paragraphs 5(B), 5(C), 5(D), 5(I) and 5(J) in violation of Title 18, United States Code, Section 371.

6.   I base this affidavit upon information I have discovered through my personal participation in this investigation, from oral and written reports made to me by other agents of the FBI and other federal, state, and local law enforcement agencies, I am familiar with the facts and

6

circumstances of the investigation. In addition, I have reviewed
numerous FBI and Drug Enforcement Administration (DEA)
investigative reports concerning information provided by
confidential informants, cooperating witnesses, and
surveillances.  These investigations have been ongoing since
approximately October 1995.  These reports, in part, summarize
the numerous meetings or telephone conversations among one or
more of the principal interceptees of this investigation.

     7.    Since this affidavit is being submitted for the limited
purpose of securing authorization for the continued interception
of wire communications, I have not included each and every fact
known to me concerning this investigation.  I have only set forth
those facts believed to be necessary to establish the requisite
foundation for the issuance of the order requested herein.

     8.    The facts and circumstances of this affidavit as set
forth below demonstrate that:

          A.    There is probable cause to believe that **FREDERICK
J. MASSARO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN
SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE
CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID
GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI, JOSEPH
ROTUNNO, ADAM T. SILVERMAN, STEVEN HOROWITZ, FRANK S. BUSCEMI,
FRANCISCO VALDEZ, AUGUSTUS V. CORRAO, TAMMY L. BUBEL, PACITA T.
MOSHER, JAMES LAPOLLA, CARLOS ENRIQUE GARCIA, FNU LNU, A/K/A**

7

"RICKY", FNU LNU A/K/A "RICO", FNU LNU A/K/A "SALLY", FNU LNU
A/K/A "PETE", FNU LNU A/K/A "FRANKIE", FNU LNU A/K/A "MARTIN",
FNU LNU A/K/A "JOE" and others as yet unknown, have committed,
are committing and will continue to commit the offenses
enumerated hereinabove in paragraphs 5(A) through 5(K).

    B.    There is probable cause to believe that **FREDERICK
J. MASSARO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN
SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE
CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID
GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI, JOSEPH
ROTUNNO, ADAM T. SILVERMAN, STEVEN HOROWITZ, FRANK S. BUSCEMI,
FRANCISCO VALDEZ, AUGUSTUS V. CORRAO, TAMMY L. BUBEL, PACITA T.
MOSHER, JAMES LAPOLLA, CARLOS ENRIQUE GARCIA, FNU LNU, A/K/A
"RICKY", FNU LNU A/K/A "RICO", FNU LNU A/K/A "SALLY",FNU LNU
A/K/A "PETE", FNU LNU A/K/A "FRANKIE", FNU LNU A/K/A "MARTIN",
FNU LNU A/K/A "JOE"** and others as yet unknown, have used, are
using, and will continue to use telephone numbers **(954) 224-7513,
(954) 224-7512, (954) 456-3020,** and **(305) 944-2929** for the
purpose of facilitating the offenses enumerated hereinabove in
paragraphs 5(A) through 5(K).

    9.    In particular, I believe that wire communications will
occur over the target telephones **(954) 224-7513, (954) 224-7512,
(954) 456-3020** and **(305) 944-2929** which will disclose:

8

A.    The precise nature and scope of the illegal activities.

B.    The disposition of proceeds of these illegal activities; and

C.    The location of resources and operations leading to the discovery of the identities of other co-conspirators, aiders and abettors, and victims, and the role of each participant in the conspiracies and in the substantive violations set forth hereinabove in paragraph 5.

D.    In addition, the wire communications are expected to constitute admissible evidence of the commission of the above-enumerated offenses.

10.    Normal investigative procedures have been tried and have not fully succeeded in achieving the objectives of the investigation, or reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.  These investigative procedures are discussed more fully below.

## DESCRIPTION OF FACILITIES
## TO BE INTERCEPTED

11.    Subject to footnote 1 on page 2 of this affidavit, the description of facilities are fully described in the attached affidavit marked Exhibit "A", which is incorporated herein by reference.

12.    There is probable cause to believe that particular wire communications of **FREDERICK J. MASSARO, ANTHONY TRENTACOSTA,**

9

**MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI, JOSEPH ROTUNNO, ADAM T. SILVERMAN, STEVEN HOROWITZ, FRANK S. BUSCEMI, FRANCISCO VALDEZ, AUGUSTUS V. CORRAO, TAMMY L. BUBEL, PACITA T. MOSHER, JAMES LAPOLLA, CARLOS ENRIQUE GARCIA, FNU LNU, A/K/A "RICKY", FNU LNU A/K/A "RICO", FNU LNU A/K/A "SALLY", FNU LNU A/K/A "PETE", FNU LNU A/K/A "FRANKIE", FNU LNU A/K/A "MARTIN", FNU LNU A/K/A "JOE"** and others yet unknown, who are engaged in the offenses enumerated in paragraphs 5(A) through 5(K) will be obtained through the interception of wire communications occurring over telephone numbers **(954) 224-7513, (954) 224-7512, (954) 456-3020,** and **(305) 944-2929.**

## BACKGROUND OF ADDITIONAL PRINCIPALS

13.   Paragraphs 12 through 25 of the attached affidavit marked as Exhibit "A" contain the background of the original principals. This affidavit contains the background of the additional principals.

14.   In addition to the facts contained in paragraph 17 of Exhibit "A", **ARIEL A. HERNANDEZ** was arrested on March 28, 1999, by the Broward Sheriff's Office and charged with the March 20, 1999 murder of Jeanette Smith. HERNANDEZ is currently detained in the Broward County jail.

10

15.    **JOSEPH ROTUNNO**, a/k/a Joey Flowers, was born on August 14, 1935, and resides at 1090 N.W. 161st Ave., Pembroke Pines, Florida.  ROTUNNO is an associate of the Colombo Organized Crime Family.  A search of the records maintained by the FBI and Florida Department of Law Enforcement (FDLE) revealed the following criminal history: ROTUNNO was first arrested on 5/25/84, in Florida by the Broward County Sheriff's Office and subsequently convicted of loan sharking, extortion, gambling, and fraud.  ROTUNNO received an unspecified term of confinement for the above listed offenses.  On April 20, 1989, ROTUNNO was arrested in Florida by Broward County Sheriff's Office for loan sharking, no disposition is listed.  ROTUNNO, through his association with the Colombo LCN Family, receives a percentage of the profits generated through illegal gambling businesses. ROTUNNO collects outstanding gambling debts from various illegal gambling businesses.  ROTUNNO further collects extensions of credit through extortionate means. Court authorized telephone intercepts indicate that ROTUNNO is criminally associated with MASSARO.

16.    **ADAM T. SILVERMAN**, a/k/a "Sonny", was born on July 6, 1967. SILVERMAN resides in Miami, Florida.  Court authorized telephone intercepts indicate that SILVERMAN is criminally associated with MASSARO. In addition to numerous arrests, SILVERMAN was convicted on June 19, 1989, in Miami, Florida, for

possession of cocaine; June 27, 1994, in Miami, Florida, for possession of cannabis; January 26, 1995, in Miami, Florida, for felon in possession of a weapon (firearm).

17. **FRANK S. BUSCEMI**, a/k/a "Frankie" was born on October 3, 1943. BUSCEMI resides in Boca Raton, Florida and is a Gambino LCN Organized Crime Family associate. Court authorized telephone intercepts indicate that BUSCEMI is criminally associated with TRENTACOSTA, MASSARO, and MIRABLE. In addition to numerous arrests, BUSCEMI was convicted on February 14, 1969 in Brooklyn, New York, for Theft of Interstate Shipment; January 5, 1973 in Brooklyn, New York, for theft from foreign shipment and conspiracy; October 24, 1986 in Atlantic City, New Jersey of fraud; January 12, 1987, FBI, New York, RICO; July 29, 1994, FBI New York, for bank fraud.

18. **FRANCISCO VALDEZ**, a/k/a "Francisco Diaz", was born on May 5, 1957. VALDEZ resides in Miami, Florida. Court authorized telephone intercepts indicate that VALDEZ is criminally associated with MASSARO and FALCO. VALDEZ has no criminal convictions.

19. **AUGUSTUS V. CORRAO**, a/k/a "Auggie Corrao," was born on July 9, 1933. CORRAO resides in South Florida and is a soldier in the Gambino LCN Organized Crime Family. Court authorized telephone intercepts indicate that CORRAO is criminally associated with MASSARO.  CORRAO has no criminal convictions.

12

20. **TAMMY L. BUBEL,** was born on August 5, 1972. BUBEL resides in Miami, Florida. Court authorized telephone intercepts indicate that BUBEL is criminally associated with MASSARO and VALDEZ. BUBEL has no criminal convictions.

21. **PACITA T. MOSHER,** a/k/a "Carol Mosher", was born on October 3, 1950. MOSHER has been identified by MASSARO to law enforcement authorities as MASSARO's fiancé. MOSHER resides with MASSARO in Hallandale, Florida. Court authorized telephone intercepts indicate that MOSHER is criminally associated with MASSARO. MOSHER has no criminal convictions.

22. **JAMES LAPOLLA** was born on January 24, 1954, and resides at 9905 Pineapple Tree Drive #2, Boynton Beach, Florida. LAPOLLA was arrested on July 8, 1980, in South Florida by Metro Dade Police Department (MDPD) and charged with selling barbiturates/traffic Quaaludes, possession of a firearm during commission of a felony and conspiracy. Adjudication was withheld on the conspiracy charge and LAPOLLA received a sentence of three months' confinement. On November 6, 1980, LAPOLLA was arrested by MDPD for intent to sell barbiturate. No further disposition for the previous charge is reported. On February 21, 1986, LAPOLLA was arrested by the Broward Sheriff's Office (BSO) and charged with cocaine trafficking. LAPOLLA received a 15 year mandatory sentence. On September 2, 1995, LAPOLLA was arrested by BSO and charged with felon in possession of a weapon and his

13

probation was subsequently revoked. Court authorized telephone intercepts indicate that an individual identified as "Jimmy" (believed to be JAMES LAPOLLA) is criminally associated with MASSARO.

23. **CARLOS ENRIQUE GARCIA** was born on November 14, 1966. GARCIA resides in Miami, Florida. Court authorized telephone intercepts indicate that GARCIA is criminally associated with MASSARO and FALCO. GARCIA has no criminal convictions.

24. The investigation has failed to disclose sufficient information to provide further background about the following individuals who are named interceptees: **STEVEN HOROWITZ**, a/k/a "Steve", **FNU LNU, A/K/A "RICKY", FNU LNU, A/K/A "RICO", FNU LNU, A/K/A "SALLY", FNU LNU A/K/A "PETE", FNU LNU A/K/A "FRANKIE", FNU LNU A/K/A "MARTIN"**, and **FNU LNU A/K/A "JOE"**.

## ADDITIONAL PREVIOUS APPLICATIONS

25. As previously set forth, on March 19, 1999, at approximately 8:00 a.m., interception of wire communications commenced to and from cellular telephone numbers **(954) 224-7513** (bearing ESN **E0F91087**) and **(954) 224-7512** (bearing ESN **EBF360E5**) and telephone numbers **(954) 456-3020** and **(305) 944-2929**. On April 9, 1999, I caused a search to be made of the Electronic Surveillance Indices of the Federal Bureau of Investigation and the Drug Enforcement Administration through in order to determine whether any previous applications have been made to intercept

14

wire, oral or electronic communications of any of the additional persons specified in this affidavit. In addition to the information set forth in paragraphs 26 through 27 of Exhibit "A", this search revealed the following applications:

A.    On March 3, 1988, The Honorable Kenneth L. Ryskamp, United States District Judge, Southern District of Florida, executed an order authorizing the interception of oral communications of **AUGUSTUS V. CORRAO** and others occurring over electronic listening devices placed in the premises known as Bancorra's Bakery, located at 1923 Hollywood Boulevard, Hollywood, Florida. On April 6, 1988 and May 6, 1988, the Honorable Kenneth L. Ryskamp executed orders authorizing extensions of time for the above-described interception of oral communications for additional thirty (30) day periods.

B.    On December 12, 1995, the Honorable Norman S. Roettger, United States District Judge, Southern District of Florida, Fort Lauderdale, Florida, signed a Court Order which authorized the interception of wire communications of **JOSEPH ROTUNNO** and others over telephone numbers (407) 683-4575, (407) 687-5555 and (407) 615-9600 subscribed to by Florida Ventures, Inc., 920 N. Congress Ave., West Palm Beach, Florida, for a period of thirty days.

C.    On December 20, 1995, the Honorable Norman S. Roettger, United States District Judge, Southern District of Florida, Fort Lauderdale, Florida, signed a Court Order which authorized the

15

interception of wire communications of **JOSEPH ROTUNNO** and others over telephone numbers (954) 772-4802, subscribed to by Mari Cresta, 205 Washingtonia Ave., Apt. 5, Lauderdale by the Sea, Florida, for a period of thirty days.

D.    On October 16, 1998, the Honorable Wilke D. Ferguson, Jr., United States District Judge, Southern District of Florida, Fort Lauderdale, Florida, signed a Court Order which authorized the interception of wire communications of **JOSEPH ROTUNNO** and others over telephone numbers (954) 295-6672, subscribed to by JOSEPH ROTUNNO, 1700 N. St. Rd. 7, Hollywood, Florida, for a period of thirty days.

E.    On November 19, 1998, the Honorable Wilke D. Ferguson, Jr., United States District Judge, Southern District of Florida, Fort Lauderdale, Florida, signed a Court Order which authorized the continued interception of wire communications of **JOSEPH ROTUNNO** and **JAMES LAPOLLA** and others over telephone numbers (954) 295-6672, subscribed to by JOSEPH ROTUNNO, 1700 N. St. Rd. 7, Hollywood, Florida, for a period of thirty days.

26.    The investigation has failed to disclose sufficient information to more fully identify the following interceptees: **STEVEN HOROWITZ,** a/k/a "Steve", **FNU LNU, A/K/A "RICKY", FNU LNU, A/K/A "RICO", FNU LNU, A/K/A "SALLY", FNU LNU, A/K/A "PETE", FNU LNU A/K/A "FRANKIE", FNU LNU A/K/A "MARTIN"** and **FNU LNU A/K/A**

"**JOE**". Accordingly, no search could be made of the above-described electronic surveillance indices.

## SUMMARY OF INTERCEPTED
## CONVERSATIONS AND RELATED INVESTIGATIONS

27.  On Friday, March 19, 1999, at approximately 3:07 p.m., a Court-authorized interception was made over telephone number (954) 224-7512.  MASSARO called (954) 454-0413, a telephone number listed to Sam Wasser, 600 Parkview Dr., Hallandale, Florida.  MASSARO spoke with an unknown male identified as "Sally".  MASSARO wanted FNU LNU, AKA "SALLY" to obtain any bank account information, either personal or corporate, in which the account is located in Florida.  FNU LNU, AKA "SALLY" advised that he would attempt to obtain the account information.  MASSARO advised that he would prefer to get a copy of the checks.  FNU LNU, AKA "SALLY" discussed a transaction in which MASSARO gave Sally $2,500.  FNU LNU, AKA "SALLY" advised that MASSARO took out $150 and now FNU LNU, AKA "SALLY" owes MASSARO $200.  FNU LNU, AKA "SALLY" told MASSARO to tell her (unknown) that he (MASSARO) took out $350 because FNU LNU, AKA "SALLY" shorted her when he gave her the money.  FNU LNU, AKA "SALLY" advised MASSARO that she (unknown) has to give MASSARO $2,500 and pay MASSARO $175 and $100 every Tuesday (I believe that this conversation relates to the operation of a usurious loan business).

28.  On Saturday, March 20, 1999, at approximately 3:43 p.m., a Court-authorized interception was made over telephone

17

number (954) 224-7512.  MASSARO called (305) 919-9753, a
telephone number listed to Olympia Beach Resort, 15701 Collins
Avenue, Sunny Isles, Florida.  MASSARO asked to be connected to
room 121. MASSARO spoke to an unidentified male. (Based on voice
comparisons, motel registration information and further
investigation by the FBI and Broward Sheriff's Office, this
individual is ARIEL HERNANDEZ.) ARIEL HERNANDEZ advised that
"things got a little messy" with the detective from the homicide.
ARIEL HERNANDEZ told MASSARO that he had tied up the loose end
but that he had a package to get rid of, and asked MASSARO what
he should do.  MASSARO advised that he will talk to ARIEL
HERNANDEZ in person. (Further investigation by the FBI and the
Broward Sheriff's Office determined that a female identified as
Jeanette Smith was murdered in room 121 of the above-mentioned
Olympia Beach Resort at approximately noon that day and that
ARIEL HERNANDEZ was directly involved in her murder).

    29.  On Sunday, March 21, 1999, at approximately 7:48 p.m.,
a Court-authorized interception was made over telephone number
(954) 224-7512. MASSARO called (561) 733-8124, an unidentified
subscriber.  MASSARO spoke to Frankie (believed to be FRANK S.
BUSCEMI).  Frankie (believed to be FRANK S. BUSCEMI) advised
MASSARO that they did not get finished unloading until 1:00 a.m.
Frankie (believed to be FRANK S. BUSCEMI) advised that it was
dynamite stuff.  Frankie (believed to be FRANK S. BUSCEMI)

advised that he will get a couple hours sleep and come to meet
MASSARO. Frankie (believed to be FRANK S. BUSCEMI) said that he
spoke with "Pep" (a nickname associated with ANTHONY TRENTACOSTA)
earlier. Frankie (believed to be FRANK S. BUSCEMI) advised that
TRENTACOSTA wanted to know how they made out with it. Frankie
(believed to be FRANK S. BUSCEMI) said that he told TRENTACOSTA
that it was the best that they ever had. Frankie (believed to be
FRANK S. BUSCEMI) continued to say that if he put his
(TRENTACOSTA's) and John's (possibly JOHN MIRABILE) together, it
can't make one of these. MASSARO advised that whatever is there,
is there, he (MASSARO) does not play with it at all, whatever
Frankie (believed to be FRANK S. BUSCEMI) buys he buys. (I
believe that this conversation relates to the shipment of
furniture of unknown origin).

     30. On Sunday, March 21, 1999, at approximately 11:48 p.m.,
a Court-authorized interception was made over telephone number
(305) 944-2929. FRANCISCO VALDEZ called MASSARO at Beach Side
Mario's from an unknown telephone. FRANCISCO VALDEZ asked
MASSARO what happened with the "job". MASSARO advised that he
has the job, where they (MASSARO and FRANCISCO VALDEZ) have to
go, in his pocket. MASSARO continued to tell FRANCISCO VALDEZ
that he (MASSARO) thinks it is understandable that the money is
owed and it has to be paid. MASSARO told FRANCISCO VALDEZ that
they had to meet because he (MASSARO) does not like talking on

the telephone.  MASSARO and FRANCISCO VALDEZ arranged to meet the next evening.  FRANCISCO VALDEZ asked MASSARO if he (MASSARO) had seen an unknown individual for what Frankie had talked to MASSARO about.  MASSARO advised that he (MASSARO) had not seen this unknown individual because he is holding off giving out any money because of the disappearance of Gene. (I believe that this conversation concerns the making and collecting of proceeds in connection with a loanshark operation in violation of Title 18, United States Code, Sections 892 and 894).

31.  On Monday, March 22, 1999, at approximately 1:28 a.m., a Court-authorized interception was made over telephone number (305) 944-2929.  FRANCISCO VALDEZ called (305) 895-6731, a telephone number identified by caller identification to Bernade Horvath.  FRANCISCO VALDEZ spoke, in Spanish, with an unknown male, identified as Carlos (possibly CARLOS ENRIQUE GARCIA).  FRANCISCO VALDEZ said that he was with MASSARO.  FRANCISCO VALDEZ told Carlos (possibly CARLOS ENRIQUE GARCIA), that MASSARO wanted to know who the individual was who was a friend of Tammy's, who wanted to buy the machines.  FRANCISCO VALDEZ continued to advise Carlos (possibly CARLOS ENRIQUE GARCIA) that he needed Tammy to call MASSARO at the pizza shop because MASSARO has the machines to sell.  FRANCISCO VALDEZ gave the telephone to MASSARO who asked Carlos (possibly CARLOS ENRIQUE GARCIA) if he (possibly CARLOS ENRIQUE GARCIA) was going to buy the machines.  MASSARO

20

returned the telephone to FRANCISCO VALDEZ because MASSARO could not hear Carlos (possibly CARLOS ENRIQUE GARCIA).  FRANCISCO VALDEZ arranged for Carlos (possibly CARLOS ENRIQUE GARCIA) to pick him up at his (FRANCISCO VALDEZ's) house the next afternoon and would go to meet MASSARO. (I believe that this conversation, in part, relates to the placing of illegal gambling machines in businesses located in South Florida in violation of Title 18, United States Code, Section 1955.)

32.    On Monday, March 22, 1999, at approximately 4:02 p.m., a Court-authorized interception was made over telephone number (305) 944-2929.  MASSARO called telephone number (305) 333-7778, an unidentified subscriber.  MASSARO spoke to an unidentified male.  MASSARO advised that he (MASSARO) was looking for "Rico". The unidentified male advised that Rico was not there and that he had not seen him (Rico) for a week.  MASSARO advised that he (MASSARO) was getting tired of trying to connect with Rico, if Rico does not want to see MASSARO then MASSARO will have to see him.  MASSARO continued that the unidentified male should tell Rico, Yuri, and any other guy connected that MASSARO is going to be looking for them. (I believe that this conversation relates to an attempt by MASSARO to make an extortionate collection of a debt in violation of Title 18, United States Code, Section 894.)

33.    On Monday, March 22, 1999, at approximately 6:16 p.m., a Court-authorized interception was made over telephone number

(305) 944-2929. MICHAEL FALCO called from target telephone number
(305) 944-2929 to telephone number (954) 806-9882, an
unidentified subscriber. FALCO spoke to an unknown male
identified as "Ricky". FALCO advised that he got FNU LNU A/K/A
"RICKY"'s telephone number from the mayor (believed to be
referring to Kenneth Defillipo, North Miami Beach City Counsel
member). FNU LNU A/K/A "RICKY" told FALCO that if FALCO tells
FNU LNU A/K/A "RICKY" to set up the room, FNU LNU A/K/A "RICKY"
will have FALCO earning money by the first part of next week.
FALCO told FNU LNU A/K/A "RICKY" to give him (FALCO) the
breakdown on that deal. FNU LNU A/K/A "RICKY" advised that he
will go and shop around for the best things for him and FALCO.
FNU LNU A/K/A "RICKY" said that telemarketing is how he made his
money. FNU LNU A/K/A "RICKY" advised that he was going to go to
two or three guys who are in operation, and he will take the best
thing to make the most money in the shortest amount of time.
FALCO asked FNU LNU A/K/A "RICKY" if he liked the credit card
protection. FNU LNU A/K/A "RICKY" advised that he does like it.
FNU LNU A/K/A "RICKY" will go and get a breakdown on it. FNU
LNU A/K/A "RICKY" said that he will have the room in operation,
making money, by Monday of the next week. FALCO advised that he
believes FNU LNU A/K/A "RICKY" because of the mayor. (I believe
that this conversation, in part, relates to the operation of an

22

illegal telemarketing business in violation of Title 18, United States Code, Sections 1341 and 1343.)

34.  On Monday, March 22, 1999, at approximately 4:02 p.m., a Court-authorized interception was made over telephone number (305) 944-2929.  MASSARO was called from an unknown telephone number by JOSEPH ROTUNNO.  ROTUNNO told MASSARO that the next day at 11- o'clock MASSARO will meet Jimmy (possibly JAMES LAPOLLA) at the shopping center on 441 and Lauderhill.  ROTUNNO advised MASSARO that he paged MASSARO to his telephone number, 438-5699, and instructed MASSARO to put the telephone number in his book if MASSARO needed it in the future. (I believe that this conversation relates to obtaining Florida Drivers' licenses in fictitious names. The following day, FBI surveillance observed MASSARO driving ARIEL HERNANDEZ to obtain a Florida driver's license).

35.  On Monday, March 22, 1999, at approximately 7:48 p.m., a Court-authorized interception was made over telephone number (305) 944-2929.  MASSARO was called from an unknown telephone number by an unknown male identified as "Rico".  MASSARO told FNU LNU, A/K/A "RICO" that he (FNU LNU, A/K/A "RICO") was "f--king" him (MASSARO) around.  FNU LNU, A/K/A "RICO" advised MASSARO that he was working.  MASSARO asked FNU LNU, A/K/A "RICO" when will he (MASSARO) see FNU LNU, A/K/A "RICO".  FNU LNU, A/K/A "RICO" advised MASSARO that he (FNU LNU, A/K/A "RICO") will see MASSARO

23

when he (FNU LNU, A/K/A "RICO") gets the check.  MASSARO advised

FNU LNU, A/K/A "RICO" that he (MASSARO) wants to see FNU LNU,

A/K/A "RICO" face to insure MASSARO that FNU LNU, A/K/A "RICO" is

in town.  MASSARO told FNU LNU, A/K/A "RICO" that he (MASSARO)

wants a telephone number that MASSARO can contact FNU LNU, A/K/A

"RICO". (I believe that this conversation relates to the

extortionate collection of a debt in violation of Title 18,

United States Code, Section 894.)

36.  On Tuesday, March 23, 1999, at approximately 10:59

p.m., a Court-authorized interception was made over telephone

number (305) 944-2929.  MASSARO was called by CS-1[3].  CS-1 asked

MASSARO if his friend "Andy" (ANTHONY RUGGIANO) died.  MASSARO

advised CS-1 that RUGGIANO died Friday. MASSARO further indicated

that he (MASSARO) was very respected by members of the Gambino

Crime Family and that, if he chose, he could be formerly inducted

as a soldier.

37.  On Tuesday, March 23, 1999, at approximately 11:01

p.m., a Court-authorized interception was made over telephone

number (305) 944-2929.  MASSARO was called by ARIEL HERNANDEZ

from an unknown telephone number.  MASSARO advised that the

package came.  HERNANDEZ asked if MASSARO went to Office Depot.

MASSARO advised that he did.  MASSARO told HERNANDEZ that he got

a strange call today from a friend that he will tell HERNANDEZ

---

[3] CS-1 is more fully described in Exhibit "A" attached hereto.

about when MASSARO sees HERNANDEZ.(Previously, MASSARO had a
telephone conversation with his niece who informed him that he
was being looked at, presumably by law enforcement.) MASSARO and
HERNANDEZ arranged to meet at the Rascal House. (I believe that
this conversation relates to the counterfeit check cashing
business previously referred to in paragraphs 49 - 51 of Exhibit
"A". A post-arrest statement of HERNANDEZ on March 28, 1999
confirmed the source information regarding the counterfeit check
business.)

38.  On Wednesday, March 24, 1999, at approximately 1:07
a.m., a Court-authorized interception was made over telephone
number (305) 944-2929.  MASSARO was called by ARIEL HERNANDEZ
from an unknown telephone.  MASSARO and HERNANDEZ talked about
doing "that thing" the next day.  HERNANDEZ told MASSARO to put
the package in one of the drawers, and HERNANDEZ would start
working on it in the morning.  MASSARO advised HERNANDEZ that he
(MASSARO) would place the package under the monitor. (The post-
arrest statement of HERNANDEZ on March 28, 1999, confirms that
this conversation relates to the counterfeit check business
previously referred to in paragraphs 49 - 51 of Exhibit "A".)

39.  On Wednesday, March 24, 1999, at approximately 11:46
a.m., a Court-authorized interception was made over telephone
number (954) 456-3020.  MASSARO was called by MICHAEL FALCO from
an unknown telephone number.  FALCO asked MASSARO if it would be

25

all right for ARIEL (ARIEL HERNANDEZ) to come in the
telemarketing room with FALCO.  MASSARO advised FALCO that
HERNANDEZ does not know what to do either.  MASSARO continued
that HERNANDEZ does not have any money and that he (HERNANDEZ)
wanted to do sex lines.  FALCO asked MASSARO if it was difficult
to set up the sex lines.  MASSARO advised that it was necessary
to get the numbers.  FALCO asked MASSARO if he (MASSARO)
remembered that he (MASSARO) was going to set up sex lines at the
other place upstairs.  MASSARO advised that his (MASSARO) sex
lines  were on the Internet where the customer could watch the
girls.  FALCO advised that he (FALCO) was at the office (possibly
A-OK Travel, FALCO's telemarketing room in North Miami Beach,
Florida). (I believe that this conversation, in part, relates to
the operation of an illegal telemarketing business in violation
of Title 18, United States Code, Sections 1341 and 1344.)

   40.  On Wednesday, March 24, 1999, at approximately 7:45
p.m., a Court-authorized interception was made over telephone
number (954) 224-7512.  MASSARO called FRANCISCO VALDEZ at
telephone number (305) 698-1416.  MASSARO advised VALDEZ that the
guy next door in the casino agreed to give them (MASSARO and
VALDEZ) the forty machines.  VALDEZ advised MASSARO that the
forty machines will make between $7,000 and $10,000  per week.
MASSARO advised Valdez that they will offer him a percentage.
VALDEZ advised that that was the kind of deal they got for the

mayor (believed to be a reference to a City Counsel member of North Miami Beach, Kenneth Defillipo). (I believe that this conversation relates to the distribution and operation of illegal gambling machines in South Florida in violation of Title 18, United States Code, Section 1955.)

41.  On Thursday, March 25, 1999, at approximately 12:42 p.m., a Court-authorized interception was made over telephone number (954) 224-7512.  MASSARO was called by unknown male identified as "Jim" (possibly JAMES LAPOLLA), a friend of "JOE"y Flowers" (a nickname commonly associated with JOSEPH ROTUNNO) from telephone number (954) 812-0692, unknown subscriber.  Jim asked MASSARO if MASSARO could have his friend available at 11:30 the next day. MASSARO advised that he (MASSARO's friend) would not be around. MASSARO asked Jim if Jim found out about the other thing.  Jim advised that he needed to talk to MASSARO in person, and that it was not as easy as Jim first thought.  MASSARO inquired about "one" (it is believed that this is referring to a fraudulent driver's license) that MASSARO had in his name, that MASSARO never renewed, and how long were they maintained on file. Jim replied that he thought that they were on file seven or ten years. (I believe that this conversation, in part, related to a fraudulent Florida Driver's license, in violation of Title 18, United States Code, Section 1028.)

27

42.  On Thursday, March 25, 1999, at approximately 1:38
p.m., a Court-authorized interception was made over telephone
number (954) 456-3020.  MASSARO was called by ANTHONY TRENTACOSTA
and an unknown male, identified as "Steve" (possibly STEVEN
HOROWITZ) from Father and Son Moving and Storage, Jacksonville,
Florida, from telephone number (904) 783-8899.  This call
appeared to be a three-way call, with TRENTACOSTA calling from
Atlanta, Georgia to Father and Son Moving and Storage.
TRENTACOSTA asked MASSARO if FRANKIE BUSCEMI had paid MASSARO.
MASSARO advised that BUSCEMI did pay MASSARO.  TRENTACOSTA asked
MASSARO if MASSARO checked the money.  TRENTACOSTA advised that
Steve (possibly STEVEN HOROWITZ) got stuck with a bad hundred.
Steve (possibly STEVEN HOROWITZ) advised MASSARO that one of the
bills was bad.  MASSARO advised that he deposited the money
already.  TRENTACOSTA said that he just wanted MASSARO to know.
TRENTACOSTA instructed Steve (possibly STEVEN HOROWITZ) to give
the first names only and that it was payment for some vaults when
the Secret Service investigates.  TRENTACOSTA does not want it to
become a big deal.  TRENTACOSTA instructed MASSARO to send
flowers to Mike Goldstein's mother because she was going into the
hospital for an operation.  When MASSARO asked where TRENTACOSTA
was at, TRENTACOSTA replied that he was in Georgia and that he
(TRENTACOSTA) would be in South Florida Monday.  (I believe that

28

this conversation, in part, relates to the distribution of proceeds among members of the enterprise.)

43.  On Saturday, March 27, 1999, at approximately 2:09 a.m., a Court-authorized interception was made over telephone number (954) 224-7512.  MASSARO was called by ARIEL HERNANDEZ from telephone number (305) 915-5049.  HERNANDEZ advised MASSARO that FRANCISCO VALDEZ said some things that disturbed HERNANDEZ. HERNANDEZ continued that VALDEZ did not know where HERNANDEZ lived, and VALDEZ wanted to find out where TAMMY L. BUBEL lived. HERNANDEZ was concerned that VALDEZ, Sonny (ADAM T. SILVERMAN), and Carlos (possibly CARLOS ENRIQUE GARCIA) were acting in a manner that caused HERNANDEZ to be alarmed.  MASSARO told HERNANDEZ to put his (HERNANDEZ') attention on that other place that she said in the car.  MASSARO continued to state that was where HERNANDEZ' problems are coming from, MASSARO guaranteed it. HERNANDEZ advised that he would find out the next day.  MASSARO stated that if HERNANDEZ had to hold up for a while, MASSARO wanted to have some help to find a place.  HERNANDEZ advised that he did not trust Sonny (ADAM T. SILVERMAN), VALDEZ, and Carlos (possibly CARLOS ENRIQUE GARCIA).  HERNANDEZ made a list of six names of people that know.  HERNANDEZ said that he trusts three. HERNANDEZ stated that the other three he does not trust. HERNANDEZ stated that Sonny (ADAM T. SILVERMAN) was a rat and VALDEZ was a blabber mouth. HERNANDEZ stated that nothing would

29

come of it from HERNANDEZ himself, MASSARO, and MASSARO's friend. HERNANDEZ advised MASSARO that Sonny (ADAM T. SILVERMAN) would not talk because Sonny (ADAM T. SILVERMAN) was part of it. HERNANDEZ told MASSARO to tell "Judy" (believed to be Judy Schulman, the general manager at the Olympia Beach Resort) that if they (law enforcement) ask her what HERNANDEZ looks like, "Judy" should give them an inaccurate description. (I believe that this conversation relates to the murder of Jeanette Smith.)

44.  On Saturday, March 27, 1999, at approximately 5:15 p.m., a Court-authorized interception was made over telephone number (954) 224-7512.  MASSARO called FRANCISCO VALDEZ at telephone number (305) 698-1416.  VALDEZ asked MASSARO if everything was all right.  MASSARO replied, so far.  VALDEZ asked MASSARO if MASSARO thought he (believed to referring to ARIEL HERNANDEZ) would leave.  MASSARO replied, no.  MASSARO, VALDEZ, and Carlos (possibly CARLOS ENRIQUE GARCIA), arranged to meet later that night at Beach Side Mario's.  VALDEZ advised MASSARO to be careful and not to trust anybody. (I believe that this conversation  relates, in part, to the murder of Jeanette Smith and the subsequent investigation being conducted by the Broward Sheriff's Office.)

45.  On Saturday, March 27, 1999, at approximately 8:53 p.m., a Court-authorized interception was made over telephone number (305) 944-2929.  MASSARO was called by ARIEL HERNANDEZ

30

from an unknown telephone number. HERNANDEZ asked MASSARO if his
(HERNANDEZ') computer was off the table. MASSARO replied that yes
it was. HERNANDEZ asked if they (HERNANDEZ and MASSARO) were
going to do some work.  MASSARO replied no, he shipped it
(computer) out to Hollywood. HERNANDEZ asked MASSARO how he
(HERNANDEZ) was going to make money.  MASSARO advised that
HERNANDEZ will have to do it over there.  MASSARO advised that he
sent it to Hollywood because of everything that was going on.
(I believe that this conversation related, in part, to the murder
investigation involving Jeanette Smith and the counterfeit check
business.)

46. On March 28, 1999, ARIEL HERNANDEZ was arrested by the
Broward County Sheriff's Office (BSO) and charged with the March
20, 1999, murder of Jeanette Smith.  The investigation to date
indicates that Smith was murdered in order to prevent her from
either reporting the criminal activities of MASSARO, HERNANDEZ,
and other co-conspirators in a counterfeit check operation
supervised by MASSARO and/or in retaliation for the theft of
counterfeit checks.

47.  On Monday, March 29, 1999, at approximately 2:22 a.m.,
a Court-authorized interception was made over telephone number
(305) 944-2929.  MASSARO was called by ARIEL HERNANDEZ from an
unknown telephone number in the Broward County Jail.  HERNANDEZ
advised MASSARO that he had been arrested for murder.  HERNANDEZ

31

advised MASSARO that Sonny (ADAM T. SILVERMAN) was providing
information to the police.  HERNANDEZ told MASSARO that the
police knew about the computer. (The interview of HERNANDEZ on
March 28, 1999, confirms that this conversation relates to a
computer that was in Beach Side Mario's, Sunny Isles, Florida,
utilized by MASSARO and HERNANDEZ to make counterfeit checks.)
HERNANDEZ continued to state that the police had photographs of
MASSARO, MIKE FALCO, Kenneth Defillipo, Mike Bilotti, JOHN ROGAN,
"Tony Pep"(ANTHONY TRENTACOSTA), and John Porcaro.  HERNANDEZ
stated that the police even had Mike's (believed to be Monzer
Agha's, aka Mike Agha) picture and the police knew about the blue
truck.  HERNANDEZ told MASSARO that the police also mentioned
"Frankie" (FRANCISCO VALDEZ).  HERNANDEZ accused Sonny (ADAM T.
SILVERMAN) of providing the police information about where
HERNANDEZ lived at the time HERNANDEZ was arrested.  HERNANDEZ
advised MASSARO that he (HERNANDEZ) was "taking everything".
MASSARO gave an affirmative reply.  HERNANDEZ continued to state
that his (HERNANDEZ') story was that it (the homicide) was the
result of rough sex and was accidental and that HERNANDEZ did
everything himself.  HERNANDEZ told MASSARO that he (MASSARO) did
not have to worry about anything but Sonny (ADAM T. SILVERMAN).
HERNANDEZ asked MASSARO if MASSARO recalled the "thing" that they
(MASSARO and HERNANDEZ) were supposed to get the money for.
MASSARO replied affirmatively.  HERNANDEZ continued and asked

32

MASSARO to give the money to Tammy (TAMMY L. BUBEL).  MASSARO
again, replied affirmatively.  (It is my understanding that
HERNANDEZ was instructing MASSARO to give his (HERNANDEZ')  share
of money derived from criminal activity to TAMMY L. BUBEL).
HERNANDEZ advised MASSARO to watch his back because the police
had everyones' photograph.  MASSARO responded that the police
always have a catalog.  (It is my understanding that this
conversation reflects that HERNANDEZ participated in a homicide
in order to maintain his position in the criminal enterprise.
This conversation reflects a violation of Title 18, United States
Code, Section 1959, Violent Crimes in Aid of Racketeering
Activity.)

     48.  On Monday, March 29, 1999, at approximately 11:12 a.m.,
a Court-authorized interception was made over telephone number
(954) 456-3020.  MASSARO was called by MICHAEL FALCO from
telephone number (305) 364-7487, a telephone number listed to
MICHAEL FALCO.  During this conversation MASSARO told FALCO about
HERNANDEZ' homicide arrest.  FALCO was surprised and asked
MASSARO if the homicide arrest was false.  MASSARO provided no
response.  FALCO advised MASSARO that they (FALCO's telemarketing
room in North Miami Beach, Florida) are doing credit cards.
FALCO continued that MASSARO knew that because FALCO told MASSARO
everything.  FALCO said that it was a hundred dollars apiece.
FALCO advised that the telemarketing room sold twelve or thirteen

33

in two days of operation.  FALCO advised that the Puerto Rican
female is good.  MASSARO interrupted FALCO to listen to the news
report related to the homicide arrest of HERNANDEZ.  Following
the news report, FALCO asked MASSARO who the girl was that was
killed.  MASSARO replied that it was the girl, the dancer.  FALCO
expressed his concern and  then continued discussion about an
unknown operation for MASSARO and FALCO.  FALCO advised that there
may be a meeting that day about the "thing" that MASSARO wanted
to do.  FALCO advised MASSARO that someone may come up with the
money to do the whole thing themselves.  FALCO continued to
advise MASSARO that the "offshore thing" would be taken care of
and  anything they needed for that.  FALCO said that he (FALCO)
has to get the crew.  FALCO told MASSARO because he (MASSARO)
knew the individual that was bringing the person who was
financing the operation.  (It is my understanding that this
conversation relates to the operation of an illegal telemarketing
business, in violation of Title 18, United States Code, Sections
1341 and 1343.)

     49.  On Monday, March 29, 1999, at approximately 12:33 p.m.,
a Court-authorized interception was made over telephone number
(954) 456-3020.  MASSARO called target telephone (954) 456-3020,
from pay telephone number (954) 454-9086, listed as Ocean Marina
Hotel, 1945 South Ocean Drive, Hallandale Beach, Florida.
MASSARO spoke to his fiancé, Carol (PACITA T. MOSHER).  Carol

(PACITA T. MOSHER) advised MASSARO that she was taking her television down that was upstairs. Carol (PACITA T. MOSHER) told MASSARO that he (ARIEL HERNANDEZ) tried to call collect but she did not accept the call. MASSARO advised that he would be back in a little while.

50. On Monday, March 29, 1999, at approximately 1:24 p.m., a Court-authorized interception was made over telephone number (954) 456-3020. MASSARO called target telephone (954) 456-3020 from an unknown telephone number. MASSARO spoke to his fiancé, Carol (PACITA T. MOSHER). Carol advised MASSARO that she could not find it. MASSARO asked an unknown person in the background if they saw the Movado box that MASSARO had earlier that day. Carol (PACITA T. MOSHER) advised that MASSARO was in the living room earlier. The individual with MASSARO advised that MASSARO was at the dining room table. MASSARO advised that it had to be around somewhere not to worry about it. (The above two calls indicate that MASSARO was in the process of hiding evidence related to the counterfeit check operation with ARIEL HERNANDEZ and the related homicide. In the related homicide, the murder victim was discarded in the Everglades inside a stereo box that was purchased by ARIEL HERNANDEZ with counterfeit checks.)

51. On Monday, March 29, 1999, FBI surveillance units observed FREDERICK MASSARO, with two unidentified white males transfer several boxes from MASSARO's residence located at 1499

35

Shoreline Way, Hallandale, Florida, and load the boxes into the rear of a Chevrolet El-Camino. The FBI surveillance units later observed MASSARO and the same two unidentified white males unload the same boxes from the El-Camino into a cargo trailer located in a truck parking lot at the Oasis Truck and Tire Service, 5900 South State Road 7, Hollywood, Florida.

52.  On Tuesday, March 30, 1999, a sealed Federal Search Warrant was executed by the FBI and the Broward County Sheriff's Office on the above mentioned cargo trailer located in the truck parking lot at the Oasis Truck and Tire Service, 5900 South State Road 7, Hollywood, Florida.  Among the items seized were televisions and stereos which were believed to be purchased with counterfeit checks.  One of the items seized was a Sony Stereo in what appeared to be the original box.  This box was similar to the box that murder victim, Jeanette Smith, was placed and discarded in the Everglades.  The investigation has revealed that ARIEL HERNANDEZ purchased with counterfeit checks, one Sony Stereo on January 27, 1999 and two Sony Stereos on February 27, 1999, from Sharper Image, located at the Sawgrass Mills Mall, Sunrise, Florida.

53.  On Tuesday, March 30, 1999, at approximately 5:11 p.m., a Court-authorized interception was made over telephone number (305) 944-2929.  An unknown male at Beachside Mario's, identified as "Peter" was called by an unidentified male from an unknown

36

telephone number.   The unidentified male and FNU LNU, A/K/A

"PETE" discussed ARIEL HERNANDEZ' arrest for the murder of

Jeanette Smith.   The unidentified male advised that they

(presumed law enforcement) were looking for two other individuals

who may be involved in the murder.   The unidentified male advised

that HERNANDEZ admitted to accidental homicide.   FNU LNU, A/K/A

"PETE" asked the unidentified male why they were looking for two

other people.   The unidentified male advised that HERNANDEZ was

probably alleging that he (HERNANDEZ) was with two other people

when the murder occurred.   The unidentified male advised that

HERNANDEZ will probably tell the police everything he (HERNANDEZ)

knows.   The unidentified male stated "thank God Freddie"

(FREDERICK MASSARO) does not have any stolen property or anything

at the pizza restaurant because the police would know about it by

now.

        54.   On Wednesday, March 31, 1999, at approximately 1:13

p.m., a Court-authorized interception was made over telephone

number (954) 224-7513.   ANTHONY TRENTACOSTA called (800) 370-7225

which telephone number was answered by an unknown male as "Father

and Son".   TRENTACOSTA asked the unknown male if this number was

in Jacksonville.   The unknown male replied affirmatively.

TRENTACOSTA asked to speak to Steve (possibly STEVEN HOROWITZ).

TRENTACOSTA advised that he was in Hallandale eating lunch with

TRENTACOSTA's friend, TONY (believed to be ANTHONY ESPERTI) when

TRENTACOSTA was paged to this called telephone number.

TRENTACOSTA did not recognize the telephone number, TRENTACOSTA

believed it was "Freddie" (believed to be FREDERICK MASSARO).

Steve (possibly STEVEN HOROWITZ) asked how his buddy was.

TRENTACOSTA replied that he(TRENTACOSTA) would tell Steve

(possibly STEVEN HOROWITZ) later.  Steve (possibly STEVEN

HOROWITZ) advised that he already knew.  (It is my understanding

that TRENTACOSTA and STEVEN HOROWITZ were referring to the arrest

of ARIEL HERNANDEZ for murder).  TRENTACOSTA and Steve (possibly

STEVEN HOROWITZ) had a conversation related to the condition of

an apartment that was owned by Father and Son Moving and Storage.

It appeared that TRENTACOSTA was staying in this apartment.

Steve (possibly STEVEN HOROWITZ) advised that he heard that his

buddy, "Freddie" (MASSARO) was "freaking out" over there because

of the kid in Miami (believed to be referring to ARIEL

HERNANDEZ).  Steve (possibly STEVEN HOROWITZ) said he heard this

from Denise. TRENTACOSTA said that he (TRENTACOSTA) never told

Denise that although he did tell her that things did not look

good.  TRENTACOSTA advised Steve (possibly STEVEN HOROWITZ) that

MASSARO was doing fine and, in fact, MASSARO came to

TRENTACOSTA's rescue the night before.

    55.  On Thursday, April 1, 1999, at approximately 9:24 a.m.,

a Court-authorized interception was made over telephone number

(954) 456-3020.  ARIEL HERNANDEZ called MASSARO at his residence

from a pay telephone located in the Broward County Jail,
telephone number (954) 527-7720. MASSARO advised HERNANDEZ that
the police were coming by that day to speak to him (MASSARO).
HERNANDEZ asked MASSARO if he (MASSARO) had seen Sonny (ADAM T.
SILVERMAN). MASSARO replied affirmatively. HERNANDEZ told
MASSARO to advise gold tooth (believed to be referring to
FRANCISCO VALDEZ, who has some gold teeth) to watch his back
because he Sonny (ADAM T. SILVERMAN) mentioned his (VALDEZ')
name. HERNANDEZ said that they (the police) came directly to his
house and the only one who knew HERNANDEZ was there was Sonny
(ADAM T. SILVERMAN). HERNANDEZ asked MASSARO what he thought
about the police showing HERNANDEZ pictures for the second time
and asking HERNANDEZ to identify the individuals depicted in the
photographs. MASSARO advised that he did not know but surmised
that the police will always show photographs. HERNANDEZ advised
that these police were with the organized crime division.
HERNANDEZ advised MASSARO that he (HERNANDEZ) was taking the
whole rap, the story that was in the news was the story that
HERNANDEZ and Jerry (believed to be HERNANDEZ' attorney, Jerry
Velasquez)came up with, so that nobody else will be incriminated.
HERNANDEZ advised MASSARO that the way it was explained to the
police was that it was an accidental rough sex homicide.
HERNANDEZ continued to explain to MASSARO that the only problem
was that the police would not find sperm or DNA from HERNANDEZ in

the homicide victim, Jeanette Smith. HERNANDEZ advised that the
Broward County police and organized crime section conducted a
search warrant at his residence which he was sharing with TAMMY
L. BUBEL. HERNANDEZ asked MASSARO if TAMMY L. BUBEL advised
MASSARO about these searches.  MASSARO replied affirmatively.
HERNANDEZ asked MASSARO if he spoke to Jerry (believed to be
HERNANDEZ' attorney, Jerry Velasquez). MASSARO replied
affirmatively.  MASSARO advised HERNANDEZ that he (MASSARO) gave
what was owed to the girl.  (It is my understanding that MASSARO
gave criminal proceeds earned by HERNANDEZ to TAMMY L. BUBEL.)
MASSARO advised that he would put money or something in the jail
commissary.  HERNANDEZ asked MASSARO if he talked to the kid
(believed to be referring to ADAM T. SILVERMAN) about what had
happened.  MASSARO replied affirmatively.  HERNANDEZ asked if he
was saying no. (It is my understanding that this means that ADAM
T. SILVERMAN told MASSARO that he was not providing information
to the police about HERNANDEZ.) MASSARO replied affirmatively,
that he (ADAM T. SILVERMAN) was not cooperating with law
enforcement. HERNANDEZ asked how the police had Sonny's (ADAM T.
SILVERMAN's) name. MASSARO said that he did not know what was
going on with this kid (ADAM T. SILVERMAN), but he (ADAM T.
SILVERMAN) could only put himself in trouble. (It is my
understanding that MASSARO was inferring that if ADAM T.
SILVERMAN was cooperating with law enforcement, SILVERMAN would

40

have to incriminate himself and his participation in the homicide
of the female.)

   56.  On Thursday, April 1, 1999, at approximately 12:44
p.m., a Court-authorized interception was made over telephone
number (954) 224-7512. Steve (possibly STEVEN HOROWITZ) called
MASSARO from telephone number (904) 783-2299, a telephone number
identified by caller identification to Father and Son Moving and
Storage, Jacksonville, Florida. Steve (possibly STEVEN HOROWITZ)
told MASSARO that he heard what happened. (It is my understanding
that STEVEN HOROWITZ  is referring to the homicide arrest of
ARIEL HERNANDEZ.) MASSARO advised Steve (possibly STEVEN
HOROWITZ) that he (MASSARO) was going at that time to meet with
Broward County Sheriff's Office homicide detectives.  Steve
(possibly STEVEN HOROWITZ) asked MASSARO if "the other guys" were
going to be there. (It is my understanding that STEVEN HOROWITZ
was referring to FBI or local organized crime investigators.)
MASSARO responded that he did not think anyone else would be
there.  Steve (possibly STEVEN HOROWITZ) stated that it was
always something. MASSARO replied that it was always something,
that bodies were always around him (MASSARO) some where.  MASSARO
and Steve (possibly STEVEN HOROWITZ) discussed the murder of the
female by HERNANDEZ. MASSARO explained that it was the result of
rough sex.  MASSARO advised that he had spoken to HERNANDEZ since
his arrest but gave no details.

57.  On Thursday, April 1, 1999, at approximately 5:43 p.m.,
a Court-authorized interception was made over telephone number
(954) 224-7512.  Steve (possibly STEVEN HOROWITZ) called MASSARO
from an unknown telephone number.  MASSARO advised that
TRENTACOSTA was there with him.  MASSARO gave the telephone to
TRENTACOSTA and TRENTACOSTA and Steve (possibly STEVEN HOROWITZ)
discussed the homicide that ARIEL HERNANDEZ was arrested for.
TRENTACOSTA advised that the homicide detectives told MASSARO
that HERNANDEZ first claimed that TRENTACOSTA and MASSARO were
accomplices in the homicide.  TRENTACOSTA returned the telephone
to MASSARO.  MASSARO confirmed the statement of TRENTACOSTA and
said that the detectives advised that the homicide was the result
of rough sex.  MASSARO asked Steve (possibly STEVEN HOROWITZ) for
his home telephone number.  Steve (possibly STEVEN HOROWITZ)
provided the telephone number, 287-8850.  (Telephone number (904)
287-8850 was identified by caller identification as STEVEN
HOROWITZ).

58.  On Saturday, April 3, 1999, at approximately 5:55 p.m.,
a Court-authorized interception was made over telephone number
(954) 224-7512.  MASSARO called  MARTIN SISKIND at telephone
number (305) 785-3939.  MASSARO advised SISKIND that he (MASSARO)
wanted his (MASSARO's) money.  SISKIND advised that MASSARO will
get his money.  SISKIND advised that the last time with Peter was
disrespectful.  MASSARO told SISKIND that he (SISKIND)

42

disrespected MASSARO by not paying MASSARO his money.  MASSARO
advised SISKIND that now he (MASSARO) wanted his interest and
everything else.  SISKIND advised that he would see MASSARO
Monday night.  MASSARO advised that if SISKIND does not have that
other money bring the black gentleman with SISKIND.  SISKIND
advised that he (SISKIND) was responsible for his (SISKIND's) end
and that he would bring the black gentleman with him (SISKIND).
SISKIND advised that the black gentleman cost SISKIND $20,000.
(It is my understanding that this conversation concerns the
making and collecting of proceeds in connection with a loanshark
operation, in violation of Title 18, United States Code, Sections
892 and 894.)

59.  On Monday, April 5, 1999, at approximately 3:27 p.m., a
Court-authorized interception was made over telephone number
(954) 224-7512.  MASSARO was called by JOSEPH ROTUNNO from
telephone number (954) 224-7512, a telephone number listed to
Joseph Rotunno, 1700 North State Road 7, Hollywood, Florida.
ROTUNNO advised MASSARO that the guy was ready and everything was
set.  (It is my understanding that this conversation relates to
the use of fraud in obtaining Florida Drivers' licenses under
fictitious names, in violation of Title 18, United States Code,
Section 1028.)  MASSARO asked ROTUNNO if ROTUNNO read the paper
about the dancer that was found in a box in the Everglades.
ROTUNNO responded to MASSARO with a question; "oh that was

43

there?" MASSARO replied affirmatively. MASSARO advised that
when MASSARO saw ROTUNNO he would talk to ROTUNNO. (It is my
understanding that this conversation relates to the homicide of
Jeanette Smith.)

60. On Wednesday, April 7, 1999, at approximately 11:16
p.m., a Court-authorized interception was made over telephone
number (305) 944-2929. MASSARO was called by CS-1. CS-1 advised
MASSARO that the guy from the flower shop (believed to be
ROTUNNO), met with "Jimmy Clemenza" (Jimmy Clemenza is a capo in
the Colombo LCN family) and "Sammy Meatballs" (Sammy Aparo is a
soldier in the Genovese LCN family who is also known as "Sammy
Meatballs"). CS-1 asked MASSARO whether he knew these
individuals. MASSARO advised that he did know them. CS-1 asked
what MASSARO thought about these individuals. MASSARO advised
that he did not know, it was difficult to determine what these
guys would do because they (ROTUNNO, Clemenza, and Aparo) were
not them (MASSARO and CS-1). (I understand this to mean that they
were not Gambino LCN family associates, inasmuch as Clemenza and
ROTUNNO are a Colombo LCN family capo and associate,
respectively.) CS-1 advised that he was very sorry that he did
not ask MASSARO for his help in the beginning. (I understand that
this conversation is referring to a situation involving an
incarcerated individual named, Scott Amister, who had requested
assistance from ROTUNNO to collect the proceeds of a

44

telemarketing operation from another individual named Chip
Hoffecker. According to an ongoing FBI investigation, Hoffecker
was holding approximately $70,000 in profits from an illegal
telemarketing operation for Amister.  Amister attempted to
recover the $70,000 from Hoffecker without success.)  CS-1
advised MASSARO that Hoffecker offered to repay $30,000; however,
this was not accepted by Clemenza and ROTUNNO. CS-1 advised that
Hoffecker and a guy by the name of "Carlo" (believed to be a
Gambino LCN family associate named Carlo Vaccarezza), is
associated with Tony (ANTHONY TRENTACOSTA) and representing
Hoffecker. MASSARO indicated that he probably knew the identity
of "Carlo."  MASSARO continued that Carlo probably is the guy who
owns a restaurant on Commercial Boulevard (Broward County,
Florida).  MASSARO said that he could speak to Carlo on this
kid's (Amister's) behalf. (I believe that this call demonstrates
MASSARO's knowledge of the members, rules and customs of the
LCN).

61.  On Friday, April 9, 1999, at approximately 11:55 a.m.,
a Court-authorized interception was made over telephone number
(954) 456-3020.  MASSARO called Father and Son Moving and Storage
at telephone number (800) 370-7225 and spoke with an unidentified
male believed to be STEVEN HOROWITZ. During this conversation,
MASSARO and the unidentified male (possibly STEVEN HOROWITZ)
discussed an individual identified as "Martin", the equipment

45

guy.  MASSARO advised that he does not like Martin but he
(MASSARO) would use Martin to open a business. MASSARO said that
Martin goes running to "Pep" (ANTHONY TRENTACOSTA) to advise
TRENTACOSTA that MASSARO does not like him (Martin).  MASSARO
further stated that Martin had gone into the "shylock business"
and that Martin called MASSARO to assist in the collection of a
debt related to this shylock business. MASSARO claimed that he
went to collect for Martin because he (MASSARO) thought it was
"business money".  MASSARO met the shylock loan victim to collect
and discovered that the loan was not related to the restaurant
business. MASSARO said that he called Martin and admonished
Martin for conducting a shylock loan business. MASSARO said that
Martin then called TRENTACOSTA and TRENTACOSTA reprimanded
Martin. (It is my understanding that this conversation concerns
the making and collecting of proceeds in connection with a
loanshark operation, in violation of Title 18, United States
Code, Sections 892 and 894.)

        62.  On Monday, April 12, 1999, at approximately 3:12 p.m.,
a Court-authorized interception was made over telephone number
(954) 456-3020.  MASSARO was called by MICHAEL FALCO from an
unknown telephone number. FALCO advised MASSARO that "Carlos"
(believed to be CARLOS ENRIQUE GARCIA) and "this other kid" are
going to give FALCO some money to operate the room (believed to
be a telemarketing room), which will pay FALCO's rent for the

room. FALCO advised that he was going to Orlando to sign the fax deal and to observe the operation. The fax deal will convert FALCO's telemarketing room into an inbound telemarketing operation. (I understand this to mean that the telemarketing room will receive incoming calls derived from advertisements faxed to potential customers. It is also my understanding, based upon the receipt of information from reliable confidential sources, that the participants believe that this method of soliciting telemarketing customers circumvents the need for a state telemarketing license.) MASSARO asked FALCO which "Carlos" he was talking about. FALCO responded that it was the "big one". (CARLOS ENRIQUE GARCIA is approximately 6 feet tall and 200 pound.) MASSARO asked FALCO if it was Carlos and the other guy with the teeth. (FRANCISCO VALDEZ has several gold front teeth.) FALCO advised that VALDEZ was out because VALDEZ never comes up with the money. FALCO said that he discontinued the credit card guard telemarketing operation because he was only operating the credit card guard temporarily at the request of the mayor (I understand this to be Kenneth A. Defillipo, Vice Mayor of North Miami Beach, Florida.) MASSARO advised that he will pay the rent for FALCO. (I believe that this conversation relates to the operation of an illegal telemarketing business in violation of Title 18, United States Code, Sections 1341 and 1343.)

47

63. On Tuesday, April 13, 1999, at approximately 11:32 a.m., a Court-authorized interception was made over telephone number (954) 224-7512. MASSARO called telephone number (954) 457-8056, and spoke to FNU LNU, AKA "SALLY". FNU LNU, AKA "SALLY" told MASSARO that an unknown female had the money for MASSARO. MASSARO acknowledged FNU LNU, AKA "SALLY"'s statement and asked what about the "other thing", to which FNU LNU, AKA "SALLY" asked what "other thing?". MASSARO said that the unknown female was going to sign over the certificate. FNU LNU, AKA "SALLY" stated that he was not sure about the $20,000, that he (FNU LNU, AKA "SALLY") had to think about it and go over it with her family. (I believe that during this conversation, MASSARO and FNU LNU, AKA "SALLY" were planning to use all or a portion of the $20,000 referred to in this conversation from the unknown female for making extortionate extensions of credit, in violation of Title 18, United States Code, Sections 892 - 894).

64. On Thursday, April 15, 1999, at approximately 9:27 a.m. a Court-authorized interception was made over telephone number (954) 456-3020. MASSARO called an unknown male at telephone number (305) 255-6888. The unknown male asked MASSARO if he (MASSARO) had spoken to Filemina (a possible reference to the spouse of missing Gambino LCN family associate, John Porcaro) about the truck. MASSARO advised that he did not, but that he (MASSARO) had to go there that day to see Dick (possibly Richard

48

Santini of United States Van Lines). MASSARO advised that he had to go there because they emptied his (MASSARO's) trailer out. (I understand that this may be a reference to the execution of the sealed Federal Search Warrant executed by the FBI and the Broward County Sheriff's Office on the above mentioned cargo trailer located in the truck parking lot at the Oasis Truck and Tire Service, 5900 South State Road 7, Hollywood, Florida on March 30, 1999). The unknown male told MASSARO that whatever MASSARO and the unknown male talk about is just between the two of them. The unknown caller was concerned that he may lose his employment as a result of his conversations with MASSARO. The unknown male advised MASSARO that he (unknown male) spoke with the lady who was providing a loan to the unknown male. The unknown male advised that he (unknown male) needed the money that day and was it possible for MASSARO to get the money. MASSARO advised that the guy was supposed to meet that day but failed to show. MASSARO continued to advise that he (MASSARO) attempted to contact the guy to no avail. The unknown male advised that they (possibly a bank) were going to check his accounts that day and the unknown male only had "so much" money in the account. MASSARO advised that he would see what he could do.

65. On Thursday, April 15, 1999, at approximately 5:05 p.m., a Court-authorized interception was made over telephone number (305) 944-2929. MASSARO was called by an unknown male

49

identified as "Frankie" from an unknown telephone number. MASSARO advised FNU LNU, AKA "FRANKIE" that he was going to the woman's house to see what the situation was. MASSARO advised that there was a kid from Father and Son Moving and Storage who had worked for MASSARO for approximately ten years. MASSARO continued that this kid has a check coming in from his in-laws to buy a home and that this kid had to put money in the bank. MASSARO advised FNU LNU, AKA "FRANKIE" that this kid was looking for some money for approximately three weeks. FNU LNU, AKA "FRANKIE" said that he would stop by that night and talk to MASSARO about this situation. (I understand that this conversation may be related to the above-mentioned intercepted call in paragraph 64 herein whereby MASSARO is arranging a possible extortionate extension of credit, in violation of Title 18, United States Code, Sections 892 - 894 for the unknown male referred to in paragraph 64).

66. This investigation has developed information that MASSARO provides the cellular telephone, with telephone number (954) 224-7513, to ANTHONY TRENTACOSTA for TRENTACOSTA's use. It is believed that this cellular telephone is primarily utilized by TRENTACOSTA while TRENTACOSTA is outside the South Florida area. Based on intercepted telephone conversations, TRENTACOSTA is expected to return to the South Florida area during the first week of May, 1999. As such, monitoring of this cellular telephone remains constant.

50

## INTERVIEWS OF ARIEL HERNANDEZ

67.  On Sunday, March 28, 1999, ARIEL HERNANDEZ was arrested
by the Broward County Sheriff's Office (BSO) and charged with the
March 20, 1999, murder of Jeanette Smith. After being advised of
his rights and waiving his rights, HERNANDEZ was first
interviewed by detectives from the Broward County Sheriff's
Office. During that interview, HERNANDEZ admitted that he killed
Jeanette Smith during an episode of rough sex. HERNANDEZ was also
interviewed by your affiant that same day. During that portion of
the interview, HERNANDEZ admitted that he and FREDERICK MASSARO
were criminally involved in a counterfeit check operation.
HERNANDEZ described this counterfeit check operation as follows:
MASSARO would obtain bank account information from the Checking
Exchange located at 2603 North Dixie Highway, Wilton Manors,
Florida. MASSARO would provide this information to HERNANDEZ who
would then produce counterfeit checks drawn on these
aforementioned accounts (either individual or corporate
accounts).  HERNANDEZ stated that he also manufactured
counterfeit identification such as drivers' licenses from several
states, including the State of Florida, that were utilized to
pass the counterfeit checks.  HERNANDEZ said that he utilized a
computer that was located in Beachside Mario's.  According to
HERNANDEZ, he and MASSARO would purchase expensive merchandise
such as televisions and stereos, electronic equipment, computer

51

equipment, jewelry, office and telecommunications equipment, clothing, and appliances. HERNANDEZ and MASSARO sold these items at half price or on occasion employed other individuals to return the fraudulently obtained merchandise for a full purchase price refund from the retailer. HERNANDEZ said that he and MASSARO last purchased merchandise on Saturday, March 27, 1999 when they purchased a lady's Movado watch. HERNANDEZ advised that both he and MASSARO stored the above-mentioned merchandise at Beachside Mario's and a truck trailer located in Hollywood, Florida. HERNANDEZ was unable to provide the exact location of the trailer. HERNANDEZ advised that MASSARO told him that he (MASSARO) moved the computer out of Beachside Mario's to Hollywood. Hernandez understood this to mean that MASSARO moved the computer to MASSARO's residence in Hallandale Beach, Florida. HERNANDEZ said that MASSARO is considered to be the biggest fence (referring to an individual who deals in stolen property) in South Florida.

A.    Based on the information contained in paragraph 67, as well as the other information set forth in paragraph 52 herein, a sealed Federal Search Warrant was executed by the FBI and the Broward County Sheriff's Office on the above mentioned cargo trailer located in the truck parking lot at the Oasis Truck and Tire Service, 5900 South State Road 7, Hollywood, Florida.

## NORMAL INVESTIGATIVE TECHNIQUES

68.  Your affiant is aware that an investigation consists of a number of techniques being used in conjunction with each other to develop enough evidence to establish a prosecutable case against all guilty individuals.  These techniques include the use of undercover agents, confidential sources, the testimony of witnesses before the Federal Grand Jury, surveillance, analysis of toll and pen register data, and the execution of search warrants.  The requested authorization for the continued wire interception is necessary because, although confidential sources, surveillance, analysis of toll and pen register, the execution of a search warrant and interviews of witnesses have been tried, they have not resulted in sufficient evidence to prosecute all the participants in the criminal enterprise.  Furthermore, these techniques appear unlikely to produce the needed results if attempted or utilized further, or they are too dangerous, as described below.

69.  Your affiant is aware that ANTHONY TRENTACOSTA and AUGUSTUS V. CORRAO are soldiers in the Gambino LCN crime family. Your affiant is also aware from prior investigations and reports of other agents that "made" members of LCN Crime families, such as TRENTACOSTA and CORRAO, typically use LCN associates, such as FREDERICK MASSARO, MICHAEL J. FALCO, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS,

53

CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY
ESPERTI, FRANCISCO VALDEZ, TAMMY L. BUBEL, PACITA T. MOSHER,
JAMES LAPOLLA, CARLOS ENRIQUE GARCIA, FNU LNU, A/K/A "RICKY", FNU
LNU A/K/A "RICO", FNU LNU A/K/A "SALLY", FNU LNU A/K/A "PETE" and
FNU LNU A/K/A "FRANKIE", FNU LNU A/K/A "MARTIN", FNU LNU A/K/A
"JOE" as insulation between themselves and outsiders.  This
buffer serves to protect the "made" member from direct dealings
with undercover agents or confidential sources.

70.  Your affiant is unaware of any undercover agents or
cooperating witnesses who can infiltrate the conspiracy at a
level high enough to identify all members of the conspiracy or
otherwise satisfy all the goals of this investigation. The
members of the conspiracy are even more suspicious of each other
and outsiders since the murder of Jeanette Smith. For example,
during the Saturday, March 27, 1999 2:09 a.m. Court-authorized
interception between MASSARO and ARIEL HERNANDEZ (see paragraph
43 herein), HERNANDEZ expressed concerned that VALDEZ, Sonny
(ADAM T. SILVERMAN), and Carlos (possibly CARLOS ENRIQUE GARCIA)
were acting in a manner that caused HERNANDEZ to be alarmed.
MASSARO stated that if HERNANDEZ had to hold up for a while,
MASSARO wanted to have some help to find a place.  HERNANDEZ
advised that he did not trust Sonny (ADAM T. SILVERMAN), VALDEZ,
and Carlos (possibly CARLOS ENRIQUE GARCIA).  HERNANDEZ made a
list of six names of people that know.  HERNANDEZ said that he

trusts three.  HERNANDEZ stated he does not trust the other three. HERNANDEZ stated that Sonny (ADAM T. SILVERMAN) was a rat and VALDEZ was a blabber mouth and that nothing would come of it from HERNANDEZ himself, MASSARO, and MASSARO's friend.  HERNANDEZ advised MASSARO that Sonny (ADAM T. SILVERMAN) would not talk because Sonny (ADAM T. SILVERMAN) was part of it.

71.  As stated in paragraphs 114 through 116 of Exhibit "A", the use of confidential sources has been very valuable in developing information; however, even though some sources are willing to testify they are not in a position to provide complete and continued details regarding the activities of this criminal enterprise.

72.  Conducting physical surveillance of participants is a commonly used investigative technique.  Surveillance has been conducted in this investigation and has assisted in disclosing some of the associations and places of meetings by the participants.  However, this technique has failed to reveal the identity of all the participants and has failed to provide sufficient admissible evidence of specific criminal activities. Without knowledge of the content of these meetings, surveillance alone is of limited value.  While surveillance can confirm the fact that a meeting took place, under most circumstances it cannot provide the content of the discussions which facilitate the organization's illegal activities.  Moreover, your affiant

knows that the subjects herein are particularly sensitive to efforts to surveil their activities.  As previously set forth in Exhibit "A", on at least one occasion, when ROGAN was being surveilled by law enforcement agents, he actually confronted one of the agents who was following him.

73.  Your affiant knows that any extensive surveillance risks exposure, and can compromise the covert nature of this investigation causing **FREDERICK J. MASSARO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI, JOSEPH ROTUNNO, ADAM T. SILVERMAN, STEVEN HOROWITZ, FRANK S. BUSCEMI, FRANCISCO VALDEZ, AUGUSTUS V. CORRAO, TAMMY L. BUBEL, PACITA T. MOSHER, JAMES LAPOLLA, CARLOS ENRIQUE GARCIA, FNU LNU, A/K/A "RICKY", FNU LNU A/K/A "RICO", FNU LNU A/K/A "SALLY", FNU LNU A/K/A "PETE", FNU LNU A/K/A "FRANKIE", FNU LNU A/K/A "MARTIN", FNU LNU A/K/A "JOE"** and their associates to alter and/or temporarily cease their criminal operations.  Continued surveillance of the residences and businesses of the principals would jeopardize the covert nature of the ongoing investigation, causing the participants to be more cautious and secretive about their ongoing criminal activity.  However, surveillance, in conjunction with the interception of

56

relevant conversations, will provide valuable evidence regarding the activities of those involved in this criminal enterprise.

74.    The possibility of initiating a Federal Grand Jury investigation at this time into the illegal activities of the principals of this investigation has been considered.  However, many of the possible witnesses are conspirators themselves, and there are presently not sufficient facts to determine which of the alleged conspirators, if any, should be or could be compelled to testify under a grant of immunity.  Individuals who are members and associates of organized crime families often invoke their Fifth Amendment testimonial privilege, and even under a grant of immunity have been known to risk and accept contempt charges rather than testify.  From your affiant's experience, as well as that of other Agents of the FBI experienced in organized crime matters, extensive overt investigations would only result in the targets further camouflaging their activities, making detection even more difficult.

75.    Consideration has been given to interviewing co-conspirators and associates of the principal subjects.  As previously discussed in paragraph 67, HERNANDEZ has been interviewed; however, HERNANDEZ is not in a position to give admissible evidence in Court. HERNANDEZ was indicted by a State of Florida grand jury sitting in Broward County, Florida for the first degree murder of Jeanette Smith. There is no plea or

57

cooperation agreement between HERNANDEZ and the government for HERNANDEZ to give any testimony concerning any of the information he has provided. HERNANDEZ has provided at least three variations of the murder of Jeanette Smith. On April 8, 1999, ARIEL HERNANDEZ, was interviewed by the undersigned which resulted from negotiations between the United States Attorneys' Office for the Southern District of Florida and his attorney, Jerry Velazquez, Esq. Pursuant to those negotiations, and a signed written proffer agreement dated April 2, 1999, HERNANDEZ received direct use immunity[4] for the statements that he made during this interview. Consequently, the information given by HERNANDEZ during this interview cannot be used against him; however, there have been investigative leads derived from the April 8, 1999 interview of HERNANDEZ. For example, personal property of Jeanette Smith was found near the location where the body was discarded. Furthermore, the Broward Sheriff's Office homicide detectives conducted an interview of MASSARO on or about April 1, 1999, wherein he said he had limited contact with ARIEL HERNANDEZ and did not have any information regarding the murder of Jeanette Smith. As the interview with MASSARO demonstrates, individuals who are knowledgeable of the criminal activities are generally participants in the crimes, and are therefore unwilling to

---

[4] Pursuant to the agreement, the government cannot use the statements made by HERNANDEZ during this interview directly against him.

provide truthful information and testify.  Even with the
testimony of a co-conspirator, there would likely be insufficient
evidence to successfully prosecute all co-conspirators or to
develop usable information relating to the full scope of the
federal violations set forth in this affidavit.  The co-
conspirators, in addition to being afraid of physical
retaliation, are often themselves prior participants or currently
involved in illegal activity, and as such refuse to cooperate
with law enforcement to any significant degree.  Even with the
benefit of several key conspirators willing to testify,
electronic surveillance is still necessary to accomplish a
successful prosecution because actual recordings of criminal
conversations are usually necessary to corroborate testimony of
witnesses with criminal backgrounds.

76.  From prior investigations and reports of other Agents,
your affiant knows that the Gambino LCN Crime family is extremely
sophisticated in detecting and avoiding investigations by law
enforcement agencies.  This has made conventional investigative
techniques, such as interviews, of very limited value.

77.  Based upon your affiant's experience and the experience
of fellow agents who have investigated organized crime activity,
your affiant believes that interviews of additional co-
conspirators or victims in this matter would be communicated to
the principals, their subordinates, or others, who would take

even more precautionary measures to avoid the further collection
of evidence by law enforcement. Moreover, it is your affiant's
belief that interviews with co-conspirators at this stage of the
investigation could jeopardize the safety of the confidential
sources.

78.    Telephone toll call records of telephones used by some
of the known participants have been obtained. These records have
been useful in revealing some of the associations and frequency
of contact of the known participants with each other. However,
these records, standing alone, do not provide proof of illegal
activities because the records do not reveal the content of
conversations. Pursuant to lawful court orders, pen registers
and trap and trace techniques have been used in this
investigation. As previously outlined in greater detail, the pen
register information has revealed the existence of telephonic
contact between the principals of this investigation, but like
toll record information these records, standing alone, do not
provide sufficient proof of illegal activities. The associations
and frequency of contacts in themselves, do not provide evidence
of criminal activity and do not identify the actual participants
in the telephone contacts.

79.    Based upon my experience, and the experiences of other
law enforcement agents as related to me, it is my belief that use
of search warrants at this time would not provide sufficient

60

evidence necessary to determine the full scope of the criminal
conspiracies, the identity of all of the co-conspirators and the
various methods used to run this criminal enterprise. For
example, and as set forth in more detail in paragraph 52 herein,
on Tuesday, March 30, 1999, a sealed Federal Search Warrant was
executed by the FBI and the Broward County Sheriff's Office on
the previously mentioned cargo trailer located in the truck
parking lot at the Oasis Truck and Tire Service, 5900 South State
Road 7, Hollywood, Florida.  Among the items seized were
televisions and stereos which were believed to be purchased with
counterfeit checks.  One of the items seized was a Sony Stereo in
what appeared to be the original box.  This box was similar to
the box that murder victim, Jeanette Smith, was placed and
discarded in the Everglades.  The investigation has revealed that
ARIEL HERNANDEZ purchased with counterfeit checks, one Sony
Stereo on January 27, 1999 and two Sony Stereos on February 27,
1999, from Sharper Image. Records concerning contacts between
criminal associates are not normally kept, and the best evidence
of a meeting would be the conversations themselves.

80.  Based on the totality of the circumstances, MASSARO and
other members of the enterprise, are conducting the affairs of
the enterprise through the pattern of racketeering set forth in
paragraph 5. Specifically, MASSARO has provided false information
concerning various aspects of the homicide investigation and has

attempted to conceal aspects of the affairs of the enterprise. Accordingly, continued interception is necessary to reveal the full scope and nature of the racketeering enterprise.

81. Due to the fact that sufficient evidence is not available through other investigative techniques, as set forth above, your affiant believes there is a need for electronic surveillance in this matter to fully reveal the manner and scope in which **FREDERICK J. MASSARO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI, JOSEPH ROTUNNO, ADAM T. SILVERMAN, STEVEN HOROWITZ, FRANK S. BUSCEMI, FRANCISCO VALDEZ, AUGUSTUS V. CORRAO, TAMMY L. BUBEL, PACITA T. MOSHER, JAMES LAPOLLA, CARLOS ENRIQUE GARCIA, FNU LNU, A/K/A "RICKY", FNU LNU A/K/A "RICO", FNU LNU A/K/A "SALLY", FNU LNU A/K/A "PETE", FNU LNU A/K/A "FRANKIE", FNU LNU A/K/A "MARTIN", FNU LNU A/K/A "JOE"** and others as yet unknown, are involved in the violations of federal statutes as set forth in paragraph 5 of this affidavit.

### MINIMIZATION

82. All interception will be minimized pursuant to Chapter 119 of Title 18, United States Code. Interception will be suspended when it is determined through voice identification,

physical surveillance, or otherwise, that none of the name intercethes or any of their confederates, when identified, are participants in the conversation, unless it is determined that the conversation is relevant to those matters under investigation.  Even if one or more of the named interceptees or their confederates, when identified, is a participant in the conversation, monitoring will be suspended if the conversation is non-pertinent to those matters under investigation.  Intermittent spot monitoring will be conducted to ensure that a minimized conversation has not become relevant.

### **PERIOD OF INTERCEPTION**

83.  It is believed that the communications to be intercepted will reflect a continuing criminal conspiracy and continuing course of criminal activity, thereby necessitating the interception of communications on a continuing basis, following the first interception of communications that are the subject of this request.  Therefore, it is requested that the interception not automatically terminate when incriminating communications are initially intercepted, but continue until communications are intercepted that reveal the full nature and manner in which **FREDERICK J. MASSARO, ANTHONY TRENTACOSTA, MICHAEL J. FALCO, MARTIN SISKIND, ARIEL A. HERNANDEZ, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, CHESTER POTASH, RICHARD DAVID GAZIE, JOHN MIRABILE, ANTHONY ESPERTI, JOSEPH SPITALERI,**

**JOSEPH ROTUNNO**, **ADAM T. SILVERMAN**, **STEVEN HOROWITZ**, **FRANK S. BUSCEMI**, **FRANCISCO VALDEZ**, **AUGUSTUS V. CORRAO**, **TAMMY L. BUBEL**, **PACITA T. MOSHER**, **JAMES LAPOLLA**, **CARLOS ENRIQUE GARCIA**, **FNU LNU, A/K/A "RICKY"**, **FNU LNU A/K/A "RICO"**, **FNU LNU A/K/A "SALLY"**, **FNU LNU A/K/A "PETE"**, **FNU LNU A/K/A "FRANKIE"**, **FNU LNU A/K/A "MARTIN"**, **FNU LNU A/K/A "JOE"** and others as yet unknown, participate in the illegal conduct referenced herein, the identities of the participants, co-conspirators, and victims, the precise nature and scope of the criminal enterprise and illegal activity, the individual acts committed by aiders, abettors, and co-conspirators, the extent of their participation in these offenses, their places of operation, the full nature of the criminal conspiracies involved therein, and the acquisition and disbursement of proceeds derived from criminal activity, for a period not to exceed thirty (30) days from the date of the Court's Order.

Terry L. Feisthammel, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this ___ day of April, 1999.

WILLIAM P. DIMITROULEAS
UNITED STATES DISTRICT JUDGE

Certified to be a true and correct copy of the original.
Carlos Juenke, Clerk
U.S. District Court
Southern District of Florida
By _____
4/20/99

64

[vdkttext]

```
                              Case Selection
Dkt type: cr   Case Number: 00-6273     Division: 0   FtLauderdale

Transaction: kseal doc -/-/- - -
                              History Record
Occurrence date:     06/08/01    Service date :              ID#  4624480
                              Document Record
Document number:    271     -1   Document type :doc          -
Date filed : 06/08/01            Date disposed :     Term # :
Date req :                       Time req :          Flag :
Requested Amt :
+---------------------------------------------------------------+
  SEALED DOCUMENT with attachments



+editing docket text---------------------------------------+

 Command mode (? for commands)
```

Attached to D.E. # _271_