UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6273-CR-HUCK

UNITED STATES OF AMERICA,

　　　　Plaintiff,

-vs-

ANTHONY TRENTACOSTA, et al.,

　　　　Defendants.
_____/

NIGHT BOX
FILED

JAN 15 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANTS' POST-TRIAL MOTIONS FOR
JUDGMENT OF ACQUITTAL AND NEW TRIAL

COMES NOW the United States of America, by and through its undersigned Assistant United States Attorneys, and hereby files its response and memorandum of law in opposition to the post-trial motions for judgment of acquittal and new trial filed by defendants Anthony Trentacosta, Frederick J. Massaro and Ariel Hernandez.

I.　　Introduction.

On December 14, 2001, the jury returned guilty verdicts against defendants Anthony Trentacosta, Frederick J. Massaro and Ariel Hernandez.[1] Thereafter, defendant Anthony Trentacosta

---

[1] Trentacosta was convicted of RICO Conspiracy (Count 1). Frederick J. Massaro was convicted on Count 1 (RICO Conspiracy - 18 USC 1962(d)), Counts 2-16 (Bank Fraud - 18 USC 1344), Count 17 (Conspiracy to Commit Murder in Aid of Racketeering - Jeanette Smith - 18 USC 1959(a)(5)), Count 18 (Murder in Aid of Racketeering - Jeanette Smith - 18 USC 1959(a)(1)), Count 20 (Conspiracy to Commit Murder in Aid of Racketeering - Ariel Hernandez - 18 USC 1959(a)(5)), Count 21 (Uttering Counterfeit Checks - 18 USC 513), Count 22 (Conspiracy to Make Extortionate Extensions of Credit - 18 USC 892(a)), Count 23 (Conspiracy to Participate in the Use of Extortionate Means to Collect Extensions of Credit - 18 USC

filed a "Motion for Judgment of Acquittal" (hereinafter "Trentacosta's Motion") and defendant Frederick J. Massaro filed a combined "Renewed Motion for Judgment of Acquittal" (hereinafter "Massaro's Acquittal Motion") and "Alternative Motion for New Trial" (hereinafter "Massaro's New Trial Motion"). Defendant Ariel Hernandez adopted Massaro's post trial motions.

### A. Trentacosta's Motion.

Defendant Trentacosta argues that the government failed to prove that he agreed to join in the commission of two acts of racketeering activity sufficient to establish a "pattern of racketeering activity" within the purview of 18 U.S.C. Section 1962(d). Trentacosta's Motion, p. 4. To reach the conclusion that he should be acquitted, counsel for Trentacosta (1) incorrectly interpreted the law regarding RICO conspiracy;[2] (2) ignored the fact that Trentacosta was a member of the conspiracy since its inception, as charged in the indictment; and (3) misinterpreted the jury finding "that the defendant did not agree to the commission of murder in violation of Section 782.04 Florida Statutes" as meaning that the jury found he was not a member of the conspiracy and therefore did not join in

---

894(a)(1)) and Count 24 (Theft from Interstate Shipments - 18 USC 659). Ariel Hernandez was convicted on Count 1 (RICO Conspiracy - 18 USC 1962(d)), Counts 2-16 (Bank Fraud - 18 USC 1344), Count 17 (Conspiracy to Commit Murder in Aid of Racketeering - Jeanette Smith - 18 USC 1959(a)(5)), Count 18 (Murder in Aid of Racketeering - Jeanette Smith - 18 USC 1959(a)(1)) and Count 21 (Uttering Counterfeit Checks - 18 USC 513).

[2]As will set forth with greater specificity below, the government can prove a RICO conspiracy by showing an agreement to participate in the affairs of an enterprise through a pattern of racketeering activity *or* through the collection of one unlawful debt. Showing an agreement to participate in the affairs of an enterprise through a pattern of racketeering activity can be proved in one of two ways: 1) by showing an agreement on an overall objective; and/or 2) by showing that a defendant agreed personally to commit two predicate acts and therefore to participate in a single objective conspiracy. If the government can prove an agreement on an overall objective, it need not prove that a defendant personally agreed to commit two predicate acts. As previously stated, the other way to prove a RICO conspiracy is to show that a defendant agreed to participate in the affairs of an enterprise through the collection of one unlawful debt.

2

the agreements to commit murder in violation of Section 782.04 Florida Statute.

The evidence at trial established that, as a member of the Gambino Organized Crime Family of La Cosa Nostra (hereinafter "Gambino" or "Gambino Crime Family"), Trentacosta profited from the criminal activities of the charged enterprise, the South Florida crew of the Gambino Crime Family (hereinafter "the crew") which was run by Massaro. The crew conducted criminal activity in South Florida which included producing counterfeit checks and/or bank fraud, dealing in stolen merchandise, making and collecting unlawful extensions of credit, obstruction of justice and murder. Massaro paid Trentacosta "tribute" in various forms, including but not limited to, checks disguised as "consulting fees" from Father & Son Moving of Jacksonville, Inc. to Denise Trezza, Trentacosta's wife. Notwithstanding the fact that Trentacosta was not "formally" recognized within the Gambino Crime Family as Massaro's boss until the death of Anthony Ruggiano a/k/a "Fat Andy" (hereinafter "Fat Andy") on March 18, 1999, Trentacosta was Massaro's *de facto* boss from at least the latter part of Fat Andy's incarceration[3] and throughout the time period from Fat Andy's release from prison up to and including the time of his death.

B.  Massaro's Acquittal Motion and New Trial Motion.

Defendant Massaro claims that the Government's evidence was "insufficient" to convict him of Counts 17 and 18, conspiring to commit and committing the murder of Jeanette Smith in aid of racketeering, and that the nature of the victim's death was prejudicial and so overwhelmed "the jury as to lead to the murder convictions." Acquittal Motion, p. 1, paragraphs 2 - 5. He makes the same argument for Count 20, conspiring to commit the murder of Ariel Hernandez. Massaro also baldly asserts that the verdicts are contrary to the law and evidence, and that the Court erred in: (1) charging

---

[3]  1984 through 1997.

3

the jury over his objections on the "recently stolen property issue;" (2) denying several of his motions for mistrial "made during trial;" and (3) allowing "certain prejudicial evidence to be admitted as 'background' and placed before the jury." New Trial Motion, p. 2, paragraph 12. As will be demonstrated below, the evidence against Massaro and Hernandez was overwhelming. Furthermore, there is no legal or factual support for Massaro's claims that the verdicts are contrary to the law and evidence.

II.   Standard of Review.

In deciding a motion for judgment of acquittal based upon allegedly insufficient evidence, the Court must review the evidence in the light most favorable to the government, drawing all reasonable inferences and credibility choices made in favor of the jury's verdict. United States v. Gilbert, 47 F.3d 1116, 1118 (11th Cir. 1995). If a reasonable jury could have concluded beyond a reasonable doubt that defendants were guilty of the offense, the jury's verdict must stand. United States v. Toler, 144 F.3d 1423, 1428 (11th Cir. 1998).

III.   The Evidence In The Light Most Favorable To The Government.

Defendants Trentacosta and Massaro grew up together in Brooklyn, New York. Massaro left New York for South Florida in the 1970s while Trentacosta relocated to Atlanta, Georgia in approximately 1991. While Trentacosta is a made member of the Gambino Crime Family and has been since the late 1980s,[4] Massaro has been a long-time non-member Gambino associate. From at least some time in the 1970s, Massaro was a non-member associate of the Gambino Crime Family

---

[4] Various government witnesses corroborated Trentacosta's stipulation that he was a made member of the Gambino Crime Family and further established that Trentacosta held the rank of soldier and that he was in the crew of Gambino capo Peter Gotti, John Gotti's brother. Trentacosta was given permission to leave the New York City area in the early 1990s and relocate to the Atlanta, Georgia area.

4

in Fat Andy's crew. In 1984, Fat Andy was convicted of RICO related crimes brought in the Southern District of Florida and began serving a long prison term. In fact, Fat Andy was not released from prison to the New York area until approximately 1997, where he resided until his death on March 18, 1999. The testimony of government witnesses Louis Maione,[5] Robert Engle,[6] Alan Cohen[7] and Steven Horowitz[8] established that, sometime during Fat Andy's incarceration, and at least as early as 1992, Massaro began making tribute payments to Trentacosta.

---

[5] Maione testified that in 1992 Trentacosta rhetorically asked Maione in response to a telephone call "Don't they [other organized crime members] know that he's [Massaro's] with me?"

[6] Engle recalled a conversation in approximately 1995 or 1996 between Trentacosta and then acting Gambino boss Nicky Corrozo during which Trentacosta told Corozzo that "he's [Massaro's] with me." Engle also testified about two conversations which occurred during the early 1990s during which Massaro indicated that he was reporting to Trentacosta.

[7] Cohen testified as to events that corroborated other evidence that Massaro worked for Trentacosta during the 1994 to 1996 time frame.

[8] Horowitz testified that in 1992, he and Massaro opened Father & Son Moving of Jacksonville, Inc. (50% was owned by Horowitz' wife and 50% was owned by Massaro) and that Massaro told him to pay Trentacosta's wife (Denise Trezza) $500 per truck per month as a "consulting fee." Despite the fact that there was no written agreement and no credible explanation justifying these payments to Trezza who lived in Atlanta, Horowitz has paid Trezza, at Massaro's direction, approximately $4,000 per month from Father & Son Moving of Jacksonville, Inc.'s accounts since 1992. Additionally, Father & Son of Jacksonville, Inc. and/or Massaro paid for Trentacosta's use of leased cars, an apartment, cellular telephones, pagers and food while Trentacosta visited South Florida. The evidence clearly established that Trezza did nothing to justify this "consulting fee" and that Trentacosta had no legal or equitable interest in Father & Son of Jacksonville, Inc. Therefore, the jury was free to conclude that Massaro disguised tribute payments to Trentacosta as "consulting fees" to Trezza and by paying other miscellaneous expenses incurred on Trentacosta's behalf. This methodology employed by Massaro to funnel tribute payments to Trentacosta was consistent with Gambino protocol. Government witness David Alwais testified that, during his association with the Gambino Crime Family, he made tribute payments in the form of allowing a Gambino Family member to use a company credit card. Supervisory Special Agent George Gabriel testified that tribute payments can take the form of paying expenses on behalf of an organized crime member or through transfers of funds between businesses controlled by organized crime members.

5

Government witness Roseann Pontorno testified that in June 1998, Trentacosta exercised authority over Massaro after Massaro tried to extort money from Pontorno. Specifically, Pontorno and her son, Michael, possessed an ownership interest, along with Gambino associate John Porcaro, in a business called Trump Financial Group, Inc. ("Trump") in Aventura, Florida. Trump was an illegal boiler room operation which cheated millions of dollars from unsuspecting victims who believed they were investing in foreign currency options. Immediately following Father's Day weekend 1998, Massaro made it known to Pontorno that Porcaro would never return to South Florida. According to Pontorno, Massaro "muscled" her for Porcaro's share of the business. Pontorno called Trentacosta, told him about what Massaro had done and asked him to intercede on her behalf to make Massaro relinquish his claim. Trentacosta did so, and Massaro abandoned his claim to Porcaro's share of the Trump business.

The government also introduced several conversations which demonstrated Trentacosta's supervision and control of Massaro's loansharking business. Specifically, on November 12, 1998 during a consensually recorded conversation between Massaro and cooperating witness David Alwais, Alwais asked Massaro to arrange a loanshark loan for John DiGiorgio, the nephew of Gambino Crime Family boss John Gotti. Massaro said that he would have to ask Trentacosta. (Government Exhibit 633). On November 13, 1998, Massaro reiterated to Alwais that he was trying to reach Trentacosta regarding the loan to DiGiorgio.(Government Exhibit 143). On November 16, 1998, Massaro informed Alwais that Trentacosta did not approve the loan.(Government Exhibit 144).

The jury heard numerous court authorized intercepted conversations between Trentacosta and

Massaro which corroborated Massaro's prior association with Fat Andy[9] and other witnesses who testified that Massaro worked for Trentacosta.[10] The government also introduced direct evidence of Trentacosta's agreement to participate in the affairs of the enterprise through collection of an unlawful debt owed by a Russian individual known as "Fat Gene." (Government Exhibit 588 - April 21, 1999 conversation between Trentacosta and Massaro).

Massaro and the crew engaged in a pattern of racketeering activity under the supervision of Trentacosta from Beachside Mario's Restaurant in Sunny Isles, Florida. Beachside Mario's was owned and used by Massaro and the crew for the purpose of producing counterfeit checks and/or bank fraud, dealing in stolen merchandise, making and collecting unlawful extensions of credit,

---

[9] Government Exhibits 512 (March 20, 1999 conversation between Massaro and Anthony Esperti), 516 (March 20, 1999 conversation between Massaro and Steve Horowitz); 532 (March 21, 1999 conversation between Massaro and David Alwais);

[10] Government Exhibit 544 - March 25, 1999 - Steve Horowitz called Massaro at home in a conference call with Trentacosta. Horowitz testified that he allowed some friends of Trentacosta's and Massaro's to use Father & Son of Jacksonville, Inc. trucks to transport merchandise to South Florida from Jacksonville. One of these "friends" named Frankie Buscemi paid Horowitz with a counterfeit $100 bill. During the recorded conversation, Trentacosta asked Massaro if Frankie from "F-Troop" paid him and, if so, to be careful because Frankie had given Horowitz a counterfeit $100 bill. Trentacosta told Massaro to collect the $100 from Frankie and then ordered him to send Mike Goldstein's mother some flowers or candy.

Government Exhibit 571 - April 1, 1999 - Trentacosta called Steve Horowitz. They talked about Massaro's appointment with the Broward Sheriff's Office homicide detectives that afternoon.

Government Exhibit 574 - April 2, 1999 - Trentacosta called Massaro. Massaro responded by saying "yes sir" to Trentacosta. Massaro acknowledged that he was taking Trentacosta to the airport.

Government Exhibit 609 - April 30, 1999 - Massaro called Vic DiBiasi. They talked about loansharking. Massaro told DiBiasi: "Whatever I do, I record. You understand I put it on record. You have to do the same thing, you first have to go get permission to do what you want to do. And I said and then when you get the permission you can operate."

obstruction of justice and planning murder.

Massaro and co-defendant Ariel Hernandez were convicted, *inter alia*, on all counts involving the counterfeit checks/bank fraud scheme (Counts 2 - 16 & 21).[11] That part of the case clearly demonstrated that the murder victim, Jeanette Smith, participated with Hernandez in this scheme to defraud, and that Massaro and Hernandez suspected that she was jeopardizing the enterprise's criminal activities. On March 20, 1999, sometime between 6:00 a.m. and 3:00 p.m., Hernandez killed Ms. Smith by asphyxiation due to strangulation in room 121 of the Olympia Villager Resort Motel (hereinafter "the Olympia Motel") which was the place where Massaro had arranged for Hernandez to live and located less than a mile from Beachside Mario's.

FBI Supervisory Special Agent George Gabriel testified as an expert concerning the rules governing the organization of the Gambino Crime Family. In addition to the hierarchal structure of the organization, he testified that the rules required that non-member associates, such as Massaro, who worked for made guys like Trentacosta, disclose their criminal activities and share their proceeds with made members, who in turn would report and share those proceeds with those above them in the hierarchy of the organization. He also testified that when non-member associates perceived that their criminal activities had been infiltrated by an informant, it was their responsibility to eliminate the infiltrator.

The jury heard evidence that on March 20, 1999, at approximately 3:00 p.m., Hernandez paged Massaro from room 121 of the Olympia Motel. Massaro called Hernandez back in room 121 at approximately 3:43 p.m. During that court authorized intercepted telephone conversation Hernandez told Massaro:

---

[11] Defendants have not challenged the sufficiency of the evidence regarding these counts.

> Hernandez: "Listen, uh, things got, uh, a little messy yesterday. Remember that, a detective from the thing?" Massaro: "From what thing?" Hernandez: "The homicide". Massaro: "Yeah". Hernandez: "Well, the thing is this I just, I, I tied up *the loose end* and I gotta package I gotta get rid of." Massaro: "Uh huh." Hernandez: "What should I do?" Massaro: "I don't know. I'll talk to you in person."[12]

Government Exhibit 514 (emphasis added).

After Massaro met with Hernandez in person, he arranged for crew member Adam Silverman to help Hernandez move Ms. Smith's body out of room 121. (Government Exhibit 517). Silverman testified that Massaro directed him to assist Hernandez in moving Smith's body utilizing a blue Mazda SUV possessed by Massaro. Silverman testified that after Hernandez placed the stereo box containing the body into the Mazda SUV, he followed Hernandez, who was driving Ms. Smith's black Mazda 626, from the Olympia Motel to Surfside to abandon Smith's car. From there, he drove Hernandez to Beachside Mario's where they picked up Massaro and Dominick Marchese. Silverman testified that these individuals then dropped him off at his apartment.

Dominick Marchese testified that Massaro recruited him to accompany Massaro and Hernandez from Beachside Mario's to the Everglades in the blue Mazda SUV to dump Smith's body. Marchese actually watched Massaro and Hernandez remove the stereo box which contained the victim's body from the back of the Mazda SUV and throw it into the water from the boat ramp. Marchese's testimony is corroborated by the cellular phone records for March 20, 1999 for 954-224-7512 (Government Exhibits 5A-E and 190), the testimony of Anthony Banks, as well as several

---

[12] Massaro argues that since a homicide detective was really looking for Hernandez in the days before Ms. Smith's death, this conversation has nothing to do with the jury's conclusion that Ms. Smith's murder was planned. Massaro fails to explain how his version of the facts would override the jury's conclusion that Hernandez told Massaro in code that he took care of killing Smith at Massaro's behest.

court authorized intercepted calls confirming that Massaro was absent from Beachside Mario's that entire Saturday evening (Government Exhibits 523, 526 & 527).

On the following day, March 21, 1999 at approximately noon, Silverman was intercepted telling Massaro that although the experience of moving Smith's body was a "shockeroo," he would never reveal what he saw to anyone (Government Exhibit 529). Later that same day, Silverman was intercepted telling Hernandez that Massaro said to get rid of the things Hernandez took from Smith's car[13] and that Massaro said he was going to give Hernandez a slap for not getting rid of that stuff. Silverman testified that, during the week of March 22, 1999, Francisco Valdes told him that the girl was killed because orders came down from up north.[14] March 21, 1999 was also the day that Massaro arranged for crew members Charlie Monico, Anthony Banks and Joey Maffei to help Hernandez dispose of evidence from room 121 and to move Hernandez' belongings out of room 121 to his girlfriend Tammy Bubel's apartment.

During the later part of the week of March 22, 1999, Massaro began to suspect that the authorities were going to arrest Hernandez. Francisco Valdes and Carlos Garcia testified that, during the early morning hours of March 27, 1999, Massaro hired them to kill Hernandez to prevent Hernandez from linking Massaro to the murder and to protect the ongoing criminal activities of the South Florida crew of the Gambino Crime Family. At the time Massaro hired them to kill Hernandez, Valdes owed Massaro money. Massaro was going to excuse Valdes' debt and pay Garcia

---

[13] Miscellaneous items such as compact discs and sunglasses.

[14] Silverman is partially corroborated by a portion of the intercepted conversation between Hernandez and Massaro during the early morning hours of March 28, 1999. (Government Exhibit 548). During that conversation, Hernandez told Massaro that Valdes may be the informant because: "It's either Frankie (Valdes) or Ricky. If Frankie could blab it out to you then he could blab it out to someone else, in order to look like a tough guy."

10

in exchange for the murder of Hernandez. According to Valdes, Massaro had given them his syringes that he used to inject insulin so that they could inject Hernandez with an overdose of cocaine. They tried to locate Hernandez and lure him to an establishment called "Billy's Bar." Court authorized intercepted conversations between Valdes and Garcia[15] and Massaro and Hernandez[16] corroborate their testimony.

In addition to corroborating that Massaro hired Valdes and Garcia to kill Hernandez, the conversation between Massaro and Hernandez on March 27, 1999 at 2:09 a.m. (Government Exhibit 548) allowed the jury to infer that Massaro believed that Ms. Smith may have previously alerted law enforcement to Hernandez. Specifically, Massaro told Hernandez, "[t]ake my word that Frankie is not the problem. Put your attention on the other place, what *she*[17] said in the car. That's where your problems are coming from." (Emphasis added). This statement by Massaro was in response to Hernandez' efforts at determining who was cooperating with law enforcement authorities and explaining to Massaro that he (Hernandez) was not cooperating with law enforcement and that

---

[15] Government Exhibit 547, 12:34 a.m. on March 27, 1999. Valdes called Garcia to tell him that Massaro wanted him to come to Beachside Mario's immediately. Garcia complied.

[16] Government Exhibit 548, 2:09 a.m. on March 27, 1999. Specifically, Hernandez told Massaro that "Frankie said some things that are disturbing. He didn't know where I lived. He came by here (Tammy's) and was yelling at the top of his lungs that he wanted to know where Tammy lived. He (Frankie) said that Sonny called him today and said that Sonny is afraid of me because I wanted him to drive a car." Hernandez wanted Massaro to call Frankie to see if that was true. Hernandez said that "Frankie would not be going through all of this trouble for a couple of checks and that Frankie and Carlos wanted him to go to Billy's Bar."

[17] There is no other identified female who was involved in the counterfeit check scheme.

Massaro had nothing to worry about with him.[18]

On the morning of March 28, 1999, Broward Sheriff's Office detectives arrested Ariel Hernandez[19] at his girlfriend Tammy Bubel's apartment in Sunny Isles. After ultimately telling the police that he accidentally killed Ms. Smith during rough sex, Hernandez was subsequently intercepted making several stunning admissions to Massaro from jail which showed that Ms. Smith's death was planned and not accidental and corroborated previous evidence that Massaro ordered it.

One conversation occurred on March 29, 1999 (Government Exhibit 559). In this conversation, Hernandez advised Massaro that he (Hernandez) was "taking everything," to which Massaro gave an affirmative reply. Hernandez then stated that his story was that it (Ms. Smith's death) was the result of rough sex, it was accidental, that Hernandez did everything himself and that he (Massaro) "did not have to worry about anything." A second conversation occurred on April 1, 1999. In that conversation, Hernandez told Massaro that he (Hernandez) "was taking the whole rap," and that the story that was in the news was the story that he and Jerry came up with "so that nobody else will get incriminated." (Government Exhibit 567).

---

[18] Hernandez: "Sonny lied in front of us.... I made a list of six people who know. Three I don't have to worry about ... it's not me, it's not you, it's not your friend ... three I don't. Don't put too much trust in Sonny. He's a rat and Frankie (Francisco Valdes) is a blabbermouth. He came up to you and said something about that ... you don't say anything in front of anyone. Frankie was making it like a bragging issue. You'll swear for Sonny and Frankie?" Massaro: "yeah I'll swear for them." Hernandez: "I'm not going to rat on myself. I made a list. The first three names no way. The last three names: the one that stuck out the most was Frankie and the little one, Dickhead. Sonny was a part of it so he's not going to say anything. It's either Frankie or Ricky. If Frankie could blab it out to you then he could blab it out to someone else, in order to look like a tough guy."

[19] Although an arrest warrant for murder was issued in Broward County, Hernandez voluntarily returned to Broward County where he was formally arrested.

III. <u>Memorandum of Law</u>.

    A.    RICO Conspiracy - 18 U.S.C. Section 1962(d).

To prove a RICO conspiracy, the government must show that the conspirators agreed to participate, directly or indirectly, in the affairs of an enterprise through a pattern of racketeering activity *or* through the collection of an unlawful debt. <u>United States v. Pepe</u>, 747 F.2d 632, 659 (11th Cir. 1984) (emphasis added). An agreement to participate in a RICO conspiracy through a pattern of racketeering activity can be proved in one of two ways: 1) by showing an agreement on an overall objective; and/or 2) by showing that a defendant agreed personally to commit two predicate acts and therefore to participate in a single objective conspiracy. <u>United States v. Abbell</u>, 271 F.3d 1286, 1299 (11th Cir. 2001), *citing* <u>United States v. To</u>, 144 F.3d 737, 744 (11th Cir. 1998). If the government can prove an agreement on an overall objective, it need not prove a defendant personally agreed to commit two predicate acts. <u>Id</u>. "In proving an agreement on an overall objective, the government can use circumstantial evidence to show 'that each defendant must necessarily have known that the others were also conspiring to participate in the same enterprise through a pattern of racketeering activity.'" <u>United States v. Shenberg</u>, 89 F.3d 1461, 1470 (11th Cir. 1996), *quoting* <u>United States v. Gonzalez</u>, 921 F.2d 1530, 1540 (11th Cir. 1991). The other way to prove defendants guilty of a RICO conspiracy is to show that they agreed to participate, directly or indirectly, in the affairs of an enterprise through the collection of one unlawful debt. <u>United States v. Pepe</u>, 747 F.2d at 660-61. The finding of a RICO conspiracy does not require an actual collection of unlawful debt, just an agreement to perform that act. <u>Id</u>. See also, <u>United States v. Weiner</u>, 3 F.3d 17, 24 (1st Cir. 1993) (a single collection of an unlawful debt satisfies 1962(c)'s "collection of an unlawful debt" requirement); <u>United States v. Vastola</u>, 899 F.2d 211, 229 (3d Cir. 1990) (to prove a violation of

section 1962(d), the government need only show that the defendant agreed to participate in the affairs of the enterprise through the collection of one unlawful debt); United States v. Angiulo, 847 F.2d 956, 964 (1st Cir. 1988) (agreement to collect unlawful debts can alternatively substitute for defendant's agreement to commit two predicate crimes in establishing a RICO conspiracy).

As previously set forth, the evidence clearly established that Trentacosta agreed to the overall objective of the South Florida crew of the Gambino Crime Family, that is, conducting a pattern of racketeering activity to make money. Given that Trentacosta, admittedly, was a member of the Gambino Crime Family since the late 1980s, a jury could reasonably infer that the payments Trentacosta received from Massaro were tribute for allowing the South Florida crew to conduct a pattern of racketeering activity. As Special Agent Gabriel testified, Gambino Family protocol required that those working for a made guy disclose their criminal activities and share their proceeds with him. The made guy, Trentacosta, would then report and share those proceeds with those above him in the hierarchy of the Gambino Family.

Neither RICO, nor any other conspiracy offense, requires proof that Trentacosta knew the full scope of the conspiracy or the identity of all co-conspirators. See, United States v. Castro, 89 F.3d 1443, 1451 (11th Cir. 1996) (government need not prove each conspirator agreed with every other conspirator, knew of his fellow conspirators, was aware of all details of the conspiracy or contemplated participating in the same related enterprise). See also, United States v. Viola, 35 F.3d 37, 44 (2d Cir. 1994) (sufficient that government established defendant knew general nature of enterprise and that enterprise extended beyond defendant's individual role in RICO conspiracy).

The evidence at trial clearly established that Massaro ran the crew on behalf of Trentacosta. This crew generated income from loansharking, extortion, bank fraud, obtaining false identification

documents (Florida drivers' licenses), and the theft of goods which were a part of interstate shipments of property. In light of the government's expert testimony regarding the duty of crew members to share proceeds, coupled with the evidence that Massaro paid Trentacosta with funds disguised as "consulting fees" to Trentacosta's wife from Father & Son of Jacksonville, Inc., the jury could rationally conclude that Trentacosta agreed to an overall objective. <u>United States v. Bellomo</u>, 176 F.3d 580, 592 (2d Cir. 1999). ("In light of the government's expert testimony regarding the duty of crew members to share proceeds from criminal activity with their capo, the jury could rationally conclude that crew members regularly shared what they took in with their capo, here [the defendant].").

Therefore, based upon the above-mentioned reasons, Trentacosta's Motion should be summarily denied. Alternatively, Trentacosta's Motion should be denied because Trentacosta himself agreed to participate in the collection of an unlawful debt involving a Russian named "Fat Gene."[20]

B.  Violent Crimes In Aid of Racketeering - 18 U.S.C. Section 1959.

Massaro and Hernandez were both convicted of Counts 17 and 18, conspiring to commit and committing the murder of Jeanette Smith in aid of racketeering and Massaro was convicted of Count 20, conspiring to commit the murder of Ariel Hernandez. These charges are based upon 18 U.S.C. Section 1959(a), which provides:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or *maintaining or increasing position* in an enterprise engaged in racketeering activity, murders, ... or attempts

---

[20] See Government Exhibit 588.

15

*or conspires* so to do, shall be punished ... .

(Emphasis added).

As set forth above, Massaro ran the South Florida crew of the Gambino Crime Family under Trentacosta's supervision from Beachside Mario's restaurant. In 1997 or 1998, after Hernandez became indebted to Massaro for bouncing checks, Hernandez began to repay Massaro through a bank fraud scheme. The scheme involved the production of corporate counterfeit checks using a computer located within Beachside Mario's. Hernandez and others would negotiate these checks at retail stores in payment for merchandise which he and others, including, Jeanette Smith, would return for cash. According to one of Hernandez's post-arrest statements, this illegal activity generated approximately $500,000.00.

The March 20, 1999 conversation from Massaro to Hernandez in room 121 of the Olympia Motel[21] allowed the jury to reasonably find that Hernandez carried out an order by Massaro to kill Ms. Smith. The subsequent actions taken by Massaro, the admissions made by Hernandez, and the resulting adoptive admissions[22] by Massaro corroborate this finding. Specifically, Massaro coordinated the disposal of the body and the evidence from room 121, he hired Valdes and Garcia to kill Hernandez once he realized that Hernandez may implicate him in the murder, and he agreed with Hernandez' plan of telling the police that the victim died accidentally so that no one else would

---

[21] Government Exhibit 514.

[22] When a statement is offered as an adoptive admission two criteria must be met. First, the statement must be such that an innocent defendant would normally be induced to respond. United States v. Joshi, 896 F.2d 1303, 1311-12 (11th Cir. 1990), *citing*, United States v. Jenkins, 779 F.2d 606, 612 (11th Cir.1986); and United States v. Carter, 760 F.2d 1568, 1579 (11th Cir.1985). Second, there must be sufficient foundational facts from which the jury could infer that the defendant "heard, understood, and acquiesced in the statement." Joshi, 896 F.2d at 1312, *citing*, Jenkins, 779 F.2d at 612; Carter, 760 F.2d at 1579. Both of these criteria were met here.

16

be incriminated. Combine this with Silverman's testimony that Valdes said that the murder resulted from orders coming down from New York and it is abundantly clear that Massaro ordered Hernandez to kill Ms. Smith to protect the viability of the enterprise.

The "maintaining or increasing" requirement of section 1959 is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership. United States v. Diaz, 176 F.3d 52, 95 (2d Cir. 1999). In Diaz, the defendants committed murders because the Latin Kings street gang suspected that one of the victims was an informant and another was a witness to a murder. The Court found that the evidence was sufficient to support convictions under 18 U.S.C. Section 1959(a) convictions because the victims could harm the enterprise's narcotics operations, and therefore the murders were in furtherance of the drug conspiracy. Id.

As Special Agent Gabriel testified, and contrary to defense counsels' arguments at trial, the protocol for the Gambino Crime Family is to have non-member associates deal with people whom they perceive are sources of information for law enforcement and who have infiltrated their operations. Jeanette Smith was involved in the counterfeit check scheme and the jury could properly infer that she was perceived as jeopardizing the enterprise in some way. As a result, Massaro and Hernandez conspired to commit, and committed, the murder of Jeanette Smith. Massaro knew the murder was expected of him, by reason of his long-time association with the Gambino Crime Family, and of Hernandez, because of his association with and indebtedness to Massaro. The same can be said of Massaro's recruitment of Valdes and Garcia to murder Hernandez. Massaro perceived that Hernandez would implicate him which would jeopardize the enterprise's operations. Therefore,

Massaro's Acquittal Motion should be summarily denied.

B.  Massaro's Remaining Claims.

Massaro's remaining claims that the verdicts are contrary to the law and evidence are equally without merit. His bald assertion that the Court erred with regard to the "recently stolen property issue" is contradicted by applicable law.  See, United States v. Gordon, 421 F.2d 1068 (5th Cir. 1970); United States v. Lee, 363 F.2d 469 (8th Cir. 1966); United States v. Redd, 438 F.2d 335 (9th Cir. 1971).

Massaro's argument that the verdicts are contrary to the law and evidence because the Court denied several of his motions for mistrial "made during trial" is too vague to permit a response. He fails to identify which motions were incorrectly decided and why.

Finally, he seeks a new trial claiming that the Court allowed "certain prejudicial evidence to be admitted as 'background' and placed before the jury." A large part of the government's case depended upon testimony of the rules or protocols governing the organization of the Gambino Crime Family, what it means to be an inducted member of the Gambino Crime Family, and all of the events surrounding the murder of Jeanette Smith. All of this evidence was highly relevant to the charges in the Indictment. Relevant evidence is properly excluded only by a finding that "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury...." Fed.R.Evid. 403; see also United States v. Terzado-Madruga, 897 F.2d 1099, 1117, 1119 (11th Cir.1990). The rule governing exclusion of relevant evidence on grounds of prejudice is an extraordinary remedy which should be used only sparingly, since it permits the trial court to exclude concededly probative evidence. United States v. Fallen, 256 F.3d 1082 (11th Cir. 2001). In the instant case, the Court carefully marshaled the admission of evidence and gave limiting instructions

when requested. If a district court issues a curative instruction, reversal is required only if the evidence "is so highly prejudicial as to be incurable by the trial court's admonition." United States v. Trujillo, 146 F.3d 838, 845 (11th Cir.1998), *quoting* United States v. Funt, 896 F.2d 1288, 1295 (11th Cir.1990). Since Massaro has failed to specifically identify which evidence was so highly prejudicial as to justify a new trial, Massaro's New Trial Motion should be summarily denied.

IV. Conclusion.

For the reasons set forth above, the above-mentioned motions, filed on behalf of the defendants, should be denied in all respects.

        Respectfully submitted,

        GUY A. LEWIS
        UNITED STATES ATTORNEY

By: _____
        JEFFREY H. SLOMAN
        Assistant United States Attorney
        Florida Bar No. 378879
        500 E. Broward Boulevard, Suite 700
        Fort Lauderdale, Florida 33394
        Telephone: (954) 356-7255x3576
        Facsimile: (954) 346-7228

        _____
        LAWRENCE D. LaVECCHIO
        Assistant United States Attorney
        Florida Bar No. 0305405
        500 E. Broward Boulevard, Suite 700
        Fort Lauderdale, Florida 33394
        Telephone: (954) 356-7255x3588
        Facsimile: (954) 346-7230

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered by United States mail this 15th day of January 2002 to:

Stephen H. Rosen, Esq. (Attorney for Anthony Trentacosta)
1221 Brickell Avenue, Ste. 1020
Miami, Florida 33131

Fred Haddad, Esq. (Attorney for Frederick J. Massaro)
One Financial Plaza, Suite 2612
Fort Lauderdale, Florida 33394

Jeffrey Weinkle, Esquire (Attorney for Ariel Hernandez)
1035 NW 11th Avenue
Miami, Florida 33136

JEFFREY H. SLOMAN
Assistant United States Attorney