UNITED STATES DISTRICT COURT IN AND
FOR THE SOUTHERN DISTRICT OF FLORIDA



UNITED STATES OF AMERICA,
    Plaintiff,

CASE # 00-6273-CR-HUCK

v.

ANTHONY TRENTACOSTA,
a/k/a/ "Tony Pep", et al.,
    Defendant.
_____/

### TRENTACOSTA'S REPLY TO GOVERNMENT'S RESPONSE TO HIS MOTION FOR JUDGMENT OF ACQUITTAL

COMES NOW the defendant, ANTHONY TRENTACOSTA (Trentacosta), by and through undersigned counsel, and replies to the government's response to his motion for judgment of acquittal previously filed pursuant to Fed.R.Crim.P., Rule 29(c), and in support thereof adopts the facts, law and argument submitted in his motion of judgment of acquittal. Additionally, Trentacosta submits the following argument.

On January 15, 2001, the government filed a response to Trentacosta's motion for judgment of acquittal. The response was substantially an accounting of the role of the various defendants in the murder of Jeanette Smith and the conspiracy to murder Ariel Hernandez. There was no evidence which connected Trentacosta to either of these violent crimes and the jury's special verdict of not guilty, in the context of those charges, evinces that the jury did not believe that Trentacosta was involved with either of the crimes. In as much as the jury found that Trentacosta was not involved with those crimes, that portion of the government's response is not applicable to Trentacosta.

As argued in Trentacosta's motion for acquittal, after consideration of the time periods

involved in the counts of the indictment and the jury's verdict as to Trentacosta's lack of agreement to the violent crimes alleged in the indictment, there was only one count, Count 24, remaining to be considered as an act of racketeering by the conspiracy which Trentacosta agreed to join.[1] Therefore, lacking the required two acts of racketeering, there was not a pattern of racketeering activity through which the conspiracy conducted the affairs of the criminal enterprise. Without a pattern of criminal activity, the evidence was insufficient to support a conviction of Trentacosta as to Count 1.

The government, in it's response to Trentacosta's motion, is arguing, for the first time in this case, that he is guilty of conspiracy to commit RICO because he participate in the affairs of the Gambino family affairs through the collection of an unlawful debt, specifically the debt of a Russian named "Fat Gene." The government's attempt to belatedly connect Trentacosta to the charged conspiracy with the proof of the collection of an unlawful debt should be reject for two reasons.

First, the government's theory of prosecution as set out in the indictment, and alleged in the extensive itemization of the predicate acts, was that Trentacosta agreed to participate in the affairs of an enterprise through a pattern of racketeering activity. The government's theory, as set out in the indictment, *did not allege that Trentacosta agreed to participate in the affairs of an enterprise through the collection of one unlawful debt.* Recognizing that Trentacosta is correct in his argument that there is insufficient evidence that he participated in the affairs of an enterprise through a pattern of racketeering activity, the government now seeks to argue that Trentacosta agreed to participate in the conduct of an enterprise's affairs through the collection of unlawful debt. The government's

---

[1] According to the attached affidavit of May 20, 1999 signed by F.B.I. Agent Feisthamel, at page 52, Trentacosta had only recently joined the conspiracy alleged in the indictment. See Attached Document 1.

2

suggestion that the proof of Trentacosta's participation in the collection of the debt of "Fat Gene" can be used to sustain a conviction of Trentacosta creates a fatal variance between the allegations in the indictment and the proof at trial.

A variance arises when evidence adduced at trial establishes facts different from those alleged in indictment, *Dunn v. United States*, 99 S.Ct. 2190 (1979), and a variance between pleading and proof which destroys a defendant's substantial right to be tried only on charges presented in indictment returned by a grand jury is too serious to be treated as nothing more than a variance and dismissed as harmless error. *Stirone v. United States*, 80 S.Ct. 270 (1960).

The second reason for rejecting the government's attempt to connect Trentacosta to the charged conspiracy with the proof of the collection of unlawful debt is that there was a specific count, count 23, which named the individuals which the government considered as participating in the collection of unlawful debts, and Trentacosta is not among those named. Count 23 set forth that numerous individuals in South Florida were the victims of unlawful debts made by the named defendants. The government attempts to connect Trentacosta to the unlawful collection of debts by the named co-defendants by a single innocuous telephone conversation (April 21, 1999) between Trentacosta and Massaro. (See Attached Doc. 2 - ¶ 24 of affidavit to submitted to support the extension of a court-authorized wire interception). As evinced by the notes of F.B.I. Special Agent Terry L. Feisthammel, the loan was by Massaro to a "Russian" and there was no comment or other indication by Trentacosta or Massaro that Massaro was doing anything other than complaining of a late payment on a loan. There was no indication in the telephone conversation that Trentacosta was to "participate" in the collection of the loan. Other than this short comment, there is no proof within the government's evidence that Trentacosta was a participant in the collection of debt owed by "Fat

Gene" to Massaro. It would be unreasonable for the jury to have found, based solely on the one telephone conversation, that Trentacosta "participated" in the collection of an unlawful debt, as required by § 1962(c). The government should be disallowed from trying to connect Trentacosta to the unlawful debt collection activity of the named defendants through the sole and insufficient evidence of the April 21, 1999 telephone conversation.

Additionally, Trentacosta submits that for this Court to determine that the jury found Trentacosta guilty of the alleged RICO conspiracy based upon "participation" in the single unlawful debt of "Fat Gene" would require this Court to set aside because of insufficient evidence. The crime of conspiring to commit RICO by the collection of an unlawful debt, is a separate offense from that of conspiring to commit RICO through a pattern of racketeering activity; *United States v. Salemme*, 1997 WL 37530 (1997), and requires its own proof. The only evidence submitted by the government to prove that Trentacosta was involved in the collection of unlawful debt(s) was the April 21, 1999 telephone call. It goes without question that that call alone is insufficient to prove that Trentacosta was participating in the collection of any unlawful debt - there was no evidence that the debt was unlawful. Even the comment of the agent submitting the affidavit, set out in the body of the affidavit, evaluated the conversation as only "possibly" concerning the collection of an unlawful debt. A verdict of guilt cannot be founded on a "possibility" of criminality.

Trentacosta was indicted for a RICO conspiracy under 18 USCA § 1962 (c). Trentacosta submits that to be convicted of participating in the conduct of an enterprise's affairs on the basis of collection of unlawful debt requires the participation in the collection of more than one unlawful debt. Trentacosta is aware of, but takes issue with, the one line comment of the 11th Circuit Court of Appeals, in *United States v Pepe,* 747 F.2d 632 (11th Cir. 1984, that the collection of a single

4

unlawful debt suffices to prove participating in the affairs of a criminal enterprise.

Trentacosta submits that the structure of the statute suggests that more than the collection of a single unlawful debt is required to convict under this provision. Section 1962(c), the provision of the statute under which Trentacosta was charged is only one of three substantive categories of proscribed conduct. Section 1962 (a) prohibits the use or investment in an enterprise of income derived "from a pattern of racketeering activity or through collection of *an* unlawful debt. 18 U.S.C. § 1962 (b) similarly makes it a crime to acquire or maintain an interest in an enterprise through a pattern of racketeering activity or through collection of *an* unlawful debt. Both of these subsections make specific reference to "an" unlawful debt, obviously requiring the collection of only a single unlawful debt. However, 18 U.S.C. § 1962 (C) uses the term "collection of unlawful debt", specifically not including the article "an" as do the other subsections. Therefore, it is an obvious interpretation of the language of the statute that the collection of multiple unlawful debts is required by §1962 (c).

Respectfully submitted,

*[signature]*

STEPHEN H. ROSEN

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was mailed to on this 22nd day of January, 2002 to:

AUSA, Lawrence LaVecchio
500 E. Broward Blvd., 7th Floor
Ft. Lauderdale, FL 33394

Fred Haddad, Esq. (Attorney for Fredrick J. Massaro)
One Financial Plaza
Suite 2612
Ft. Lauderdale, FL 33394
954-467-6767

Jeffrey Weinkle, Esq. (Attorney for Ariel Hernandez)
1035 NW 11th Avenue
Miami, FL 33136

        **LAW OFFICES OF STEPHEN H. ROSEN, P.A.**
        1221 Brickell Avenue
        Suite 1020
        Miami, Florida 33131
        Florida Bar No. 154144
        (305) 358-6789

        _____
        STEPHEN H. ROSEN
        Counsel for Defendant Trentacosta

trailer located in the truck parking lot at the Oasis Truck and Tire Service, 5900 South State Road 7, Hollywood, Florida. Among the items seized were televisions and stereos which were believed to be purchased with counterfeit checks. One of the items seized was a Sony Stereo in what appeared to be the original box. This box was similar to the box that murder victim, Jeanette Smith, was placed and discarded in the Everglades. The investigation has revealed that ARIEL HERNANDEZ purchased with counterfeit checks, one Sony Stereo on January 27, 1999 and two Sony Stereos on February 27, 1999, from Sharper Image. Records concerning contacts between criminal associates are not normally kept, and the best evidence of a meeting would be the conversations themselves.

70. Based on the totality of the circumstances, MASSARO and other members of the enterprise, are conducting the affairs of the enterprise through the pattern of racketeering set forth in paragraph 6. Specifically, MASSARO has provided false information concerning various aspects of the homicide investigation and has attempted to conceal aspects of the affairs of the enterprise. Accordingly, continued interception is necessary to reveal the full scope and nature of the racketeering enterprise.

71. On March 19, 1999, the first day of court authorized wire interception, it was discovered that Anthony Ruggiano, aka "Fat Andy" had died as a result of a heart attack. On March 20, 1999, the second day of court authorized wire interception, ARIEL HERNANDEZ murdered Jeannette A. Smith. Details concerning this

Document 1

murder were discovered through the interception of wire communications conducted pursuant to this court's prior orders, and that evidence contributed to the March 28, 1999, arrest of HERNANDEZ by the Broward County Sheriff's Office. As a result of these two events, MASSARO had been operating cautiously and without assignment of a crew leader from whom MASSARO could seek guidance and permission to conduct criminal activity. Without the availability of HERNANDEZ to produce counterfeit checks, MASSARO has had to change his source of income. Within the last twenty days it appears that MASSARO has increased the number of telephone conversations in which he engages that relate to extortionate collection illegal debts. Through the more recent interceptions, investigators are discovering the existence of more loansharking victims. Further interceptions will assist in identifying these and other recently discussed victims, some of whom may ultimately become witnesses in this matter. In addition, inasmuch as FALCO has indicated to CS-1 that MASSARO has recently been assigned to the crew of TRENTACOSTA, it is anticipated that MASSARO will have more contact with TRENTACOSTA as MASSARO receives instructions from TRENTACOSTA on criminal matters.

72. Due to the fact that sufficient evidence is not available through other investigative techniques, as set forth above, your affiant believes there is a need for electronic surveillance in this matter to fully reveal the manner and scope in which **FREDERICK J. MASSARO, ANTHONY TRENTACOSTA, MICHAEL J.**

FALCO, MARTIN SISKIND, JOHN PATRICK ROGAN, JULIUS BRUCE CHIUSANO, IRVING HAROLD WEISS, ARIEL A. HERNANDEZ, CHESTER POTASH, RICHARD DAVID GAZIE, JOSEPH F. SPITALERI, JOHN MIRABILE, ANTHONY ESPERTI, FRANCISCO VALDEZ, CARLOS ENRIQUE GARCIA, FRANK S. BUSCEMI, ADAM T. SILVERMAN, TAMMY L. BUBEL, AUGUSTUS V. CORRAO, PACITA T. MOSHER, FRANCIS RUGGIERO, CHARLES P. MONICO, STEVEN HOROWITZ, MICHAEL DEJESUS, RICK SEPTEMBER, RICHARD SANTINI, TOMMY KEENAN, PETER D. NASH, FNU LNU A/K/A "RICKY", FNU LNU A/K/A "RICO", FNU LNU A/K/A "SALLY", FNU LNU A/K/A "MARTIN", FNU LNU A/K/A "JOE", FNU LNU A/K/A "VICTOR", FNU LNU A/K/A "DOMINIC", FNU LNU A/K/A "JOEY", FNU LNU A/K/A "DAVID", FNU LNU A/K/A "TONY", FNU LNU A/K/A "HELEN", FNU LNU A/K/A "RJ" and others as yet unknown, are involved in the violations of federal statutes as set forth in paragraph 6 of this affidavit. Electronic surveillance of the target telephones are necessary to identify the victims of MASSARO's loanshark loan operation and to otherwise provide evidence concerning the other crimes under investigation herein.

## MINIMIZATION

73. All interception will be minimized pursuant to Chapter 119 of Title 18, United States Code. Interception will be suspended when it is determined through voice identification, physical surveillance, or otherwise, that none of the name interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined that the conversation is relevant to those matters under

23. On Wednesday, April 21, 1999, at approximately 10:19 p.m. a Court-authorized interception was made over telephone number (305) 944-2929. MASSARO called telephone number (305) 773-5387 and spoke to an unknown male identified only as Ted. MASSARO gave the telephone to FRANK RUGGIERO to speak to Ted. RUGGIERO advised that he was supposed to see Ted that day, but that he was unable to do so because RUGGIERO was out of town. RUGGIERO advised Ted that he would go to Ted's work the next day between 12:00 and 12:30 p.m. MASSARO advised Ted that RUGGIERO was a nice guy who would take care of Ted's situation. (I understand this call to be related to previous calls during which an employee of United States Van Lines, who had worked for MASSARO for approximately ten years, was looking for some money to put in the bank for approximately three weeks.) (I understand that this conversation possibly concerns the making and collecting of proceeds in connection with a loanshark operation.)

24. On Wednesday, April 21, 1999, at approximately 10:27 p.m. a Court-authorized interception was made over telephone number (954) 224-7512. MASSARO called telephone number (770) 781-5262 and spoke to ANTHONY TRENTACOSTA. MASSARO asked TRENTACOSTA whether he had heard from the "fat boy ... the Russian." TRENTACOSTA advised that he had not heard from him at all. TRENTACOSTA advised that he would call him, and told MASSARO to look for him. MASSARO told TRENTACOSTA that, if TRENTACOSTA talked to the Russian, to tell him (Russian) that he was not

15

*Document 2* (handwritten)

doing the right thing. MASSARO said that he (the Russian) told him (MASSARO) that he had the money coming. TRENTACOSTA advised MASSARO that he did not know how the Russian was going to be able to pay because he does not make any money. MASSARO stated that he would find a way for the Russian to pay him (MASSARO). (I understand that this conversation possibly concerns the making and collecting of proceeds in connection with a loanshark operation.)

25. On Wednesday, April 21, 1999, at approximately 11:49 p.m. a Court-authorized interception was made over telephone number (954) 456-3020. MASSARO was called by MICHAEL DEJESUS from telephone number (305) 335-7111. MASSARO asked DEJESUS whether it was possible for DEJESUS to run a couple of automobile license plates. DEJESUS replied that he would, and asked MASSARO for the license plate numbers. MASSARO provided DEJESUS with the following license numbers: GN711Q for a white Mitsubishi Mirage, and ES078F or ES078F for a red 3000GT. DEJESUS told MASSARO that he would see what he could do.

26. On Thursday, April 22, 1999, at approximately 12:49 a.m. a Court-authorized interception was made over telephone number (954) 456-3020. MASSARO was called by MICHAEL DEJESUS from telephone number (305) 335-7111. DEJESUS gave MASSARO the automobile registration information which he had obtained with reference to the license plates described during the prior telephone conversation.