UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6273-CR-HUCK

UNITED STATES OF AMERICA,

      Plaintiff,

-vs-

ANTHONY TRENTACOSTA,

      Defendant.

_____/

**NIGHT BOX
FILED**

APR 1 8 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

GOVERNMENT'S RESPONSE TO DEFENDANT'S
OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

COMES NOW the United States of America, by and through its undersigned Assistant

United States Attorneys, and hereby files its response to the objections to the presentence

investigation report (hereinafter "PSR") filed by defendant Anthony Trentacosta.

1.    *PSR - paragraph 8.* The defendant claims that the evidence at trial did not support
the claim "that he was Massaro's boss, *de facto* or otherwise, at any time prior to
March 18, 1999."

*Government's response.* Defendants Trentacosta and Massaro grew up together in
Brooklyn, New York. Massaro left New York for South Florida in the 1970s while
Trentacosta relocated to Atlanta, Georgia in approximately 1991. While Trentacosta
is a made member of the Gambino Crime Family and has been since the late 1980s,[1]
Massaro has been a long-time non-member Gambino associate. From at least some
time in the 1970s, Massaro was a non-member associate of the Gambino Crime
Family in Anthony "Fat Andy" Ruggiano's crew. In 1984, Fat Andy was convicted
of RICO related crimes brought in the Southern District of Florida and began serving

---

[1] Various government witnesses corroborated Trentacosta's stipulation that he was a
made member of the Gambino Crime Family and further established that Trentacosta held the
rank of soldier and that he was in the crew of Gambino capo Peter Gotti, John Gotti's brother.
Trentacosta was given permission to leave the New York City area in the early 1990s and
relocate to the Atlanta, Georgia area.



a long prison term. In fact, Fat Andy was not released from prison to the New York area until approximately 1997, where he resided until his death on March 18, 1999. The testimony of government witnesses Louis Maione,[2] Robert Engle,[3] Alan Cohen[4] and Steven Horowitz[5] established that, sometime during Fat Andy's incarceration, and at least as early as 1992, Massaro began making tribute payments to Trentacosta.

Government witness Roseann Pontorno testified that in June 1998, Trentacosta exercised authority over Massaro after Massaro tried to extort money from Pontorno. Specifically, Pontorno and her son, Michael, possessed an ownership interest, along with Gambino associate John Porcaro, in a business called Trump Financial Group, Inc. ("Trump") in Aventura, Florida. Trump was an illegal boiler room operation which cheated millions of dollars from unsuspecting victims who believed they were investing in foreign currency options. Immediately following

---

[2] Maione testified that in 1992 Trentacosta rhetorically asked Maione in response to a telephone call "Don't they [other organized crime members] know that he's [Massaro's] with me?"

[3] Engle recalled a conversation in approximately 1995 or 1996 between Trentacosta and then acting Gambino boss Nicky Corrozo during which Trentacosta told Corozzo that "he's [Massaro's] with me."

[4] Cohen testified as to events that corroborated other evidence that Massaro worked for Trentacosta during the 1994 to 1996 time frame.

[5] Horowitz testified that in 1992, he and Massaro opened Father & Son Moving of Jacksonville, Inc. (50% was owned by Horowitz' wife and 50% was owned by Massaro) and that Massaro told him to pay Trentacosta's wife (Denise Trezza) $500 per truck per month as a "consulting fee." Despite the fact that there was no written agreement and no credible explanation justifying these payments to Trezza who lived in Atlanta, Horowitz has paid Trezza, at Massaro's direction, approximately $4,000 per month from Father & Son Moving of Jacksonville, Inc.'s accounts since 1992. Additionally, Father & Son of Jacksonville, Inc. and/or Massaro paid for Trentacosta's use of leased cars, an apartment, cellular telephones, pagers and food while Trentacosta visited South Florida. The evidence clearly established that Trezza did nothing to justify this "consulting fee" and that Trentacosta had no legal or equitable interest in Father & Son of Jacksonville, Inc. Therefore, the jury was free to conclude that Massaro disguised tribute payments to Trentacosta as "consulting fees" to Trezza and by paying other miscellaneous expenses incurred on Trentacosta's behalf. This methodology employed by Massaro to funnel tribute payments to Trentacosta was consistent with Gambino protocol. Government witness David Alwais testified that, during his association with the Gambino Crime Family, he made tribute payments in the form of allowing a Gambino Family member to use a company credit card. Supervisory Special Agent George Gabriel testified that tribute payments can take the form of paying expenses on behalf of an organized crime member or through transfers of funds between businesses.

2

Father's Day weekend 1998, Massaro made it known to Pontorno that Porcaro would never return to South Florida. According to Pontorno, Massaro "muscled" her for Porcaro's share of the business. Pontorno called Trentacosta, told him about what Massaro had done and asked him to intercede on her behalf to make Massaro relinquish his claim. Trentacosta did so, and Massaro abandoned his claim to Porcaro's share of the Trump business.

The government also introduced several conversations which demonstrated Trentacosta's supervision and control of Massaro's loanshark business. Specifically, on November 12, 1998 during a consensually recorded conversation between Massaro and cooperating witness David Alwais, Alwais asked Massaro to arrange a loanshark loan for John DiGiorgio, the nephew of Gambino Crime Family boss John Gotti. Massaro said that he would have to ask Trentacosta. (Government Exhibit 633). On November 13, 1998, Massaro reiterated to Alwais that he was trying to reach Trentacosta regarding the loan to DiGiorgio.(Government Exhibit 143). On November 16, 1998, Massaro informed Alwais that Trentacosta did not approve the loan.(Government Exhibit 144).

The jury heard numerous court authorized intercepted conversations between Trentacosta and Massaro which corroborated Massaro's prior association with Fat Andy[6] and other witnesses who testified that Massaro worked for Trentacosta.[7] The

---

[6] Government Exhibits 512 (March 20, 1999 conversation between Massaro and Anthony Esperti), 516 (March 20, 1999 conversation between Massaro and Steve Horowitz); 532 (March 21, 1999 conversation between Massaro and David Alwais);

[7] Government Exhibit 544 - March 25, 1999 - Steve Horowitz called Massaro at home in a conference call with Trentacosta. Horowitz testified that he allowed some friends of Trentacosta's and Massaro's to use Father & Son of Jacksonville, Inc. trucks to transport merchandise to South Florida from Jacksonville. One of these "friends" named Frankie Buscemi paid Horowitz with a counterfeit $100 bill. During the recorded conversation, Trentacosta asked Massaro if Frankie from "F-Troop" paid him and, if so, to be careful because Frankie had given Horowitz a counterfeit $100 bill. Trentacosta told Massaro to collect the $100 from Frankie and then ordered him to send Mike Goldstein's mother some flowers or candy.

Government Exhibit 571 - April 1, 1999 - Trentacosta called Steve Horowitz. They talked about Massaro's appointment with the Broward Sheriff's Office homicide detectives that afternoon.

Government Exhibit 574 - April 2, 1999 - Trentacosta called Massaro. Massaro responded by saying "yes sir" to Trentacosta. Massaro acknowledged that he was taking Trentacosta to the airport.

Government Exhibit 609 - April 30, 1999 - Massaro called Vic DiBiasi. They talked about loansharking. Massaro told DiBiasi: "Whatever I do, I record. You understand I put it on

government also introduced direct evidence of Trentacosta's agreement to participate in the affairs of the enterprise through collection of an unlawful debt owed by a Russian individual known as "Fat Gene." (Government Exhibit 588 - April 21, 1999 conversation between Trentacosta and Massaro).

2.  *PSR - paragraph 9.* The defendant denies that he assumed official responsibility for the daily activities of the South Florida crew of the Gambino Crime Family after March 18, 1999.

    *Government's response.* As the above-mentioned response to the objections to paragraph 8 demonstrates, Massaro originally worked for Fat Andy. During and after Fat Andy's incarceration, Massaro made tribute payments to Trentacosta and sought and received instructions from Trentacosta regarding enterprise related criminal activity. Therefore, whatever remaining relationship that existed between Massaro and Fat Andy ended on March 18, 1999, the day Fat Andy died.

3.  *PSR - paragraph 10.* The defendant denies that he maintained authority and control over the enterprise by meeting and speaking with Massaro and giving Massaro instructions concerning the enterprise.

    *Government's response.* See government's response to defendant's objection to paragraph 8.

4.  *PSR - paragraph 11.* The defendant denies that Massaro paid him "tribute" as well as the allegations that he advised Massaro, in any manner, in the matter of loansharking activities. He also "disagrees with the conclusion that any alleged courtesy extended from Massaro to Trentacosta during Trentacosta's trips to South Florida proves that Trentacosta managed in any way Massaro."

    *Government's response.* See government's response to defendant's objection to paragraph 8.

5.  *PSR - paragraph 12.* The defendant denies the allegation that he influenced Massaro as to any differences which existed between Massaro and Rose Ann Pontorno. Additionally, the defendant objects to the inclusion of any allegations which preceded March 18, 1999, the date which the indictment alleges Trentacosta "joined the conspiracy."

    *Government's response.* See government's response to defendant's objection to paragraph 8. Furthermore, the indictment does not allege that Trentacosta "joined the

---

record. You have to do the same thing, you first have to go get permission to do what you want to do. And I said and then when you get the permission you can operate."

conspiracy" after March 18, 1999. Count 1 states as follows:

> "From on or about October 1, 1994 and continuing thereafter up to and including the date of this Indictment (September 19, 2000), in the Southern District of Florida and elsewhere, the defendants ... did knowingly and willfully conspire ... to violate Title 18, United States Code, Section 1962(c)." (Emphasis added). Count 1 further describes the Enterprise, the Pattern of Racketeering Activity, the Collection of Unlawful Debts, the Object of the Racketeering Conspiracy, and the Means and Methods of the Racketeering Conspiracy.

Paragraph 5 of the General Allegations section states:

> "Defendant ANTHONY TRENTACOSTA, a/k/a "Tony Pep," was a soldier in the Gambino Crime Family who operated primarily from Atlanta, Georgia and who, on or about March 19, 1999, assumed responsibility for the day to day control of the aforementioned crew of the Gambino Crime Family which had previously been controlled by Anthony Ruggiano." (Emphasis added). It does not state that defendant Trentacosta joined the conspiracy after March 18, 1999. The evidence and indictment are consistent. Massaro originally worked for Fat Andy. During and after Fat Andy's incarceration Massaro, while technically in Fat Andy's crew, made tribute payments to Trentacosta and sought and received instructions from Trentacosta regarding Gambino Family related criminal activity. Upon Fat Andy's release from prison in 1997, Massaro, while technically a member of Fat Andy's crew, continued to make tribute payments to Trentacosta and sought and received instructions from Trentacosta regarding Gambino Family related criminal activity. Therefore, whatever remaining relationship that existed between Massaro and Fat Andy ended on March 19, 1999, the day Fat Andy died.

6.  *PSR - paragraphs 36 & 37.* These paragraphs assign the defendant a four level increase pursuant to section 3B1.1(a). The defendant baldly asserts that these allegations were not proven at trial.

> *Government's response.* The four-level enhancement applies when the defendant plays a leadership role in criminal activity involving five or more participants. A participant is a person who is criminally responsible for the commission of the offense. The defendant counts as one of the participants. *United States v. Holland,* 22 F.3d 1040 (11th Cir. 1994); *United States v. Rodriguez,* 981 F.2d 1199 (11th Cir. 1993). Even where the activity involves fewer than five participants, a four-level enhancement applies where the defendant plays a leadership role and the operation is otherwise extensive. No set number of participants is required to find that the operation was "otherwise extensive." *United States v. Hall,* 996 F.2d 284 (11th Cir. 1993); *United States v. Holland,* supra. With regard to this prong, "in assessing whether an organization is 'otherwise extensive', all persons involved during the

course of the entire offense are to be considered," including outsiders who provide services unknowingly. *Id.*; U.S.S.G. Section 3B1.1, comment. (n.3). The government need only prove the defendant's role only by a preponderance of the evidence. *United States v. Yates*, 990 F.2d 1179 (11th Cir. 1993). Here, the four level enhancement applies based on either prong.

7.     *PSR - paragraphs 44 - 72.* The defendant maintains that his base offense level should be 19 pursuant to U.S.S.G. Section 2E1.3(a) because he, according to the indictment, did not join the conspiracy until after March 19, 1999 and that the only substantive count that occurred after that date was for an offense that totaled less than 19.

*Government's response.* See Government's Objections to Presentence Investigation Report and Motion for Upward Departure filed April 10, 2002 (DE 501, p. 5 - 9).

Finally, in a heading entitled "Other Arguments" at page 5 of his motion, the defendant claims that the government misrepresented facts to the jury during its rebuttal closing argument. This argument has nothing to do with the PSR, is improperly raised at this stage of the litigation and should be stricken. Specifically, he claims that:

[t]he government argued in it's rebuttal during closing argument, that the transcript between Massaro and informant Alwais of November 12, 1998 proved, that Trentacosta was involved in loansharking and was the supervisor of Massaro. Contrary to the government's argument, during the conversations that followed, Massaro tells Alwais that "Tony" went back to Atlanta and he didn't speak to him about the loan. Further, in a November 16, 1998 conversation, Massaro tells Alwais that "Tony" stated, "I don't understand why he (person seeking the loan) doesn't go towards his relatives over that who's go the cigar bar.[8]

According to counsel for Trentacosta, "these conversations in no way suggest that Trentacosta supervised Massaro or has involved himself in any loansharking. The jury was mislead. The jury was never made aware of the conversations of the 13th and 16th by the government during their argument."

---

[8]     Government Exhibits 633, 143 and 144.

*Government's response.* The conversations clearly establish that Massaro had to get approval from the defendant before he made the loan to the potential borrower therefore suggesting that the defendant supervised Massaro and involved himself in Massaro's loansharking activities.

For the reasons set forth above, the above-mentioned objections, filed on behalf of defendant Anthony Trentacosta, should be overruled in all respects.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____

JEFFREY H. SLOMAN
Assistant United States Attorney
Florida Bar No. 378879
500 E. Broward Boulevard, Suite 700
Fort Lauderdale, Florida 33394
Telephone: (954) 356-7255x3576
Facsimile: (954) 346-7336

_____

LAWRENCE D. LaVECCHIO
Assistant United States Attorney
Florida Bar No. 0305405
500 E. Broward Boulevard, Suite 700
Fort Lauderdale, Florida 33394
Telephone: (954) 356-7255x3588
Facsimile: (954) 346-7230

7

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered by United

States mail and facsimile this 18th day of April 2002 to:


Stephen H. Rosen, Esq. (Attorney for Anthony Trentacosta)
1221 Brickell Avenue, Ste. 1020
Miami, Florida 33131

Fred Haddad, Esq. (Attorney for Frederick J. Massaro)
One Financial Plaza, Suite 2612
Fort Lauderdale, Florida 33394

Jeffrey Weinkle, Esquire (Attorney for Ariel Hernandez)
1035 NW 11th Avenue
Miami, Florida 33136

Julia K. Hyle, USPO
Room 315
300 N.E. 1st Avenue
Miami, Florida 33132

JEFFREY H. SLOMAN
Assistant United States Attorney

8